KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
SARA D. KALIN (Cal. Bar No. 212156)
Email: kalins@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 8:21-cv-1427 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA | |
| Defendants. | |

1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**JURISDICTION AND VENUE**

1.       The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a); and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2.       Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.       Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a); and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because all of the individual Defendants reside in this district, and Defendant Elite Aerospace Group, Inc. has its principal place of business in this district.

**SUMMARY**

4.       This matter concerns two overlapping fraudulent schemes, both involving the sale of Elite Aerospace Group, Inc. ("Elite") securities.

5.       The "Boiler Room Scheme" raised approximately $67 million between 2014 and 2018, and involved Elite paying undisclosed commissions to salespeople who solicited investments in Elite, as well as more than $35,000 per week to entities controlled by securities fraud recidivist Michael Owens for "consulting services" primarily related to the offering, but misleadingly disguised as marketing fees.

6.       Owens controlled the boiler room operation in Elite's offices, but was

2

assisted by his affiliates, Dawson Davenport (also a securities fraud recidivist), Robert Gunton, Andrea Lindstrom and Julie Yale (with Owens, the "Owens Group"). Elite's founders and executive officers, Dustin Tillman and Zeeshawn Zia, authorized the Owens Group to manage Elite's capital-raising activities, and were aware of the boiler room activities.

7.     As part of the Boiler Room Scheme, Owens, Davenport, Lindstrom, Tillman, and Zia engaged in deceptive conduct involving the concealment of commissions to salespeople who solicited investments in Elite, and the failure to disclose the true amount of investor proceeds that Elite spent on offering costs.  In addition, Owens acted as an unregistered broker by, for example, setting up and controlling the boiler room, and providing lead lists to Elite's salespeople.

8.     By 2018, Davenport, Lindstrom, Tillman and Zia continued the scheme to defraud investors by making false statements in Elite's unaudited financial statements about alleged acquisitions in the second quarter of Elite's 2018 fiscal year.

9.     During the course of the Boiler Room Scheme Tillman, and Zia also made affirmative misrepresentations to investors regarding the status of Elite's audits and acquisition activity.

10.     The "RMMH Scheme" involved Owens' entity, RMMH, LLC ("RMMH"), selling approximately $2 million of unregistered Elite common stock in 2017, and issuing Elite stock certificates to about 20 purchasers without the knowledge or authorization of Tillman and Zia.

11.     The Owens Group maintained Elite's stock ledger and issued its stock certificates.  This allowed them to secretly sell unregistered Elite shares owned by RMMH.  The stock purchase agreements used in the RMMH offering indicated that Elite's transfer agent would cancel RMMH's old shares and issue new ones in the names of the purchasing investors.  In reality, Elite had no transfer agent.  Yale was the person responsible for issuing Elite's stock certificates, and had the ability to generate the certificates.  As part of Elite's stock offerings, she issued Elite stock

certificates with the authorization of Tillman and Zia, and had their permission to use signature stamps on the certificates when necessary.  She did not have the same authorization for RMMH's offering, but generated Elite stock certificates and used the signature stamps in the same way.

12.     As part of the RMMH Scheme, Owens, Davenport, Gunton, Lindstrom, and Yale engaged in deceptive conduct including failing to inform Tillman and Zia about the offering, misrepresenting to purchasers that Elite's transfer agent would issue their stock certificates, and being involved with the issuance of unauthorized stock certificates.

13.     In addition, Owens, Gunton, and Yale violated the registration provisions of the Securities Act by offering unregistered securities to investors without complying with the requirements of any applicable exemptions.

14.     By this conduct, Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Exchange Act Rules 10b-5(a) and 10b-5(c), 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).  Defendants Elite, Tillman, and Zia violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b); and Exchange Act Rule 10b-5(b), 17 C.F.R. §§ 240.10b-5(b).  Defendants Gunton, Owens, and Yale violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  Finally, Defendant Owens violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

15.     The SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia; penny stock bars against Defendants Davenport, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia; and officer and director bars against Davenport, Gunton, Lindstrom, Owens, Tillman, and Zia.

## THE DEFENDANTS

16.     **Dawson L. Davenport,** age 65, is a resident of Irvine, California. Davenport is the principal of Davenport Consulting Group, Inc., a private California corporation headquartered in Irvine, California that allegedly provides business consulting and real estate services.  In 2007, the SEC charged Davenport with registration and antifraud violations for his involvement with a boiler room securities fraud, and he settled to all charges in 2009.

17.     **Elite Aerospace Group, Inc. (f/k/a Elite Aviation Products, Inc.),** is a Delaware corporation headquartered in Tustin, California.  Elite designs, manufactures, and sells components for rockets, spacecraft, aircraft, and satellites.

18.     **Robert A. Gunton**, age 38, resides in Tustin, California.  Gunton is the sole officer and director of Big Gun Creative, Inc., a California corporation headquartered in Irvine, California that provides media production services.

19.     **Andrea J. Lindstrom**, age 42, resides in Anaheim, California. Lindstrom is the sole officer and director of Edge of the Desert, Inc., a California corporation headquartered in Anaheim, California that allegedly provides business consulting services.

20.     **Michael P. Owens**, age 57, resides in Newport Coast, California. Owens is a principal of several entities, most of which are purportedly in the business of media and marketing.  The SEC charged Owens in 2007 with perpetrating a $50 million offering fraud and running a boiler room, and subsequently barred him from associating with a broker or dealer.

21.     **Dustin B. Tillman**, age 38, resides in San Juan Capistrano, California. Tillman was one of Elite's founders, and was its CEO and a director from inception of Elite through his resignation in January 2021.

22.     **Julie A. Yale**, age 57, resides in Laguna Hills, California, and owns Yale Entity Services Corp., a bookkeeping service.

23.     **Zeeshawn S. Zia**, age 42, resides in Yorba Linda, California.  Zia was

one of Elite's founders, is the current CEO, and has been an Elite director since its inception.

## THE ALLEGATIONS

### A.    Background

24.    In 2007, the SEC charged Owens and Davenport with securities fraud and registration violations for their involvement in a boiler room scheme.  The complaint in *SEC v. Real Estate Partners Inc. et al*, Case No. SACV 07-1022 AG (RNBx) (C.D. Cal., filed Sept. 6, 2007) included allegations that Owens and Davenport misrepresented how investor funds would be used, and failed to disclose that over 50% of investor funds were used to pay sales commissions.  The complaint also alleged additional misrepresentations by Owens and Davenport, and further alleged that the company involved was running a Ponzi-like scheme.  Owens was also charged with acting as an unregistered broker, in violation of the SEC's broker-dealer registration requirements.

25.    Davenport settled to all charges in *SEC v. Real Estate Partners Inc.* in 2009.  As part of the settlement, he consented to permanent injunctions prohibiting him from violating Sections 5 and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5.   In a final judgment, the district court ordered Davenport to pay disgorgement plus prejudgment interest of $368,063.53 and a penalty of $256,667.27.  Davenport has not paid anything on either the disgorgement or penalty ordered by the court.

26.    Owens also settled to all charges in *SEC v. Real Estate Partners Inc.* in 2009.  As part of the settlement, he consented to permanent injunctions prohibiting him from violating Sections 5 and 17(a) of the Securities Act, and Sections 10(b) and 15(a) of the Exchange Act and Rule 10b-5.  In a final judgment, the district court ordered Owens to pay disgorgement plus prejudgment interest of $4,816,535.88 that was reduced to $45,993.98 based on Owen's sworn representations in his Statement of Financial Condition.  Owens paid the $45,993.98.  In a separate SEC order, Owens

was barred from association with any broker or dealer as a result of the permanent injunction prohibiting him from violating Section 15(a) of the Exchange Act (acting as an unregistered broker).

27.     In 2013, Owens met Tillman through a social connection.  At the time, Tillman was working in the aerospace industry and hoped to start an aerospace company with his friend and colleague, Zia.  Neither he nor Zia had experience running a business or raising capital.

28.     Owens told Tillman that he provided a plug-and-play solution to new companies, and that he and his affiliates, including Davenport, Gunton, Lindstrom, and Yale, could take care of fundraising, bookkeeping, information technology, marketing, legal issues, and other administrative tasks.  According to Owens, these services would allow Tillman and Zia to spend more time focused on growing their business.

29.     Tillman and Zia decided to work with Owens, and in 2013 they founded Elite Aviation Products, Inc. (which subsequently became known as Elite Aerospace Group, Inc.) with initial financing provided by Owens.  As part of the arrangement, Tillman and Zia agreed to pay Owens a large weekly consulting fee, and issue him Elite common stock.

30.     Owens initially used his company RealMedia Marketing, Inc. ("RealMedia"), as the entity providing services to Elite.

31.     Lindstrom and Gunton were officers of RealMedia, but Owens controlled the company through his ownership.

32.     RealMedia entered into a consulting agreement with Elite in 2014, and the agreement was updated in 2015.

33.     In or around late 2016, Owens formed a new business, Evolution Consulting Services, Inc., which effectively took over RealMedia's business, performed substantially identical services, and involved the same primary individuals (collectively with RealMedia, "Evolution").

7

34.     Lindstrom and Gunton were officers of Evolution and allegedly owned 10% each, but Owens controlled the company through his 80% ownership.

35.     In early 2017, Elite entered into a consulting agreement with Evolution.

36.     The consulting agreements between Evolution and Elite (the "Consulting Agreements") outlined the services Evolution would provide Elite, and required Elite to pay Evolution approximately $35,000 - $40,000 per week.  Under the terms of the later agreements, Elite was required to let Evolution appoint two of Elite's five board members.

37.     Over the next several years, the Owens Group was involved in multiple aspects of Elite's business.  The Owens Group controlled Elite's capital raising functions.  Owens and Davenport attended Elite board meetings as board advisors and weighed in on most significant aspects of the business.

38.     Evolution exercised its right to appoint two board members, and Gunton and Lindstrom joined Elite's board of directors in 2016 and 2017, respectively.

39.     Tillman and Zia began having significant disagreements with the Owens Group in or around 2017.  In July 2018, Elite terminated its consulting agreement with Evolution.

40.     Gunton and Lindstrom resigned as board directors in early 2019 following a shareholder vote regarding their removal.

**B.     Elite's Securities Offerings**

41.     Beginning in or around 2014, Elite began raising capital by selling Elite stock to investors.  Between 2014 and 2018, over $67 million of Elite securities were sold to investors.

42.     At least some of Elite's investors were solicited through e-mail communications.

43.     At least some Elite's investors made interstate electronic transfers of funds to purchase Elite's securities.

8

## C.     The Boiler Room Scheme

44.     Between 2014 and summer 2018, the Owens Group controlled Elite's capital raising efforts.  Over this period, the Owens Group managed numerous salespeople at a time, none of whom were registered with the SEC as broker-dealers or associated with a registered broker-dealer.

45.     The salespeople made unsolicited calls to potential investors using call leads provided by one of Owens' entities.

46.     The salespeople's primary function was to solicit investments in Elite.

47.     The salespeople generally received commissions equal to 15% of each new investment, and 10% of re-investments.  "Fronters," who initially spoke with a potential investor, received 5%; and "closers," who closed the deal, received 10%.  If the same person was both the fronter and closer, they received 15%.

48.     The salespeople were also offered additional incentives, like vacations, electronics, or cash, if they hit specific sales goals.

49.     The salespeople were fired if they didn't meet certain sales requirements.

50.     Although the Owens Group was running a boiler room out of Elite's offices, Owens structured his operation in a way that made it falsely appear to be compliant with the securities laws, and controlled by Elite – not Owens or his entities.

### 1.     Concealed Commissions

51.     Because he had previously been charged by the SEC for acting as an unregistered broker, Owens knew there was potential liability associated with paying unregistered salespeople commissions for soliciting investments.

52.     Instead of calling the salespeople's compensation "commissions," Owens referred to them as discretionary, or performance bonuses, and instructed others to do so, as well.

53.     For example, in an email on or about November 7, 2015 regarding another small business that Tillman had referred to Owens, the small business owners asked Tillman how much Elite paid in sales commissions, and included in the subject

line of the email, "Sales Commission Question." Tillman forwarded the email to Owens, Davenport, and Gunton, and asked in his email, "did you guys have the 'salesmen do not make commissions' conversation with them?" Owens responded by saying:

> [y]eah, But they're Transitioning and trying to equate a number they were already Given. Any performance bonus is at the floor Managers discretion and effectively Mirrors [Elite's] (not a commission) Told them it would be in their use of Proceeds. [sic]

54. The salespeople's compensation was also largely undocumented.

55. Davenport helped perpetrate the fraud by coordinating the production of false and backdated documents to auditors.

56. In fall 2016, Elite was trying to get its financial statements audited in preparation for a public offering. The auditors asked for documentation explaining payments that had been made to a few of Elite's salespeople in January 2015.

57. On or around November 14, 2016, Davenport created four different letters on Elite letterhead, addressed to the salespeople in which the auditors were interested.

58. All of the letters bore dates in January 2015 – over a year-and-a-half before.

59. In addition, Davenport included language in the letters falsely stating that the salespeople were receiving discretionary awards and bonuses suggested by "operational management" and based on extraordinary effort or dedication.

60. He made no mention of commissions or investor solicitation in the letters, even though the individuals at issue were salespeople who solicited investments in Elite and received sales commissions on each investment they closed.

61. On or about November 14, 2016, Davenport forwarded the four fabricated letters to Yale, asking her to add Tillman's signature to the letters.

62.     Two days later, Yale emailed the letters to an accounting department employee with a copy to Davenport and Zia, asking her to get Tillman's signatures. The letters bearing Tillman's signature were sent to the auditors the following day by another Elite accounting department employee.

63.     Tillman and Zia also engaged in deceptive conduct to conceal Elite's payment of commissions to the salespeople.

64.     During a second audit in 2017, a new set of auditors began asking questions about how Elite's salespeople were compensated.

65.     After some discussions in or around summer 2017 involving Tillman, Zia, the auditors and Elite's lawyer, the parties agreed that Elite's lawyer at the time review the issue and provide the audit firm with a securities law analysis regarding Elite's payments to unregistered salespeople.

66.     Both Tillman and Zia knew that the salespeople's primary – and often only – duty at Elite was to solicit investments.  They also knew that the salespeople received transaction-based compensation, and that the salespeople regularly "closed" investments.

67.     Nevertheless, Tillman and Zia signed a representation to the law firm stating:

[n]o compensation paid to any [salesperson] is linked to or dependent upon a transaction in securities by [Elite].  No such employee is ever paid a selling commission or other remuneration based either directly or indirectly on transactions in securities.

68.     The representation letter further stated that the salespeople were restricted in their participation in Elite's securities offering, and implied that only Tillman and Zia closed investment transactions.  Finally, the letter stated that the salespeople primarily perform, or will primarily perform substantial duties for Elite

other than in connection with the securities offerings.

### 2.     The Owens Group's Concealed Control

69.     The Owens Group also engaged in deceptive conduct by concealing the extent of their involvement in Elite's capital-raising process.

70.     For example, Owens required all of the salespeople to be Elite employees on paper and paid directly by Elite, even though they were hired, fired, and managed by Evolution personnel or other Owens affiliates.

71.     Evolution's consulting agreements with Elite also minimized Evolution's involvement with investor solicitation.

72.     For example, the 2015 consulting agreement between Evolution and Elite includes statements like, "[Evolution] is not licensed to and does not in any way market or sell securities of any kind."

73.     Davenport drafted the 2015 consulting agreement between Evolution and Elite, and Owens reviewed and had ultimate control over the agreement.

74.     Lindstrom was the person at Evolution who was primarily responsible for the administrative and compliance services that Evolution provided to Elite.

75.     Lindstrom assisted in drafting a description of the "Administrative" and "Compliance" services portion of the 2015 consulting agreement between Evolution and Elite.

76.     Significant parts of these descriptions were false.  They stated that Elite was required to have its own investor relations supervisor, and that Evolution only assisted such person and was not involved in promoting Elite's offerings or acting as an investor relations representative.  In reality, Lindstrom controlled the investor relations department and sent and received emails using Elite's investor relations email address.  Lindstrom also knew that Evolution controlled Elite's securities offering process, as she helped oversee the sales floor and announced new bonus incentives.

77.     Davenport knew that the consulting agreement falsely concealed the

amount of control Evolution had with respect to Elite's business, and the fact that Evolution controlled Elite's capital-raising functions.

78.    For example, a week before the 2015 consulting agreement was signed, Davenport was copied on the "Sales Commission Question" e-mail described above, and about a year later, he falsified and back-dated documents sent to Elite's auditors to hide compensation related to investor solicitation.

79.    Owens knew that the consulting agreement falsely concealed the amount of control Evolution had over Elite's business because Evolution was his company, his plug-and-play solution involved handling all aspects of the capital-raising process, and he ultimately controlled Elite's sales floor.

80.    In 2017, Evolution and Elite entered into a new consulting agreement which contained language similar to the 2015 agreement that concealed Evolution's control over Elite and Elite's sales floor.

81.    Davenport was primarily responsible for drafting and updating the agreement.

82.    Other members of the Owens Group, including Owens and Lindstrom, reviewed the document.

**3.    False Disclosures Regarding Use of Proceeds and Payment of Commissions**

83.    Owens, Davenport, Lindstrom, Tillman, and Zia also misrepresented or omitted information regarding the use of investor proceeds and the payment of commissions in Elite's offering prospectuses.

84.    The prospectuses at issue were dated July 15, 2014, October 19, 2015, August 15, 2016, September 1, 2017, and April 2, 2018 (collectively, the "Prospectuses").

85.    The specific securities offered in each prospectus varied.  For example, the August 15, 2016 prospectus offered Series A Preferred Stock; the September 1, 2017 prospectus offered Series A-1 Preferred Stock; and the April 2, 2018 prospectus

offered Series A-1 Preferred Stock.

86.    All of the Prospectuses offered securities to investors and each Prospectus stated that the offering was being made pursuant to Rule 506(c) of the Securities Act of 1933.

87.    As part of Owens' plug-and-play solution, the Owens Group engaged attorneys they had worked with in the past to assist with Elite's Prospectuses, and Owens, Davenport, Lindstrom and Yale were routinely copied on e-mails regarding Elite's prospectuses.

88.    The attorneys provided Elite with templates for its prospectuses.

89.    Davenport was primarily responsible for filling in the offering-specific information, including the use of proceeds disclosure.

90.    The disclosure did not reveal that approximately 15% of investments would be used to pay investment-related commissions, or that close to 30% of investment proceeds were used to pay offering costs.

91.    Although Tillman and Zia relied on the Owens Group to help draft the Prospectuses, coordinate with attorneys, and distribute the Prospectuses to investors, because they were Elite's executives, they had ultimate authority over the content of the Prospectuses.

92.    Tillman and Zia reviewed and approved the Prospectuses before they were distributed.

93.    Lindstrom helped coordinate the review and approval process before uploading final documents to Elite's website investor portal.

94.    Owens, Davenport, Lindstrom, Tillman, and Zia all knew, or were reckless or negligent in not knowing, that the "Use of Proceeds" disclosure in the Prospectuses was false, because they knew about the sales commissions and large payments to Evolution.

95.    In carrying out the Boiler Room Scheme, Davenport knew, or was reckless or negligent in not knowing, that he was concealing the payment of

14

commissions to unregistered brokers, and was involved in distributing false use of proceeds information to investors.

96.    In carrying out the Boiler Room Scheme, Lindstrom knew, or was reckless or negligent in not knowing, that she was concealing Evolution's role in Elite's capital raising process, and was involved in distributing false use of proceeds information to investors.

97.    In carrying out the Boiler Room Scheme, Owens knew, or was reckless or negligent in not knowing, that he was concealing his control of Elite's capital-raising process, concealing the payment of commissions to unregistered brokers, and was involved in distributing false use of proceeds information to investors.

98.    In carrying out the Boiler Room Scheme, Tillman knew, or was reckless or negligent in not knowing, that he was concealing the payment of commissions to unregistered brokers, and was involved in distributing false use of proceeds information to investors.

99.    In carrying out the Boiler Room Scheme, Zia knew, or was reckless or negligent in not knowing, that he was concealing the payment of commissions to unregistered brokers, and was involved in distributing false use of proceeds information to investors.

100.    Tillman's and Zia's state of mind is attributed to Elite, because at all relevant times, they were the founders of the company, as well as executive officers and directors.

101.    Defendants' false and misleading statements to investors are material.  A reasonable investor would have considered it important to know that Elite was using investor funds to pay sales commissions to unregistered salespeople, and was using a higher percentage of investor funds to pay offering costs than it disclosed.

15

**4.      Scheme to Include False Footnote to Unaudited Financial Statements**

102.      In May 2018, Elite began another offering, using a new prospectus dated April 2, 2018.  As part of the prospectus review process in April 2018, Davenport added the following footnote to Elite's unaudited financial statements.

> *Note: There were two acquisitions slated for completion in mid to late 2017 that were delayed until Q2 2018. These acquisitions were projected to add to the effective gross revenue of the company. The resultant delay reduced booked revenue by over $15,000,000 annually. Once these transactions are completed the acquisitions are projected to have a material positive effect on the financial position of the company.*

103.      The language above was false because on March 15, 2018, Elite's board had voted to implement several procedures that would effectively stop all acquisition activity until Elite met certain financial targets that it was nowhere near attaining.  In addition, by March 2018, Elite had stopped making the payments required to close the pending acquisition of Spearman Aerospace, Inc. ("Spearman"), had sought to terminate the Spearman acquisition agreement, and was not seriously considering any additional acquisitions at the time.

104.      Davenport knew the footnote was false.  He attended the March 2018 board meeting, and had pressured Tillman to terminate the Spearman acquisition agreement shortly before the meeting.  Furthermore, the date of the prospectus was April 2, 2018 – a date on which no one at Elite could have reasonably expected two significant acquisitions to close in the second quarter of Elite's 2018 fiscal year, which ended June 30, 2018.  As of April 2, 2018, Elite had ceased making payments to Spearman and had sought termination of the Spearman agreement and the return of its funds.  It had also taken board action to curtail acquisition activity, and had no

16

other acquisitions close to being consummated by June 30, 2018.

105.   After adding the footnote, Davenport exchanged multiple e-mails with Lindstrom and Zia highlighting the language he added.  Zia approved the final prospectus with the footnote on May 21, 2018, at which point closing two acquisitions by June 30 was even more unlikely, given the passage of time and the lack of any new acquisition developments.  Lindstrom then coordinated the distribution of the prospectus to prospective investors.

106.   Lindstrom knew the footnote was false because she had attended the March 15, 2018 board meeting, and had either motioned for, or seconded the actions restricting acquisition activity.  In addition, the acquisition restrictions were something the Owens Group wanted, and on the day of the board meeting, Lindstrom circulated an email regarding "EAG Board Concerns" to other members of the Owens Group.  As part of the email, she proposed the question, "[n]ow that we know that DSS[1] is off the table and Spearman is off the table, what legal actions are we going to take against both?"

107.   Zia knew the footnote was false because he attended the March 15, 2018 board meeting, voted in favor of the acquisition restrictions, and motioned to file a lawsuit against DSS.  Zia was also the President of Elite and knew, or should have known, that Elite had ceased making payments to Spearman and was seeking to terminate the Spearman acquisition agreement.

108.   In carrying out this fraud, Davenport knew, or was reckless or negligent in not knowing, that he was involved in falsely representing to Elite investors that two significant acquisitions were expected to close by June 30, 2018.

109.   In carrying out this fraud, Lindstrom knew, or was reckless or negligent in not knowing, that she was involved in falsely representing to Elite investors that two significant acquisitions were expected to close by June 30, 2018.

---

[1] Douglas Steel Supply ("DSS") was another acquisition that Elite was considering in early 2018.

110.   In carrying out this fraud, Zia knew, or was reckless or negligent in not knowing, that he was involved in falsely representing to Elite investors that two significant acquisitions were expected to close by June 30, 2018.

111.   Zia's state of mind is attributed to Elite, because at all relevant times, he was a founder of the company, as well as an executive officer and director.

### 5.   Owens Acted as an Unregistered Broker

112.   During the Boiler Room Scheme, Owens acted as an unregistered broker for Elite's securities offerings.

113.   He provided a plug-and-play solution for Elite that included setting up and running a boiler room used to solicit investments in the company, as well as ensuring that the salespeople received transaction-based compensation.

114.   Owens also has a history of setting up boiler rooms for other issuers and selling their securities, including the conduct for which he was charged by the SEC in 2007.

115.   Owens helped solicit Elite investors by being involved in phone calls and meetings with Tillman, Zia, and potential investors.

116.   Owens also provided marketing and advertising services for Elite through his entity, Evolution.

117.   In addition, Owens made valuations about Elite's stock in the form of price targets included in solicitation scripts that he helped draft and distribute to Elite's salespeople.

118.   Owens was also an active finder of investors because he used one of his other entities to provide lead lists to Elite's salespeople.

119.   He regularly participates in securities transactions, as evidenced by his past conduct, as well as a more recent venture with other members of the Owens Group.

120.   For example, on January 14, 2020, a cannabis-related entity called CertCan Labs, Inc. ("CertCan") made a filing with the SEC disclosing that it was

conducting an $18,000,000 private offering of securities.  Both Owens and Gunton were listed as directors, and Davenport's 27-year-old daughter, Dallas Davenport, purportedly signed the filing as CertCan's President.  Yale made a CertCan corporate filing with California in June 2019, and filed another Statement of Information on February 25, 2021.

121.    Finally, during the Boiler Room Scheme, Owens engaged in other activities similar to a broker.  For example, he used other members of the Owens Group to process investor subscription paperwork and handle investment funds.  He also received "consulting fees" through his entity, Evolution, for work in connection with Elite's offerings.

122.    Owens never registered with the SEC in accordance with Section 15(b) of the Exchange Act and was not associated with a registered broker-dealer during any of Elite's offerings.

**D.    The RMMH Scheme**

123.    Pursuant to the terms of the Consulting Agreements, Elite issued approximately 20% of its unregistered common stock to Owens or entities he controlled.

124.    RMMH is an entity owned and controlled by Owens at all relevant times.

125.    As of late 2016, RMMH held approximately 18,000,000 unregistered shares of Elite's common stock, which doubled following a reorganization that Elite completed in March 2017.

126.    In or around December 2016, the Owens Group began soliciting investors to purchase unregistered Elite shares from RMMH at a discount to the price of shares in Elite's offerings (the "RMMH Offering").

127.    For example, most of the common shares RMMH sold were priced at $.375 per share.  At the same time, Elite was offering Series A Preferred shares, which were immediately convertible to common stock at a one-to-one ratio, for $.50

per share.

128.  RMMH sold a total of approximately 5.5 million shares of Elite common stock for an aggregate of approximately $2 million to approximately 20 investors in five different states between December 2016 and December 2017.  These share numbers are on an as-converted basis following Elite's business reorganization in March 2017.

129.   The Owens Group did not tell Tillman or Zia about the RMMH Offering, and took steps to conceal it from them.

130.  For example, as part of the RMMH Offering, on or about December 21, 2016, Gunton emailed a stock purchase agreement to one offeree with a blind copy to Lindstrom, using the subject, "Confidential Stock Purchase Agreement (Highly Confidential)."  In the email, he stated,

> **<u>Please treat this agreement with the highest level of confidentiality.</u>**
> Additionally, I would ask that you kindly communicate with me directly with no intermediary communication moving forward.

131.  In addition, the stock purchase agreements that were used as part of the RMMH Offering stated that upon receipt of funds from the purchasers, RMMH would surrender to Elite's transfer agent stock certificates representing the shares being purchased, and the transfer agent would issue a new Elite stock certificate to the purchaser.

132.  In reality, Elite did not have a transfer agent.  Instead, Yale simply issued the new stock certificates without the knowledge or authorization of Tillman and Zia.  She was able to do this because issuing stock certificates and keeping the stock ledger was one of the services Owens had offered Tillman and Zia.

133.  Yale was the person responsible for issuing Elite stock certificates.

134.  Unlike the shares issued as part of Elite's offerings, Tillman and Zia did

not know about and had not authorized Yale to issue stock certificates or use their signatures on certificates issued as part of the RMMH Offering.

135.   The Owens Group also falsely held Gunton out as the Managing Member of RMMH in an apparent attempt to conceal Owens' involvement.

136.   The stock purchase agreements used in the RMMH Offering were signed by Gunton, using the title, "Managing Member" of RMMH.  However, Gunton was never RMMH's Managing Member.

137.   On or about December 9, 2016, Davenport circulated a draft of the stock purchase agreement to be used in the RMMH Offering for review by Owens, Gunton, and Lindstrom.  The draft falsely named Gunton as RMMH's Managing Member.

138.   On or about December 21, 2016, Owens opened the bank account used for the RMMH Offering, listing himself as Managing Member of RMMH, and including Gunton – with no corporate title – as an authorized signer.

139.   Gunton signed a stock purchase agreement dated the same day, as RMMH's Managing Member.

140.   In or around June 2017, Owens added Gunton as a Co-Managing Member of RMMH, but continued to retain full control of RMMH through his 100% ownership of the entity and his status as the other Co-Managing Member.

141.   As late as December 29, 2017, Gunton was still signing the stock purchase agreements as RMMH's "Managing Member."

142.   Owens was aware of the RMMH Offering, the terms of the stock purchase agreements, and the fact that Gunton was soliciting investors.  For example, on or about December 9, 2016, Davenport sent Owens, Lindstrom, and Gunton an email that included a draft stock purchase agreement.  On or about March 31, 2017, Gunton blind copied Owens and Davenport on e-mail communications between Gunton and investors.

143.   Owens controlled the RMMH bank account and used the vast majority of investor funds for himself or his other entities.

144.   During the RMMH Offering, Gunton was primarily responsible for soliciting investors.  Davenport was primarily responsible for drafting the stock purchase agreements used in the RMMH Offering.  Davenport knew that Yale issued Elite's stock certificates and that Elite did not have a transfer agent.  In fact, after Elite's business reorganization in March 2017, he provided Yale with advice on the documents she should provide to all Elite shareholders when she sent them their new Elite stock certificates.

145.   Davenport also knew that Gunton was not RMMH's Managing Member, as he helped coordinate and distribute the RMMH corporate documentation adding Gunton as a Co-Managing Member in summer 2017.

146.   Davenport also engaged in conduct to conceal the RMMH Offering.

147.   Prior to Elite's discovery of the RMMH Offering, on or about June 5, 2018, Davenport falsely stated in sworn testimony that he had no involvement with RMMH.

148.   In addition, in May 2018, he wrote the words, "no knowledge," next to "RMMH, LLC" in his response to the SEC's subpoena, which listed a number of individuals and entities about which the SEC sought information.

149.   Gunton and Lindstrom were also involved in the drafting process for the stock purchase agreements.  For example, on December 9, 2016, Davenport sent them both the initial draft of the stock purchase agreement for review.

150.   In addition, Gunton helped draft a confidentiality provision in the agreements, and Lindstrom drafted at least two agreements for specific investors using the standard template for the RMMH Offering.

151.   Gunton and Lindstrom both knew that Elite did not have a transfer agent and that Yale was the person issuing Elite stock certificates.  For example, Gunton coordinated with Yale to have Elite stock certificates issued to purchasers in the RMMH Offering, and Lindstrom coordinated with Yale on the issuance of certificates to other Elite investors.

152.   Gunton and Lindstrom also both knew that Gunton was not the Managing Member of RMMH.  For example, on or about June 23, 2017, Davenport sent them both an email attaching the updated RMMH corporate documents in June 2017, which added Gunton as a Co-Managing Member.

153.   Gunton also engaged in conduct to conceal the RMMH Offering.  For example, he never told Tillman and Zia about the offering or sought their authorization for the stock certificates issued to purchasers in the RMMH Offering. He worked on drafting confidentiality language used in the stock purchase agreements, and in some of his communications with investors.  Finally, despite the fact that Gunton was an Elite director who owed a fiduciary duty to Elite and its investors, he failed to disclose the conflict of interest between his duties to Elite and his activities soliciting investors to purchase Elite securities from RMMH instead of Elite – effectively reducing the amount of money Elite was able to raise.

154.   Lindstrom also engaged in conduct to conceal the RMMH Offering.  For example, she never told Tillman and Zia about the offering, and despite the fact that she was allegedly involved with for Elite's corporate compliance functions, she allowed Yale to issue unauthorized Elite stock certificates to purchasers in the RMMH Offering.  In addition, she was an Elite director beginning in May 2017, and owed a fiduciary duty to Elite and its investors for the second half of the RMMH Offering.  However, she failed to disclose the conflict of interest between her duties to Elite and her involvement in the RMMH Offering, which effectively reduced the amount of money Elite was able to raise.

155.   Additionally, in December 2017, Lindstrom was working on packets of information to be sent to all Elite investors in advance of the annual shareholder meeting.  Elite's paralegal told Lindstrom that Elite's stock ledger was required to be sent to the investors.  In an e-mail to Davenport on or about December 6, 2017, Lindstrom said, "[a]nd the shareholders have to get the Ledger?  NO.  I don't think so … ."

156.   Yale also engaged in conduct to conceal the RMMH Offering.  For example, she never told Tillman or Zia about the offering, and failed to obtain their permission before issuing Elite stock certificates to purchasers in the RMMH Offering, and using their signature stamps as part of the RMMH Offering.

157.   In carrying out the RMMH Scheme, Davenport knew, or was reckless or negligent in not knowing, that he was concealing the RMMH Offering from Tillman and Zia, that he was involved in falsely representing to purchasers that Elite's transfer agent would issue their Elite shares, and that he was involved in falsely representing to purchasers that Gunton was RMMH's Managing Member.

158.   In carrying out the RMMH Scheme, Gunton knew, or was reckless or negligent in not knowing, that he was falsely holding himself out as RMMH's Managing Member, falsely representing to purchasers that their shares would be issued by Elite's transfer agent, concealing the RMMH Offering from Tillman and Zia, coordinating the issuance of unauthorized stock certificates to purchasers, and failing to disclose the conflict of interest between his duties to Elite and his solicitation of investors in the RMMH Offering.

159.   In carrying out the RMMH Scheme, Lindstrom knew, or was reckless or negligent in not knowing, that she was concealing the RMMH Offering from Tillman and Zia, involved in falsely representing to purchasers that Elite's transfer agent would issue their Elite shares, involved in falsely representing to purchasers that Gunton was RMMH's Managing Member, and failing to disclose the conflict of interest between her duties to Elite and her involvement in the RMMH Offering.

160.   In carrying out the RMMH Scheme, Owens knew, or was reckless or negligent in not knowing, that he was concealing his involvement in the RMMH Offering, concealing the RMMH Offering from Tillman and Zia, and involved in the issuance of unauthorized stock certificates to purchasers.

161.   In carrying out the RMMH Scheme, Yale knew, or was reckless or negligent in not knowing, that she was concealing the RMMH Offering from Tillman

and Zia, and was issuing unauthorized stock certificates to purchasers.

**E.   Lack of Registration of RMMH's Sale of Elite Stock**

162.   The RMMH Offering was not registered with the SEC.

163.   No registration statement was ever filed with the SEC for the offer or sale of any Elite shares.

164.   Owens directly sold the Elite shares without registration because he owned and controlled RMMH at all relevant times, and was aware of the RMMH Offering.

165.   Gunton directly sold the Elite shares without registration because he solicited investors during the RMMH Offering.

166.   No exemptions from registration are available to Owens or Gunton. Resellers of unregistered securities may rely on the safe harbor provided by Securities Act Rule 144 to sell their securities, but only when they comply with Rule 144. Owens and Gunton did not comply with Rule 144 because they were "affiliates" of Elite during the RMMH Offering and did not take the steps required of affiliates prior to RMMH's offers and sales.

167.   Owens was an affiliate of Elite because he controlled its capital-raising process, attended board meetings, and owned close to 20% of its outstanding common stock.

168.   Gunton was an affiliate of Elite because he was a director.

169.   Because Gunton and Owens were affiliates, under Rule 144, they were required to use a registered broker or otherwise comply with the Rule 144 manner of sale requirements; file Forms 144 with the Commission; and provide certain information regarding Elite's business to their resale purchasers.  They failed to comply with these requirements, and cannot avail themselves of the Rule 144 safe harbor.

170.   Yale was a necessary participant and substantial factor in the RMMH Offering because she had the tools necessary to issue Elite stock certificates,

including the means to generate the certificates, as well as the signature stamps of Tillman and Zia.  Without Yale's participation, RMMH would not have been able to secretly sell its shares and issue unauthorized stock certificates to investors.

**F.      Tillman's and Zia's Material Misrepresentations and Omissions**

171.    Between February 21 and March 28, 2018, Tillman and Zia also made material misrepresentations to Elite's investors concerning aspects of Elite's business.

**1.      Tillman Misrepresented the Status of a Material Acquisition**

172.    During a recorded investor conference call in February 2018, Tillman told investors that Elite had closed an acquisition with Spearman, and was in the process of integrating the company.

173.    Elite had touted the potential acquisition for some time, claiming it would increase Elite's revenues.

174.    In fact, the Spearman acquisition had not closed at the time of the conference call and never did close, because Elite failed to make the required payments.

175.    Following the February 2018 conference call, Elite continued to raise money from investors.

176.    Tillman knew at the time of the conference call that Elite had not completed its payments and was not yet entitled to Spearman's assets.

177.    A reasonable investor would have considered it material that an acquisition touted as having been significant and completed, had not, in fact been completed.

178.    Tillman knew, or was reckless in not knowing, that he was misrepresenting that the Spearman acquisition had closed, and that Elite was in the process of integrating Spearman.

179.    Tillman's state of mind is attributed to Elite, because at all relevant times, he was a founder, as well an executive officer and director of Elite.

180.    Tillman and Elite are the makers of the statement in the investor

conference call because Tillman was the individual who spoke the statement in the call and he is an executive officer and director of Elite.

### 2.    Zia Misrepresented the Status of Elite's Financial Audits

181.    During an investor conference call in March 2018, Zia stated that Elite's auditors had told the company to wait and include future contracts before finalizing the audit, so that Elite would be more attractive in a public offering.

182.    Zia's statement was false because (1) at the time of the call, Zia knew that Elite did not have an auditor, and (2) neither of Elite's prior two auditors had made any such statement.

183.    In fact, on or about September 27, 2017, in a letter to Elite's board of directors regarding issues related to the 2014 audit, Elite's first auditor cited lack of audit evidence as a reason for the delay in completing the 2014 audit.

184.    On or about January 26, 2018, in a resignation letter, Elite's second auditor cited lack of internal controls as one of its reasons for resignation.

185.    A reasonable investor would have considered it material that Elite did not, in fact, have an auditor at the time of Zia's statements; that past auditors had told the company that financial audits had been delayed due to a lack of audit evidence; that auditors had resigned, in part, due to internal control weaknesses; and that no auditors had told the company to delay completion of Elite's audits in order to include future transactions.

186.    Following the March 2018 conference call, Elite continued to raise money from investors.

187.    Zia knew, or was reckless in not knowing, that he was misrepresenting the fact that Elite had an auditor; and that the delay in completing Elite's financial audit was because auditors had told the company to delay completion of its audit in order to include future transactions.

188.    Zia's state of mind is attributed to Elite, because at all relevant times, he was a founder, as well as an executive officer and director of Elite.

189.   Zia and Elite are the makers of the statement in the investor conference call because Zia was the individual who made the statement in the call and he was a founder, as well as an executive officer and director of Elite.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

**(Against All Defendants)**

190.   The SEC realleges and incorporates by reference paragraphs 1 through 189 above.

191.   As alleged above, Defendants Davenport, Elite, Lindstrom, Owens, Tillman, and Zia engaged in the Boiler Room scheme by, for example, taking steps to conceal the payment of sales commissions to unregistered brokers, and failing to accurately disclose the amount of investor funds that would be used to pay Elite's offering costs.

192.   As alleged above, Defendants Davenport, Lindstrom, and Zia engaged in a fraudulent scheme to include a false footnote to Elite's unaudited financial statements.  For example, Davenport drafted the false footnote, Zia approved it, and Lindstrom reviewed it and coordinated its distribution at a time when all three Defendants knew it was false.

193.   As alleged above, Defendants Davenport, Gunton, Lindstrom, Owens, and Yale engaged in a fraudulent scheme to sell RMMH's Elite shares by, for example, failing to secure authorization from Elite before conducting the private, unregistered offering; using Tillmans's and Zia's signatures on Elite stock certificates without permission; and falsely stating that Elite's transfer agent would issue new stock certificates.

194.   By engaging in the conduct described above, Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia, and each of them, directly

or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

195.   By engaging in the conduct described above, Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Tillman, Zia, and Elite)

196.   The SEC realleges and incorporates by reference paragraphs 1 through 189 above.

197.   As set forth above, Defendants Tillman, Zia, and Elite made material misrepresentations to investors, including Defendant Tillman's false statement that the Spearman acquisition had closed; and Defendant Zia's false statement that Elite's auditors had advised the company to delay finalizing Elite's financial audit.

198.   By engaging in the conduct described above, Defendants Tillman, Zia, and Elite, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

199.   By engaging in the conduct described above, Defendants Tillman, Zia,

and Elite violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

### (Against All Defendants)

200.   The SEC realleges and incorporates by reference paragraphs 1 through 189 above.

201.   As alleged above, Defendants Davenport, Elite, Lindstrom, Owens, Tillman, and Zia engaged in a the Boiler Room scheme by, for example, taking steps to conceal the payment of sales commissions to unregistered brokers, and failing to accurately disclose the amount of investor funds that would be used to pay Elite's offering costs.

202.   As alleged above, Defendants Davenport, Lindstrom, and Zia engaged in a fraudulent scheme to include a false footnote to Elite's unaudited financial statements.  For example, Davenport drafted the false footnote, Zia approved it, and Lindstrom reviewed it and coordinated its distribution at a time when all three Defendants knew it was false.

203.   As alleged above, Defendants Davenport, Gunton, Lindstrom, Owens, and Yale engaged in a fraudulent scheme to sell RMMH's Elite shares by, for example, failing to secure authorization from Elite before conducting the private, unregistered offering; using Tillman's and Zia's signatures on Elite stock certificates without permission; and falsely stating that Elite's transfer agent would issue new stock certificates.

204.   By engaging in the conduct described above, Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange,: (a) knowingly and recklessly employed devices, schemes, or artifices to defraud; and (b) knowingly, recklessly and negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

205. By engaging in the conduct described above, Defendants Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and § 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Defendants Owens, Gunton, and Yale)

206. The SEC realleges and incorporates by reference paragraphs 1 through 189 above.

207. RMMH's sale of Elite shares was not registered with the SEC, and no exemption to the registration requirements was available. RMMH was owned and controlled by Owens at all relevant times. Gunton solicited investors in the RMMH Offering. Yale was a necessary participant and substantial factor in RMMH's unregistered sales because she issued the unauthorized stock certificates.

208. By engaging in the conduct described above, Defendants Owens, Gunton, and Yale, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means of instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

209.   By engaging in the conduct described above, Defendants Owens, Gunton, and Yale violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77(e)(c).

### FIFTH CLAIM FOR RELIEF

**Unregistered Broker-Dealer**

**Violation of Section 15(a) of the Exchange Act**

**(Against Defendant Owens)**

210.   The SEC realleges and incorporates by reference paragraphs 1 through 189 above.

211.   As alleged above, Owens acted as an unregistered broker by, among other things, setting up and controlling a boiler room, providing leads to Elite's salespeople, hiring sales representatives to solicit investors, drafting and reviewing sales scripts, and controlling the collection of investor funds and paperwork.

212.   By engaging in the conduct described above, Owens made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being registered as a broker in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

213.   By engaging in the conduct described above, Defendant Owens violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

#### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

#### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure:

(a)  permanently enjoining Davenport, Elite, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

(b)  permanently enjoining Gunton, Owens, and Yale and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and

(c)  permanently enjoining Owens, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

### III.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### IV.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V.

Enter an order against Defendants Davenport, Gunton, Lindstrom, Owens,

Tillman, and Zia pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), prohibiting them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 78 U.S.C. § 78o(d).

## VI.

Enter an order against Defendants Davenport, Gunton, Lindstrom, Owens, Tillman, Yale, and Zia prohibiting them from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 31, 2021

                                        */s/ Kathryn Wanner*
                                        Kathryn C. Wanner
                                        Attorney for Plaintiff
                                        Securities and Exchange Commission