John van Loben Sels (Bar. No. 201354)
jvanlobensels@thoits.com
Brittany M. Nobles (Bar No. 343513)
Bnobles@thoits.com
**THOITS LAW**
A Professional Corporation
400 Main Street, Suite 205
Los Altos, California 94022
Telephone:  (650) 327-4200
Facsimile:  (650) 325-5572

*Attorneys for Defendants, Dawson L. Davenport;*
*Robert A. Gunton; Andrea J. Lindstrom; Michael P.*
*Owens*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA,<br><br>Defendants. | Case No.:  8:21-cv-01427-JLS-JDE<br><br>**DECLARATION OF DAWSON L. DAVENPORT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  August 18, 2023<br>Time: 10:30 a.m.<br>Courtroom: 8A, 8th Floor<br>Judge: Hon. Josephine L. Staton |

I, Dawson L. Davenport, declare as follows:

1.     I am one of the defendants in this matter.

2.     The matters stated herein are based upon my personal knowledge of the facts of this case. If called upon, I could and would competently testify thereto.

3.     I hereby submit this declaration in support of Defendants' Motion for Summary Judgment.

4.     During the time Evolution Consulting, Inc. (formerly Real Media Marketing, Inc.) ("Evolution") was engaged with Elite Aerospace Group, Inc.

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

THOITS LAW
A PROFESIONAL CORPORATION

1  (formerly Elite Aviation Products, Inc.), I was engaged as a consultant for EAG

2  (Elite Aerospace Group) ("Elite") to mostly assist in real estate leasing, acquisition,

3  construction oversight and general facilities related matters as well as to help

4  expedite certain organizational issues on the periphery to allow the officers,

5  directors, and employees of EAG to maintain focus on EAG's core business

6  operations.

7       5.    I was a third-party consultant, not hired directly by EAG or its

8  affiliates, and my engagement and work for Elite was performed through my

9  engagement with Evolution. At no time was I an employee, shareholder, officer or

10  director of Elite.

11       6.    Some years ago, I entered into a consent decree with the Securities

12  and Exchange Commission ("SEC") without denying or admitting the allegations

13  levied against me by the SEC. From well before the outset of Evolution's

14  relationship with Elite, Evolution's principal Mr. Michael Owens was aware of my

15  consent decree. In addition, I disclosed the same to Elite's management.

16       7.    My consent decree was not a secret, nor was Mr. Owens' consent

17  decree, which he had entered into with the Securities and Exchange Commission

18  ("SEC") without denying or admitting the allegations levied against him by the

19  SEC. The both of us made sure Elite's management as well as its internal Legal

20  Counsel as well as all external legal counsel that we may have come into contact

21  with were  all well aware of these facts, and we encouraged Elite to disclose the

22  same in documents to actual and potential investors during Elite's capitalization

23  efforts, given that Mr. Owens and I provided support to Elite through Evolution's

24  consulting agreements during capital raises and in connection with public facing

25  media and marketing pursued by Elite. There were times during which Elite's

26  management, Owens, and I discussed our consent decrees and roles with regard to

27  Elite at length with Elite's outside partners and vendors, and other individuals as

28  appropriate.

THOITS LAW
A PROFESSIONAL CORPORATION

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

8.     I was never an officer or director of Elite. Never did I have an ownership interest or any stock in Elite.

9.     I have never sold securities on behalf of Elite.

10.    At no time ever did I have the authority to hire or fire any employees of Elite. Certainly, I did not ever have the authority to hire or fire any of Elite's investor salespeople.

11.    At no time was I instructed or informed by Elite that its own investor salespeople would report to me or Evolution instead of someone within Elite's own organizational structure. No such authority over investor salespeople was ever a part of any of Evolution's agreements with Elite. At no time did any Elite investor salesperson ever assert or intimate to me or anyone else to my knowledge that they reported to me in connection with Elite's organizational structure.

12.    At no time did I ever control Elite's capital raising processes. At no time did I ever intentionally or knowingly conceal any person or entity's control over Elite's capital raising processes. I am unaware of any agreement or instrument that conceals any person or entity's control over Elite's capital raising processes. At no time did I ever take on a contractual duty or other obligation to ensure that Elite did not conceal who within its organization controlled or otherwise managed its capital raising processes.

13.    At no time did I take any action to conceal the payment of any purported commission to any unregistered broker of securities. At no time did I have a duty or reason to know whether Elite concealed payments of any alleged commissions to unregistered brokers or used the services of Evolution or myself to conceal payments of any alleged commissions to unregistered brokers.

14.    As far as I ever knew, Elite's investor salespeople did not make commissions, but were paid performance based bonuses, As was later evidenced and confirmed by a compensation audit prepared by their Securities counsel Richardson and Associates.

40084.001/2158306                    3

THOITS LAW
A PROFESIONAL CORPORATION

15. Neither Evolution nor I was responsible under any agreement with Elite for determining how Elite's investor proceeds were used. Any information concerning how Elite would use its proceeds from investors was provided to me or Evolution by Elite's management, which included Messrs. Tillman, Zia, Gunawardane, Smith and their CFO or Controller

16. One of Evolution's roles with Elite was to package information provided to Evolution by Elite. That included reviewing and proofing documents such as Elite's prospectuses and PPMs. At no time did I have ownership or control over the information included in any Elite prospectus or PPM. All such information that I may have assisted in preparing was provided to me by Elite. All work product that was to be released to the public was to be reviewed and approved by the principals and the Chief Legal Officer of Elite which I believed was a contractual requirement of Elite.

17. At no time did I have a duty under any agreement or other obligation to determine or confirm the veracity of the information Elite's management provided me concerning its use of proceeds from investor sales, when they presented to me and Evolution factual information as fact. Nor during the time periods when Evolution helped prepare Elite's prospectuses did, I have any reason to know or believe that information provided to me or Evolution by Elite concerning Elite's use of proceeds was inaccurate. During the time periods when Evolution helped prepare Elite's prospectuses, I did not have access to Elite financial information or other reason sufficient to know whether any use of proceeds as provided for inclusion in a prospectus was false in fact it was false which to my knowledge there were no false statements made.

18. I never included a false footnote in any Elite prospectus or unaudited financial statement. When I included a footnote that was dictated to me by Messer's Tillman and Zia in a 2018 Elite prospectus concerning two potential acquisitions that were intended to be completed and then set to be delayed through Q2 of 2018,

THOITS LAW
A PROFESSIONAL CORPORATION

1  I understood the reason for these delays to be that Elite's management needed to
2  ensure other acquisitions were first completed, and that Elite needed to update and
3  organize certain financial matters. I understood at the time that Elite's board
4  cautioned its managers to handle those matters first, before continuing efforts to
5  acquire the two companies. At no time did I understand Elite had determined not to
6  pursue those acquisitions after it addressed its internal financial matters as
7  recommended by Elite's board. To this day, I cannot identify any portion of the
8  footnote that was false at the time it was included in the prospectus.

9      19.    At the time I included the footnote in the 2018 prospectus, I would
10  have had no reason to know whether Tillman, Zia, or any of Elite's other company
11  management had independently determined that they would no longer allow the
12  company to pursue the two acquisitions identified in the footnote.

13      20.    With regard to any information I personally typed to be included into
14  a draft of any Elite prospectus, I received that information from Elite's
15  management, whether that management person was Tillman, Zia, or Elite's
16  counsel.

17      21.    At no time did I have the authority to dictate how Elite salespeople
18  would communicate with existing or potential investors. That authority, as I
19  understood it remained with Elite's management, namely Messrs. Dustin Tillman
20  and Zeeshawn Zia, who were the company's co-founders, but also Messrs. Lee and
21  Gunawardane. Nor did I ever attempt to dictate or direct what information Elite
22  salespeople communicated with its existing or potential investors. I was not an
23  aerospace professional and had limited knowledge of the aerospace industry.

24      22.    At no time did I ever conceal RMMH's sale of its stock from Dustin
25  Tillman or Zeeshawn Zia. In fact the matter was discussed regularly with Messer's
26  Tillman and Zia.

27      23.    I have never intentionally or knowingly made a false statement in any
28  document related to Elite's prospectuses, PPMs, or in connection with any

THOITS LAW
A PROFESSIONAL CORPORATION

40084.001/2158306

5

document in connection with Elite's business. Nor am I aware of any false statement I included or assisted in preparing in any Elite document or statement.

24.    I did not maintain Elite's stock ledger. Nor did I issue Elite's stock certificates. I understood that at all times, Elite acted as its own transfer agent or had a transfer agent to assist with Elite's issuance of stock, whether that person was Ms. Julie Yale, or Ms. Kimberly Brooks, an attorney I came to know of who performed work and routinely audited Elites stock register as well as filing Elite's Reg D filings on behalf of Elite.

25.    At no time did I coordinate the backdating of documents to auditors.

26.    At no time did I ever develop any knowledge that any of the Evolution consulting agreements with Elite concealed some purported level of control by Evolution over Elite's capital raising functions, because Evolution simply had no such control to my knowledge. I never witnessed any Evolution employee take any action that showed Evolution to have control over Elite's capital raising efforts. In fact the Evolution contract specifically prohibited such activities and Elite was required to maintain control over all capital related activities which they did to my knowledge.

27.    I never witnessed Mr. Owens or any other Evolution employee or contractor exercise control over any Elite salespeople or their work for Elite. Messer's Tillman and Zia maintained active management desks on their own sales floor to support the efforts of the Elite floor manager and sales people who were employees of Elite and not Evolution. .

28.    In 2017, when Real Media Marketing Holdings, Inc. ("RMMH") sought to sell some of its stock in Elite, I understood that RMMH's sale of stock was explicitly approved by Elite's principals Tillman and Zia. In fact the sale was requested specifically by Zia when an increase in the contract amount due to increased workloads were imposed by Elite upon Real Media. At the time, I understood Owens had approved of and had included Gunton as a co-managing

THOITS LAW
A PROFESSIONAL CORPORATION

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 | member of RMMH. As a result, in connection with my work to assist RMMH in
2 | preparing the stock purchase agreement to be used by RMMH to sell its Elite stock,
3 | I specified Mr. Gunton as a co-managing member of RMMH. At the time I assisted
4 | in the preparation of the RMMH stock purchase agreement, I did not believe any
5 | information I included in that agreement to be false. Furthermore in all instances
6 | any work product provided by me is to be subject to review of same by the clients'
7 | legal counsel or accounting professionals as is stated in all my email
8 | correspondence as a disclosure.

9 |     29.    It was further my understanding that once a purchaser purchased Elite
10 | stock from RMMH that the RMMH stock certificates would be returned to Elite,
11 | and that they would be reissued in the name of the purchaser by Elite's transfer
12 | agent.

13 |     30.    I took no action to conceal RMMH's sale of Elite stock from Elite or
14 | its principals. In fact it was openly discussed on a regular basis with Messrs.
15 | Tillman and Zia.

16 |     31.    I was never a managing member of RMMH, nor did I hold an
17 | ownership interest in RMMH. I did not have the authority, nor did I ever, make
18 | decisions on behalf of RMMH. I also never received any compensation or
19 | consideration from RMMH.

20 |     I declare under penalty of perjury under the laws of the United States of
21 | America, the foregoing is true and correct. Executed on June 30, 2023 at Irvine,
22 | California.

**Dawnson L. Davenport**

THOITS LAW
A PROFESIONAL CORPORATION

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT