John van Loben Sels (Bar. No. 201354)
jvanlobensels@thoits.com
Brittany M. Nobles (Bar No. 343513)
Bnobles@thoits.com
**THOITS LAW**
A Professional Corporation
400 Main Street, Suite 205
Los Altos, California 94022
Telephone: (650) 327-4200
Facsimile: (650) 325-5572

*Attorneys for Defendants, Dawson L. Davenport; Robert A. Gunton; Andrea J. Lindstrom; Michael P. Owens*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA,<br><br>Defendants. | Case No.: 8:21-cv-01427-JLS-JDE<br><br>**DECLARATION OF ROBERT A. GUNTON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 18, 2023<br>Time: 10:30 a.m.<br>Courtroom: 8A, 8th Floor<br>Judge: Hon. Josephine L. Staton |

I, Robert A. Gunton, declare as follows:

1. I am one of the defendants in this matter.

2. The matters stated herein are based upon my personal knowledge of the facts of this case. If called upon, I could and would competently testify thereto.

3. I hereby submit this declaration in support of Defendants' Motion for Summary Judgment.

4. Between 2014 and 2021, I was a principal of Real Media Marketing, Inc. ("RMM"), which subsequently became Evolution Consulting, Inc.

("Evolution"). Hereafter, "Evolution" shall mean and refer to Evolution whether it was Evolution or RMM at the time, unless it is necessary to specifically identify RMM during the specific time the company operated as RMM.

5. I am a voice actor, acting coach, and creative and advertising professional. During the years Evolution was engaged with Elite Aerospace Products ("EAP"), subsequently Elite Aerospace Group ("EAG") (collectively, "Elite"), I provided services to Elite through Evolution and my own company Big Gun Creative, Inc. ("Big Gun Creative") at the time.

6. Outside the entertainment industry, I employ years of experience training salespeople in the field(s) of advertising, marketing, and branding, including training sales forces for some of the largest companies in the United States, including the internet monolith, Autotrader.com. I offer executive programs focused on development of strong communication, leadership, and public speaking skills.

7. Big Gun Creative was a Telly Award winning agency, which provides media and marketing solutions for tech and manufacturing startups, focusing on providing effective solutions to core areas of work that typically create the most fear, frustration, and confusion for new and experienced executives and business owners alike.

8. Through Evolution, my video production team and I spent hundreds of hours on approximately 25-30 marketing videos for Elite over the life of Evolution's consulting agreements with Elite.

9. As a result of EAP and RMM entering into a 2015 Services Agreement, EAP issued to RMM and its designees a total of 22,600,000 shares of EAP's common stock, which were non-dilutable Founders Shares that were fully transferrable. Of that total number, I received 1,000,000 shares.

10. In September 2016, EAP entered into an Agreement of Merger and Plan of Reorganization (the "Merger Agreement"), by which EAG acquired the

shares of common stock of several companies, including EAP's wholly owned subsidiaries. As a result of the Merger Agreement, the shareholders of EAP common stock received two shares of EAG common stock for every single share of EAP common stock held. Accordingly, my shares of EAP common stock under the Merger Agreement increased to 2,000,000.

11. I was aware Mr. Michael Owens entered into a consent decree with the Securities and Exchange Commission. This was something Mr. Owens wanted to ensure was disclosed to Elite's potential investors, given that Evolution worked with Elite to package and market Elite's investor and public facing media while Elite sought private capitalization. From the outset of Evolution's business relationship with Elite, Mr. Owens had made known to Elite, including its co-founders Messrs. Dustin Tillman and Zeeshawn Zia that he had entered into the consent decree. Mr. Owens also made Elite's Corporate Counsel and Compliance Officer (and eventually Chief Legal Officer) Mr. Saji Gunawardane aware of the same. However, Evolution learned that Mr. Gunawardane advised that the consent decree need not be disclosed.

12. On February 10, 2016, I wrote a letter to Messrs. Tillman and Zia confirming that EAP would amend its offering memorandum after RMM continued to raise concerns about Elite's disclosure obligations. The letter memorializes the previous disclosure of Mr. Owens' consent decree and multiple meetings he and RMM had with Mr. Gunawardane and other officers of Elite suggesting Elite should disclose the consent decree to potential investors "out of an abundance of caution." My letter further memorializes that a decision was made to finally disclose Mr. Owens' consent decree, and that RMM "whole heartedly agree[s] with this decision," noting its disclosure was, "a disclosure we have been advocating for quite some time." I, on behalf of RMM, further stated that Mr. Gunawardane, or preferably outside counsel, should provide an opinion letter that disclosure was not

previously required. Mr. Owens' consent decree was disclosed in Elite's 2017 and 2018 prospectuses.

13. In 2017, Evolution and EAG entered into a new Agreement for Services (the "2017 Agreement"), which commenced on March 1, 2017, and was for a term of two years unless terminated in accordance with the provisions in the agreement. That 2017 Agreement authorized a minimum of a five-person board of directors for Elite, to which two (2) board members would be appointed by Evolution. By this time, Elite had defaulted several times on its payments to Evolution.

14. In May 2017, I, on behalf of Evolution, provided Mr. Tillman and Mr. Zia a letter as notice of its intent to declare a formal default under the 2017 Agreement. Among a list of issues, Mr. Gunton provided written notice that Elite and its affiliates had failed to provide complete and accurate financial records for the past two (2) calendar years as well as monthly financials. Also, Elite had failed to have an annual independent audit.

15. Evolution was also concerned that Elite had not appointed two (2) members of Evolution to its board, which was important to Evolution to bring oversight and transparency over the inner workings and overall financial health of the company. After this letter, Elite provided a consolidated sheet of financials to Evolution and appointed Ms. Lindstrom and me to its board. Although the term of the 2017 Agreement began in March 2017, it was not until Elite's Annual Meeting in December 2017 that Ms. Lindstrom and I were both elected to Elite's board by a majority of the shareholders.

16. After this board appointment, Evolution hoped it would be able to gain access to Elite's accounting and financials, but this continued to be a challenge and a point of contention between Elite and Evolution. Evolution continued to make requests to review Elite's financials. On March 28, 2018, I, as a board member of Elite, requested that Lee Smith, Elite's then COO, provide Elite's board of directors

as well as the family of shareholders consolidated financial statements for all of EAG divisions and companies for 2015, 2016, 2017 and through February 2018 and then on a monthly basis moving forward.

17. In mid-July 2018, after subpoenas had been issued by the SEC in May 2018, Ms. Lindstrom and I called an emergency board meeting to address numerous topics, including incomplete acquisitions, the financial standing of Elite and its divisions, a revenue neutrality update, executive compensation, and a formal review of EAG board minutes since inception. Once all board members were in attendance, Mr. Tillman called the meeting to order and adjourned shortly after forming a "special committee," which included Mr. Tillman, Mr. Zia, and Michael Forbes. That special committee then voted to exclude Ms. Lindstrom and me from all future board matters, despite being duly elected by a majority of shareholders. Mr. Tillman alleged that this special committee was formed to examine the relationship between Elite and Evolution. Mr. Tillman then adjourned the meeting and asked Ms. Lindstrom and me to leave the premises. After that, Ms. Lindstrom and I were barred from board meetings, and Elite quickly terminated my corporate email address, blocking me from accessing essential board documentation.

18. Over the next several months after this emergency board meeting and Tillman and Zia's deliberate exclusion of Ms. Lindstrom and me from board matters, my concerns about Elite's lack of financial and accounting transparency continued to grow.

19. Finally, I had learned that on September 1, 2018, Elite authorized and issued a new private placement memorandum ("PPM") with $40,000 in salary increases for Mr. Tillman and Mr. Zia, which brought their individual annual compensation up to $389,400, exclusive of housing and auto allowances, and travel expenses. In addition, Lee Smith received an annual increase of $83,500, which brought his salary to a total of $258,500, exclusive of housing, auto allowances, and travel expenses. These salary increases were not approved by Mrs. Lindstrom or

me, despite Elite's obligations to the board of directors and its shareholders.

20. As a result, on September 5, 2018, I wrote a second demand for Elite to provide comprehensive and accounting statements on behalf of the Board of Directors and shareholders. A true and correct copy of my letter is attached hereto as **Exhibit A**.

21. On October 1, 2018, I made a third such demand. I received no further board communications and, on March 5, 2019, by the same letter, Ms. Lindstrom and I resigned from our board positions. In that letter, we cited our inability to execute our duties as directors and elected board members, despite numerous demands for transparency and inclusion. A true and correct copy of our resignation letter is attached hereto as **Exhibit B**.

### A. Evolution and Elite Entered Into a Settlement Agreement, Which Elite Breached

22. In September 2019, Evolution and Elite entered into a global settlement, wherein Elite agreed to provide full releases for all Evolution personnel, as well as agreed to purchase all owned shares from Evolution, its personnel. This included the Elite shares owned by RMMH and Mr. Owens, as well as Ms. Lindstrom, Ms. Davenport, Mr. Eldred, Ms. Yale, and me. After entering the agreement and demonstrating payments to Evolution (and Mr. Owens) for approximately one hundred twenty (120) days, Elite defaulted on its scheduled monthly installment payments. The majority of our shares were returned by an escrow service, which was hired to facilitate the incremental transfer of stock according to the terms of the agreement, from Evolution to Elite.

### B. I Did Not Engage In A Fraudulent Scheme To Sell RMMH's Elite Stock Without Elite's Knowledge

23. I did not engage in a fraudulent scheme to sell RMMH's Elite stock without Elite's knowledge. In 2017, Elite was specifically aware of the sale of RMMH's Elite stock, which was explicitly authorized by Elite.

24. In mid-2016, Mr. Tillman and Mr. Zia asked Evolution to provide marketing and support services to four of its other corporate entities, wholly owned subsidiaries called Elite Engineering Services, Inc., Elite Financial Services, Inc., Elite Metal Manufacturing, Inc., Elite Aviation Interiors, Inc., and Elite Logistics & Integration. Evolution and Elite were not able to come to an agreement about the fee Evolution would receive if it were to expand its services to four additional entities and Mr. Zia suggested and encouraged Mr. Owens to sell shares of Elite Common Stock held by RMMH to provide supplemental income for Evolution in lieu of a contractual compensation increase.

25. The work Evolution performed for these additional "subdivisions" was solely marketing and not the type of administrative or compliance services it provided to Elite. These marketing services, included but were not limited to, video productions, layout and print production of numerous product sales material for the various subdivisions, and branded materials for trade shows. Both Elite and Evolution mutually agreed to RMMH selling a portion of its Elite shares in exchange for these additional services. Regrettably, the parties did not memorialize these terms in writing.

26. In late 2016, I, on behalf of RMMH, reached out to a professional contact Yvonne Ryono who had a list of prospective shareholders separate and apart from sources that Elite used. RMMH entered into a Finders Agreement with Ms. Ryono which provided that she would receive one share of EAG common stock for each 10 shares of EAG common stock purchased by a qualified buyer provided by her. A true and correct copy of that agreement is attached hereto as **Exhibit C**.

27. I asked Ms. Ryono to keep this confidential, as Mr. Zia had requested that it be confidential in order to not derail Elite's salespeople. This is also why I requested that Ms. Ryono treat the draft stock sale and purchase agreement that I sent her "with the highest level of confidentiality" in an email dated December 21, 2016. A true and correct copy of that correspondence is attached hereto as **Exhibit**

**D**.

28. For all of the EAG common shares held by RMMH that were sold, RMMH entered into Stock Sale and Purchase Agreements ("Stock Agreements") whereby it was clear that RMMH was selling to the buyer common shares of EAG. The prices ranged, but generally the stock was sold for $.375 per share, and again all were authorized by Mr. Zia and Mr. Tillman. Most of the Stock Agreements were from May through December 2017, with the exception of a few that occurred earlier that year. On these Stock Agreements, I am listed as the Managing Member of RMMH.

29. This is because, on May 1, 2017, RMMH restated and amended its Operating Agreement whereby Mr. Owens made me a co-managing member or RMMH. A true and correct copy of that agreement is attached hereto as **Exhibit E**. Although there was a delay in formally memorializing this co-member management role, at all times prior to May 1, 2017, I was authorized by Mr. Owens to act a co-managing member on behalf of RMMH.

30. In addition, the Stock Agreements indicated at closing that the buyer will deliver payment of the purchase price simultaneously as the seller surrenders to, "the Company's transfer agent (the "Transfer Agent") the certificate representing the Shares, and has directed the Transfer Agent to issue a new certificate representing the Shares to be registered in the name of the Buyer." *See* **Exhibit F**.

31. Ms. Yale was Elite's transfer agent for all of its issued shares, and she acted as the transfer agent in connection with the sale of RMMH's Elite stock.

32. During 2017, and at the express approval of Mr. Zia and Mr. Tillman, RMMH sold 6,111,417 shares of EAG common stock to approximately 20 investors and made no sale transfers of 388,583 shares to RMMH for a total of 6,500,000 shares transferred. No prospective shareholder of EAG was misappropriated as relationships with the RMMH investors were preexisting and

came from sources other than EAG, primarily from Ms. Ryono and through referrals sourced by Ms. Ryono. Elite's stock ledger indicates the retitle of the shares. Further, Tillman and Zia even gave tours of Elite's premises to prospective purchasers of RMMH's Elite stock.

33. Also, Mr. Zia and Mr. Tillman's signatures are affixed to each stock certificate. While many of the certificates have signature stamps of Mr. Zia and Mr. Tillman, the use of those stamps by Julie Yale on those certificates were specifically authorized by them. There are also a number of certificates with wet signatures, which further undercuts any suggestion that these shares were not authorized. Further, the certificates clearly indicate it is EAG's "Common Stock" whereas the preferred stock that Elite sold through its capital raising campaigns is clearly labeled "Preferred Stock." *See* Exhibits D and E.

34. Mr. Zia personally signed almost a dozen of these certificates of "Common Stock," which were only held by Elite's executives, Mr. Owens and the Evolution group, and a few select others. If he had not authorized these sales, which he did, he immediately would have been alerted that these certificates were for common stock and not affixed his handwritten signature to them.

35. It is further clear that Elite approved the RMMH sales of Elite shares, as Elite's private placement memorandum ("PPM") dated September 1, 2018, adjusted the amount of RMMH shares to reflect the 6,500,000 shares of RMMH that were transferred. Elite's September 2017 PPM indicated that RMMH had 38,200,000 shares of EAG common stock, and Elite's September 2018 PPM specifically accounted for the sale of the 6,500,000 shares indicating RMMH held 31,700,000. The content of Elite's PPMs was always approved by Elite's management, between Mr. Tillman and Mr. Zia, including with respect to the September 2017 and 2018 PPMs.

36. In addition, as indicated by the 2015 Agreement between RMM and EAP, there was no stock restriction on the Founders Shares that RMMH received

1  pursuant to its contract with Elite. RMMH and Mr. Owens held Founders Shares
2  like Mr. Tillman and Mr. Zia. Mr. Tillman similarly freely transferred 1,000,000 of
3  his Founders Shares of EAP to Mr. Owens in 2016 as collateral for approximately
4  a $15,000 loan. Mr. Tillman's pledged share certificates includes the same legend
5  as certificates that were issued to Mr. Owens and RMMH and, accordingly, were
6  fully transferrable.

7        37.    In sum, Tillman and Zia authorized the sale of RMMH's shares of
8  EAG common stock, and at no time did I ever possess fraudulent, manipulative, or
9  deceptive intent to hide or otherwise conceal the sale of that stock from Tillman or
10 Zia.

11       38.    All of the RMMH shares of Elite common stock sold as described
12 above were sold to accredited investors who satisfied the specific requirements of
13 an accredited investor. In particular, Evolution took the reasonable steps of
14 verifying investor documents to ensure that each investor actual satisfied the
15 accredited investor criteria.

16       39.    The number of purchasers of the RMMH Elite stock was small, only
17 twenty-four (24) persons. These individuals each possessed a sufficiently high net
18 worth and were not investment novices. Each of these twenty-four (24) investors.

19       40.    The total number of shares sold by RMMH was approximately
20 6,100,000 out of the 38,200,000 Elite shares owned by RMMH, meaning only
21 about sixteen percent (16%) of RMMH's Elite shares.

22       I declare under penalty of perjury under the laws of the United States of
23 America, the foregoing is true and correct. Executed on June 30, 2023 at
24 __Costa Mesa__, California.

*Robert A. Gunton*

**Robert A. Gunton**

# Signature Certificate

Reference number: 2DZOJ-NURAJ-BABJO-KWQI2

| Signer | Timestamp | Signature |
|---|---|---|
| **Robert A. Gunton**<br>Email: robertgunton@icloud.com | | |
| Sent: | 30 Jun 2023 22:26:40 UTC | |
| Viewed: | 30 Jun 2023 22:27:36 UTC | |
| Signed: | 30 Jun 2023 22:27:49 UTC | |
| **Recipient Verification:** | | IP address: 72.219.84.21 |
| ✓ Email verified | 30 Jun 2023 22:27:36 UTC | Location: Mission Viejo, United States |

Document completed by all parties on:
30 Jun 2023 22:27:49 UTC

Page 1 of 1



Signed with PandaDoc

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

