John van Loben Sels (Bar. No. 201354)
jvanlobensels@thoits.com
Brittany M. Nobles (Bar No. 343513)
Bnobles@thoits.com
**THOITS LAW**
A Professional Corporation
400 Main Street, Suite 205
Los Altos, California 94022
Telephone: (650) 327-4200
Facsimile: (650) 325-5572

*Attorneys for Defendants, Dawson L. Davenport; Robert A. Gunton; Andrea J. Lindstrom; Michael P. Owens*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA,<br><br>Defendants. | Case No.: 8:21-cv-01427-JLS-JDE<br><br>**DECLARATION OF MICHAEL P. OWENS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 18, 2023<br>Time: 10:30 a.m.<br>Courtroom: 8A, 8th Floor<br>Judge: Hon. Josephine L. Staton |

I, Michael P. Owens, declare as follows:

1. I am one of the Defendants in this matter.

2. The matters stated herein are based upon my personal knowledge of the facts of this case. If called upon, I could and would competently testify thereto.

3. I hereby submit this declaration in support of Defendants' Motion for Summary Judgment.

//

**A. Dustin Tillman Pursued Owens' Investment In Elite**

4. I first met Dustin Tillman in or about May of 2013. During that initial meeting, I was at an event for my wife's band, "The Band Orlina." Tillman's wife became a backup singer and keyboard player in my wife's band. During our initial meeting, I learned that Mr. Tillman was a supply chain manager with Zodiac Aerospace, an aerospace design and manufacturing firm, and he was interested in forming a design, engineering, and manufacturing aerospace company.

5. During our conversations about our respective businesses and Mr. Tillman's proposed business concept, I disclosed to Mr. Tillman that in 2009 in connection with a previous business, I had entered into a consent decree and final judgment with the SEC without admitting or denying the alleged violations asserted by the SEC, and was permanently enjoined from future violations of Section 5(a), 5(c) and 17(a) of the Securities Act and Sections 10(b) and 15(a) of the Exchange Act, and Rule 10b-5 thereunder. I also disclosed to Mr. Tillman that I paid a fine to the SEC. I explained to Mr. Tillman that my experience should be a lesson for other start-ups and small businesses seeking capital, private financing, or capitalization from private investors, and while my prior experience was regrettable, I could potentially help other companies avoid a similar outcome.

6. At the time, I owned Real Media Marketing, Inc. ("RMM"), a media, marketing, and consulting business that helped start-up businesses communicate their business' messaging more effectively and navigate the potential hurdles most start-up businesses face when their creation and execution necessitates private financing or capitalization from investors. At the time I met Mr. Tillman, RMM was managing my wife's band.

7. Throughout 2013, Mr. Owens and Mr. Tillman would regularly see one another at many events and concerts to watch our wives perform. Over these months, Mr. Tillman made it clear to me that he was looking for ways to provide

1  initial capitalization to fund his business concept, Elite Aviation Products
2  ("EAP"). Ultimately, Mr. Tillman, made clear to me that he was seeking an
3  investment, or loan from me and presented me with an initial EAP business plan.
4  Over several months, Mr. Tillman continued to pursue me for a loan, business
5  advice, and opinions on capitalizing on his concept. Despite his persistence, I
6  made it clear that I was not interested in investing in Mr. Tillman's business
7  venture and strongly suggested Mr. Tillman seek alternative sources of capital,
8  before seeking capital from individual investors and again described my history,
9  previous consent decree, and the pitfalls associated with capitalizing in such a
10 manner.

11     8.    However, I did refer Tillman to legal counsel, Geoffrey Barry, for
12 the formation of Tillman's conceptual company, which ultimately became EAP,
13 the predecessor to Elite Aerospace Group ("EAG") (collectively, "Elite").

14     9.    After Mr. Tillman's continued pursing me for a loan, I loaned EAP
15 $100,000 in exchange for 15,000,000 shares of EAP common stock. I later
16 offered and Elite entered into a Line of Credit agreement for an additional
17 $500,000 of which Elite drew down on it in the amounts of $88,000, $25,000,
18 $10,000 and $10,000 for a total of $133,000 additional dollars loaned. The total
19 investment in Elite was over $230,000.   Mr. Tillman represented to me that he
20 had already secured the interest of multiple aerospace "industry insiders"
21 including Ravi Govindan, who was employed by Boeing, Zeeshawn Zia, a long-
22 time friend of Mr. Tillman, who became a co-founder of EAP, and John Kent,
23 legal counsel for Panasonic Avionics Corporation and former coworker of Mr.
24 Tillman's from Ducommun Aerostructures. Shortly after my investment in EAP,
25 Mr. Tillman engaged my marketing and consulting business RMM to assist EAP
26 in their corporate branding and image enhancement.

27     10.    RMM has had several clients over the years, including Elite Aviation
28 Elite. RMM first began performing work for Elite Aviation Products in 2014.

11.     On March 12, 2014, RMM entered into a consulting agreement with Elite Aviation Products (the "2014 Consulting Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**. Under the 2014 Consulting Agreement, RMM was to provide media and marketing services as well as consulting services for: these services included full service media production, marketing, Elite's investor relations training and assistance in personnel hiring and screening; assistance with sales team acquisition, and development; sales and marketing identity marketing; media and television spot ad development (cable and syndicated); email marketing campaigns; social media marketing; publication of Elite's industry related educational materials for electronic and print distribution; production of Elite employee and sales training materials; and oversight for management of investor related communications; and website development and assistance with customer and investor relations management software integration and development.

12.     RMM's role under the 2014 Agreement was strictly that of a consultant, and the 2014 Agreement explicitly required that all sales, marketing, and investor relations personnel for Elite's capitalization efforts were to be Elite's employees, employed directly by Elite, and that Elite would bear all cost, management and control of their employment.

13.     In consideration for RMM's services under the 2014 Consulting Agreement, RMM was paid an initial fee of $350,000 over three (3) months and then on a twice per month basis, a total of $60,000.

14.     In addition to these fees, RMM was also to receive 36,600,000 shares of EAP's common stock. Although the 2014 Agreement stated that the shares were not registered under the federal Securities Act of 1933, the California Corporations code, or the law of any other state and the 2014 Consulting Agreement stated they "may not be transferred in the absence of registration," it was never the intention of the parties for RMM to receive

restricted shares. Rather, the parties intended RMM to receive Founders Shares similar to those received by Mr. Tillman (EAP's then CEO) and Mr. Zia (EAP's then President and Chief Operating Officer). As a result, the parties entered into a subsequent agreement in 2015 that removed the restrictive language for the Elite common shares that RMM received under the 2014 Agreement. The shares were ultimately not issued until late 2015 after the restriction was removed. All shares issued were unrestricted Common Founders Shares.

15. RMM (and subsequently as Evolution) undertook and completed projects for Elite for a period of about four (4) years total. During those four years, Tillman and Zia held me out to Elite employees and those who came to Elite's offices for whatever reason, including potential investors in Elite, as Elite's oldest and largest investor as well their Marketing Partner..

16. As an investor in Elite, I passionately believed in its business and wanted it to succeed.

**B. RMM And Elite Entered Into A 2015 Services Agreement**

17. On November 1, 2015, RMM and EAP executed a new, thirty-six (36) month agreement for services, a true and correct copy of which is attached hereto as **Exhibit B** (the "2015 Services Agreement). The 2015 Services Agreement effectively replaced the 2014 Agreement. Under the terms of the 2015 Services Agreement, RMM was to provide a broad spectrum of consulting, administrative, and marketing services to Elite as Elite worked on growing and capitalizing to establish its foothold in the aerospace engineering industry.

18. Both Dustin Tillman and Mr. Saji Gunawardane acting as Chief Legal Officer and in-house counsel for Elite, negotiated the terms of the 2015 Services Agreement with RMM on behalf of Elite.

19. RMM's marketing services under the 2015 Services Agreement included, but were not limited to market research, copywriting, branding,

1  graphic design, video production (in part through the use of additional vendors),
2  market strategy, public relations, and marketing account management.
3      20. In connection with RMM's marketing services, RMM worked with
4  Mr. Robert Gunton, a trained voice actor, public speaking coach, and creative
5  services provider through his company Big Gun Creative, LLC to provide
6  media services to Elite directly. During the four (4) years RMM provided
7  services to Elite, RMM (and subsequently as Evolution) produced
8  approximately 25-30 marketing videos for Elite. To produce those videos,
9  RMM worked directly with Mr. Robert Gunton and his video production team,
10 who spent hundreds of hours on these videos over the four-year period during
11 which RMM provided services to Elite.
12     21. To effect the marketing services under the 2015 Services
13 Agreement, RMM utilized its employee Mr. Adam Eldred, who was the
14 Creative Marketing Director for RMM (and later Evolution, a subsequent
15 iteration of RMM). In his role as Creative Marketing Director for RMM, Mr.
16 Eldred managed a complete team of RMM (and later Evolution) employees
17 dedicated to creative projects.
18     22. On every project he worked for Elite, Mr. Eldred and his team
19 consulted with the principals and management of Elite, primarily Messrs.
20 Tillman and Zia, and Mr. Delmar Lee Smith, who became Elite's Corporate
21 Operations Officer during the time RMM provided services to Elite. Each of the
22 projects on which Mr. Eldred worked for Elite were carried out under the
23 direction of Elite.
24     23. During the four years RMM provided services to Elite, Mr.
25 Eldred's work for Elite and under its direction included the preparation and
26 creation of: quarterly newsletters; website development; online content
27 copywriting; brochure design and layout; press release copywriting; social
28 media management; product centric brochures and pamphlets; event

THOITS LAW
A PROFESIONAL CORPORATION

40084.001/2158303

6

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  presentations; branded promotional event giveaway items; design of custom
2  branded apparel; interior design items such as branded banners for their
3  facilities; custom exterior signage for multiple facilities; custom interior signage
4  for their manufacturing floors at multiple facilities; digital design and layout for
5  internal handbooks; custom letterhead; copywriting for online blog entries;
6  business card design; custom branded folders for promotional materials; digital
7  design; layout and print production of numerous product sales materials for
8  multiple different 'sub divisions' of Elite Aerospace Group; design of custom
9  branded email signatures; branded materials for trade shows; and a multitude of
10 other marketing projects.

11  24.  During the term of the 2015 Services Agreement, RMM performed
12 its obligations and provided to Elite the services specified in the 2015 Services
13 Agreement.

14  25.  In providing services to Elite, I was aware of and completely intent
15 on compliance with securities laws, clarity, and transparency with both Elite
16 and its investors as to my own background, especially having in the past agreed
17 to a consent decree with the Securities and Exchange Commission. As a result,
18 when negotiating the 2015 Services Agreement, I wanted to establish that
19 neither I nor RMM would provide any legal, accounting, or professional
20 counsel on behalf of Elite. I urged and required contractually, Elite to seek and
21 retain legal counsel and accounting professionals for advice on securities and
22 accounting matters and memorialized that in the 2015 Services Agreement.

23  26.  In addition, I urged Elite to disclose to potential investors my
24 consent decree, given how closely RMM would be working with Elite's
25 management to create marketing materials and pursue media opportunities for
26 Elite as Elite continued capitalization and its search for customers for its
27 aerospace engineering products.
28 //

27. As to compliance and administrative support services, pursuant to the 2015 Services Agreement, RMM provided administrative services to support Elite's own Investor Relations Department, and RMM's services were provided at Elite's direction. These services included but were not limited to the following: compiling the daily metrics used to determine sales performance as set forth by Elite's sales floor manager as well as Messrs. Tillman and Zia; assisting with distribution of approved (by Elite's Chief Legal Officer Saji Gunawardane) company information to the sales manager (who would then distribute it to Elite's own employed sales people) and approved (by Elite) correspondence or other mailings to subscribers; agent training on the CRM or IRIS database platform; and assisting the Investor Relations Sales Manager in administrative capacities.

28. RMM's compliance specific services included providing Elite with administrative services in its Compliance Department, in particular, providing administrative help to assist the Issuer/Subscriber Relationship Department through a Compliance Team Member. The Compliance Team Member's role was to: assist issuers with clerical or Investor/Subscriber Relation reporting with RMM's proprietary CRM (the IRIS database); assist with distribution of company (Elite) approved information to both the Investor/Subscriber Relations Department and their Investor/Subscribers, and to potential subscribers; and coordinate invitations for all prospective shareholder and shareholder conference calls.

29. With regard to the compliance services provided by RMM under the 2015 Services Agreement, RMM worked with Ms. Andrea Lindstrom, who provided Elite administrative services generally as set forth in the 2015 Sales Agreement generally and, specifically, in connection with Elite's information gathering efforts as Elite gathered information to confirm potential investors were accredited. In particular, RMM developed the compliance database (IRIS)

1 with requirements that potential Elite investors were required to satisfy before
2 their file could be moved forward in the accreditation process.

3      30.    Ms. Lindstrom, who was RMM's Chief Operating Officer, assisted Elite as the Compliance Team Member under the 2015 Services Agreement. At no time during the four (4) years RMM provided services to Elite did I ever observe or hear from any other person that any employee of Elite, nor Ms. Lindstrom in particular, held themselves out as Elite's Compliance Officer. In fact, in providing services to Elite, RMM required that Elite have its own Compliance Officer to handle compliance related decisions and make approvals related to investor/subscriber funds. From 2014 to 2017, Elite's attorney Mr. Saji Gunawardane served as Elite's Compliance Officer.

     31.    Determinations of third-party accreditation of potential investors in Elite were not made by any RMM employee, Ms. Lindstrom, or myself. Those determinations were made by third parties or Elite, including its Chief Legal Officer Mr. Saji Gunawardane. At no time did RMM or I ever negotiate with Elite that anyone from RMM would make third party accreditation status determinations, nor did anyone from RMM ever make such determinations with respect to potential investors in Elite.

     32.    In fact, the 2015 Services Agreement explicitly stated that RMM would not and does not make final approval of any funds submitted to its client, Elite, nor would RMM make any representations or certifications that the investor/subscriber was indeed an accredited investor. The 2015 Services Agreement further explicitly stated that it is the issuer's sole responsibility to take reasonable steps to verify each investor/subscriber and approve their accreditation and funds prior to deposit. *See* Exhibit B.

     33.    Further, to be clear, the 2015 Services Agreement specifically provided that the Compliance Team Member does not act on behalf of the Issuer as a human resources department or in a human resources capacity for

the issuer; nor does the Compliance Team Member sell or promote the issuer's offering or act as the investor/subscriber relations representative for the issuer. At no time did RMM nor Ms. Lindstrom as the Compliance Team Member act as a human resources department or in a human resources capacity for Elite; nor did RMM or Ms. Lindstrom ever sell or promote Elite's offering or act as the investor/subscriber relations representative for Elite.

### C. Issuance Of Elite Unrestricted Common Shares To RMM And Effect Of EAG Merger

34. As a result of RMM and EAP entering into the 2015 Services Agreement, EAP issued to RMM and its designees a total of 36,600,000 shares of EAP's common stock, which were non-dilutable Founders Shares that were fully transferrable. At RMM's request, of the total 36,600,000 shares, RMMH, LLC received 19,100,000 shares, Mr. Gunton received 1,000,000 shares, Ms. Lindstrom received 1,000,000 shares, Gabriela Davenport received 1,000,000 shares, Mr. Eldred received 250,000 shares, and Ms. Julie Yale, RMM's bookkeeper, received 250,000 shares.

35. The stock certificates evidencing the issuance of the common stock issued to RMMH and RMM team members did not contain any restrictive language on either the front or back of the stock certificates, because there were no restrictions on the stock. Attached hereto as **Exhibit C** are true and correct copies of those stock certificates.

36. These shares of common stock issued under the 2015 Services Agreement differed from Elite's preferred shares that were sold to investors through various capital raising campaigns. Among other differences, Elite's preferred shares sold to investors contained a restriction on the back of the corresponding stock certificates, which stated: "THE SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED," except under certain circumstances. No such language appeared on the stock

40084.001/2158303

10

DECLARATION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 certificates for the common stock issued under the 2015 Services Agreement.

2  37. In September 2016, EAP entered into an Agreement of Merger and Plan of Reorganization (the "Merger Agreement"), by which EAG acquired the shares of common stock of several companies, including EAP's wholly owned subsidiaries. As a result of the Merger Agreement, the shareholders of EAP common stock received two shares of EAG common stock for every single share of EAP common stock held. Accordingly, the shares of EAP common stock under the Merger Agreement increased as follows: RMMH's shares increased to 38,200,000; my total shares increased to 30,000,000; Mr. Gunton's shares increased to 2,000,000; and Ms. Lindstrom's shares to 2,000,000.

**D. Evolution And EAG Entered Into A 2017 Services Agreement**

38. After the merger, RMM rebranded its name and became Evolution Consulting, Inc. ("Evolution"). In 2017, Evolution and EAG entered into a new Agreement for Services (the "2017 Agreement"), which commenced on March 1, 2017, and was set for a term of two (2) years unless terminated as set forth in that agreement. A true and correct copy of the 2017 Agreement is attached hereto as **Exhibit D**.

39. Under the 2017 Agreement, Evolution provided EAG marketing, administrative, consulting, sales training, and compliance services as defined in that agreement. In consideration of this substantial undertaking, EAG paid Evolution a weekly fixed fee of $39,750.

40. Like the prior agreements with EAP, the 2017 Agreement specifically provided that Evolution was not EAG's legal, accounting, or professional counsel, and encouraged EAG to seek professional advice for any accounting, tax, or legal advice, including specifically as to compliance with securities laws. The terms of the 2017 Agreement further made clear that Evolution does not in any way offer or transact in securities on behalf of its clients. At no time did Evolution or I ever transact securities on behalf of Elite.

41. As with its prior agreements with Elite, under the 2017 Agreement, Evolution provided administrative services, including the services of a Compliance Team Member to ensure that subscribers properly fill out their subscription documentation and other supplemental paperwork involved in their subscription to the issuer's investment as supplied by the issuer. Again under this 2017 Agreement, Evolution required that EAG have an Investor Compliance Officer "designated by the Client [EAG] to be the primary responsible party for Client's company in relation to investment rules and processes." At no time did Evolution or I hold out that either Evolution or I would take responsibility for EAG's investment processes or decisions. The agreement has a specific clause that clearly states that Evolution does not provide any Securities related services in an exhibit to the same.

42. The 2017 Agreement stated plainly that EAG's Compliance Officer should be well versed in the current law and regulations that pertain to EAG's offering, and that neither Evolution nor its compliance assistance team rendered final decisions on behalf of a client in relation to the final acceptance of investment funds from EAG's investors. At no time did Evolution or I ever render such a final decision on behalf of Elite.

43. In addition, pursuant to the 2017 Agreement, EAG authorized a minimum of a five (5)-person board of directors, to which two (2) members would be appointed by Evolution. At EAG's annual meeting in December 2017, both of Mr. Gunton and Ms. Lindstrom were elected to EAG's board by a majority of EAG's shareholders. Collectively, RMMH and I owned the most stock in Elite.

44. At no time did I ever solicit any individual to purchase stock from Elite, either on my own or on behalf of Elite.

45. At no time did I ever develop or originate any valuation of Elite's stock to distribute to Elite investor salespeople.

### E. Evolution And I Repeatedly Requested My Consent Decree Be Disclosed To Investors

46. Since the inception of Evolution's business relationship with Elite (including the time it was RMM), both the Evolution principals and I not only disclosed my prior consent decree, but regularly raised concerns about whether it should be disclosed to investors in Elite's PPMs and urged Elite and their counsel to disclose my consent decree and the services contract to which they eventually did in at least one of their offerings. Elite's Corporate Counsel and Compliance Officer Saji Gunawardane was not only aware of my consent decree, but I became aware he advised Elite that it did not need to be disclosed as neither I nor anyone within Evolution, nor evolution itself controlled or sold securities for Elite.

47. On February 10, 2016, Mr. Gunton wrote a letter to Mr. Tillman and Mr. Zia confirming that EAP is going to amend their offering memorandum after RMM continued to raise concerns about Elite's disclosure obligations. The letter memorialized the previous disclosure of my consent decree and multiple meetings that RMM and I had with Mr. Gunawardane and other officers of Elite suggesting Elite should disclose the consent decree to potential investors "out of an abundance of caution." A true and correct copy of the letter is attached hereto as **Exhibit E**.

48. Mr. Gunton's letter further memorialized Elite's decision to finally disclose my consent decree and that RMM "whole heartedly agree[s] with this decision," stating "a disclosure we have been advocating for quite some time." Mr. Gunton on behalf of RMM further stated that Mr. Gunawardane, or preferably outside counsel, should provide an opinion letter that disclosure was not previously required. *See* Exhibit E. My consent decree was disclosed in Elite's 2017 and 2018 prospectuses the contract was disclosed in all prospectuses from 2015 on.

### F. Evolution Repeatedly Sought Further Transparency From Elite While Elite's Defaults On the 2017 Agreement Were Ongoing

49. At no time during the business relationship between Evolution, formerly RMM, and Elite did Elite ever send Evolution a notice of default of any of the agreements between them. However, on several occasions, Evolution provided notices of default to Elite and expressed concerns about Elite's lack of transparency around its financial records.

50. In May 2017, Mr. Gunton, on behalf of Evolution, provided Mr. Tillman and Mr. Zia a letter as notice of its intent to declare a formal default under the 2017 Agreement. Among a list of issues, Mr. Gunton provided written notice that Elite and its affiliates had failed to provide complete and accurate financial records for the prior two (2) calendar years as well as monthly financials. Also, Elite had failed to undergo an annual independent audit.

51. At the time, Evolution was also concerned about Elite's lack of transparency, because Elite had not yet appointed two members of Evolution to its board, which was important to Evolution to bring oversight and transparency over the inner workings and overall financial health of the company, especially as Evolution's services included providing detailed media to the public about Elite as Elite sought continued growth and investments.

52. Only after the transmission of this letter to Elite did Elite provide to Evolution a consolidated sheet of financials and appoint Mr. Gunton and Ms. Lindstrom to the board. Despite Evolution's initial optimism that the board appointments would yield access to and information about Elite's accounting and financials, this continued to be a challenge and point of contention between Elite and Evolution.

53. Despite the challenge of obtaining financial transparency from Elite's other board members, I became aware that on March 28, 2018, Mr.

Gunton in his role as a board member of Elite requested that Lee Smith, Elite's then COO, provide Elite's board of directors as well as shareholders consolidated financial statements for all of EAG divisions and companies for the years 2015, 2016, 2017, and through February 2018, and thereafter such financial information on a monthly basis.

### G. None of RMM, Evolution, Nor I Controlled Elite's Capital Raising Processes; Nor Did Evolution Or I Conceal Any Information That Evolution Or I Had A Duty To Disclose

54. At no time ever did I have the authority to hire or fire any employees of Elite. Certainly, I did not ever have the authority to hire or fire any of Elite's investor salespeople. No such authority was ever a part of any of Evolution's agreements with Elite in fact the 2015 and 2017 contracts specifically stated that RMM/Evolution do not act as Human resources for Elite.

55. At no time was I instructed or informed by Elite that its own investor salespeople would report to me or Evolution instead of someone within Elite's own organizational structure. No such authority over investor salespeople was ever a part of any of Evolution's agreements with Elite. At no time did any Elite investor salesperson ever assert or intimate to me or anyone else to my knowledge that they reported to me in connection with Elite's organizational structure.

56. At no time did I ever control Elite's capital raising processes. At no time did I ever intentionally or knowingly conceal any person or entity's control over Elite's capital raising processes. I am unaware of any agreement or instrument that conceals any person or entity's control over Elite's capital raising processes. At no time did I ever take on a contractual duty or other obligation to ensure that Elite did not conceal who within its organization controlled or otherwise managed its capital raising processes.

57. At no time was I ever an officer or director of Elite. At no time was I ever an employee of Elite nor was I ever a signer or authority on Elite's banking accounts or other financials.

58. At no time was an individual named Rourke Oakland an employee of Evolution.

59. At no time ever was an individual named Kent Greeley an employee of Evolution.

60. At no time did Evolution or RMM (collectively, "Evolution") ever control Elite's capital raising processes. At no time did any of Evolution's agreements with Elite ever conceal any purported degree of control over Elite's capital raising processes. At all times during which Evolution was engaged to provide consulting services to Elite, I knew and understood that Elite controlled its capital raising processes.

61. At no time during Evolution's entire engagement with Elite did I take any action to conceal the payment of any purported commission to any unregistered broker of securities.

62. At no time during Evolution's entire engagement with Elite did I have a duty or reason to know whether Elite concealed payments of any alleged commissions to unregistered brokers or used the services of Evolution or myself to conceal payments of any alleged commissions to unregistered brokers. As far as I ever knew, Elite's investor salespeople did not make commissions, but performance-based bonuses. Any and all information I received on this topic came from Elite's management, which included Messrs. Tillman, Zia, Gunawardane, and Smith. This was further confirmed by a compensation audit performed by Richardson and Associates, Elite's securities counsel.

63. Neither Evolution nor I was responsible under any agreement with Elite for determining how Elite's investor sales proceeds were used. Any information concerning how Elite would use its proceeds from investor sales

was provided to me as an investor or Evolution by Elite's management, which included Messrs. Tillman, Zia, Gunawardane, and Smith.

64. At no time did I have a duty under any agreement or other obligation to determine or confirm the veracity of the information Elite's management provided me concerning its use of proceeds from investor sales, when they presented to me and Evolution factual information as fact. Nor during the time periods when Evolution helped prepare Elite's prospectuses did I have any reason to know or believe that information provided to me or Evolution by Elite concerning Elite's use of proceeds was inaccurate. During the time periods when Evolution helped prepare Elite's prospectuses, as a shareholder and principal of one of Elite's vendors, I did not have access to Elite financial information or other reason sufficient to know whether any use of proceeds as provided for inclusion in a prospectus was false.

65. Because I lacked access to Elite's financials, I never had any reason to know whether Elite's distribution of use of proceeds information was false. Nowhere in any agreement between Elite and Evolution was anyone from Evolution ever to be provided by Elite financial information sufficient to determine whether Elite's use of proceeds information included in prospectuses was false.

66. At no time did Evolution or I have the authority to dictate how Elite salespeople would communicate with existing or potential investors. That authority as I understood it remained with Elite's management, namely Messrs. Dustin Tillman and Zeeshawn Zia, who were the company's co-founders, but also Messrs. Smith and Gunawardane.

**H. Tillman and Zia Sought Encouraged RMMH's Sale Of Elite Stock In Lieu Of A Contractual Compensation Increase**

67. At no time did I ever conceal RMMH's sale of its stock from Dustin Tillman or Zeeshawn Zia.

68. In mid-2016, Tillman and Zia asked Evolution to provide marketing and support services to five other corporate entities that would eventually become wholly owned subsidiaries of EAG: Elite Engineering Services, Inc. ("EES"), Elite Financial Services, Inc. ("EFS"), Elite Metal Manufacturing, Inc. ("EMM"), Elite Aviation Interiors, Inc. ("EAI"), and Elite Logistics & Integration ("ELI").

69. In connection with RMMH's sale of Elite shares, Dustin Tillman and Zeeshawn Zia gave tours of Elite's facilities to prospective purchasers of RMMH's Elite shares.

70. Each of the purchasers of Elite stock from RMMH in 2017 was an accredited investor.

### I. Disputes With Elite Grew And Elite Terminated Its Relationship With Evolution

71. In late July 2018, Elite improperly terminated its 2017 Agreement with Evolution.

72. On September 5, 2018, Mr. Gunton, on behalf Elite's board of directors and its shareholders, made a second demand to Elite's management to provide comprehensive accounting statements.

73. On October 1, 2018, Mr. Gunton made a third demand to review Elite's financial and accounting statements.

74. On March 5, 2019, after a lack of communication from Elite's management, Mr. Gunton and Ms. Lindstrom resigned from the board of directors, citing their inability to execute their duties as directors and elected board members, despite numerous demands for transparency and inclusion.

//
//
//
//

I declare under penalty of perjury under the laws of the United States of America, the foregoing is true and correct. Executed on June 30, 2023 at Irvine, California.

_____
Michael P. Owens