John van Loben Sels (Bar. No. 201354)
jvanlobensels@thoits.com
Brittany M. Nobles (Bar No. 343513)
Bnobles@thoits.com
**THOITS LAW**
A Professional Corporation
400 Main Street, Suite 205
Los Altos, California 94022
Telephone:  (650) 327-4200
Facsimile:  (650) 325-5572

*Attorneys for Defendants,*
DAWSON L. DAVENPORT, ROBERT A. GUNTON,
ANDREA J. LINDSTROM, and MICHAEL P.
OWENS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.:   8:21-cv-01427-JLS-JDE |
| Plaintiff, | **DECLARATION OF MICHAEL P. OWENS IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA, | Date:  August 18, 2023 Time: 10:30 a.m. Courtroom: 8A, 8th Floor Judge: Hon. Josephine L. Staton |
| Defendants. | |

I, Michael P. Owens, declare as follows:

1.      I am a Defendant in this action.

2.      The matters stated herein are based upon my personal knowledge. If called upon, I could and would competently testify thereto.

3.      I hereby submit this declaration authenticating records in support of Defendants' Motion for Summary Judgment.

THOITS LAW
A PROFESSIONAL CORPORATION

1    4.    I was the President and Manager of RealMedia Marketing, Inc.

2    ("RMM") and Evolution Consulting, Inc. ("Evolution") and I was the custodian

3    of the business records of RMM and Evolution.

4    5.    I am not the custodian of Elite Aerospace, Inc's ("Elite") business

5    records.

6    6.    I am not familiar with how Elite's business records are kept in the

7    course of regularly conducted business activities.

8    7.    I am not familiar with the source, method, or circumstances in

9    which Elite's business records are prepared and maintained; therefore, I cannot

10    testify as to their authenticity.

11    8.    The following documents, attached as exhibits to the Declaration

12    of John van Loben Sels in Support of Defendants' Motion for Summary

13    Judgment ("JvLS Decl.") (Dkt. 59) are true and accurate copies of the original

14    records and documents that were made and kept in the regular course of RMM

15    and Evolution business: JvLS Decl. Exhibit 2 (Dkt. 59-1) (DAV000001-

16    DAV000001), JvLS Decl. Exhibit 3 (Dkt. 59-2) (DAV000155-DAV000186),

17    JvLS Decl. Exhibit 6 (Dkt. 59-1), JvLS Decl. Exhibit 7 (Dkt. 59-1), JvLS Decl.

18    Exhibit 8 (Dkt. 59-2) (DAV000555-DAV000557), JvLS Decl. Exhibit 13 (Dkt.

19    59-2), JvLS Decl. Exhibit 17 (Dkt. 59-2) (EVO021738-EVO021760), JvLS

20    Decl. Exhibit 23 (Dkt. 59-2) (DAV005372-DAV005372), JvLS Decl. Exhibit

21    25 (Dkt. 59-2) (EVO012200-EVO012203), JvLS Decl. Exhibit 26 (Dkt. 59-2)

22    (EAGSEC0013787- EAGSEC0013791), JvLS Decl. Exhibit 27 (Dkt. 59-2)

23    (EVO007488-EVO007488), JvLS Decl. Exhibit 29 (Dkt. 59-2), JvLS Decl.

24    Exhibit 30 (Dkt. 59-2) (EVO026344-EVO026371), JvLS Decl. Exhibit 31 (Dkt.

25    59-2) (EVO022478-EVO022499), JvLS Decl. Exhibit 32 (Dkt. 59-3)

26    (EVO023232-EVO023254), and JvLS Decl. Exhibit 33 (Dkt. 59-3)

27    (EVO023727-EVO023752).

28

9.      The documents referenced herein are copies of records that were made at or near the time of the information recorded.

10.     It was the regular practice of RMM and Evolution to record the information set forth in the above referenced records.

11.     I am familiar with the records and the circumstances under which they were made.

12.     RMM and Evolution are not parties to this action.


I declare under penalty of perjury under the laws of the United States of America, the foregoing is true and correct. Executed on August 3, 2023 at Irvine, California.

DocuSigned by:

00E61AE38D3B466...

**Michael P. Owens**

**THOITS LAW**
A PROFESIONAL CORPORATION

DECLARATION IN SUPPORT OF DEFENDANTS' REPLY
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# Exhibit 02

## Gabriela Davenport

| | |
|---|---|
| **From:** | Mike Owens |
| **Sent:** | Thursday, October 25, 2018 9:15 AM |
| **To:** | Gabriela Davenport; Dawson Davenport; Robert Gunton; Andrea Lindstrom; Adam Eldred; Rourke Oakland |
| **Subject:** | Fwd: $10 MM Debt Offering Conference Call |

Found it!

Sent from my iPhone

Begin forwarded message:

> **From:** ROBERT WEIN <bobwein@msn.com>
> **Date:** October 24, 2018 at 6:28:39 PM PDT
> **To:** Mike Owens <m.owens@EVO.CONSULTING>
> **Subject:** Fwd: $10 MM Debt Offering Conference Call
>
>
> Get Outlook for iOS
>
> **From:** ELITE AEROSPACE GROUP <investorrelations@eliteaerospacecorp.com>
> **Sent:** Tuesday, October 23, 2018 7:11:21 PM
> **To:** bobwein@msn.com
> **Subject:** $10 MM Debt Offering Conference Call



$10 MM Debt Offering Conference Call          View this email in your browser

ELITE

1

Confidential                                                                              DAV000001

Confidential

DAV000002



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

## Message from the CEO

October 23, 2018

Dear Valued Shareholders,

Firstly, thank you for your continued support, interest, and steadfast encouragement in partnering with Elite as we transition out of our equity offering and into a strategic debt instrument we feel is going to be extremely advantageous for the company. This is the case for the following reasons: (1) as an enterprise we believe we've grown to a point where the cost of money is better served in debt deployment rather than equity dilution; (2) given current forecasted contract revenue, and the removal of previously budgeted expenses associated with Elite's former contract marketing vendor and affiliates, the picture of profitability has become clearer, and more favorable than ever, especially concerning our focus on acquisitions, which leads us into our final point: (3) given the accretive nature of our anticipated, and thoroughly vetted, acquisitions, recognition of this revenue once Elite integrates and optimizes, will strongly favor this debt service strategy.

Secondly, this debt offering is intended to allow Elite to execute on planned capital expenditures, i.e., machine tool purchases, and associated facility infrastructure, etc., finance planned acquisitions, and integrate and optimize accordingly. Lastly, and perhaps most importantly, this debt offering will allow us to structure the company for a larger capitalization strategy. With the onboarding of our new CFO, Mark Babich, and his tenured understanding of finance architecture and stewardship, along with the discernment in composing a Board of Directorship adept in public markets, we feel we now have the recipe to grow unencumbered into the very distant future, creating shareholder value along the way. I can't tell you how excited we are to be steering down this pathway, and for the opportunity we now have as a leadership team to dedicate all of our time and attention where it's best served; building our business.

Again, thank you for your interest in this opportunity. We look forward to addressing any and all questions on our call tomorrow. In attendance will be myself, Zee, Mark, and Jonathan.

Very best,

Dustin Tillman - CEO

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may effect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: https://EliteAerospaceCorp.com

DAV000003

Confidential

DAV000004

Memorandum No.: _____     For the Exclusive Use of: _____

Date: October 2018



## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## <u>ELITE AEROSPACE GROUP, INC.</u>

### Maximum of $10,000,000

### in

### 12% Unsecured Convertible Notes

### Minimum Investment of $250,000.00

.

## INITIAL DISCLOSURE STATEMENT

## <u>INTRODUCTION</u>

THIS PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM") IS INTENDED TO BE USED BY ELITE AEROSPACE GROUP, INC., A DELAWARE CORPORATION (THE "COMPANY" OR "EAG"), IN CONNECTION WITH A PRIVATE OFFERING OF THE SALE AND PURCHASE OF UP TO $10,000,000.00 (THE "OFFERING") IN 12% UNSECURED CONVERTIBLE NOTES (THE "NOTES") OF THE COMPANY, CONVERTIBLE AT A MAXIMUM PER SHARE PRICE OF $2.00 FOR CLASS B SHARES OR THE LOWER PRICE PER SHARE OFFERED IN THE NEXT ROUND OF EQUITY FINANCING, SUBJECT TO FURTHER DISCOUNTS DESCRIBED IN "OFEERING" SECTION OF THE MEMORANDUM.

**THE OFFERING IS BEING MADE AVAILABLE TO ALL EXISTING MEMBERS OF THE COMPANY, AND PROSPECTIVE NEW INVESTORS (COLLECTIVELY, "OFFEREES" AND INDIVIDUALLY, AN "OFFEREE") WHO MEET CERTAIN SUITABILITY STANDARDS AND REQUIREMENTS, IN ACCORDANCE WITH THE PRE-EMPTIVE RIGHTS GRANTED EXISTING MEMBERS PER THE COMPANY'S BYLAWS.**

THIS MEMORANDUM IS CONFIDENTIAL IN NATURE AND IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH OR WHOM IT IS GIVEN OR TRANSMITTED. THIS MEMORANDUM MAY NOT BE DISTRIBUTED OR REPRODUCED WITHOUT THE COMPANY'S PRIOR WRITTEN CONSENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, OR ANY OTHER MATERIAL IN CONNECTION WITH THIS OFFERING, OFFEREE AGREES NOT TO DISCLOSE SUCH CONTENTS TO ANY THIRD PARTY OR OTHERWISE USE THE CONTENTS FOR ANY PURPOSE OTHER THAN EVALUATION BY SUCH OFFEREE OF AN INVESTMENT. OFFEREES SHALL RETURN THIS MEMORANDUM AND ALL SUCH OTHER MATERIAL TO THE COMPANY IF SUCH OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY NOTES, OR IF THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, OR IF THIS OFFERING IS TERMINATED OR WITHDRAWN.

## EXCLUSIVE NATURE OF PRIVATE PLACEMENT MEMORANDUM

EXCEPT FOR SUCH INFORMATION CONTAINED IN THIS MEMORANDUM OR THAT IS PROVIDED BY THE COMPANY IN RESPONSE TO REQUESTS FROM OFFEREES OR THEIR ADVISORS, NO PERSON OR ENTITY HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS CONCERNING THE COMPANY OR THE SECURITIES REFERENCED HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION(S) SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THE COMPANY DISCLAIMS ANY AND ALL LIABILITIES FOR REPRESENTATIONS OR WARRANTIES EXPRESSED OR IMPLIED, CONTAINED IN, OR OMISSIONS FROM, THIS MEMORANDUM, OR ANY OTHER WRITTEN OR ORAL COMMUNICATION TRANSMITTED OR MADE AVAILABLE TO THE RECIPIENT.

THIS MEMORANDUM DOES NOT PURPORT TO BE ALL-INCLUSIVE OR TO CONTAIN ALL OF THE INFORMATION THAT AN OFFEREE MAY DESIRE IN EVALUATING A PURCHASE OF NOTES IN THE COMPANY.

STATEMENTS MADE IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE STATED AND ARE SUBJECT TO CHANGE, COMPLETION OR AMENDMENT WITHOUT NOTICE. NEITHER THE DELIVERY OF THIS MEMORANDUM, AT ANY TIME, NOR THE SALE OF THE SECURITIES HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

CERTAIN PROVISIONS OF VARIOUS AGREEMENTS ARE SUMMARIZED IN THIS MEMORANDUM, BUT OFFEREES SHOULD NOT ASSUME THAT THE SUMMARIES ARE COMPLETE.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY ANY NOTE OR SECURITY OTHER THAN THOSE OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY FROM ANY PERSON IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL, OR IN WHICH THE PERSON OR ENTITY MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, OR TO A PERSON OR ENTITY TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.

THE COMPANY RESERVES THE RIGHT AT ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE OFFERING, AND/OR ACCEPT OR REJECT IN WHOLE OR IN PART ANY INVESTMENT IN THE NOTES.

## SPECULATIVE; HIGH RISK; DUE DILIGENCE

THE SECURITIES REFERENCED HEREIN ARE HIGHLY SPECULATIVE AND ANY INVESTMENT INVOLVES A HIGH DEGREE OF RISK. OFFEREES SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME AND BE AWARE THAT THEY MAY SUSTAIN A LOSS OF THEIR ENTIRE INVESTMENT.

EACH OFFEREE WILL BE REQUIRED TO REPRESENT THAT THEY ACKNOWLEDGE AND UNDERSTAND THE TERMS, RISKS, AND MERITS OF THE OFFERING DESCRIBED HEREIN AND ALL ATTACHMENTS TO THIS MEMORANDUM.

THIS MEMORANDUM HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY IN ORDER TO ASSIST OFFEREES IN EVALUATING AN INVESTMENT IN THE COMPANY. OFFEREES ARE EXPECTED TO CONDUCT THEIR OWN INVESTIGATIONS WITH REGARD TO THE COMPANY AND ITS PROSPECTS. IN MAKING AN INVESTMENT DECISION, OFFEREES MUST CONDUCT AND RELY ON THEIR OWN EXAMINATIONS OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION WITH RESPECT TO THIS MEMORANDUM.

DAV000006

## SECURITIES LAWS; REGISTRATION

THE OFFER AND SALE OF NOTES, AND THE SECURITIES INTO WHICH THE NOTES ARE CONVERTIBLE, HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED, AND REGULATION D PROMULGATED THEREUNDER, AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS.

THE SECURITIES HAVE NOT BEEN REGISTERED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY SUCH STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM.

## RESTRICTIONS; TRANSFERABILITY

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE. THE SECURITIES MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND/OR THE COMPANY'S BYLAWS ATTACHED HERETO AS EXHIBIT F (THE "BYLAWS").

## SAFE HARBOR STATEMENT; FORWARD-LOOKING STATEMENTS

THIS MEMORANDUM INCLUDES PROJECTIONS, ESTIMATES OF FUTURE PERFORMANCE OF THE COMPANY OR VARIOUS ELEMENTS OF THE COMPANY'S BUSINESS, AND "FORWARD-LOOKING STATEMENTS". SUCH PROJECTIONS, ESTIMATES AND "FORWARD-LOOKING STATEMENTS" ARE BASED ON ASSUMPTIONS AS TO FUTURE EVENTS THAT ARE INHERENTLY UNCERTAIN AND SUBJECTIVE. THE COMPANY MAKES NO REPRESENTATION OR WARRANTY AS TO THE ATTAINABILITY OF SUCH ASSUMPTIONS OR AS TO WHETHER FUTURE RESULTS SHALL OCCUR AS PROJECTED.

IT MUST BE RECOGNIZED THAT THE PROJECTIONS AND "FORWARD-LOOKING STATEMENTS" ARE NECESSARILY SUBJECT TO A HIGH DEGREE OF RISK AND UNCERTAINTY, THAT ACTUAL RESULTS CAN BE EXPECTED TO VARY FROM THE RESULTS PROJECTED, AND THAT SUCH VARIANCES MAY BE MATERIAL AND ADVERSE. THE RISKS AND UNCERTAINTIES, INDIVIDUALLY OR MUTUALLY, MAY IMPACT THE MATTERS HEREIN DESCRIBED, INCLUDING BUT NOT LIMITED TO, FINANCIAL PROJECTIONS, PRODUCT DEMAND AND MARKET ACCEPTANCE, THE EFFECT OF ECONOMIC CONDITIONS, THE IMPACT OF COMPETITIVE PRODUCTS AND PRICING, GOVERNMENT REGULATIONS, TECHNOLOGICAL DIFFICULTIES AND/OR OTHER FACTORS OUTSIDE THE CONTROL OF THE COMPANY. OFFEREES SHOULD EXPECT THAT ANTICIPATED EVENTS AND CIRCUMSTANCES MAY NOT OCCUR, THAT UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY OCCUR, AND THAT ACTUAL RESULTS MAY LIKELY VARY FROM THE "FORWARD-LOOKING CIRCUMSTANCES".

OFFEREES SHOULD BE AWARE THAT A NUMBER OF FACTORS COULD CAUSE THE "FORWARD-LOOKING STATEMENTS" OR PROJECTIONS CONTAINED IN THIS MEMORANDUM OR OTHERWISE MADE BY OR ON BEHALF OF THE COMPANY TO BE INCORRECT OR TO DIFFER MATERIALLY FROM ACTUAL RESULTS. SUCH FACTORS MAY INCLUDE, WITHOUT LIMITATION: (i) THE ABILITY OF THE COMPANY TO MEET ITS EXISTING FINANCIAL OBLIGATIONS; (ii) THE DEMAND FOR AND TIMING OF DEMAND FOR ITS PRODUCTS; (iii) COMPETITION FROM OTHER PRODUCTS AND COMPANIES; (iv) THE COMPANY'S SALES AND MARKETING CAPABILITIES; (v) THE COMPANY'S ABILITY TO SELL ITS PRODUCTS PROFITABLY; (vi) AVAILABILITY OF ADEQUATE DEBT AND EQUITY FINANCING; (vii) POTENTIAL LITIGATION THAT MAY ARISE, (viii) REGULATORY CONDITIONS AT A STATE AND FEDERAL LEVEL AND (ix) GENERAL BUSINESS AND ECONOMIC CONDITIONS. THESE IMPORTANT FACTORS AND CERTAIN OTHER FACTORS THAT MIGHT AFFECT THE COMPANY'S FINANCIAL AND BUSINESS RESULTS ARE DISCUSSED IN THIS MEMORANDUM UNDER THE SECTION TITLED "RISK FACTORS."

THERE ARE NO ASSURANCES THAT THE COMPANY SHALL BE ABLE TO ANTICIPATE, RESPOND TO OR ADAPT TO CHANGES IN ANY FACTORS AFFECTING THE COMPANY'S BUSINESS AND FINANCIAL

DAV000007

RESULTS.

## INVESTOR SUITABILITY; DISCLOSURES; BACKGROUND CHECKS

THE SECURITIES HEREIN ARE BEING OFFERED EXCLUSIVELY TO THOSE OFFEREES WHO MAY QUALIFY AS BOTH SOPHISTICATED AND "ACCREDITED INVESTORS" AND POSSESS THE QUALIFICATIONS NECESSARY TO PERMIT THE SECURITIES TO BE OFFERED AND SOLD IN RELIANCE UPON CERTAIN EXEMPTIONS AND/OR AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933.

OFFEREES ARE ADVISED THAT THEY MUST MEET CERTAIN MINIMUM ANNUAL INCOME OR NET WORTH THRESHOLDS PROVIDED IN THE INVESTOR SUITABILITY QUESTIONNAIRE AS WELL AS OTHER ADDITIONAL SUITABILITY REQUIREMENTS AS MAY BE DETERMINED BY THE COMPANY. OFFEREES ARE FURTHER ADVISED THAT THEY MAY IN CONNECTION WITH SUCH SUITABILITY REQUIREMENTS, BE REQUIRED TO SUBMIT FINANCIAL STATEMENTS, W-2 FORMS, 1099 FORMS, SCHEDULE K-1 OF 1065 FORMS, 1040 FORMS, TAX RETURNS, A SUITABILITY QUESTIONNAIRE, AND/OR OTHER DOCUMENTATION.

THE SECURITIES OFFERED HEREIN MAY BE OFFERED THROUGH ONE OR MORE BROKER-DEALERS AND PLACEMENT AGENTS ON A NON-EXCLUSIVE "BEST EFFORTS" BASIS.

ALL COMPANY SPECIFIC INFORMATION PROVIDED HEREIN, INCLUDING COMPARISONS OF THE COMPANY'S PRODUCTS OR SERVICES TO COMPETITIVE PRODUCTS OR SERVICES, UNLESS OTHERWISE CITED, WERE PROVIDED BY COMPANY STAFF, AND HAVE NOT BEEN INDEPENDENTLY VERIFIED BY ANY BROKER DEALER, AND NO BROKER DEALER MAKES ANY REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AS TO THE ACCURACY OF COMPLETENESS OF SUCH INFORMATION. FURTHER, ANY COMPARISONS WITH COMPETITORS ARE INTENDED EXCLUSIVELY TO DELINEATE THE COMPANY'S COMPETITIVE DIFFERENTIATION IN THE MARKETPLACE AND IN NO WAY SHOULD BE CONSIDERED A COMPARISON OF POTENTIAL INVESTMENTS.

## NOTICE TO NON-UNITED STATES RESIDENTS

IT IS THE RESPONSIBILITY OF ANY ENTITY WISHING TO PURCHASE THE NOTES HEREIN TO SATISFY THEMSELVES AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

## LEGAL ADVICE

OFFEREES SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, BUSINESS, OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT THEIR OWN COUNSEL, ACCOUNTANT, OR FINANCIAL ADVISOR AS TO LEGAL, BUSINESS, OR TAX RELATED MATTERS CONCERNING THE PURCHASE OF ANY SHARES HEREIN.

## JURISDICTIONAL (NASAA) LEGENDS

FOR RESIDENTS OF ALL STATES: THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

1.      FOR CALIFORNIA RESIDENTS ONLY: THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF

Confidential

CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY THE CALIFORNIA CORPORATIONS CODE OR THE NATIONAL SECURITIES MARKET IMPROVEMENT ACT OF 1996. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITIONED UPON SUCH QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

2.    FOR FLORIDA RESIDENTS:  THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES.  EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR THE PURCHASE OF SECURITIES HEREIN HAS THE RIGHT, PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES ACT, TO WITHDRAW HIS SUBSCRIPTION FOR SUCH PURCHASE AND RECEIVE A FULL REFUND OF ALL MONIES PAID WITHIN THREE BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT OR PAYMENT FOR THE PURCHASE HAS BEEN MADE, WHICHEVER IS LATER.  WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR TELEGRAM TO THE COMPANY AT ITS ADDRESS SET FORTH IN THE TEXT OF THIS MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW.  SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY.  IT IS ADVISABLE TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED. TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. IF THE REQUEST IS MADE ORALLY (IN PERSONAL OR BY TELEPHONE TO THE COMPANY AT THE NUMBER LISTED IN THE TEXT OF THIS MEMORANDUM), A WRITTEN CONFIRMATION THAT THE REQUEST HAS BEEN RECEIVED SHOULD BE REQUESTED.

3.    FOR PENNSYLVANIA RESIDENTS:  THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER SECTION 201 OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (THE "ACT") AND MAY BE RESOLD BY RESIDENTS OF PENNSYLVANIA ONLY IF REGISTERED PURSUANT TO THE PROVISIONS OF THAT ACT OR IF AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(d), (f), (p) OR (r), DIRECTLY FROM AN ISSUER OR AFFILIATE OF AN ISSUER SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON, WITHIN TWO BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO WRITTEN BINDING CONTRACT OF PURCHASE, WITHIN TWO BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED.

SEE THE SUBSCRIPTION AGREEMENT FOR OTHER STATE NOTICES, IF APPLICABLE.

## INQUIRIES

PRIOR TO PURCHASING NOTES, EACH OFFEREE HAS THE RIGHT TO ASK QUESTIONS REGARDING THE TERMS OF THE OFFERING AND OBTAIN ADDITIONAL INFORMATION, TO THE EXTENT THAT EAG POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, WHICH IS NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN. INQUIRIES MAY BE DIRECTED TO:

**ELITE AEROSPACE GROUP, INC.**
ATTN:  INVESTOR RELATIONS
15773 GATEWAY CIRCLE
TUSTIN, CALIFORNIA 92780
PHONE: (949) 748-1299 (OPTION 4)
INVESTORRELATIONS@ELITEAEROSPACECORP.COM

# EXECUTIVE SUMMARY

*The following summary is qualified in its entirety by the more detailed information and financial statements appearing elsewhere or incorporated by reference in this Memorandum.*

## Elite Aerospace Group, Inc.

Elite Aviation Products (EAP) was the first pillar of the Elite Aerospace Group and functioned as one of the company's primary service offerings. Founded in 2013, EAP rapidly became a standout component manufacturer in the aerospace industry. In stark contrast of the "PO to PO" (purchase order) mindset of its competition, Elite Aviation Products focused their resources on obtaining the most advanced machine technology and expanding their business in order to provide full service customer centered solutions. Subsequently, Elite Aerospace Group, Inc. was created ("EAG", "we", "us", "our", or the "Company") as a Delaware corporation formed in May 2016 which, through its wholly owned subsidiaries, is designing, manufacturing, and selling sophisticated components for rockets, spacecraft, aircraft, and satellites for the burgeoning global aerospace market. Our customers include Space-X, for which we have a supply chain management contract, Boeing Company, and other aerospace manufacturers.

We endeavor to create long term capital appreciation in the value of the Company by selling products and services in the commercial aerospace industry. We plan to take advantage of robust demand created by the simultaneous development of entirely new fleets of aircraft by most of the major airframe manufacturers in the world, as well as an expansion of existing aircraft platforms and the development of new technologies. The emerging private space flight and rocket industry is another market opportunity for us. As a result of this unprecedented phenomenon, all airframe manufacturers and related component assembly integrators are challenging the capacity and capability constraints of those suppliers traditionally called upon to support this scope of work.

Due to our executive management team's extensive marketplace knowledge and experience in service-oriented parts solutions, we intend to make a significant impact by offering a rejuvenated competitive alternative to a traditionally antiquated business environment. Harnessing this momentum and drawing on our management team's global and diversified positioning, we intend to expand our manufacturing operations both domestically and internationally, as well as develop other revenue generating business units. The ultimate goal is for The Elite Group family of companies to emerge as a profit and performance driven powerhouse with global reach.

As of January 1, 2018, EAG consolidated its previous five divisions and the multiple companies acquired in 2017 into four new primary business segments. The following companies are wholly owned subsidiaries of EAG and lead each of the four new business segments of the Company:

- Elite Engineering Services, Inc. (EES) was established and commenced operations in March 2015. It provides engineering and consultation services to help companies improve their product development processes. It is expected that many of its clients will see value in working with other Elite Group companies.

- Elite Financial Services, Inc. (EFS) was established and commenced operations in August 2016. EFS intends to offer financial services, including financial services to support machine tool leases for companies looking to expand, and financial services for mergers and acquisitions in the industry.

- Elite Metal Manufacturing, Inc. (EMM) was established and commenced operations in September 2017 and primarily focuses on metallic manufacturing for the aerospace, defense, and orbital rocket industries as well as logistics and integration services.

DAV000010

- Elite Aviation Interiors, Inc. (EAI) was established and commenced operations in September 2017. EAI services the aircraft interiors industry through its management agreement with TTF Aerospace. Additionally, EAI produces USB devices and other cabin related technologies through its subsidiary, Elite 360 Technologies, Inc. (E360T).

The following organizational chart depicts the current corporate structure of EAG:



Capital raised through this offering will be used to continue to fuel our operational stabilization and expansionary goals, as well as grow the other related business segments. We realize that to achieve the forecasts as identified in this Memorandum, certain regulatory compliance standards will have to be met. We have taken proactive measures to ensure that attainment of these required certifications is achieved on par with the requirements our management team has identified as imminent. To that end, we have achieved our AS9100 Rev. D and ISO 9001 certifications as of May 31, 2015 and became Digital Product Definition ("DPD") approved for Boeing work as of August 26, 2015 in preparation for expected contracts with existing customers. Additionally, the Company has achieved ITAR (International Traffic in Arms Regulations) registered status which allows the Company to participate in Department of Defense (DoD) statements of work. Our initial contract sales efforts have been centered on distributor and tier-1 customer categories for build-to-print manufactured products and services. This effort is aptly referred to as Phase 1 by us. Subsequent phases entail the further enhancement of Phase 1 activities along with additional phases that focus on more strategic customer categories, which require more mature operational capabilities and infrastructure. This will include, but is not limited to, OEM direct support along with other, more expansive, solution orientated initiatives such as complex assembly integration, vertical incorporation of other specialty products/processes, and engineering service support as part of our overall value proposition.

We previously completed a private placement of our Series A Preferred Stock pursuant to Rule 506(c) of Regulation D of the Securities Act of 1933, as amended, which commenced on August 15, 2016. In that offering, we raised total capital of $26,504,144 by selling and issuing a total of 53,008,288 shares of our Series A Preferred Stock at $0.50 per share. Each share of the Series A Preferred Stock is convertible into one share of our common stock. The Company is in the process of converting all outstanding Series A Preferred Stock into an equivalent number of shares of our voting common stock.

Our executive offices are located at 15773 Gateway Circle, Tustin, California 92780 and our telephone number is (949) 748-1299 Option 4. We recently expanded our operational footprint to the Tustin, California facility as part of our expansion plans to support customer requirements. Our website address is https://EliteAerospaceCorp.com and our e-mail address is investorrelations@eliteaerospacecorp.com.

**Investment Analysis**

Management believes that we have strong economic prospects by virtue of the following dynamics of the industry and us:

---

[1] Organizational chart as depicted is subject to change based upon business and operational needs, goals, and strategies.

Confidential

1. Management believes that based on recent market analysis the demand for commercial, defense, and business aircraft as well as spacecraft will continue to increase over the next twenty years.

2. Management believes that there is currently a projected backlog of over 35,000 commercial planes which need to be built in the next two decades. This projection has significantly increased quarter over quarter.

3. Management believes that the current aerospace supply chain is substantially underserving the needs of large OEM's and tier 1 manufacturers, while tremendous demand for a more comprehensive service experience and new capacity have lowered the barrier to entry to work with the largest players in the aerospace and defense industries.

4. Management believes that passenger air travel, cargo traffic and private space flight are projected to increase continually for the coming decades and will contribute to strong demand for new aircraft and other services in the aerospace and defense industries.

There is no assurance that we will be profitable, or that the industry's favorable dynamics will not be outweighed in the future by unanticipated losses, adverse regulatory developments, and other risks. Investors should carefully consider the various risk factors before investing in the shares. See "RISK FACTORS."

**Risk Factors**

An investment in the Company involves various risk factors that Investors should carefully consider before investing in the shares. The aerospace manufacturing and design industries are extremely competitive and highly regulated. See "RISK FACTORS."

**The Offering**

Amount of Offering: **Up to $10,000,000**

**Securities Offered**

Unsecured Convertible Notes in the form attached to the Purchase Agreement in Exhibit E.

**Note Terms**

- <u>Term</u>:      Date of Issuance until the two (2) year anniversary.

- <u>Interest Rate</u>:      12% per annum, non-compounded and computed on the basis of the actual number of days elapsed and a year of 365 days.

- <u>Payments</u>:      Interest for the first 12 months is paid-in-kind and added to the principal amount. Thereafter, if not converted, payments are made each quarter in arrears with "balloon" payment at maturity.

- <u>Prepayment Penalty</u>:      None

- <u>Security</u>:      Unsecured obligation of the Company

**Minimum Investment**

The minimum required investment is $250,000.00. The Company may accept investments for less than $250,000.00 in its sole discretion.

DAV000012

## Conversion to Equity

The principal amount, plus any accrued but unpaid interest, may be converted into Class B Shares of the Company at a price of $2.00 per Class B Share (the "Class B Conversion Price"), or if the Company completes a qualified financing in a new class of equity security, the holder of the Note will have the right to convert, into either (A) Class B Shares at the Class B Conversion Price or (B) the new class of securities offered in the qualified financing at a price per share equal to the lesser of the Class B Conversion Price or the average price per share other investors paid for the equity securities in such qualified financing. The Class B Conversion Price is based on the price per Share previously sold to others in the sale of Class B Shares to investors; it has no direct relationship to earnings, value, fair market value, assets or other objective standards of worth.

## Conversion Discount

In the event an Offeree agrees to invest within thirty (30) days of receipt of the Offering Date (as defined below), Offeree will receive an additional 70% discount to any applicable conversion price if and when converted. Further, in the event a holder of a Note converts the principal amount of the debt and all accrued paid-in-kind interest within the first 12 months of Note issuance, holder will receive an additional 10% discount on the conversion price on top of the 70% discount, if applicable.

## Modification Right

The Company reserves the right to modify the conversion price; provided that all Offerees will have the right to receive a similar modification to their conversion price.

## Offering Period

The "Offering Period" shall be twelve (12) months, commencing October 12, 2018 (the "Offering Date"), unless extended or terminated by the Company for up to an additional 90 (ninety) calendar days.

## Multiple "Closings" and Right of Rejection

The Company may release funds on a rolling basis. The Company has the right to accept or reject any investment from any Offeree.

## Pre-Emptive Rights

This Offering is being made available to all existing members in the Company as part of your pre-emptive rights. Each existing investor may participate and invest an amount up to their pro rata share (meaning percentage of ownership multiplied by the maximum financing round size) so that upon conversion (excluding conversion incentives), such existing investor will maintain their same ownership percentage. To the extent an existing member wishes to invest more than his pro rata share, and provided there is availability, existing members will take priority over new investors, and should the Offering be oversubscribed, any new prospective investor's investment, including the lead investor, will be curtailed and/or repaid to meet the Company's pre-emptive obligations to its members. However, to the extent the Offering is undersubscribed by existing shareholders and there is availability, new prospective investors will have the opportunity to participate. The Company is simultaneously making the Offering available to prospective new investors to meet certain suitability standards and requirements.

## FINANCIAL INFORMATION

### Financial Projections

THE PROJECTIONS ARE "FORWARD LOOKING STATEMENTS" AND WERE NOT PREPARED WITH A VIEW TO PUBLIC DISCLOSURE OR COMPLIANCE WITH PUBLISHED GUIDELINES

DAV000013

OF THE COMMISSION OR ANY STATE SECURITIES COMMISSION. THE COMPANY ADVISES ALL OFFEREES TO PURSUE THEIR OWN INDEPENDENT INVESTIGATION WITH RESPECT TO THE PROJECTED FINANCIAL INFORMATION INCLUDED.

The financial projections included in Exhibit A include projected results for the remainder of 2018 (the current fiscal year) as well as the next 4 fiscal years through the end of 2020. Additionally, the financial projections in Exhibit B include a 10-year breakdown of revenue by corporate division, and 10-year breakdown of revenue by customer. Finally, EAG's Q2 and Q3 report is included and available in Exhibit C. Some of the key assumptions used in creating these projections include:

- Current/actual signed Long-Term Agreements (LTA), Vendor Purchase Agreements (VPA), Purchase Orders (PO) and blanket PO's with our customers.

- Predicated on customer production rate requirements and program rates, i.e. skyline reports from The Boeing Company, as well as the demand requirements provided to EAG by each of its customers.

- Industrialization requirements for our facilities to support booked demand, inclusive of machine tool asset costs, tooling/fixtures costs, and other machine-related expenses.

- Additional capital expenditures are included in order to finalize pending acquisition deals, intended to grow the enterprise by adding capacity, customers, contracts, as well as customer certifications. There may be additional cost requirements as demand dictates.

There are many other assumptions and variables used in the creation of the projections. Differences between actual data points in the future and assumptions used within these projections could produce very different results than what is projected.

## USE OF PROCEEDS

The net proceeds received from this offering are expected to be approximately $10,000,000.00 after the payment of offering costs including printing, mailing, legal and accounting costs, and potential brokerage and employee bonuses and consulting fees that may be incurred. We intend the net proceeds from the offering to be used for working capital and general corporate purposes, including the following estimates:

i.   Up to $4,700,000.00 for general corporate purposes, including marketing and advertising, product development, salaries, legal and regulatory, recapitalization and infrastructure.

ii.  Up to $300,000.00 for accounting services necessary to perform an audit of the 2015, 2016, 2017, and current financials;

iii. Up to $4,000,000.00 for acquisition costs associated with completion of pending transactions.

iv.  Up to $1,000,000.00 for offering expenses.

If we receive substantially less than the maximum proceeds in this offering, we intend to use such proceeds for working capital, general corporate purposes, and legal/regulatory needs.  The expected use of the net proceeds from this offering represents our intentions based upon our current plans and business conditions, which could change in the future as our plans and business conditions evolve. The amounts and timing of our actual expenditures will depend on numerous factors (see "BUSINESS" and "RISK FACTORS"), and as a result, our management will have broad discretion in applying the net proceeds from this offering.

## ELITE AEROSPACE GROUP & MARKET OPPORTUNITY

**Plan of Operation**

Confidential

DAV000014

EAG is a Delaware corporation formed in May 2016 to design, manufacture and sell sophisticated components for rockets, spacecraft, aircraft and satellites in the burgeoning global aerospace industry. Our customers include Space X, Boeing Company and other aerospace manufacturers. In addition to supplying components, we have a supply chain management contract with Space X.

Our goal is to create long-term capital appreciation in the value of the Company through the sale of products and services for market opportunities emerging in the worldwide commercial aerospace industry. These opportunities reflect comprehensive changes to airframe development being implemented by designers and manufacturers across a broad spectrum of the industry, and a dramatic increase in private space travel. We plan to take advantage of what management believes to be the bourgeoning demand created by the simultaneous development of entirely new fleets of aircraft by virtually every major airframe manufacturer in the world, as well as an increasing national defense budget for expansion of existing aircraft platforms and the development of new technologies. The emerging private space flight and rocket industry is another market opportunity for the Company. As a result of this unprecedented phenomenon, all airframe manufacturers and related component assembly integrators are challenging the capacity and capability constraints of those suppliers traditionally called upon to support this scope of work.

**The Aerospace Industry**

We believe few industries have had such a marked impact on the world as aerospace. From its earliest relevant roots dating back to the late 1800's, a rich and illustrious history has emerged. While much of the aerospace activity that took place was customarily reserved for the defense industry, the turning point, in what is now considered modern commercial aerospace, took place in the 1950's. In homage to its roots, it was furthered by the aeronautical advancements introduced during World War II, as well as a capitalistic yearning to provide the public an alternative, far reaching, and relatively affordable mode of travel apart from the traditional methods of the time. From that onset, proliferated by the Airline Deregulation Act of 1978, airlines, aiming to meet the constant demands of the passengers based on their ever-changing tastes and preferences, have aggressively worked toward providing air travelers a comfortable and safe environment with which to travel. Presently, the industry is commanded by four principal commercial original equipment manufacturers ("OEMs"): Boeing (USA), Airbus (France), Embraer (Brazil), and Bombardier (Canada), and over a thousand airlines who strive to offer the most affordable and distinctive alternatives to the marketplace. According to The Boeing Company, the aerospace marketplace is expected to be valued at nearly $5 trillion over the next 20 years as evidenced by the over 35,000 aircraft which management believes will need to be built during that time as airlines vie to embrace the most cost-effective solutions available.

Air travel remains a large and growing industry. We believe that it is directly responsible for facilitating economic growth, world trade, international investments, and tourism. In the past decade alone air travel has grown seven percent (7%) per year, with U.S. based carriers air travel alone to grow by over 2.5% per year for the next 20 years to over 1 billion travelers per year (according to the LA TIMES March 28, 2015). We believe the prospects for continued and unmitigated growth are undeniable. Despite being subject to some of the most turbulent economic roadblocks ever observed, the aerospace industry has enigmatically persevered as a powerhouse whose resiliency inspires even the most incredulous critics. Today the general aerospace industry, overseen by the FAA (according to the FAA as of YE 2012), is responsible for approximately 5.4 percent of the U.S.'s gross domestic product or more than $700 billion annually, with approximately $210 billion directly attributable (and increasing) to the airlines, airports, and related ground services, according to the International Air Transport Association. As it relates to the manufacturing face of the industry, the same weight prevails. According to the Society of Manufacturing Engineers, the global aerospace and defense manufacturing industry is valued at $170 billion annually and is roughly divided into five sub categories: military, civil, space, related products & services, and missiles. (Source: ReportLinker.com, June 10, 2015).

Management believes that what the aerospace industry is experiencing is a phenomenon seen only once every two or three decades due to the extraordinarily long lifecycles of aircraft. As the past era, epitomized by the DC-10's, Boeing 747's, 757's and 777's wanes, we believe that the inevitable result is retirement for these expiring fleets. Consequently, we believe that air framers, incentivized by the airlines

Confidential

that are forced to respond to the ever-changing customer volume and technologically encouraged tastes and preferences of the passengers, will be forced to meet demand or risk impending dissolution. We believe this ultimately translates into very large orders for the commercial aviation industry, both in terms of volume and dollars, challenging every tier-support institution's ability to accommodate this unfounded workload.

In its 2015 "Global Aerospace & Defense Outlook", Deloitte states that the global commercial aerospace sector is expected to sustain its significant revenue and earnings growth, underlined by extended record-setting production volume both at the platform level and in the supplier base. This comes as no surprise to those 'in-the-know' within the sector. This growth can be attributed primarily to increased production rates spurred by the accelerated replacement cycle of obsolete aircraft with next generation fuel-efficient aircraft, as well as continued increases in passenger travel demand. Since this report, Deloitte has published subsequent "Global Aerospace & Defense Outlook" reports for years 2016, 2017 and 2018 that are available on-line for review. According to The Boeing Company, global passenger travel demand is expected to increase by 5% every year over the next 20 years. In order to meet this overwhelming demand, The Boeing Company anticipates commercial aircraft annual production levels to increase by an estimated 20% over the next decade. Please refer to Boeing's Commercial Market Outlook (CMO) Report for 2018 for updated information, also available on-line for review.

**The Satellite Industry**

The satellite industry, which encompasses the endeavors of HALO Industries, Inc., a recent acquisition by us, reports several areas of growth in recent years. The *2016 State of the Satellite Industry Report* includes the following results: Satellite service revenue increased by four percent (4%) globally from 2014 to 2015, reaching $127.4 billion, powered by continued growth in consumer satellite television, satellite broadband and earth-observation services. Satellite manufacturing revenues, reflecting the value of satellites launched in 2015, grew by four percent (4%) worldwide to $16.6 billion. There were orders for 17 commercial GEO satellites with 11 orders won by U.S. manufacturers for a domestic market share of 65%, up from 57% in 2014. Satellite ground equipment revenue rose by one percent over 2014 to reach $58.9 billion. Satellite navigation (GNSS) equipment for both consumer and industrial customers represented approximately 53% of the overall ground equipment revenue. Please refer to the *2017 State of the Satellite Report* for updated information, also available on-line for review.

NSR's (Northern Sky Research) VSAT and Broadband Satellite Markets 15th Edition report, recently released, forecasts the global installed base for fixed VSATs to increase by 12.2 million by 2025, generating over $133.7 billion in cumulative service revenues over the 2015-25 period. Despite near term challenges, insatiable data demand and HTS capacity are expected to ignite long-term growth, as observed in the above referenced report, quoted in pertinent part as follows:

"The consumer broadband segment had another year of slow development, despite the massive addressable market still to be covered. Congested capacity over North America, and still underdeveloped retail channels in the rest of the world, were the main barriers," stated Lluc Palerm, NSR Senior Analyst and report author. "Even with these short-term challenges, NSR is optimistic about the medium and long-term prospects. New capacity over North America will enter service very soon adding to growth, while consolidation in Europe is creating stronger retail players accelerating sign ups. The Australian NBN program is rolling out with spectacular growth rates, new actors are populating the Latin American market, and innovative business models like Wi-Fi hotspots have the potential to unlock tremendous opportunities in the Middle East, Africa and Asia," stated Palerm.

The Fixed Enterprise VSAT market also had another challenging year. Developed regions continue to face strong competition from ground networks and market saturation. Additionally, poor macroeconomic factors like currency exchange rates and commodity prices limited growth in emerging economies.

NSR sees positive signs of a turnaround. Cheaper capacity prices are unlocking new markets like Mobile Backhaul, which may become the major driver for growth in the coming years, generating over a

Confidential

Tbps of demand by 2025. Despite not returning to the number of shipments before the slowdown, most VSAT ground vendors are now back on a growth track. NSR forecasts the installed base for Fixed Enterprise VSATs to incorporate more than 1 million new sites generating $4.5 billion in net growth for annual service revenues.

## Target Markets

*Distribution.* We expect that distributors will be a significant client base for us for a number of reasons. First and foremost, the value proposition they are capable of providing is attractive to those end-customer who, although cumulatively require vast quantities to support production requirements, desire to receive smaller, intermittent quantities of product on a more frequent basis for the sake of operations planning and production management, as well as a reduction of inventory holding costs. Further, the Company recognizes that those end-customers tend to procure an assortment of similar and dissimilar components, for which distributors readily stock, and appreciate the ease of one-stop-shopping that distributors are capable of offering. Additionally, end-customers are able to take advantage of long-term contract arrangements through narrowing their supplier panel to a few choice, competitive distribution companies, thereby capitalizing on favorable commercial terms and conditions, and limiting burdensome administrative costs associated with maintaining a more expansive approved supplier list.

Lastly, we believe that distributors will be able to provide us exposure to a variety of different end-customers, as well as industries through association with their networks precipitated by the positive attractiveness and value proposition of the Company and its relevant affiliations within the marketplace.

*Original Equipment Manufacturers* ("OEM"). We believe the OEM direct market represents an extremely valuable pool and will be the most invested customer category to surmount the bureaucratic and administrative channels required to ultimately become a certified supply source. Nevertheless, and despite these evident challenges, we believe we are poised to aggressively overcome these obstacles in the second phase of implementation due to the unique and intimate relationship network maintained with several of these targeted OEM organizations. Once the Company becomes qualified to supply directly to OEMs, this market segment will be in competition with the distribution-direct market in terms of revenue generation, with the potential to take it over altogether.

*Assembly Integrators* ("Tier 1s"). We believe Tier 1 assembly integrators (i.e., companies that are responsible for manufacturing and integrating component assemblies) will represent yet another abundant market customer segment and will remain, regardless of significant direct sales, a very important facet of our operational robustness, and enrich our value proposition given the relationship that exists between the distributors and the Tier 1 assembly integrators. In essence, maintaining a healthy relationship with the end-buyer of integrated assembly components will allow us insights into the program intelligence required for planning and forecasting.

## Products

We aim to continue to sell a variety of high-tolerance, high-cost-of-failure, and complex manufacturing components to support the aerospace and non-aerospace industries. We intend to deploy our product offerings in subsequent phases, precipitated by the release of our launch products. These include manufacturing inserts, bushings, panel pins, as well as other turn-milled hardware within the 15-35mm diameter range, and larger, more complex metallic products such as enclosures, encasements, manifolds, and structural inserts. We expect these staples will serve as the foundation of our product lines and remain core products in our catalogue as the offering is expanded to support other revenue streams borne in even more complex manufacturing opportunities.

## Facilities and Systems

We maintain our 17,000 square-foot facility at 1641-1645 Reynolds Avenue, Irvine, California 92614, and we recently expanded our manufacturing footprint by an additional 34,000 square feet at 15773

Confidential

Gateway Circle, Tustin, California 92780[2].





Furthermore, as a result of our engineering service expansion efforts into the Pacific Northwest, we also maintain a presence in the state of Washington at 22232 17th Ave SE, Bothell, Washington 98021. We elected to establish our manufacturing presence in Southern California, where we have taken, and intend to continue to take, advantage of a logistically accessible manufacturing hub centrally located within a rich allotment of customers and potential customers.

We believe these locations ultimately position us to further augment our desirability by being able to provide just-in-time deliveries to our customers as well as react to urgent, aircraft-on-ground ("AOG")

---

[2] Illustrations of facilities as depicted are subject to change based upon business and operational needs.

DAV000018

demand requests. Additionally, and based on this proximate convenience, we believe we will be able to respond expeditiously to engineering change requests that, given the nature of the product lines and stringent requirements of the customers, will be recognized as an invaluable and further differentiating feature.

All of these facilities are leased under multi-year arrangements, with options to extend the term. Management estimates that as of the date of this offering, the facility in Irvine, California is at 65% machine tool capacity, and we have begun operations in Tustin, California. The Bothell, Washington facility is exclusively used, currently, as an engineering service office to support customers within that region and beyond.



**BOTHELL, WA**

Elite Engineering Services

**Acquisition of HALO Industries, Inc.**

On April 10, 2017, Elite Space Services, Inc., a Delaware corporation (the "Purchaser" or "ESS") and wholly owned subsidiary of EAG purchased 100% of the issued and outstanding stock of HALO Industries, Inc., a California corporation ("HALO") from Zachary P. Halopoff, an individual, and Juli A. Halopoff, an individual (collectively, the "Sellers") pursuant to a stock purchase agreement ("SPA"). The Sellers conveyed 100% of the issued and outstanding capital stock of HALO to Purchaser in consideration for a total of $1,500,000 consisting of (i) cash payments totaling $750,000 (the "Cash Consideration") and (ii) a promissory note in the amount of $750,000 bearing interest at the simple rate of five percent (5%) per annum, payable principal and accrued but unpaid interest in full on or before December 10, 2018 (the "Note"). The Cash Consideration was payable $500,000 on April 10, 2017 and $250,000 on April 25, 2017. The Sellers agreed to allocate the Cash Consideration first to pay off in full any remaining balance under HALO's line of credit with Wells Fargo Bank, with any remaining Cash Consideration payable to Sellers. Concurrently with the execution of the SPA, Purchaser entered into an employment agreement with Zachary P. Halopoff (the "Employment Agreement").

HALO was founded in 1989 with a singular purpose: to produce the highest quality precision-machined components in the aerospace and communication satellite industries. HALO specializes in creating cutting-edge, prototype parts for some of the industry's most highly regarded players, catering to all aspects of customers' design, delivery and quality assurance needs. HALO's commitment to continuous

improvement drives it to constantly review and reassess its manufacturing process to ensure meeting and exceeding its clients' evolving demands. Given the toughest manufacturing challenges, HALO endeavors to engineer a solution, a goal that hasn't changed since its inception 28 years ago.

The acquisition of HALO by ESS is expected to create significant opportunities for both entities, as reported by MCA Advisors Corp. in its Business Valuation Report of HALO for EAP ("EAP") (March 2017). To this union, HALO brings a 28-year history as a quality, premier gold supplier to the largest aerospace and defense EOMs: Boeing Satellite Systems (BSS), Parker Hannifin, Meggitt Defense Systems, Raytheon Company, Northrup Grumman, and Boeing Defense and Security (BDS). For nearly three decades, the HALO team has strived to perfect highly reliable and proprietary manufacturing engineering methods and processes that have enabled it to tackle complex mission critical projects when other suppliers shied away.



When these unique qualities of HALO are coupled with our superior business development, proven supply chain management methodology, capital-raising capability, and established growth-vision and drive, the resulting combination is anticipated to enjoy the following benefits:

i. Esteemed access to a combined list of top aerospace, aviation and defense OEMs, including Boeing, SpaceX, AST, KLX, Parker, Raytheon, Lockheed Martin, Northrup Grumman, Meggitt
ii. Utilization of superior manufacturing and engineering services
iii. Considerable and diversified manufacturing and a quality infrastructure including multiple 5-axis and 3-axis capabilities, wire and sinker CNC EDM, horizontal and vertical milling solutions, Swiss turn, true lathe and turn/mill capabilities, Romer ARM probe and scanning inspection capabilities
iv. Combined total floor space optimized to accommodate the acquisition of new machinery and equipment
v. Strengthened standing as a reliable, modern and diversified super-supplier utilizing the combined and expanded entity's comprehensive list of clients
vi. Centralization of shared services, including accounting and legal professionals, IT and administration personnel, which will produce cost-savings and efficiencies
vii. Leveraged optimization of outstanding accounts receivables and debt restructuring

Particularly in the areas of sales and marketing, the blend of these two entities, HALO and EAG, should enhance their performance. EAG's professional business development team will share its well-structured sales and marketing strategies to leverage HALO's highly disciplined engineering, planning and technical service teams into a broader range of qualified clients. This strategy should enable HALO's annual gross revenue to exceed $4.5M resulting from this expanded client base. Furthermore, EAG's

Confidential

sophisticated supply chain network and supply chain management tools are expected to enhance HALO's capabilities to outsource and manage projects beyond its current production capacity.

The following is an unaudited overview of HALO's operating results from fiscal year 2011 to fiscal year 2014 (i.e. fiscal year ending March 31, 2015, since HALO's fiscal years ended on March 31 until 2016, when its fiscal year was changed to its calendar year).

**Unaudited Financial Statement (in thousands)**

| ACCOUNT NAME | FY2011 | FY2012 | FY2013 | FY2014 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Gross Revenue | 2,716 | 2,875 | 3,328 | 2,643 | 2,682 | 1,757 |
| COGS | 1,668 | 1,859 | 1,910 | 2,006 | 2,065 | 1,522 |
| Gross Margin $ | 1,048 | 1,017 | 1,417 | 637 | 617 | 235 |
| SG&A (Excl. D&A) | 741 | 866 | 1,052 | 802 | 846 | 208 |
| Operating Income | 307 | 151 | 366 | (165) | (229) | 27 |
| Interest Expense | 3 | 8 | 9 | 7 | 68 | 5 |
| EBT | 304 | 143 | 356 | (172) | (297) | 20 |
| Tax Expense | 1 | 4 | 1 | 5 | 0 | 1 |
| Net Income | $52 | $(105) | $281 | $(252) | $(472) | 19 |
| Depreciation | 251 | 244 | 75 | 75 | 175 | 1 |

**Manufacturing Technologies**

We have presently on-boarded four different manufacturing technologies (3/4/5 axis vertical milling, CNC mill-turn, wire EDM, and Swiss-style turn milling) to allow for a broad spectrum of production capabilities. These include a variety of machine tool centers, as described below, as well as a fully functional Quality Management System ("QMS").

To meet the operational pressures that we expect will surface as a result of the successful effects of our innovative sales and marketing efforts, we will also continue to position the Company strategically to expand our operational footprint to other industry-specific epicenters of aerospace activity. These customer hubs may include, but are not limited to, Seattle, Washington; Hamburg, Germany; Montreal, Canada; and São José dos Campos, Brazil. We expect that our focus on implementing best practices and incorporating effective and innovative human capital will serve to establish robust and repeatable systems we can successfully install during the course of our expansion, thereby working to facilitate our scalability initiatives.

We have entered into a partnership agreement with Ellison Technologies Inc. ("Ellison"), following Ellison's performance in our "Request for Proposal" process. Ellison supplies and supports all of our machine and solution requirements. We believe this partnership has ensured we are acquiring the most suitable machine tools based on our customer's requirements, as well as optimized configuration mapping of our facilities to maximize space. We, along with Ellison Technologies, are working to establish repeatable systems to accommodate expansion requirements and continue to develop our human capital bench to meet and exceed those requirements.

**Service**

Our reputation and success will be predicated upon four key characteristics: cost, quality, supply availability (lead time), and customer service.

*Cost:* Customers require competitive pricing regardless of how cherished the relationship is with their supplier. While customers will compromise on price to ensure quality, given the availability of alternative sources in the marketplace, they need not compromise for long. We expect to ensure that our

DAV000021

operations and products are as cost-effective as possible.

*Quality*: A hallmark of the aerospace industry is its stringent regulatory compliance requirements. Closely monitored by the Federal Aviation Administration ("FAA"), all participants contributing in any way, supply or otherwise, to the assemblage of an aircraft are held to the highest standards. This applies not only to product quality requirements, but also administrative requirements, such as documentation integrity. We intend to guarantee the quality of our operations and products by satisfying additional quality standards as mentioned below under "Regulatory Requirements."

*Supply Availability* (lead time): Ensuring cost effective and quality parts are delivered on time, every time should be the highest benchmark a company hopes to achieve. Lead time inflexibility can lead to failed attempts to meet end-customers' deliverable requirements, which can ultimately lead to the enforcement of delivery delay penalties. While there are certain nuances to the industry which cannot be predicted, we believe our ability to maneuver as required by the customer to meet those delivery expectations is critical.

*Customer Service*: Truly understanding the needs of the customer, specifically the cultural and operational distinctions, are pivotal to the maintenance of a healthy, sustainable, and successful business relationship. While service expectations are often devalued at risk of cost incursions, a great customer service experience remains a cherished occasion, especially in the aerospace industry where these experiences are becoming less and less the norm as a result of large company acquisitions and bureaucratic practices where customer service expectations are far from met and rarely exceeded. We intend to break the norm and provide a customer service that sets us apart from our competitors.

**Profit and Affordability Plan**

The aerospace industry is experiencing unprecedented pressures as demands to reduce the rise in manufacturing costs reach critical mass. Within this "doing more with less" mindset, discussions of affordability will center on aircraft programs and services. This becomes an attractive topic, one which we have embraced.

The demand for affordability in the U.S. Department of Defense ("DOD") alone is underscored by Secretary of Defense, Dr. Ashton Carter. In a series of memos issued in 2010 and 2011 while Dr. Ashton Carter was Under Secretary of Defense for Acquisition, Technology, and Logistics, he stressed that affordability targets are now required for a majority of government aircraft programs. Recent expansion proposals of the DOD budget will likely increase expansion and development of aerospace manufacturing to unprecedented levels with expenses anticipated for 2016 alone to exceed $180 billion. Longer-term projects are now being planned for a shift into smaller more agile force structure including both manned and unmanned projects. (Source: Fortune Magazine, February 9, 2015, author Clay Dillow.)

In other words, the requirement of affordability is expected to be the basis for driving cost management and cost-reduction efforts. Significant on-shoring is resulting due to highly increased costs from other countries such as China whose wage costs have more than doubled and whose workers produce less than 25% production per worker compared to a U.S. based operation. (Source: Puget Sound Business Journal, March 1, 2015.) Apart from simple evaluations conducted to examine opportunities for cost reduction, the expectation is that companies intending to compete for business lay out specific and executable roadmaps that can be implemented to manage and reduce costs as well as improve affordability measures. We recognize the importance of affordability management and, more importantly, know that, by building this understanding into the bedrock of our foundations, we will be able to use this proficiency as a mechanism for further growth and distinction.

The objective of this effort, if successful, is to substantially lower total program costs while sustaining profitability without cutting back on program scope or capabilities.

When executed, affordability targets can provide far more visibility of cost composition and cost drivers, components that will enable us to support more accurate decision-making models. From first-

Confidential

DAV000022

hand experience in conducting a range of affordability reviews from high level (top-down approach) to deep dives (bottom-up approach) in both the private sector and in the defense industry, our executive management team believes affordability initiatives offer several key advantages to customers and stakeholders alike in the long-term. For example, they:

  i.   Provide an understanding of both "cost to produce" and "over-specification" cost reduction opportunities;
  ii.  Deliver the cost details to support fact-based negotiations;
  iii. Set the foundation for implementable cost reductions;
  iv.  Limit future design changes (through reusable designs); and
  v.   Assess the true impact of product decisions and trade-offs.

To that end, we target significant profit margins and net earnings from our operations. We expect that the accelerated profitability will be directly tied to our ability to take advantage of the economies of scale intrinsic to the raw material and outside processing we procure along with the general cost-reduction efficiencies achieved by our operational stability initiatives. We believe our management team has seasoned expertise in the execution of key supply chain value stream optimization strategies.

We anticipate that diversification of our product lines will also play a vital role in the sustainability of our profitability objectives. As product volumes and complexity evolve, we expect to realize a weighted average increase in the blended price of our product offering.

We believe employment of this blended offering approach will allow us to capitalize on varied, commodity and non-commodity market opportunities and reinforce the resiliency and flexibility of our economic pursuits.

**Marketing Strategy**

We intend to aggressively market and brand "The Elite Difference" through tactical advertising campaigns propagated by customer-direct solicitations and endorsements. Due to the backlog of customers and emerging product demand opportunities, we anticipate postponing further direct advertising efforts, such as presence in industry-specific periodicals, until Phase 3 of our strategic growth plan, in order to avoid an unsustainable burden and an over extension of our resources and capacities.

We plan to target customers based on the product development horizon. In conjunction with the availability of internal capabilities and resources to support the targeted customer.product opportunity, we plan to pursue aggressively an engagement effort tailored specifically to that prospect and work steadfastly to secure receipt of purchase order contracts. Employing this approach, we expect to expand our exposure within the identified prospect and concurrently grow its revenue share. We will also endeavor to employ key account representatives who will be responsible for managing all aspects of an identified revenue opportunity, from initial engagement to receipt, negotiation and first deliveries. These account representatives will also be responsible for managing the strategic relationships of these accounts and will be critical to the growth and impression of the Company worldwide.

**Consulting Agreement**

Commencing on November 1, 2015, EAP entered into a 36-month agreement for services (the "Consulting Agreement") with Real Media Marketing, Inc., a Delaware corporation ("RMM"). Pursuant to the Consulting Agreement, RMM provided marketing, administrative, compliance and other services to EAP in consideration for a weekly consulting fee of $34,750 and a number of shares of EAP common stock equal to under 20% of the outstanding stock of EAP. The Consulting Agreement was terminated on December 31, 2016. On or about January 1, 2017, EAG entered into an agreement for services (the "New Agreement") with Evolution Consulting, Inc. ("ECI"), an affiliate of RMM, pursuant to which ECI agreed to provide media, marketing, administrative, and sales training consulting services (the "Services") to the Company in consideration for $39,750 per week, subject to a 2% discount with respect to weekly payments made more than one week in advance and a 3% discount with respect to weekly payments made more than

Confidential

DAV000023

one month in advance. The term of the New Agreement was from March 1, 2017 to February 28, 2019. On July 25, 2018, EAG formally terminated the New Agreement for cause due to a series of material breaches by ECI of the New Agreement. On July 27, 2018, EAG received correspondence from ECI requesting payment of the early termination fee listed in the New Agreement. Ultimately, it is our position that ECI is not entitled to any early termination fee, as all of the actions undertaken by EAG were proper given ECI's material breaches of the New Agreement.

**Competition**

We directly compete with well-established component manufacturing companies and competitive solution providers, which may be better capitalized, have more experienced management and have established name recognition associated with their services and products. We anticipate intense competition in our efforts to establish, market, and implement our business plan. Some of our competitors are larger, more diversified companies with longer operating histories, and have greater financial, marketing, production, and research and development resources. As a result, they may be better able to withstand the effects of periodic economic downturns. Our operations and financial performance will be negatively impacted if our competitors:

    i.   Develop superior products;
    ii.  Develop products that are more competitively priced;
    iii. Develop methods of more efficiently and effectively providing products and services; or
    iv.  Adapt more quickly to new technologies or evolving customer requirements.

We believe that the principal points of competition in our markets will be product quality, price, design and engineering capabilities, product development, conformity to customer specifications, quality of support after the sale, timeliness of delivery, and effectiveness of the distribution organization. Maintaining and improving our competitive position will require continued investment in manufacturing, engineering, quality standards, marketing, customer service and support, and of our distribution networks. If we do not maintain sufficient resources to make these investments or are not successful in maintaining our competitive position, our operations and financial performance will suffer.

HALO has a multitude of competitors, some significantly larger than HALO and some considerably smaller. Nevertheless, we believe that it is possible for HALO to prevail in this competitive landscape because of its unique characteristics. HALO is in a particular niche market where it creates complex aviation and aeronautical parts with exotic and expensive materials. This is a specialty that other smaller companies cannot or do not wish to offer and, normally, a market segment where medium and big players prevail. In spite of its ability to produce parts routinely manufactured by a bigger player, HALO works and performs as a small company would: offering short lead times, rendering quotes within 2-3 days, or the same day, if required, and employing a sophisticated MRP software system to track the production process and costs. Another factor that lends a competitive edge to HALO's position is its relatively low overhead costs, which allow it, even when manufacturing complex parts, to be extremely competitive in terms of pricing. Another coveted attribute enabling HALO to be highly competitive is that HALO has Boeing DPD – MBD approval, a status that is generally not available to companies as small as Halo. Among the local California companies that more directly compete with HALO are TJ Aerospace, Inc. in Garden Grove, Technical Arts, Inc. in Placentia, Aero Chip, Inc. in Santa Fe Springs, and Johnson Manufacturing, Inc. in Huntington Beach.

**Government Regulation**

A hallmark of the aerospace industry is its preventive regulatory compliance measures. Closely monitored by the FAA, all participants contributing in any way, supply or otherwise, to the assemblage of an aircraft are held to the highest standards. This applies not only to product quality requirements, but also administrative requirements (e.g., documentation integrity, etc.). We have received AS9100 Rev. D and ISO9001 certifications which enable us to supply directly to customers in line with our growth trajectories. The Elite Aerospace Group is also an ITAR (International Traffic in Arms Regulations) registered company which allows the Company to participate in Department of Defense (DoD) statements of work.

DAV000024

During the forthcoming period, we will endeavor to maintain these distinctions. This is consistent with our business growth and regulatory compliance strategies.

### Employees

As of August 31, 2018, we had 118 full-time employees and no part-time employees, of which 92 work in product manufacturing and design, 11 work in investor relations, and 15 work in management and administration roles. These employees have been hired for the purposes of achieving our day-to-day operational demands, including satisfying sales and expansion goals, operational sustainability and growth goals of the Company.

### Liquidity and Capital Resources

We are not engaged in any other financing arrangements as of the date of this Memorandum outside of equipment leases. EAP has to-date funded its capital requirements through the contributions of its founders and through private placements of notes, common stock, and preferred stock. We believe that the continuing efforts of raising working capital through this and future offerings will provide the necessary liquidity to maintain our day-to-day operations until operations generate sufficient cash flow to fund our ongoing capital needs. Further explanation and example of EAG's liquidity and capital resource sources and uses and be observed on the attached Exhibit A.

### Property

We currently lease approximately 17,000 square feet of office space at 1641-1645 Reynolds Avenue, Irvine, California 92614, at a cost of approximately $16,000 per month. Our lease is a ten-year lease which commenced on May 21, 2014. We also recently expanded our manufacturing footprint by leasing an additional commercial space, approximately 34,000 square feet at 15773 Gateway Circle, Tustin, California 92780 at a cost of $32,118 per month pursuant to a seven-year lease which commenced on September 3, 2015, as well as an approximately 15,000 square foot facility occupied by our recently acquired HALO subsidiary which is located at 15422 Assembly Lane, Huntington Beach, California 92649. This lease is a short-term lease of 2 years commencing in May 2017. This lease term was held short to allow us the flexibility to relocate and to expand production in the future. Further, as a result of our engineering service expansion efforts into the Pacific Northwest, we also lease office space in the state of Washington at 22232 17th Ave SE, Bothell, Washington, at a cost of approximately $5,390.96 per month pursuant to a three-year lease which commenced on January 8, 2016. We also have a leased facility in Montana located at 1045 Reeve Road, Unit C, Bozeman, Montana 59715, encompassing approximately 1,100 square feet to house the recently acquired Montana Design & Engineering, Inc., an adjunct to our Elite Engineering Services division, pursuant to a month to month lease at a cost of approximately $1,235.00 per month.

### Seasonality

This industry and our operations are generally not affected by seasonality. They are driven by the increasing demands in the aerospace marketplace for qualified supply chain manufacturers and high-precision engineering capabilities.

### Formal Order of Investigation by the SEC

In May 2017, EAG received a subpoena from the United States Securities and Exchange Commission for documents pursuant to a Formal Order of Investigation. The SEC seeks, among other things, certain information related to EAG's consultant, Evolution Consulting, Inc., its principals and related entities, as well as information regarding EAG's structure, contracts, financial information, and investor materials. Certain of EAG's employees have also received subpoenas. EAG is cooperating fully with the investigation, but cannot predict its outcome or timing of the conclusion of the investigation.

DAV000025

# RISK FACTORS

An investment in the Offering is speculative and involves a high degree of risk. Only those persons economically able to lose their entire investment should purchase these securities. Prospective investors, prior to making an investment decision, should (i) consult his or her own attorney, business advisor and tax advisor as to legal, business, tax and related matters associated with this offering, and (ii) carefully consider, along with other matters referred to herein, the following risk factors, which may not be an exhaustive list of potential risk factors:

## Cautionary Statements

The discussions and information in this Memorandum may contain both historical and forward-looking statements. We desire to take advantage of the "Safe-Harbor" provisions of the Private Securities Litigation Reform Act of 1995 and we are including this statement for the express purpose of availing ourselves of the protections of such safe harbor with respect to all of such forward-looking statements. Examples of forward-looking statements include, but are not limited to (i) projections of revenues, income or loss, earnings or loss per share, capital expenditures, growth prospects, dividends, capital structure and other financial items, (ii) statements of plans and objectives of ours or our management or Board of Directors, including the introduction of new services, estimates or predictions of actions by customers, suppliers, competitors or regulating authorities, (iii) statements of future economic performance and (iv) statements of assumptions underlying other statements and statements about us or our business. To the extent that the Memorandum contains forward-looking statements regarding the financial condition, operating results, business prospects, or any other aspect of our business, please be advised that our actual financial condition, operating results, and business performance may differ materially from that projected or estimated by us in forward-looking statements. We have attempted to identify, in context, certain of the factors we currently believe may cause actual future experience and results to differ from our current expectations. The differences may be caused by a variety of factors, including but not limited to adverse economic conditions, lack of market acceptance of our products, losses from theft, intense competition, including entry of new competitors, falling demand for our products, adverse federal, state, and local government regulation, contraction of the market for aerospace and aviation products, unexpected costs and operating deficits, lower sales and revenues than forecast, default on leases or other indebtedness, persistent operating deficits, loss of suppliers, loss of supply, distribution, and service contracts, price increases for capital, supplies and materials, inadequate capital, inability to raise financing, failure to obtain customers, loss of customers and failure to obtain new customers, failure to earn profits, the risk of litigation and administrative proceedings involving us or our employees, loss of government licenses and permits, higher than anticipated labor costs, the possible acquisition of new businesses or products that result in operating losses or that do not perform as anticipated, resulting in unanticipated losses, the possible fluctuation and volatility of our operating results and financial condition, adverse publicity and news coverage, inability to carry out marketing and sales plans, loss of key executives, changes in interest rates, inflationary factors, dilution in the investors' ownership of the Company, and other specific risks that may be alluded to in this Memorandum or in other reports issued us or third party publishers. Therefore, we wish to caution each reader of the Memorandum to carefully consider specific factors, including competition for products, services and technology; such factors in some cases have affected; and in the future (together with other factors) could affect, our ability to achieve our projected results and may cause actual results to differ materially from those expressed herein.

## Risks Relating to Business

***We are a growth stage company, which makes it difficult to accurately evaluate our business prospects.*** We are in the growth stage, and our current and proposed operations are subject to all of the risks inherent in the establishment of a new business enterprise. We have incurred and will continue to incur significant start-up expenses relating to the development of our business plan as well as salaries, lease, equipment and materials acquisitions, and other overhead expenses. Since inception, we have incurred operating losses. Our financial viability is dependent upon raising funds pursuant to this offering and successfully implementing our business plan. The likelihood of our success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in

DAV000026

connection with starting and expanding a business and the relatively competitive environment in which we operate. Unanticipated delays, expenses and other problems are frequently encountered in establishing a new business. Because of our limited operating history, we have limited historical financial data on which to base planned long-term operating expenses. Accordingly, our expense levels, which are fixed to a large extent, will be based in part on our expectation of future revenues. As a result of the fixed nature of many of our expenses, we may be unable to adjust spending in a timely manner to compensate for any unexpected delays in the development of our business plan or any subsequent revenue shortfall. Any such delays or shortfalls will have an immediate material adverse impact on our business, operating results and financial condition.

***Our financial statements are not audited.*** EAG previously engaged the firm of Bartlett Pringle and Wolf (BPW), certified public accountants, to perform an independent audit of our financial statements beginning in the calendar (fiscal) year 2014. The audit for 2014 has been completed. BPW has provided a quote for conducting a financial audit of EAG's and EAP's financial statements for the years ended December 31, 2015, December 31, 2016, and December 31, 2017. Currently, the Company's financial statements are prepared by management and are not audited. In light of the current status of the financial audit process, no representations or assurances can be given as to our historical financial results. The limited information provided to investors may not completely or accurately represent the financial condition of the Company and its subsidiaries. Furthermore, as we are not subject to Securities and Exchange Commission ("SEC") reporting requirements, we are not required to provide you with annual audited financial statements or quarterly unaudited financial statements. The financial statements of the Company included in this Memorandum are not audited by BPW or any other independent certified public accounting firm. EAG has since disengaged with BPW and has retained the services of MJF & Associates to perform audits for 2015, 2016, and 2017 EAG financials.

***We face risks inherent in the acquisition of other businesses.*** We recently acquired 100% of HALO, an unaffiliated aerospace manufacturer with facilities in Tustin, California. We are also closing the acquisition of another smaller unaffiliated business in the industry in August 2017. Inherent in the process of such an acquisition is integrating the new business with the existing businesses of the Company. There is no assurance that we will be successful in integrating HALO or any other acquisitions with our other businesses, that HALO or other newly acquired businesses will be profitable, or that they will create the synergies and benefits for the Company's enterprise that we expect.

***We may not be able to successfully manage our growth.*** Our plan of operations currently calls for the rapid expansion of marketing our product solutions and service capabilities. Our ability to successfully expand our services will depend on a number of factors, including, but not limited to: our ability to contract with and effectively manage our relationships with suppliers, affiliated partners, advertisers and other providers; the hiring and training of sufficiently skilled management and technical personnel; and other factors, such as general economic and demographic conditions, many of which are beyond our control. Such expansion is expected to place significant strains on our financial, management and operational resources. We cannot assure that we will be successful in managing any expansion, and the failure to do so could adversely affect our business, operating results and financial condition.

***The aerospace industry in which we operate is subject to cyclical markets.*** In the aerospace segment, demand for our products is dependent upon several factors, including, but not limited to, capital investment, product innovations, economic growth and wealth creation, defense spending, and technology upgrades. In addition, the commercial airline industry is highly cyclical and sensitive to fuel price increases, labor disputes, global economic conditions, availability of capital to fund new aircraft purchases and upgrades of existing aircraft, and passenger demand. A change in any of these factors could result in a reduction in the amount of air travel and the ability of airlines to invest in new aircraft or to upgrade existing aircraft. These factors could reduce orders for new aircraft and would likely reduce spending by airlines for cabin upgrades for which we supply products, thus reducing our sales and profits. A reduction in air travel may also result in our commercial airline customers being unable to pay our invoices on a timely basis or not at all.

***Terrorism and war could lead to decreased demand for our products.*** Continued terror attacks,

DAV000027

war or other disturbances could lead to further economic instability and decreases in demand for our products, which could negatively impact our business, financial condition and results of operations. Terrorist attacks world-wide have caused instability from time to time in global financial markets and the aerospace industry. The long-term effects of terrorist attacks on us are unknown. These attacks and the U.S. Government's continued efforts against terrorist organizations may lead to additional armed hostilities or to further acts of terrorism and civil disturbance in the United States or elsewhere, which may further contribute to economic instability.

*Our ability to protect our intellectual property is uncertain*. We rely on trade secrets, trademarks, patents, and proprietary knowledge and technology, both internally-developed and acquired, and will continue to do so in order to maintain a competitive advantage. Our inability to defend against the unauthorized use of these rights and assets could have an adverse effect on our operations and financial condition. Litigation may be necessary to protect intellectual property rights or defend against claims of infringement. This litigation could result in significant costs and divert management's focus away from operations.

*Our business may suffer due to our reliance on subcontractors*. Many of our contracts will involve subcontracts with other companies upon which we rely to perform a portion of the services we must provide to our customers. There is a risk that we may have disputes with our subcontractors, including, but not limited to, those regarding the quality and timeliness of work performed by the subcontractor, or customer concerns about the subcontractor. Failure by subcontractors to satisfactorily provide on a timely basis the agreed-upon supplies or perform the agreed-upon services may materially and adversely impact our ability to perform our obligations with our customers. Subcontractor performance deficiencies could result in customers terminating a contract for default. A default termination could expose us to liability and substantially impair our ability to compete for future contracts and orders. In addition, a delay our ability to obtain components and equipment parts from our suppliers may affect our ability to meet our customers' needs and may have an adverse effect upon our profitability.

*We may incur late delivery penalties*. Failure to deliver in a timely manner due to supplier problems, development schedule delays, manufacturing difficulties, or similar schedule related events could have a material adverse effect on our business.

*Our business will be adversely affected if our products are defective or otherwise do not perform as expected*. Defects in the design and manufacture of our products may necessitate a product recall. We include complex system design and components in our products that could contain errors or defects, or may require revisions, particularly when we incorporate new technology into our products or when direction from our customers changes based on the customers' varying production needs. If any of our products are defective, we could be required to redesign or recall those products or pay substantial damages or warranty claims. Such an event could result in significant expenses, disrupt sales and affect our reputation and that of our products.

*Our inability to adapt to technological changes could adversely affect our business*. The technologies related to our products may undergo significant change. To succeed, we will need to continue to design, develop, manufacture, assemble, test, market and support new products and enhancements on a timely and cost-effective basis. Our competitors may develop technologies and products that are more effective than those we develop or that render our technology and products obsolete or uncompetitive. Furthermore, our products could become unmarketable if new industry standards emerge. We may have to modify our products significantly in the future to remain competitive, and new products introduced may not be accepted by our customers.

*There is no assurance that any of our research and development activities will result in any new products*. We may experience difficulties that could delay or prevent the successful development of new products or product enhancements, and new products or product enhancements may not be accepted by our customers. In addition, the development expenses we incur may exceed our cost estimates, and new products we develop may not generate sales sufficient to offset its costs. If any of these events occur, our sales and profits could be adversely affected.

Confidential

*Financial projections included with this Memorandum may prove to be inaccurate*. Financial projections concerning our estimated operating results may be included with the Memorandum. Any projections would be based on certain assumptions which could prove to be inaccurate and which would be subject to future conditions, which may be beyond our control, such as general industry conditions. We may experience unanticipated costs, or anticipated revenues may not materialize, resulting in lower operating results than forecasted. We cannot assure that the results illustrated in any financial projections will in fact be realized by us. Any financial projections would be prepared by our management and would not be examined or compiled by independent certified public accountants. Counsel to us has had no participation in the preparation or review of any financial projections prepared by us. Accordingly, neither the independent certified public accountants nor our counsel would be able to provide any level of assurance on them. We cannot assure that we will earn net profits. We cannot assure that we will be able to raise capital in this placement of Series A-1 Preferred Stock, or that we will have sufficient capital to fund our business operations. We cannot assure that we could obtain additional financing or capital from any source, or that such financing or capital would be available to us on terms acceptable to us.

*We may not be able to successfully compete against companies with substantially greater resources*. We directly compete with well-established component manufacturing companies and competitive solution providers, which may be better capitalized, have more experienced management and have established name recognition associated with their services and products. We anticipate intense competition in our efforts to establish, market, and implement our business plan. Some of our competitors are larger, more diversified companies with longer operating histories, and have greater financial, marketing, production, and research and development resources. As a result, they may be better able to withstand the effects of periodic economic downturns. Our operations and financial performance will be negatively impacted if its competitors:

    i.   Develop superior products;
    ii.  Develop products that are more competitively priced;
    iii. Develop methods of more efficiently and effectively providing products and services; or
    iv. Adapt more quickly to new technologies or evolving customer requirements.

We believe that the principal points of competition in our markets will be product quality, price, design, and engineering capabilities, product development, conformity to customer specifications, quality of support after the sale, timeliness of delivery and effectiveness of the distribution organization. Maintaining and improving our competitive position will require continued investment in manufacturing, engineering, quality standards, marketing, customer service and support and of our distribution networks. If we do not maintain sufficient resources to make these investments or are not successful in maintaining our competitive position, our operations and financial performance will suffer.

*Our business is subject to various government regulations*. We are subject to various federal, state and local laws affecting aerospace products. The Federal Trade Commission, the Federal Aviation Administration ("FAA"), and equivalent state agencies regulate manufacturing, advertising and representations made by businesses in the sale of products, which apply to us. The FAA strictly enforces quality control and safety regulations applicable to aviation and aerospace manufacturing. We may be required to obtain permits from various states in order to ship certain of our products to those states. We are also subject to government laws and regulations governing health, safety, working conditions, employee relations, wrongful termination, wages, taxes and other matters applicable to businesses in general.

*We cannot assure that we will earn a profit or that our products will be accepted by the aviation and aerospace industry*. Our business is speculative and dependent upon acceptance of our products by the aviation and aerospace industry. Our operating performance will be heavily dependent on whether or not we are able to earn a profit on the sale of our products. We cannot assure that we will be successful or earn any revenue or profit, or that investors will not lose their entire investment.

*Management has broad discretion with respect to the application of proceeds*. Management

Confidential

DAV000029

intends to utilize a substantial portion of the net proceeds of this offering for the purposes set forth in "USE OF PROCEEDS." Even though the proposed Use of Proceeds have been designated for general corporate and working capital purposes, such proposed use are estimates only and proceeds of the offering may be expended at management's sole discretion. In light of ECI's termination, Management may allocate capital to the response, defense, and/or prosecution of claims associated with the New Agreement, pursuit of which should not have any material impact on EAG's financial or operational condition. Furthermore, we have broad discretion with respect to redirecting the application and allocation of the net proceeds of the offering to acquisitions or other uses, in light of changing circumstances. As a result of the foregoing, any return on investment to investors will be substantially dependent upon the discretion and judgment of our management team with respect to the application and allocation of the net proceeds of the offering. Pending our use of the proceeds described above, the net proceeds of the offering may be invested by us in short-term securities or money market funds. We do not require that any specific minimum investment criteria be used in selecting such short-term investments, but will select such investments as we deem appropriate, taking into consideration such factors as liquidity, return on and safety of the investment. See "USE OF PROCEEDS."

*We may not have adequate capital to fund our business.* We will have limited capital available to us, to the extent that we raise capital from this offering. If our entire original capital is fully expended and additional costs cannot be funded from borrowings or capital from other sources, then our financial condition, results of operations, and business performance would be materially adversely affected. It is also uncertain when revenues from operations will be sufficient to meet our overhead and general operating requirements. We may require additional funds to finance our operations. Should funds from revenues be delayed, the funds raised from this offering may be insufficient to satisfy further operating needs. In the event borrowing is required, we may be highly leveraged and subject to all the risks of any such borrowing. We cannot assure that any required financing will be available on acceptable terms.

*We may incur uninsured losses.* Although we maintain modest theft, casualty, liability, and property insurance coverage, along with workmen's compensation and related insurance, we cannot assure that we will not incur uninsured liabilities and losses as a result of the conduct of our business. In particular, we may incur liability if one of our products is deemed to have caused a personal injury. Should uninsured losses occur, the holders of our Series A Preferred Stock could lose their invested capital.

*We will be subject to potential litigation.* We may become a party to litigation in the ordinary course of our business, including, but not limited to, matters alleging product liability, warranty claims, breach of commercial or government contract or other legal actions relating to our business and management operations. In general, litigation claims can be expensive, resource-intensive, and time-consuming to bring or defend against, and could result in settlements or damages that could significantly impact our operations and financial condition.

*Litigation.* A current shareholder of EAG filed a lawsuit against the Elite Aerospace Group, Inc., Mr. Zia, Mr. Tillman, and Mr. Forbes, seeking a declaratory judgement, permanent injunction, appointment of a receiver, and damages. The Company intends to defend itself vigorously and is seeking a dismissal of the case in its entirety. Notwithstanding the foregoing, should the Company lose the case and the Plaintiff receive a judgement or order in its favor against the Company for the full amount of damages, the Company would be materially and adversely impacted. [*Kauffman Investments LLC v. Elite Aerospace Group, Inc., 8:18-CV-01801*]

Additionally, EAG's previous in-house general counsel filed a demand for mediation against Elite Aerospace Group Inc., seeking breach of contract damages. [*CM 25007.00037*]

Finally, Aerospace Designs, Inc., filed a lawsuit against Elite Aerospace Group, Inc., seeking money damages in relation to EAG's alleged breach of contract, breach of covenant of good faith and fair dealing, and intentional misrepresentation. [*Robert Pecanic Jr., v. Elite Aerospace Group, Inc., 30-2018-01009426-CU-BC-CJC*]

*We cannot assure that we will have the resources to repay all of our liabilities in the future.* We

Confidential

DAV000030

have liabilities and may in the future have other liabilities to affiliated or unaffiliated lenders. These liabilities represent fixed costs, which are required to be paid regardless of the level of business or profitability experienced by us. We cannot assure that we will not incur debt in the future, that we will have sufficient funds to repay our indebtedness or that we will not default on our debt, jeopardizing our business viability. Furthermore, we may not be able to borrow or raise additional capital in the future to meet our needs or to otherwise provide the capital necessary to conduct our business. We may utilize purchase order financing from third party lenders when we are supplying or distributing goods, which would increase our costs and the risks that we may incur a default, which would harm our business reputation and financial condition. We cannot assure that we will be able to pay all of our liabilities, or that we will not experience a default on our indebtedness.

*We may incur cost overruns in the development, production and distribution of our various products.* We may incur substantial cost overruns in the development, production and distribution of our products. Management is not obligated to contribute capital to us. Unanticipated costs may force us to obtain additional capital or financing from other sources or may cause us to lose our entire investment in us if we are unable to obtain the additional funds necessary to implement our business plan. We cannot assure that we will be able to obtain sufficient capital to successfully continue to implement our business plan. If a greater investment is required in the business because of cost overruns, the probability of earning a profit or a return of the shareholders' investment in us is diminished.

*If we are unable to pay for material and services timely, we could be subject to liens.* If we fail to pay for materials and services for our business on a timely basis, our assets could be subject to material men's and workmen's liens. We may also be subject to bank liens in the event that we default on loans from banks, if any.

*Directors and officers have limited liability.* Our bylaws provide that we will indemnify and hold harmless our officers and directors against claims arising from our activities, to the maximum extent permitted by Delaware law. If we were called upon to perform under our indemnification agreement, then the portion of our assets expended for such purpose would reduce the amount otherwise available for our business.

*If we were to lose the services of our key personnel, we may not be able to execute our business strategy.* We are dependent on our present officers, subject to the direction of our Board of Directors. Should one or more of the officers cease to be employed by us before acceptable replacements are found, there could be a material adverse effect on our business and prospects and no assurance is given that suitable replacements could be hired, if at all, without substantial cost to us. Loss of key personnel could therefore significantly impair the value of the Series A-1 Preferred Stock. See "MANAGEMENT." In addition, competition for qualified technical personnel in the aerospace industry is intense, and we believe that our future growth and success will depend on our ability to attract, train and retain such personnel.

*If we are unable to hire, retain or motivate qualified personnel, consultants, independent contractors, and advisors, we may not be able to grow effectively.* Our performance will be largely dependent on the talents and efforts of highly skilled individuals. Our future success depends on our continuing ability to identify, hire, develop, motivate and retain highly qualified personnel for all areas of our organization. Competition for such qualified employees is intense. If we do not succeed in attracting excellent personnel or in retaining or motivating them, we may be unable to grow effectively. In addition, our future success will depend in large part on our ability to retain key consultants and advisors. We cannot assure that any skilled individuals will agree to become an employee, consultant, or independent contractor of EAG. Our inability to retain their services could negatively impact our business and our ability to execute our business strategy.

*The consideration being paid to our management is not based on arm's length negotiation.* The common stock and cash consideration paid or being paid by us to our management have not been determined based on arm's length negotiation. While management believes that the consideration is fair for the work being performed, we cannot assure that the consideration to management reflects the true market value of its services.

Confidential

*We presently have only one independent director.* Currently, the members of our board of directors are Dustin Tillman, Zeeshawn Zia, Michael Forbes. Only Mr. Forbes is considered to be an "independent director," as defined under Financial Industry Regulatory Authority, Inc. ("FINRA") listing standards and Nasdaq Marketplace Rules. Currently we do not have any committees of the board of directors. We plan to form audit and compensation committees in the future, but may need to add one or two independent directors with financial acumen before we can form those committees.

*Our bylaws may be amended by our board and our articles and bylaws may be amended by a majority vote of our shareholders.* Under the Delaware Corporations Law, a corporation's articles of incorporation may be amended by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote, and a majority of the outstanding shares of each class entitled to vote as a class, unless the certificate requires the vote of a larger percentage of shares. Our Articles of Incorporation, as amended, do not require the vote of a larger percentage of shares. As permitted under the Delaware Corporations Law, our bylaws give our board of directors the power to adopt, amend, or repeal our bylaws. Our shareholders entitled to vote have concurrent power to adopt, amend, or repeal our bylaws.

*We may incur liability as a result of the ongoing SEC investigation.* In May 2017, EAG received a subpoena from the United States Securities and Exchange Commission for documents pursuant to a Formal Order of Investigation. The SEC seeks, among other things, certain information related to EAG's consultant, Evolution Consulting, Inc., its principals and related entities, as well as information regarding EAG's structure, contracts, financial information, and investor materials. Certain of EAG's employees have also received subpoenas. EAG is cooperating fully with the investigation but cannot predict its outcome or timing of the conclusion of the investigation. We cannot assure that EAG will not be subject to liability, including financial penalties related to this investigation.

**Risks Related to the Offering**

*Failure to Raise Sufficient Capital in Offering.* The Offering is not underwritten. The Notes are offered on a "best efforts" basis by the Company through its officers and directors. The Company has not set a minimum offering amount as described herein. All proceeds from the sale of Notes will be deposited into the Company's operating account and will be available for use by the Company at its discretion. Notes may also be sold by FINRA member brokers or dealers who will receive a commission. The Company reserves the right to pay expenses related to this Offering from the proceeds of the Offering. There can be no assurance that the Offering will be successful and raise sufficient capital to meet the Company's expense demand.

*Continued Investment May Be Required.* The Company intends to continue to improve in its manufacturing facilities and operations, and invest in raw materials, inventory, equipment, technology and other capital needs in order to make its facilities and other related businesses successful. Changes in market environment, technology, demand, regulations and others or sales growth beyond currently established production capabilities may require further investment. However, there can be no assurances that the Company will generate sufficient funds from operations to finance any required investment or that other sources of funding shall be available.

*If the Company Raises Less than the Maximum Amount of this Offering, the Company May Not Be Able Reach Profitability.* The Company currently has outstanding obligations totaling $4.93 million and working capital needs of $1.2 million/month. If less than the full Offering is subscribed for, there is no assurance that the Company will be able to meet its current expenses and anticipated working capital needs.

*No Public Trading Market Exists for Notes.* There is currently no established public trading market for Notes in the Company and an active trading market will not develop despite this Offering. Therefore, equity in the Company may not be traded on an established securities market or readily traded on a secondary market or the substantial equivalent thereof. The Company, therefore, will not apply for listing of the Notes or its equity units on any stock exchange. As a result, Notes are not readily available

DAV000032

for sale. Offerees must be prepared to hold the Notes for an indefinite period of time.

*Limited Liquidity of the Notes.* Because of the Company being private, and with potential restrictions on transferability of Notes, and the fact that no trading market exists or is expected to develop for the Notes, holders of the Notes are not likely to be able to liquidate their investments or pledge the Notes as security on a loan in the event of an emergency. Thus, the Notes should be considered only as a long-term investment. There can be no assurances that the Company will be able to affect a public registration of its Notes or any equity of the Company, as its present level of business does not merit public ownership.

*The Offering Was Determined by Capital Needs and Does Not Reflect Intrinsic Value.* The amount of the Offering was primarily based on the projected capital needs of the Company. There is no relationship to any established criteria of value such as book value or earnings per unit. No outside party has been requested to value the Company as a whole or its prospects for success. The conversion price was based on price per Class Preferred A-1 Share sold previously.

*The Notes Are Subject to Securities Laws.* The Notes are being offered pursuant to exemptions from the registration requirements of the Securities Act of 1933 (the "Act") and must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available and state securities laws are complied with. The Company is under no obligation to register the Notes or the shares into which the Notes are converted under the Act or any state securities laws.

*Dilution of the Shares into Which the Notes Are Convertible.* If, for any reason, the Company is required in the future to raise additional equity capital and if such equity capital is raised at a lesser implied enterprise value, investors in this Offering may suffer some dilution of their shares should such investor have previously converted into Class B Shares, notwithstanding their broad based anti-dilution protection. There is no assurance that Class B Shares, or any other shares into which the Notes are converted, will not be diluted in the future.

*Absence of Merit Review.* Investors are cautioned that these Securities have not been registered under the Securities Act and any state review by the securities administrators in some states in which interests may be offered and sold is limited to the form and compliance with certain disclosure requirements. No state authority has reviewed the accuracy or adequacy of the information contained herein nor has any regulatory authority made a merit review of the pricing of this Offering, the percentage of securities offered to investors, or the compensation paid to Managers or other corporations under their control, and any dilutive factors there from. Therefore, investors must recognize that they do not have all the protections afforded by securities laws to register or qualify offerings in states with merit reviews and must therefore judge for themselves the adequacies of the disclosures.

*Our principal shareholders own voting control of EAG.* Our current officers, directors, founders, and principal shareholders currently own a total of 192,200,000 shares of our common stock or approximately 41.2% of the total issued and outstanding capital stock of the Company, as of August 31, 2018. Our current officers, directors, founders, and principal shareholders will own approximately 192,200,000 shares of our common stock or approximately 41.2% of the outstanding votes assuming that 12,500,000 shares of Series A-1 Preferred Stock are issued in this offering, and approximately 40.2% of the outstanding votes assuming that all shares of Series A-1 Preferred Stock are converted into common stock (the Series A-1 Preferred Stock does not have voting rights but is convertible into voting common stock). These shareholders are able to exercise significant control over all matters requiring shareholder approval, including the election of directors and approval of significant corporate transactions. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. This concentration of ownership may not be in the best interests of all of our shareholders.

*Our failure to maintain effective internal controls over financial reporting could have an adverse impact on us.* We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established,

Confidential

could adversely impact our public disclosures regarding our business, financial condition or results of operations. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting, disclosure of management's assessment of our internal controls over financial reporting or disclosure of our public accounting firm's attestation to or report on management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

DAV000034

## MANAGEMENT TEAM

### Executive Management and Directors of EAG

The table below sets forth our directors and executive management as of the date of this Memorandum.

| Name | Age | Position |
| --- | --- | --- |
| Dustin Tillman | 35 | Chairman of the Board, Chief Executive Officer, Founder, and Secretary |
| Zeeshawn Zia | 39 | President, Director, and Founder |
| Mark Babich | 60 | Chief Financial Officer |
| Lee Smith | 44 | Chief Operating Officer of EAG, and President of EES |
| Bobby Sawhney | 40 | Vice-President of Investor Relations |
| Michael Forbes | 61 | Director |

*Dustin Tillman* has been our chairman of the board, chief executive officer, and secretary of EAG since its inception in May 2016, and the president from inception in May 2016 until December 31, 2017. He was re-elected as chairman of the board of EAG by the shareholders of EAG at their annual meeting on December 27, 2017. He has been the chairman of the board, chief executive officer, president, and secretary of EAP since its inception in October 2013, chairman and president of ELI since its inception in May 2015, the chairman and secretary of E360T since its inception in March 2015, and the chairman of EES since its inception in March 2015. Mr. Tillman is the creator of the Elite brand and architect and founder of the business. He is fueled with an entrepreneurial spirit and the desire to make a positive impact in any environment with which he is connected. Mr. Tillman graduated from the University of California, Los Angeles, in 2006, where he received his Bachelor of Arts degrees in economics and political science. In 2007, Mr. Tillman joined Lipscomb Chemical Company where he quickly entered the challenging field of supply chain management ultimately leveraging this experience to attain a role as director of supply chain management in 2008 to 2011 for Zodiac Aerospace, a multibillion-dollar aerospace manufacturing company with global exposure and responsibilities. From 2010 to 2011, Mr. Tillman also worked for Ducommun Aerostructures as the company's supply chain manager. From 2011 until EAP's inception, he worked for Panasonic Avionics Corporation where he was the business seating manager.

*Zeeshawn Zia* has been a director and President of EAG since its inception in May 2016, and the chief operating officer of EAG from May 2016 until December 31, 2017. He was re-elected as a director of EAG by the shareholders of EAG at their annual meeting on December 27, 2017. Mr. Zia has been a director, and chief operating officer of EAP since its inception in October 2013, a director, chief executive officer, chief financial officer, and secretary of ELI since its inception in May 2015, a director, chief executive officer, and chief financial officer of E360T since its inception in March 2015, and a director, chief executive officer, and chief financial officer of EES since its inception in March 2015. A flagship partner and co-founder of the Company, Mr. Zia brings 15 years of experience across multiple disciplines within the commercial aerospace and defense sectors. Mr. Zia graduated from the California State University, Fullerton, in 2001 where he earned his Bachelor of Arts degree in business administration. From 2001 to 2007, Mr. Zia worked for The Boeing Company where he was a supply chain manager. From 2007 to 2011, he worked for Northrop Grumman where he served as the lead for subcontracts or performance and execution and the principal international supplier program manager. From 2011 to 2012, Mr. Zia worked for Ducommun Aerostructures where he was the senior supplier development manager. From 2012 until EAP's inception, he worked for Zodiac Aerospace where he was the director of global supply chain.

DAV000035

**Mark Babich** joins EAG following a career spanning more than 35 years in the securities, finance, regulatory, and tax industries. Mr. Babich began his career with Schultz, Chez, and Jesser, one of Chicago's premier accounting and financial management firms where he represented many of the City's most prominent trading firms, regulatory practices, and money managers. In 1996, Mr. Babich was elected to the position of Chief Financial Officer of BOTTA Trading, a proprietary trading firm at the Chicago Board Options Exchange. During his tenure at BOTTA, Mr. Babich was integral in the companies membership expansion to the American Stock Exchange, Pacific Stock Exchange and the Philadelphia Stock Exchange. Moreover, through affiliated entities, Mr. Babich's position – which was expanded to include all legal, accounting, and regulatory matters – spearheaded BOTTA's expansion to Amsterdam, Frankfurt, and London. In August of 2010, Mr. Babich was brought on as Chief Financial Officer of WSP Commodity Trading, one of CME's largest 100 trading enterprises. While at WSP, Mr. Babich was charged with leading the firms legal, accounting, and regulatory compliance departments, that included leading the company's organizational, structural, and membership matters. Mr. Babich also served as Chief Financial Officer at AlphaGen Securities, a tenured member of the Chicago Board Options Exchange, where he, again, lead the company's legal, accounting, and regulatory back office that included management and compliance related to the firms investments in multiple proprietary trading firms for which AlphaGen bared all back office responsibilities. Among the many cap-stones illuminated throughout Mr. Babich's career, one that may rise above the rest is his election by the Chicago Board Options Exchange to be principally responsible for the drafting the Exchange's new financial reporting rules with respect to its newly organized Designated Primary Market Maker operations.

**Lee Smith** has been the president of EES since August 2016 and was an executive officer of EES from May 2015 to July 2016. Mr. Smith has also been the chief operating officer of EAG since January 1, 2018. Mr. Smith brings 24 years of experience in manufacturing and engineering disciplines within the commercial aerospace and defense manufacturing sectors. Mr. Smith graduated from Edmonds College in Washington in 1991, where he studied administration in addition to various industry-related certification courses relating to design for manufacture and technical operations. From 1991 to 2011, Mr. Smith worked for C&D Zodiac (formally C&D Aerospace and Northwest Composites) in various operational management roles in which he was responsible for providing strategic operational direction and overseeing and managing engineering technical service teams and initiatives. From 2011 to 2013, he worked for C&D Zodiac as the Zodiac seat technical integration manager. From 2013, until joining EES in May 2015 as its vice-president, Mr. Smith worked for Zodiac Seats US, a division of Zodiac Aerospace, where he was responsible for directing engineering integration efforts for the Zodiac Seat segment companies, as well as directing various Zodiac Group engineering systems and service initiatives across the enterprise.

**Bobby Sawhney** has been a shareholder since early 2015 and subsequently came on board as a part of the Elite Aviation Products (EAP) family to support the growth of our manufacturing business. Mr. Sawhney served initially as a Customer Solutions Manager in the Operations Team starting in August 2015. During this time, he focused on developing and maintaining a customer-centric culture and a strong spirit of partnership with our customers. In short order, he moved into supporting areas including Estimating & Quoting for machined components and managing overall areas of Product Fulfillment Management. Subsequently, he was promoted in April of 2017 to serve as the Director of Business Development and Customer Solutions for Elite Aerospace Group (EAG), where he developed and managed three important departments for the group level of the company including, Business Development, Estimating/Commercial Proposals and Customer Solutions. In this role, he oversaw the strategy development of all business growth efforts for each divisional unit of EAG, including EAP (Irvine/Tustin), E360 Technologies, EES (Redmond/Montana) and ESS (Halo Industries, Inc.). Mr. Sawhney was responsible for ensuring that each business unit developed their milestones and tracked their progress towards achievement of the organization's goals and worked closely with the Executive Team to ensure the necessary support and guidance was provided accordingly. Due to successful performance in this capacity, the Executive Team extended a new promotion to Mr. Sawhney in February 2018, serving in his current role as the Vice President – Investor Relations. Mr. Sawhney is tasked with the management and communication of all relationships with our existing Investor base. One of Mr. Sawhney's focused responsibilities is to provide detailed corporate updates to our existing Investors and ensure overall investor satisfaction, coupled with the performance of the company. Mr. Sawhney is pivotal in providing visibility to the current and future state of EAG. In this capacity, he provides regular communication to EAG's

DAV000036

investors on multiple platforms and also partners with the Executive Team to effectively support the continued growth of the enterprise overall. Mr. Sawhney graduated from University of California, Riverside in June of 2001 with the following degree: Major: in Liberal Studies; emphasis in Business Administrative Studies & Psychology, and Minor: in Philosophy of Social Policy Analysis; emphasis in Justice and Law. Subsequently, he graduated from Pepperdine University with his Master's in Business Administration in December of 2017. Mr. Sawhney has held various positions prior to EAG in his professional experience, one of which was at a Fortune 500 company, and has been an entrepreneur for over 20 years.

*Michael Forbes* has been a director of EAG since its inception in May of 2016 and re-elected to that position by the shareholders of EAG at their annual meeting on December 27, 2017. Mr. Forbes has served as a director at EAP since February of 2016 and served informally as a strategic advisor to EAP since its inception in October 2014. Mr. Forbes brings nearly two decades of senior supply chain management experience in the commercial aerospace and defense sector to the Company. His service on the board is intended to provide key strategic advice to help position and steer the company's customer outreach campaigns, work procurement and contract solicitations, as well as counsel the company on setting appropriate, achievable strategic growth targets, manufacturing efficiencies, and financial governance protocols. Mr. Forbes served as corporate director of supply chain at Northrop Grumman Corporation from 2008 to 2015, and as sector director of subcontracts for Northrop Grumman Integrated Systems from 2006 to 2008. Prior to joining Northrop Grumman, he worked as a director of supply chain management at Raytheon Company from 1999 to 2006. Mr. Forbes began his career with TRW Space and Defense Group as a deputy director subcontract manager from 1978 to 1999 after graduating from Michigan State University as a member of the first class, receiving a Bachelor of Arts in material and operations management. Mr. Forbes earned a Master of Business Administration from California State University, Long Beach and completed the American Production and Inventory Control certification program at California State University, Dominquez.

**Executive Management Compensation**

Since its inception in May 2016, EAG or its subsidiaries have paid annual salaries to its executive officers and management. As of January 12, 2018, the annual salaries of the three most highly paid executive officers of the Company have been reset going forward as follows:

| Name | Position | Annual Salary |
|------|----------|---------------|
| Dustin Tillman* | Chief Executive Officer, Founder, and Secretary | $389,400.00 |
| Zeeshawn Zia* | President & Founder | $389,400.00 |
| Mark Babich | Chief Financial Officer | $127,500.00 |
| Bobby Sawhney | Vice President of Investor Relations | $150,000.00 |
| Lee Smith | Chief Operating Officer | $258,500.00 |

* These two (2) members of executive management are the founders of EAG, as indicated. Additional compensation for these operations officers includes incentives to secure customer contracts to support revenue targets for the EAG companies. These officers may receive a sales compensation of up to 3% of annual revenue generated from these contracts, subject to EAG board approval.

We may defer paying all or a portion of salaries and other employment benefits to our executive officers from time to time in amounts to be determined by our board of directors, when the Company has insufficient funds. Our directors and executive officers are also reimbursed for their business expenses. We expect to pay employee compensation in the form of salary, bonus and benefits to other executive

DAV000037

officers who may be hired during the fiscal year ending December 31, 2018 or thereafter, in amounts to be determined.

Certain executive officers of the Company received perquisites; therefore, those principals of EAG will be returning to the company the total sum of $52,005.55 plus interest over a 10 year Note, thereby ensuring no diminution of the value of EAG to its shareholders.

**Employment Agreements**

Effective January 12, 2018, EAG entered into an employment agreement with Mr. Dustin Tillman, the chief executive officer of EAG. Salary has been adjusted to account for previously agreed upon expenses.

Effective January 12, 2018, EAG entered into an employment agreement with Mr. Zeeshawn Zia, the President of EAG. Salary has been adjusted to account for previously agreed upon expenses.

Effective October 10, 2018, EAG entered into an employment agreement with Mr. Mark Babich, the Chief Financial Officer of EAG. In addition to Mr. Babich's base salary, his total compensation package will also include bonuses tied to specific milestone accomplishments.

Effective May 16, 2017 EAG entered into an employment agreement with Mr. Lee Smith, the COO of EAG. Prior to being named COO, Lee served as the company's President & General Manager.

Effective January 29, 2018 EAG entered into an employment agreement with Mr. Bobby Sawhney, the Vice President - Investor Relations.

**Stock Incentive Plan**

In the future, we will establish a management stock incentive plan pursuant to which stock options and awards may be authorized and granted to our executive officers, directors, employees and key consultants. We expect to authorize approximately 10% of our issued and outstanding common stock (including 4,910,000 shares of our common stock which we have already set aside for issuance as awards to existing employees whose shares of EAP common stock did not vest prior to the Business Combination) for future issuance under a Stock Incentive Plan for Directors, Executive Officers, Employees and Key Consultants, which is expected to be adopted by our board of directors by the end of 2018. Stock options or a significant equity ownership position in us may be utilized by us in the future to attract one or more new key senior executives from the commercial aerospace industry to manage and facilitate our growth.

**Board of Directors**

Our Board of Directors currently consists of Mr. Tillman and Mr. Zia, our co-founders and officers of EAG, as well as Mr. Michael Forbes. Mr. Forbes is our only "independent" director as defined in Rule 4200 of FINRA's listing standards. We may expand the board and appoint additional independent directors to our board of directors in the future, to serve on our planned committees. As of the date of this memorandum, EAG has nominated Gerald ("Jerry") Goodwin to join the Board, and he has accepted. Final ratification pending shareholder vote. Jerry would be joining the EAG Board with over 30 years of experience in aerospace & defense, including nearly a decade serving as Senior Aerospace's CEO.

**Committees of the Board of Directors**

We plan to establish an audit committee, compensation committee and a nominating and governance committee. Until such committees are established, matters otherwise addressed by such committees will be acted upon by the independent directors, who will advise the whole board of directors in the course of seeking authorization for any proposed resolutions, or for general reports and recommendations. The following is a brief description of our contemplated committees.

DAV000038

*Audit Committee*. We plan to establish an audit committee consisting of members considered to be independent as defined in Rule 4200 of FINRA's listing standards and who meet the applicable FINRA listing standards for designation as an "Audit Committee Financial Expert." Currently management does not believe that it has an independent director who qualifies as a financial expert to form the planned audit committee. Our board of directors also plans to adopt a written charter of the audit committee. The functions of the audit committee will include:

- meeting with management periodically to consider the adequacy of our internal controls and the objectivity of our financial reporting;

- engaging and pre-approving audit and non-audit services to be rendered by our independent auditors;

- recommending to the board of directors the engagement of our independent auditors and oversight of the work of the independent auditors;

- reviewing our financial statements and periodic reports and discussing the statements and reports with management, including any significant adjustments, management judgments and estimates, new accounting policies and disagreements with management;

- establishing procedures for the receipt, retention and treatment of complaints received by our regarding accounting, internal accounting controls and auditing matters; and

- administering and discussing with management and our independent auditors our code of ethics.

*Compensation Committee*. We plan to establish a compensation committee. The functions of the compensation committee will include:

- reviewing and, as it deems appropriate, recommending to the board of directors, policies, practices and procedures relating to the compensation of our directors and executive officers and the establishment and administration of certain employee benefit plans;

- exercising authority under certain employee benefit plans; and

- reviewing and approving executive officer and director indemnification and insurance matters.

*Corporate Governance and Nominating Committee*. We plan to establish a corporate governance and nominating committee. The functions of the corporate governance and nominating committee will include:

- developing and recommending to the board of directors our corporate governance guidelines;

- overseeing the evaluation of the board of directors;

- identifying qualified candidates to become members of the board of directors;

- selecting nominees for election of directors at the next annual meeting of stockholders (or special meeting of stockholders at which directors are to be elected); and

- selecting candidates to fill vacancies on the board of directors.

*Special Committee to Evaluate Conflicts between Evolution & EAG*. The committee was established in July 19, 2018 to evaluate the relationship between EAG and Evolution Consulting Inc.

**General Counsel to EAG**

Effective as of September, 2018, EAG engaged Hart David Carson LLP ("HDC") to serve as outside general counsel to the Company. HDC brings to the table their industry-leading middle-market pre-IPO corporate representation and strategic governance practice.

**Director Compensation**

We currently do not pay our employee directors any compensation for their services as board members. In the course of this offering, we plan to pay our independent directors and independent, non-employee members of certain of our board committees, if any, to the board up to $2,500 per meeting for their participation in board meetings (attended in person or telephonically, as required by the board). Board compensation is subject to board confirmation and may be adjusted as the board determines is appropriate.

**Limitation of Liability and Indemnification of Officers and Directors**

Our Certificate of Incorporation limits the liability of directors to the maximum extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for breach of their fiduciary duties as directors, except liability for:

- any breach of their duty of loyalty to the corporation or its stockholders;
- acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;
- unlawful payments of dividends or unlawful stock repurchases or redemptions; or
- any transaction from which the director derived an improper personal benefit.

Our bylaws provide that we will indemnify our directors, officers, employees and other agents to the fullest extent permitted by law. We believe that indemnification under our bylaws covers at least negligence and gross negligence on the part of indemnified parties. Our bylaws also permit us to secure insurance on behalf of any officer, director, employee or other agent for any liability arising out of his or her actions in connection with their services to us, regardless of whether our bylaws permit such indemnification.

We intend to enter into separate indemnification agreements with our directors and officers, in addition to the indemnification provided for in our bylaws. These agreements, among other things, will provide that we will indemnify our directors and officers for certain expenses (including attorneys' fees), judgments, fines and settlement amounts incurred by a director or executive officer in any action or proceeding arising out of such person's services as one of our directors or officers, or rendering services at our request, to any of our subsidiaries or any other company or enterprise. We believe that these provisions and agreements are necessary to attract and retain qualified persons as directors and officers.

**Amendment of Certificate of Incorporation and Bylaws**

Under the Delaware law, a corporation's certificate of incorporation can be amended by the affirmative vote of the holders of a majority of the outstanding shares entitled to vote, and a majority of the outstanding stock of each class entitled to vote as a class, unless the certificate requires the vote of a larger portion of the stock. Our Certificate of Incorporation, as amended, does not require a larger percentage affirmative vote. As is permitted by Delaware law, our bylaws give our board of directors the power to adopt, amend or repeal our bylaws. Our shareholders entitled to vote have concurrent power to adopt, amend or repeal our bylaws.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

DAV000040

## NOTE PURCHASE PROCEDURE

To complete your investment, if the Offeree is an existing investor in the Company, please review, complete and sign the Purchase Agreement attached hereto as Exhibit E (the "Purchase Agreement"). If the Offeree is not an existing member in the Company, such Offeree will also be required to complete the Investor Questionnaire attached as Exhibit D (the "Investor Questionnaire").

Once the Purchase Agreement (and Investor Questionnaire, as applicable) is returned to the Company and funds are wired into the Company's operating account, you will receive an Unsecured Convertible Promissory Note in the form attached to the Purchase Agreement.

In the event a Noteholder wishes to convert the Note to equity in the Company, such Noteholder will complete and return the Notice of Conversion form attached to the Purchase Agreement.

NOTE: EACH NOTEHOLDER HAS THE OPTION TO CONVERT AND NOT THE OBLIGATION AT ANY TIME DURING THE TERM OF THE NOTE INTO EITHER CLASS B SHARES OR THE NEXT EQUITY ROUND UPON A QUALIFIED FINANCING. BECAUSE THIS DECISION IS OPTIONAL, THE INFORMATION PROVIDED IN THIS MEMORANDUM TO EACH OFFEREE IS DESIGNED TO ASSIST AN OFFEREE IN MAKING THEIR INVESTMENT DECISION IN THE NOTE ITSELF AND NOT THE SHARES INTO WHICH THE NOTE IS CONVERTIBLE. SHOULD A NOTEHOLDER REQUEST ADDITIONAL INFORMATION FROM THE COMPANY PRIOR TO MAKING THAT DECISION, PLEASE CONTACT THE COMPANY DIRECTLY.

As previously noted the Company is under no obligation to accept your investment and reserves the right to reject your investment at its sole and absolute discretion. If the Purchase Agreement is not completed and executed to the Company's satisfaction, and completion of other due diligence, the Company may not accept your investment. Note that if the Offeree is purchasing on behalf of an entity (i.e., other than an individual), Offeree shall supply the Company with a properly executed instrument authorizing the purchase by the agent on behalf of the entity as per the Purchase Agreement. Foreign investors may be required to provide additional documentation. In the event a subscription is rejected, all funds delivered to the Company with such subscription will be returned to the subscriber as soon as practicable following rejection, without interest.

DAV000041

# INVESTOR SUITABILITY STANDARDS

**Overview**

Prospective purchasers of the Notes offered by this Memorandum should give careful consideration to certain risk factors described under "RISK FACTORS" section and especially to the speculative nature of this investment and the limitations described under that caption with respect to the lack of a readily available market for the Notes and the resulting long-term nature of any investment in the Company. This Offering is available only to suitable Accredited Investors having adequate means to assume such risks and of otherwise providing for their current needs and contingencies.

**General**

The Notes will not be sold to any person unless such prospective purchaser or his or her duly authorized representative shall have represented in writing to the Company in the Purchase Agreement that:
- The prospective purchaser has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment of the Notes;
- The prospective purchaser's overall commitment to investments which are not readily marketable is not disproportionate to his, her, or its net worth and the investment in the Notes will not cause such overall commitment to become excessive; and
- The prospective purchaser is an "Accredited Investor" (as defined on the next page) suitable for purchase in the Notes.

Each person acquiring Notes will be required to represent that he, she, or it is purchasing the Notes for his, her, or its own account for investment purposes and not with a view to resale or distribution.

**Accredited Investors**

The Company will conduct the Offering in such a manner that Notes may be sold only to "Accredited Investors" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act"). In summary, a prospective investor will qualify as an "Accredited Investor" if he, she, or it meets any one of the following criteria:
- Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase, exceeds $1,000,000.

  Except as provided in paragraph (2) of this section, for purposes of calculating net worth under this paragraph:

  (i) The person's primary residence shall not be included as an asset; and

  (ii) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

  (iii) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

- Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who has a reasonable expectation of reaching the same income level in the current year;
- Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual

DAV000042

or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities and Exchange Act of 1934 (the "Exchange Act"); any insurance company as defined in Section 2(13) of the Exchange Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company (SBIC) licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $10,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $10,000,000 or, if a self-directed plan, with investment decisions made solely by persons who are Accredited Investors;

- Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;
- Any organization described in Section 501(c)(3)(d) of the Internal Revenue Code, corporation, business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $10,000,000;
- Any director or executive officer, or general partner of the issuer of the securities being sold, or any director, executive officer, or general partner of a general partner of that issuer;
- Any trust, with total assets in excess of $10,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 501(b)(2)(ii) of Regulation D adopted under the Act; and
- Any entity in which all the equity owners are Accredited Investors.

**Other Information**

Each prospective purchaser of Notes may be required to furnish such information as the Company may require to determine whether any person or entity purchasing Notes is an Accredited Investor.

Confidential

# EXHIBIT A

## FINANCIAL STATEMENTS (UNAUDITED)

Confidential

DAV000044

**EAS Cash Flow Forecast**
**(October 2018 - December 2019)**
**Working Model v20.06.18**

| | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jul-19 | Aug-19 | Sep-19 | Oct-19 | Nov-19 | Dec-19 | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Inflows** | | | | | | | | | | | | | | | | |
| Investor / Debt Funding | | | | | | | | | | | | | | | | |
| Inflow Phase 1 | | | | | | | | | | | | | | | | |
| Inflow Phase 2 | | | | | | | | | | | | | | | | |
| Inflow Phase 3 | | | | | | | | | | | | | | | | |
| **Total Cash Inflows** | | | | | | | | | | | | | | | | 100% |
| **Cash Outflows** | | | | | | | | | | | | | | | | |
| **Less: Cost of Sales (Variable Exp.)** | | | | | | | | | | | | | | | | |
| Prod Materials, Tools & Supplies | | | | | | | | | | | | | | | | |
| Salaries, Wages & Subcontractors | | | | | | | | | | | | | | | | |
| Building & Utilities | | | | | | | | | | | | | | | | |
| Repairs & Maintenance | | | | | | | | | | | | | | | | |
| Machinery & Equipment | | | | | | | | | | | | | | | | |
| Industrialization & Consolidation | | | | | | | | | | | | | | | | |
| Prod. Payment Plant, Fleet & Penalties | | | | | | | | | | | | | | | | |
| **Total Cost of Sales** | | | | | | | | | | | | | | | | |
| **GROSS INFLOWS / (OUTFLOWS)** | | | | | | | | | | | | | | | | |
| Gross Profit % of Total Income | | | | | | | | | | | | | | | | |
| **Less: Admin Support (Fixed Exp.)** | | | | | | | | | | | | | | | | |
| IR Salaries & Wages (incl. tax & benefits) | | | | | | | | | | | | | | | | |
| IR Related Overhead Payment | | | | | | | | | | | | | | | | |
| Core Exec, G&A - Salaries & Wages(Inc)New | | | | | | | | | | | | | | | | |
| Licenses, Fees, Fines & Subcontractors | | | | | | | | | | | | | | | | |
| Office/Admin Area & Utilities | | | | | | | | | | | | | | | | |
| Repairs & Maintenance | | | | | | | | | | | | | | | | |
| IT, Accounting & ERP Related | | | | | | | | | | | | | | | | |
| Taxes, Legal, Fines & Penalties Related | | | | | | | | | | | | | | | | |
| Drilling Wells Opex & Token-Services | | | | | | | | | | | | | | | | |
| Acquisition Promissory Notes | | | | | | | | | | | | | | | | |
| EAG Payment Plant, Fines & Penalties | | | | | | | | | | | | | | | | |
| Office Equipment, Leases & Supplies | | | | | | | | | | | | | | | | |
| **Total Admin/Fixed Expenses** | | | | | | | | | | | | | | | | |
| **OPERATING CASH INFLOWS / (OUTFLOWS)** | | | | | | | | | | | | | | | | |
| Operating Cash Outflows % of Total Income | | | | | | | | | | | | | | | | |
| **Less: Other Expenses** | | | | | | | | | | | | | | | | |
| Capital Lease/Interest Expense | | | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | | | |
| Loan Fees | | | | | | | | | | | | | | | | |
| **Total Other Expenses** | | | | | | | | | | | | | | | | |
| **NET CASH INFLOWS / (OUTFLOWS)** | | | | | | | | | | | | | | | | |
| Net Cash % of Total Cash Inflows | | | | | | | | | | | | | | | | 102% |

**Noted Assumptions:**
(1) Revenues based on EAG 10 years Revenue Projections.
(2) Revenues Sharing is based on a City projection of the Boeing Assembly Gross Revenues.
(3) Manufacturing projections only include 2 with 5000m machines and 3 Farems FPC-1000.
(4) HALO/EDAP Consolidation is based on Jan-19 projection date.
(5) Epicor to M-1 ERP migration is based on Apr-19 go-live.
(6) Estimated Dividends payment to Investor at $25K/mo. Starting March 2019.

Confidential

## EXHIBIT B

## 10-YEAR PROJECTIONS (CONSERVATIVE)

### Notification & Disclosures Concerning Forward-Looking Statements

This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "may," "should," "expects," "intends," "projects," "plans," "believes," "estimates," "targets," "anticipates," and similar expressions generally identify these forward-looking statements. Examples of forward-looking statements include statements relating to our future financial condition and operating results, as well as any other statement that does not directly relate to any historical or current fact. Forward-looking statements are based on expectations and assumptions that we believe to be reasonable when made, but that may not prove to be accurate. These statements are not guarantees and are subject to risks, uncertainties, and changes in circumstances that are difficult to predict. Many factors could cause actual results to differ materially and adversely from these forward-looking statements. Among these factors are risks related to: (1) general conditions in the economy and our industry, including those due to regulatory changes; (2) our reliance on our aerospace customers; (3) changing budget and appropriation levels and acquisition priorities; (4) our dependence on U.S. government contracts; (5) our reliance on fixed-price contracts; (6) our reliance on cost-type contracts; (7) our dependence on our subcontractors and suppliers, as well as the availability of raw materials; (8) changes in accounting estimates; (9) changes in the competitive landscape in our markets; (10) threats to the security of our or our customers' information; (11) potential adverse developments in new or pending litigation and/or government investigations; (12) customer and aircraft concentration in our customer financing portfolio; (13) changes in our ability to obtain debt on commercially reasonable terms and at competitive rates in order to fund our operations and contractual commitments; (14) realizing the anticipated benefits of mergers, acquisitions, joint ventures/strategic alliances or divestitures; (15) the adequacy of our insurance coverage to cover significant risk exposures; (16) potential business disruptions, including those related to physical security threats, information technology or cyberattacks or natural disasters; (17) work stoppages or other labor disruptions; (18) potential environmental liabilities.

Any forward-looking statement speaks only as of the date on which it is made, and we assume no obligation to update or revise any forward-looking statement, whether as a result of new information, future events, or otherwise, except as required by law.

DAV000046

| Division | Customer | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EES - Services | AIM Aerospace | | | | $ - | 81,200 | 100,530 | 110,852 | 121,387 | 133,526 | 146,879 |
| EES - Software | Anacapa Engineering and Design | | | | $ - | 1,760 | 1,848 | 1,903 | 1,961 | 2,019 | 2,080 |
| EES - Services | Andrews-Cooper | | | | $ - | 2,725 | 50,000 | 52,500 | 55,125 | 57,881 | 60,775 |
| EES - Services | AWE Industries | | | | $ 13,000 | | $ - | | $ - | | |
| EES - Services | B&G | | | | $ - | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 | 7,600 |
| EES - Services | Big Water, LLC | | | | $ - | 2,200 | 2,310 | 2,379 | 2,451 | 2,524 | 2,600 |
| EES - Services | Boeing Rotorcraft | | | | $ 134,432 | 1,267,110 | 1,750,000 | 1,825,000 | 2,117,500 | 2,329,250 | 2,562,175 |
| EES - Services | Crissair, Inc. | | | | $ 17,577 | $ - | | | | | |
| EES - Services | Cross Manufacturing | | | | $ - | 3,150 | 3,686 | 4,054 | 4,459 | 4,505 | 5,396 |
| EES - Software | Culp and Tanner | | | | $ - | 5,280 | 5,280 | 5,280 | 5,438 | 5,602 | 5,770 |
| EES - Software | Davis Tool | | | | $ - | 4,450 | 4,673 | 4,813 | 4,957 | 5,106 | 5,259 |
| EES - Services | Diehl Aircabin | | | | $ 50,390 | $ - | | | $ - | | |
| EES - Services | Ducommun | | | | $ 11,670 | 725,000 | 800,000 | 880,000 | 968,000 | 1,064,800 | 1,171,280 |
| EES - Services | DZyne Technologies | | | | $ 13,350 | 13,350 | 14,018 | 14,718 | 15,454 | 16,227 | 17,038 |
| EES - Services | E360 | | | | $ - | 35,128 | 35,128 | 35,128 | 35,128 | 35,128 | 35,128 |
| EES - Services | EAP | | | | $ 125,400 | 12,089 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| EES - Services | Encore Interiors | | | | $ 134,964 | 315,000 | 600,000 | 420,000 | 441,000 | 463,090 | 486,203 |
| EES - Services | Encore International | | | | $ - | 31,470 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| EES - Services | Fibreform | | | | $ 12,381 | $ - | | | | | |
| EES - Services | Hickman Van Horn & Associates | | | | $ 1,300 | $ - | | | | | |
| EES - Services | Hinds-Bock | | | | $ - | 20,390 | 100,000 | 105,000 | 110,250 | 115,763 | 121,551 |
| EES - Services | Imaginetics | | | | $ - | 87,651 | 250,000 | 262,500 | 275,625 | 289,406 | 303,877 |
| EES - Services | Janicki Industries | | | | $ 21,700 | 69,160 | 100,000 | 105,000 | 110,250 | 113,763 | 121,551 |
| EES - Software | Lift by Encore | | | | $ 47,147 | 26,408 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 |
| EES - Services | Marketech | | | | $ 10,160 | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 | 2,280 |
| EES - Services | Millennium Space Systems | | | | $ 27,875 | $ - | 15,000 | 15,750 | 16,538 | 17,364 | 18,233 |
| EES - Services | Norfil, LLC | | | | $ 8,123 | $ - | | | | | |
| EES - Services | Pioneer | | | | $ 59,651 | 183,395 | 250,000 | 262,500 | 275,625 | 289,496 | 303,877 |
| EES - Services | Precision Manifold Systems | | | | $ - | 14,679 | 15,413 | 16,184 | 16,993 | 17,842 | 18,735 |
| EES - Services | Protingent | | | | $ - | 2,950 | 3,088 | 3,252 | 3,425 | 3,588 | 3,765 |
| EES - PTC Software / Service | | | | | | | | | | | |
| EES - Services | Raptor Manufacturing | | | | $ - | 1,400 | 2,500 | 2,625 | 2,756 | 2,894 | 3,039 |
| EES - Software | Royell Manufacturing | | | | $ 172,246 | $ - | 50,000 | 52,500 | 55,125 | 57,881 | 60,775 |
| EES - Software | SpaceX | | | | $ - | 7,164 | 50,000 | 52,500 | 55,125 | 57,881 | 60,775 |
| EES - Software | Spirit Aerosystems | | | | $ - | 22,480 | 19,200 | 20,190 | 20,765 | 21,368 | 22,029 |
| EES - Software | Stratolaunch | | | | $ - | 22,795 | 23,933 | 24,653 | 25,392 | 26,154 | 26,939 |
| EES - Software | Tanis | | | | $ 2,800 | $ - | | | | | |
| EES - Services | Tesla Motors | | | | $ - | 5,280 | 5,544 | 5,710 | 5,882 | 6,058 | 6,240 |
| EES - Software | Tribine Harvester | | | | $ - | 4,923 | 30,000 | 31,500 | 33,075 | 34,729 | 36,465 |
| EES - Services | TTF Aerospace | | | | $ 308,340 | 781,028 | 780,000 | 780,000 | 780,000 | 780,000 | 780,000 |
| EES - Software | Zodiac Aerospace | | | | $ 248,312 | 499,937 | 650,000 | 790,000 | 930,000 | 1,123,200 | 1,347,840 |
| EES - Software | ZWWS | | | | $ 80,626 | 5,600 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| EES - Software | Roger Thomason | | | | $ - | $ - | 2,500 | 2,575 | 2,652 | 2,732 | 2,814 |
| EES - Services | Maeco Aerospace | | | | $ - | $ - | 1,080,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Halo | Airbus / OneWeb | | | | $ 157,054 | 97,010 | 2,450,000 | 4,383,000 | 4,383,000 | 1,931,000 | |
| Halo | ATK-PSI Edko | | | | $ 9,619 | 2,847 | 75,000 | 82,500 | 90,750 | 99,825 | 109,808 |
| Halo | Barber Nichol | | | | $ 38,090 | $ - | 60,000 | 55,000 | 60,500 | 66,550 | 73,205 |
| Halo | Boeing | | | | $ 583,441 | 1,804,718 | 2,000,000 | 2,500,000 | 2,625,000 | 2,756,250 | 2,894,063 |
| Halo | Designatro-Hicks | | | | $ - | 33,888 | 33,888 | 33,888 | 33,888 | 33,888 | 33,888 |
| Halo | Gurley | | | | $ - | 54,714 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Halo | Meggitt | | | | $ 188,058 | 415,244 | 450,000 | 540,000 | 648,000 | 777,040 | 933,520 |
| Halo | Moffy | | | | $ 84,660 | 18,500 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Halo | Neotech | | | | $ 326,918 | $ - | | | | | |
| Halo | Northrop Grumman | | | | $ - | 14,074 | 75,000 | 80,000 | 108,000 | 129,600 | 155,520 |
| Halo | Parker Hannifin | | | | $ 401,731 | 245,006 | 750,000 | 900,000 | 1,080,000 | 1,296,000 | 1,555,200 |
| Halo | Raytheon | | | | $ 184,421 | 170,918 | 300,000 | 240,000 | 288,000 | 345,400 | 414,720 |
| Halo | Rockwell | | | | $ - | 3,890 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Halo | Techstlab | | | | $ 16,285 | $ - | | | | | |
| Halo | TTF | | | | $ 1,480 | 25,385 | | | | | |
| Halo | Virgin Orbit | | | | $ - | 22,351 | 50,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Elite | Space Exploration Technologies | | | | $ 2,645,705 | 1,500,000 | 2,400,000 | 2,400,000 | 2,800,000 | 2,898,000 | 3,221,000 |
| Elite | Numrich Arms Products (Sterling) | | | | $ 380,606 | 140,000 | 380,000 | 410,000 | 858,800 | 900,740 | 990,559 |
| Elite | Amgraft Hardware West | | | | $ 213,634 | 545,000 | 588,225 | 647,048 | 711,752 | 782,928 | 861,220 |
| Elite | Aero Sealing Technologies | | | | $ 140,609 | $ - | 150,000 | 350,000 | 330,000 | 363,000 | 399,300 |
| Elite | Electro Enterprises, Inc. | | | | $ 37,346 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Elite | KLX Aerospace Solutions | | | | $ 55,247 | 180,000 | 542,328 | 1,300,000 | 1,725,000 | 1,793,250 | 2,383,343 |
| Elite | MARSON ENGINEERING CO. INC | | | | $ 49,125 | 103,394 | 175,000 | 201,250 | 331,438 | 364,313 | 300,000 |
| Elite | Senior Aerospace Absolute Manufacturing | | | | $ 52,604 | 45,000 | 50,000 | 52,500 | 55,125 | 57,881 | 60,775 |
| Elite | Encssalt Fabuel Jet Corp | | | | $ 47,340 | 75,000 | 100,000 | 110,750 | 121,000 | 133,100 | 146,410 |
| Elite | RESEARCH METALS INDUSTRIES | | | | $ 9,040 | $ - | | | | | |
| Elite | AMCOY CABLE, INC | | | | $ 26,145 | 180,000 | 200,000 | 210,000 | 220,500 | 291,525 | 243,801 |
| Elite | Madison Aerospace, Inc | | | | $ 11,300 | $ - | | | | | |
| Elite | General Aerospace GmbH | | | | $ 7,710 | 25,000 | 25,000 | 26,250 | 27,563 | | |
| Elite | Standard Aero | | | | $ 3,580 | $ - | | | | | |
| Elite | TTF Aerospace | | | | $ 8,163 | 175,000 | 500,000 | 1,000,000 | 1,470,000 | 1,210,000 | 1,331,000 |
| Elite | Rocket Lab USA Inc | | | | $ 2,696 | $ - | | | | | |
| Elite | Bombardier | | | | $ - | 50,000 | 75,000 | 78,750 | 82,688 | 86,822 | 91,163 |
| Elite | Uncommon Aerostructures | | | | $ - | $ - | 35,000,000 | 35,000,000 | 13,000,000 | 12,000,000 | 13,100,000 |
| Elite | Applied Composites (Encore Aerospace) | | | | $ - | 35,000 | 450,000 | 450,000 | 480,000 | 480,000 | 480,000 |
| Elite | Vista | | | | $ - | 40,000 | | | | | |
| Elite | Tanis | | | | $ - | $ - | | | | | |

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue (EAG - Halo / EAP / EES) | | $ - | $ 1,200,000 | $ 2,700,000 | $ 7,236,735 | $ 10,451,101 | $ 27,860,562 | $ 34,899,602 | $ 38,727,711 | $ 35,727,588 | $ 42,541,428 |

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Spearman Aerospace | | | | | $ 3,229,514 | $ 5,714,290 | $ 9,265,928 | $ 10,785,528 | $ 12,127,932 | $ 15,135,000 |
| TTF Aerospace | | | | | $ 19,566,212 | $ 32,137,096 | $ 42,537,840 | $ 52,305,500 | $ 67,488,000 | $ 77,325,000 |
| Snowline Engineering | | | | | $ 13,171,540 | $ 15,805,843 | $ 19,737,304 | $ 25,684,485 | $ 35,701,448 | $ 51,225,000 |
| Cosmic Aerospace | | | | | $ 13,047,000 | $ 19,066,000 | $ 22,125,000 | $ 27,534,000 | $ 33,323,000 | $ 37,051,000 |
| Total Revenue (Acquisitions) | | | | | $ 49,014,266 | $ 72,743,229 | $ 93,666,072 | $ 116,319,513 | $ 148,647,380 | $ 180,736,000 |
| Total Revenue (EAG -All + Acquisitions) | | | | | $ 59,465,366 | $ 100,603,791 | $ 128,571,674 | $ 154,536,225 | $ 185,445,969 | $ 223,277,488 |

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| EAG | $ - | $ 1.2 | $ 2.7 | $ 7.2 | $ 10.5 | $ 27.9 | $ 34.9 | $ 38.2 | $ 39.7 | $ 42.5 |
| Acquisitions | | | | | $ 49.1 | $ 72.7 | $ 93.7 | $ 116.3 | $ 148.6 | $ 180.7 |
| Total Enterprise | | | | | $ 59.6 | $ 100.6 | $ 128.6 | $ 154.5 | $ 188.3 | $ 223.2 |

Confidential

| Division | Customer | Management Assumptions (9/20/2018) |
|---|---|---|
| EES - Services | AIM Aerospace | Current service customer, anticipating spike in 2019, and a 10% growth trajectory year over year. |
| EES - Software | Anacapa Engineering and Design | Current booked software service revenue based on actuals. |
| EES - Services | Andrews-Cooper | Projections based on anticipated NC programming revenues. |
| EES - Services | AWE Industries | On hold for now, did over $1mm with them in 2016, and they still owe us money. |
| EES - Services | B&G | Small NC programming customer. Stable business, but not many opportunities for growth. |
| EES - Software | Big Water, LLC | Projection based on current software license revenue. |
| EES - Services | Boeing Rotorcraft | Based on past and current projections, and intelligence from the customer that we're now quoting in a non-competitive environment, meaning sole-source. |
| EES - Services | Crissair, Inc. | Nothing currently additionally anticipated. |
| EES - Services | Cross Manufacturing | Small NC programming customer. Stable business, but not many opportunities for growth. |
| EES - Software | Culp and Tanner | Projections based on current software sales. |
| EES - Software | Davis Tool | Projections based on current software sales. |
| EES - Services | Diehl Aircabin | Some revenues historically recognized, but nothing currently on the docket. Opportunity for growth. |
| EES - Services | Ducommun | Significant revenue growth projected due to current programs we're supporting, and intelligence from the customer. |
| EES - Services | DZyne Technologies | NC programming customer with anticipated growth at a 5% rate. |
| EES - Services | E360 | Revnues based on anticipated engineering requirements with the current customer base. |
| EES - Services | EAP | Revenue from EAP / EAG based on outsourcing and overflow requirements. |
| EES - Services | Encore Interiors | Projections based on current services requirements from the customer with an anticipated 5% growth rate built in. |
| EES - Services | Encore International | Encore Mexico work for their off-shore engineering requirements. |
| EES - Services | Fibreform | Nothing anticipated. |
| EES - Services | Hickman Van Horn & Associates | Nothing anticipated. |
| EES - Services | Hinds-Bock | Engineering offload services customer with anticipated 5% growth rate expected with this customer. |
| EES - Services | Imaginetics | Engineering offload services customer with anticipated 5% growth rate expected with this customer. |
| EES - Services | Janicki Industries | Engineering offload services customer with anticipated 5% growth rate expected with this customer. |
| EES - Software | Lift by Encore | Projections based on fixed revenue expectation based on past results. |
| EES - Services | Marketech | Some revenue anticipated, but not currently able to grow with this customer beyond what's described based on their lack of work, and the bringing resources in-house. |
| EES - Services | Millennium Space Systems | |
| EES - Services | Norfil, LLC | Nothing anticipated. |
| EES - Services | Pioneer | Great growth possibilities based on customer intelligence and past results. |
| EES - Services | Precision Manifold Systems | NC programming customer with anticipated growth at a 5% rate. |
| EES - Services | Protingent | NC programming customer with anticipated growth at a 5% rate. |
| EES - PTC Software / Service | PTC Future Customer Revenues Anticipated | Anticipated revenues based on future customers PTC will be handing over to Elite. Validated by PTC. |
| EES - Services | Raptor Manufacturing | NC programming customer with anticipated growth at a 5% rate. |
| EES - Services | Royell Manufacturing | Growth anticipated at a 5% clip after 2019. |
| EES - Software | SpaceX | Recently added SpaceX as a software customer. Growth is expected through the 2023 and beyond and we integrate further and further to understand their longterm requirements. |

DAV000048

| EES - Software | Spirit Aerosystems | Recently added Spirit Aerosystems as a software customer. Growth is expected through the 2023 and beyond and we integrate further and further to understand their longterm requirements. |
| --- | --- | --- |
| EES - Software | Stratolaunch | Recently added as a software customer. Growth is expected through the 2023 and beyond and we integrate further and further to understand their longterm requirements. |
| EES - Services | Tanis | Nothing anticipated at the moment beyond what's already been recognized. |
| EES - Software | Tesla Motors | While only currently earmarked for the software we've sold to them thus far, there is strong growth potential with Telsa. |
| EES - Software | Tribine Harvester | Software customer anticipated to grow considerably at a 5% growth rate. |
| EES - Services | TTF Aerospace | Projections assume we (EES) will take over all of TTF's engineering requirements post acquisition. |
| EES - Services | Zodiac Aerospace | Very predicatble customer with strong growth expected, only catalyzed by the acquisition of Safran. |
| EES - Software | ZWWS | Some software sale expected, but lots of potential not reflected currently based on lack of intelligence to validate a growth rate. |
| EES - Software | Roger Thomason | Small software client. |
| EES - Software | Haeco Aerospace | In the middle of a significant bid that could translate into over $900K annually. Stong likely of win. |
| Halo | Airbus / OneWeb | Based on $5.8mm in options, model assumes options revenues start hitting in 2020-2022 |
| Halo | ATK-PSI Edina | Beginning in 2019, Elite intends to aggressively reengage ATK (now Northrop Grummun) and grow workshare considerable. Halo was supplier of the year to Northrop in 2007 |
| Halo | Barber Nichol | Great initial work and relationship built with this customer. Intend to campaign aggressively to grow workshare. |
| Halo | Boeing | 2019 and 2020, 20% growth expected. Thereafter, projection assumes 5% growth. Opportunities for growth beyond that. Conservative estimate. |
| Halo | Designatro Hicks | Assumes steady, consistent revenue year over year. |
| Halo | Elite | Taking Elite off as a customer from Halo's projection. |
| Halo | Gurley | Holding prediction same based on original forecast. |
| Halo | Marvin Engineering | Removing from Halo. Duplicate customer for EAG. |
| Halo | Meggitt | Beginning in 2019, we anticipate climbing to $450K in revenue and growing this customer 20% year over year thereafter. |
| Halo | Motiv | Projections kept as is based on uncertainly with the Mars Rover program. |
| Halo | Neotech | Keeping as is for now. |
| Halo | Northrop Grumman | Targeting to grow to $75K next year, and grow 20% year over year thereafter. |
| Halo | Parker Hannifin | Beginning in 2019 anticipate growing to $750K, and growing 20% year over year thereafter based on current contracts and Derick Baisa's historical relationships. |
| Halo | Raytheon | Anticipating $200K in 2019, with increase of 20% thereafter. |
| Halo | Rockwest | No change |
| Halo | Technifab | No change |
| Halo | TTF | No change |
| Halo | Virgin-Orbit | No change |
| Elite | Space Exploration Technologies | Because of Block 4 to Block 5 change we saw a significant decline. With that said, beginning in 2019 we anticipate revenues climbing to $2.2mm, and growing 10% thereafter. |
| Elite | Norwich Aero Products (Esterline) | Expect revenues to climb in 2019 to $380K (what we did in 2017), and grow at a 10% growth rate year over year. |
| Elite | Aircraft Hardware West | Assuming 10% growth in 2019, and 10% growth on the current LTA value thereafter. |

DAV000049

| Elite | AIRBUS ONEWEB SATELLITES LLC | Deleting as already captured in Halo projection. |
|-------|------------------------------|--------------------------------------------------|
| Elite | Aero Seating Technologies | Anticipating growth in 2019 with a 10% growth clip thereafter based on demand, contract, and relationship with Derick Baisa. |
| Elite | Electro Enterprises, Inc. | Distributor for USB chargers. Expecting $100K in 2019, with fixed expectations through 2023. |
| Elite | KLX Aerospace Solutions | Expecting growth in 2020, and continued growth 2021 and beyond at a 15% growth rate. |
| Elite | MARVIN ENGINEERING CO, INC. | Beginning in 2019, we anticipate $175,000 based on customer intelligence and current work, and thereafter anticipate a 15% increase in sales year over year. |
| Elite | Senior / Absolute Manufacturing | Targeting $50K in 2019, and expected to grow 5% per year. |
| Elite | Dassault Falcon Jet Corp. | Goal to target $100K with Dassault in 2019, and grow 10% per year. |
| Elite | RESEARCH METALS INDUSTRIES | Nothing currently additionally anticipated. |
| Elite | AXON' CABLE, INC. | Anticpated to grow this customer at a 5% rate based on current projections and historical results. |
| Elite | Madison Aerospace, Inc. | Nothing projected |
| Elite | General Aerospace GmbH | Projection based on minimal growth |
| Elite | Standard Aero | Nothing currently additionally anticipated. |
| Elite | TIF Aerospace | Anticpates that through acquisition we obtain all of the precision machining work. |
| Elite | Rocket Lab USA Inc | Nothing additionally anticipated. |
| Elite | Bombardier | Leveraging the E360 product, we anticipate campaigning products and services as well. |
| Elite | DUCOMMUN INC. | Assumes ramp-up of the Boeing 737 Max project, and A320neo Blocker Door project. |
| Elite | Applied Composites | Significant revenue growth projected due to current programs we're supporting, and intelligence from the customer. |
| Elite | Halo | Not going to be included moving forward. |
| Elite | Tanis | Nothing additionally anticipated. |

DAV000050

**EXHIBIT C**

**PROJECTIONS (Q2/Q3 REPORT)**

Confidential

DAV000051



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**



Welcome to this edition of The Elite Report! The EAG Executive Management Team is pleased to provide our stakeholders with a comprehensive update for each division of the Elite Aerospace Group. Below you will find an in-depth overview for both Q2 and Q3 of 2018. We hope you enjoy reading about these developments and our customer highlights, and sincerely appreciate all your support and partnership towards building our business together!

## EAG FINANCIAL UPDATES:

**FINANCIAL HISTORY, CURRENT POSITION AND PROJECTIONS:**

Revenue expectations in 2018 have been revised as of this quarter due to multiple customer considerations. Specifically, SpaceX has decreased their production due to change in the Block IV to Block V configuration shift. Additionally, our contract with Ducommun on the 737MAX and Airbus OneWeb has slid a quarter, with aggressive ramp up now poised for 2019; while some revenue for these programs will certainly be recognized in 2018 the lion-share of this growth will be in 2019 and beyond. These combined factors have in turn decreased the revenue position for 2018 and accordingly increased revenue for 2019 production. Nonetheless, in 2018, we will capture additional revenue from the Non-Recurring Earnings (NRE) for both the Ducommun 737MAX and Airbus OneWeb contracts. Please see the following information in both graphs listed below:



Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

  DAV000052

CONFIDENTIAL AND PROPRIETARY MEMORANDUM



*Please note: Revenues from acquired companies are only realized on EAG Financial Statements after deal closure.*

In summary:

➢ EAG successfully delivered a multitude of Precision Machining, Swiss-Turn and Engineering Services to the biggest names in Aerospace.
➢ Secured key Capex investments to support long-term infrastructure development for initial phase of current customer demand.
➢ Captured significant commercial aerospace and satellite precision machining content
➢ Demonstrated EAG growth and execution; captured new opportunities across legacy and new development platforms
➢ Continue to strategically complement EAG's organic growth strategy with selective investment opportunities.

To that end, the business environment in the Aerospace, Defense and Orbital Launch Industry is thriving. For instance, as depicted above on Boeing's Q2 snapshot, the growth environment in which EAG is supporting is upwards of $8.1 trillion over the next decade.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

Confidential                                                                                                          DAV000053



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

# EAG DIVISIONAL UPDATES:



## Elite Financial Services

As the A&D marketplace (and now the orbital rocket industry) continue to soar, pressures within the supply chain intensify the need for all involved to invest and reinvest in infrastructure. Elite Financial Services intends to leverage this momentum by offering financial services to support these growth industries. This includes financial services to support machine tool leases for companies looking to expand, mergers & acquisitions, and emerging new technologies.



**MERGERS & ACQUISITIONS (M&A):**



**Spearman Aerospace:** (http://www.spearmanaerospace.com/)

- ➢ Pending finalization of Acquisition and Integration with EAG. Spearman is positioned to be added and assimilated as an additional division within our metallic manufacturing division of EAG, EMM. Spearman currently services the Commercial and DoD Marketplace for 10+ years as top-tier provider.
- ➢ Spearman Aerospace remains an extremely exciting acquisition prospect for the group. Not only have we seen continued performance with respect to the previously contracted work, we also see continued growth into the future centered on additional commercial aerospace platforms for which we have shared interests; specifically, from a customer and competency perspective.
- ➢ EAG has already financed over half of the acquisition purchase price, $1.2mm, and looks forward to additional financing being used to finalize the deal in its entirety so it can immediately begin integration and growth efforts.
- ➢ As of the date of this update, despite monies paid, and efforts put forth thus far, discussions are being held currently pending clarity from the SEC investigation, and discrepancies surrounding final payment amounts.



**Snowline Engineering:** (http://www.snowlineengineering.com/)

- ➢ Pending finalization of Acquisition and Integration with EAG. Snowline is positioned to be added and assimilated as an additional division within our metallic manufacturing companies of EAG, EMM. Snowline successfully competes within the Commercial, Defense, Semi-Conductor and Rail sectors for over 3 decades.
- ➢ The Elite Aerospace Group remains closely connected with Snowline Engineering and has been privy to wonderful updates with respect to new customer prospects and shared opportunities in their business.
- ➢ While recent challenges have postponed the envisioned partnership, given the synergies, thorough due diligence and integration efforts that have been conducted, and shared interests amongst the parties, EAG intends to finalize the acquisition once an appropriate and final purchase price and finance instrument can be determined and selected.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

**TTF Aerospace:** (http://www.ttfaero.com/)

> As previously stated, the Elite Aerospace Group entered into a management agreement with TTF Aerospace on October 17th, 2017 will the sole purpose of stewarding the company out of several challenging situations and steering the company towards a more effective and efficient corporate atmosphere.
> The results of our involvement were tremendous; the backlog tripled, EAG overtook engineering and introduced enhanced methods and processes, customer confidence went up, new customers began to come onboard, and best practices on the manufacturing floor were implemented.
> Due to the anticipated level of financing required to take the company to the next gate increasing significantly above and beyond previous projections, the Elite Aerospace Group elected to take a step back while it recalibrated a finance strategy that would fit their current state. Discussions are active at present, and we are working towards a final plan that involves a move of the facility to the Mid-West, which will drive cost down increasing profitability.
> Given the current investment in TTF through product support, engineering services, and direct investment, to the tune of $3.7mm, Elite is in the process of taking ownership of the company for monies already paid, and are soliciting direct debt financing for growth.



**Cormer Aerospace & Defense:** (https://cormergroup.com/)

> A new addition to our due diligence efforts is a company called Cormer Aerospace & Defense, located in Winnipeg, Canada. EAG was engaged by them in August as through discovery they determined Cormer might be a good fit for the group.
> After an initial evaluation and cursory overview of their company it was determined that the company's profile, which includes attractive customer, capability, and competency attributes would allow Elite to access customers currently outside of its purview and introduce extremely large format manufacturing capabilities, which is a movement we've long been contemplating.

**Quality Tech Manufacturing (QTM):** (https://www.qualitytechmfg.com/)

> Another new addition to our due diligence efforts is company out of Rialto, CA called Quality Tech Manufacturing, Inc. EAG was introduced to QTM by an employee at Elite who has a common relationship with the ownership. This company has been in business since 1996 and they have established themselves as a precision machining operation supporting both commercial and defense sectors of the industry.
> As noted above regarding other acquisitions, there is great potential for synergies on supporting the growth of their company through the Elite Brand. Likewise, this partnership would also give EAG access to a series of new customers as well as programs with existing customers that are currently sourced only from QTM, not to mention additional overall machining capacity for our EMM Division of Elite.
> As of the date of this memorandum, the target is being preliminarily evaluated, and Elite is at the beginning of its due diligence process.

There is no prominent A&D company in existence today that did not grow through acquisition. In fact, if you trace it back, most of these house-hold names grew principally through acquisitions over the decades. Now that Elite has established itself as a global brand, contender, and operator, the aim forward as we look more strategically towards acquisitions is to ensure they represent value addition, opposed to value dilution.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

DAV000055



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

Accretive acquisitions are value including, and as we look for healthier and healthier companies to acquire our strategy will center around integrating and optimizing with new acquisition targets. The good news is there's plenty of companies out there in need of what we can offer that desire to be a more competitive value-proposition than traditionally available in the marketplace.

Accordingly, PricewaterhouseCoopers (PwC) recently published an informative outlook on all the M&A Activity that has occurred thus far in 2018 (please reference the chart above and table below), providing further validation to the strength behind our acquisition and integration strategy: https://www.pwc.com/us/en/industrial-products/publications/assets/pwc-aerospace-defense-industry-mergers-acquisitions-h1-2018.pdf

|  | H1 2018 versus H1 2017 | H1 2018 versus Ten-year avg |
|---|---|---|
| **H1 2018** | | |
| Total deal value | 39% | 89% |
| **$24.2B** | | |
| Total deal volume | 17% | 4% |
| **187** | | |
| Average deal size | 50% | 87% |
| **$315M** | | |

*Source: Thomson Reuters*

### Top 10 A&D deals 2018

| Announced | Target name | Target nation | Acquirer name | Acquirer nation | Status | Deal value¹ | Category |
|---|---|---|---|---|---|---|---|
| 02/09/18 | CSRA Inc. | United States | General Dynamics Corp | United States | Completed | 9,591 | Software and Security Systems |
| 05/01/18 | KLX Inc. | United States | Boeing Co. | United States | Pending | 4,197 | Supporting Services |
| 02/14/18 | Shanghai Waigaoqiao Shipbuilding Co. Ltd. | China | China CSSC Holdings Ltd. | China | Pending | 980 | Arms and Vehicles |
| 06/29/18 | Power Products Llc-Global Marine & Mobile Business | United States | Brunswick Corp. | United States | Pending | 910 | Electronic Equipment |
| 05/30/18 | Boat Holdings LLC | United States | Polaris Industries Inc. | United States | Completed | 825 | Arms and Vehicles |
| 01/26/18 | Shanghai Waigaoqiao Shipbuilding Co. Ltd. | China | Investor Group | China | Completed | 756 | Arms and Vehicles |
| 05/02/18 | S.R.I.F. NV | Belgium | Spirit AeroSystems Holdings Inc. | United States | Pending | 650 | Aircraft and Parts |
| 05/03/18 | Bombardier Inc.-Downsview Property | Canada | Public Sector Pension Investment Board | Canada | Completed | 635 | Aircraft and Parts |
| 03/11/18 | Israel Military Industries Ltd. | Israel | Elbit Systems Ltd. | Israel | Pending | 552 | Arms and Vehicles |
| 03/19/18 | Extant Components Group Holdings Inc. | United States | TransDigm Group Inc. | United States | Pending | 525 | Electronic Equipment |

*Source: Thomson Reuters and other publicly available sources*
*¹ In Million USD*



### Elite Metal Manufacturing

Elite Metal Manufacturing (EMM) was the first pillar of the Elite Aerospace Group and functions as one of the company's primary service offerings. Since inception, EMM has rapidly become a standout component manufacturer in the aerospace industry. In stark contrast of the "PO to PO" (purchase order) mindset of its competition, Elite Metal Manufacturing has focused their resources on obtaining the most advanced machine technology and expanding their business in order to provide full service customer centered solutions.

### *IRVINE, TUSTIN & HUNTINGTON BEACH FACILITIES*

#### KLX AEROSPACE: (NASDAQ: KLXI)

KLX (https://www.klxaerospace.com/klxaero/) and all its subsidiaries, is noted as the world's largest distributer, providing aerospace fasteners, consumables, and logistics service  solutions worldwide. The Aerospace Solutions Group segment distributes a wide variety of consumable components such as bolts, clips, hinges, rings, screws, carbon-faced seals, gaskets, O-rings, and various other products.

EAG supports KLX by providing a variety of panel inserts, or fasteners, that are precision machined on our Swiss-Turn Production Line at our Irvine, CA facility. As a strategic supplier to KLX, and a Master

*Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.*

Confidential                                                                                     DAV000056



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

Long-Term Agreement (LTA) holder, EAG is positioned to grow our business with this customer and has already added additional volumes & part numbers since landing our initial LTA on 8/24/17. Furthermore, with Boeing's recent acquisition of KLX Aerospace, this places EAG in a stronger position for growth as we are approved suppliers to both of these companies. The future is bright, and we are proud to have KLX, Boeing, on board as a strategic customer to EAG.

**DUCOMMUN: (NYSE: DCO)**

Ducommun (https://www.ducommun.com/) is a global supplier & integrator of a wide variety of manufactured components, as well as engineering services to the Commercial Aerospace, Defense and Orbital Launch Industries.



Earlier this year, EAG was awarded 50% of the volume requirements for a work package consisting of 36-part numbers pertaining to the 737 MAX Program, specifically the Spoilers of the aircraft. This 4-year contract, worth approximately $6MM per initial order volumes is a game changer for EAG, as it opens the door to many other programs we can support for this leading Tier 1 Supplier to the A&D marketplace. Based on our performance thus far in our planning phase for this project, the customer has already increased the volume requirements and has indicated an interest in moving the remainder of work package to EAG, predicated on successful performance in the first few months of production in 2019.



*source: Okuma*

We are currently in process of fulfilling the First Article Inspection (FAI) units, or test units, for these metallic components. Considering the high-volume manufacturing requirements for this product set, our manufacturing engineering team has selected a Flexible Manufacturing System (FMS) solution for ongoing production at rate. After a thorough, competitive bidding process we selected the Okuma MB-5000H w/ 318 Tool Matrix Magazine, along with a Fastems Flexible Pallet Container (FPC). Here's a link to an informative YouTube video that explains how the system works: https://www.youtube.com/watch?v=Br2eEpiiwvU

In order to industrialize for this new machining cell, we plotted the exact space that will be designated for this new equipment, and broke ground at our Tustin, CA facility to prepare for the arrival of these machine tools. This is a hallmark occasion for us at EAG as it reflects our continual efforts to develop the Tustin, CA facility into the "Factory of the Future." Additionally, we are strategically working on becoming certified for the Outside Process (OP) finishing requirements for these parts, as the goal is to keep the components in house at EAG from start to finish in order to





lower costs and maximize profitability. Our customer is excited about our approach and appreciates EAG's efforts to partner with them on this project.

*Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.*

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

6

Confidential

DAV000057

**AIRCRAFT HARDWARE WEST (AHW):**



AHW (https://ahw-global.com/) is a successful international distributor of hardware products to the A&D Industry. This customer has 3 distribution locations: 1. Long Beach, CA (HQ), 2. Rancho Cucamonga, CA and 3. Chihuahua, Mexico, specifically in support of Zodiac Aerospace's Seating Division. Our senior leadership at EAG has a long-standing relationship with the ownership of AHW and we have grown our business with them significantly since the inception of the company.

Now, with two LTA's in hand and continued growth across multiple programs, EAG's partnership with AHW is positioned to develop further as the program rates continue to increase with our shared customers. Specifically, EAG manufactures multiple variations of threaded/non-threaded panel inserts, or fasteners, along with bushings, bolts, and various other types of hardware for AHW. We are proud to have them as one of our first, and key, customers to the organization.

*source: AHW*

**AIRBUS ONEWEB: (OTCMKTS: EADSY)**

Airbus and OneWeb Satellites (https://www.airbus.com/space/telecommunications-satellites/oneweb-satellites-connection-for-people-all-over-the-globe.html) formed a strategic partnership to achieve a shared mission: to develop and launch a constellation of microsatellites in effort to provide high-speed internet access anywhere in the world. The key differentiating factor in their business model is developing the ability to rapidly build light-weight satellites in a consistent and repeatable manner; utilizing automated assembly and integration technology will aid greatly in this effort. Ultimately, as in any program, true success hinges on the ability of their supply chain to support them with successful on-time delivery and quality products throughout the life of the program.



*source: Airbus OneWeb*

Accordingly, EAG performed approximately 1.5 years of Research & Development (R&D) support on design for manufacture (DFM) improvements for the structural metallic components of these micro-satellites. Collectively, all this hard work and diligent effort has successfully led to design stability, and ultimately, an executed Supplier Contract with Airbus OneWeb Satellites in June of 2018 to support them with high-volume mass production of these components. This work package is comprised of 26 unique part numbers to support 900 shipsets across 4 years, with an additional 700 shipsets as an option. The contract has a value of $7.5MM for the first 4 years, and the option is valued at approximately $5.8MM. We are excited to continue our industrialization efforts to support this part package and grow the program even further based on our own efforts to automate and streamline our operations towards lights-out production for this program.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com                    7

                                                                    DAV000058



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

**RAYTHEON: (NYSE: RTN)** Raytheon (https://www.raytheon.com/) is a leading defense contractor to the US Government and a global provider specializing in weapons manufacturing, as well as electronic components for military and commercial applications. Most recently, Raytheon was just awarded a $1.5 Billion production contract for Poland's Patriot Integrated Missile and Defense System. With $25 Billion in sales, in 2017, and new contracts like the one mentioned above, this customer is positioned for solid growth in the years to come. Our objective is to continue to leverage our performance standard and positive reputation towards further developing new contracts with Raytheon.



Raytheon – Space Mission Solutions is a division of the company that has decades of experience supporting the Orbital Launch Industry. As a global provider of a variety of space-related products and services, this is a key area where EAG supports this customer, in virtue of our acquisition of Halo Industries in Huntington Beach, CA.

*source: Raytheon*

*PROSPECTIVE CUSTOMERS – PENDING PROPOSAL SUBMISSION*

**ENSIGN-BICKFORD AEROSPACE AND DEFENSE (EBAD):**



EBAD (https://www.eba-d.com/) is a manufacturer of hardware and energetic systems, and has a broad spectrum of capabilities that are utilized in the Commercial Aerospace & Defense, and Orbital Launch industries. Currently, EAG is working directly with the EBAD engineering team on design improvements for manufacture (DFM) for Release Mechanism Actuators that pertain to space applications. Design modification suggestions were recently submitted, and we are anticipating detailed engineering updates and revisions are slated to be completed before the end of the year.

Based on the recommendations provided by EAG, we are hopeful that we will be identified as the supplier of choice for this particular part package, with a conservative approximate value of $500K annually. There are several variants of this product line in terms of size requirements that could also be awarded, so we are excited to hear back from EBAD, and officially on-board them as a customer. To that end, we have already participated in their Supplier Qualification Process and accordingly, we recently passed their rigorous Quality Audit, a main gate towards becoming an approved supplier.

Since our initial engagements have gone so well, EBAD is already in the process of sending us more Requests for Quotes (RFQ's) to review with our engineering and estimating teams. The potential for growth with this prospective client is very promising, and we look forward to on-boarding them soon as a new customer to EAG.

**MECACHROME:**

Mecachrome (http://www.mecachrome.com/5-36802-Home.php) has been in business for the past 8 decades and has developed a sound reputation as a precision R&D innovator in the marketplace. They are now a prominent competitor providing a wide range of services including engineering design, manufacturing, and complex assembly capabilities. The company consists of 3 main divisions: 1. MK Automotive, 2. Aero-Engine and 3. Aerostructure.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

Confidential

DAV000059



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

Through organic Business Development efforts, our Sales Team successful gained Mecachrome's attention through their initial supplier qualification process. After diligent communication efforts, EAG received a large RFQ package for 57 part numbers, totaling approximately 13,457 parts annually with demand through 2020. These components are in support of their end-user, Airbus, directly pertaining to the A320NEO, A330NEO, A330, A350, AA400 and



Source: *Mecachrome*

Passport 20 Programs. Initial estimated values of this contract range from $10MM to $30MM, or more annually, depending on the volume rates and numbers of parts awarded. Our engineering and estimating teams are currently conducting their detailed review process, and we are excited about the business potential and partnership capability with this prospective customer. Here's a link to a brief YouTube video that describes the types of components supported by the Aerostructures Division at Mecachrome: https://www.youtube.com/watch?v=CtNd2RfM4oI

*PROUD CUSTOMERS OF EMM*



**BOTHELL, WA & BOZEMAN, MT OFFICES**



### Elite Engineering Services

A crucial piece of Elite Aerospace Group's business plan is the recognition that the current supply chain is not providing the level of comprehensive service that their customers desire. By providing both metallic component manufacturing and engineering services under the same roof, EAG's customers experience a level of service and efficiency far superior to the competition.

### DUCOMMUN: (NYSE: DCO)

Our Engineering Division continues to actively support Ducommun (https://www.ducommun.com/) for both the TOW Missile Case and Airbus A320 Blocker Door projects. Here's some exciting details about each project:

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

9

Confidential

DAV000060

**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

*A320 Blocker Door:* We recently received a PO for the blocker door for approximately 3,000 hours of direct engineering design support worth $285 K in value. The Scope of Work (SOW) requirements for this particular program is expected to continue through Q2 of 2019. Program Design Review (PDR) for this blocker door project is scheduled for mid-October. Additionally, our EES engineers have been invited to meet with Ducommun's Engineering Team at the Gardena, CA facility to support additional design review for this project.



*TOW Missile Case:* The TOW missile case is part of the TOW Weapon System providing a major portion of the electromechanical interface between the TOW RF missiles and the platforms from which they may be launched. The principle functions of the case are wired electrical and mechanical interface, missile encapsulation and environmental protection. Our SOW has expanded to include prototype and production design support for this program. Specifically,

EES is performing engineering and design services for Ducommun Aerostructures, supporting the



following areas of need:

➢ Design tooling for prototype development and production units.

➢ Develop manufacturing instructions and industrialization plans to support high-volume production of the TOW case itself.

➢ Accordingly, the YTD revenue for this particular project is valued at approximately $169K thus far, and our total value of PO's in hand for this project equals $243K at present.

We are proud of our developing relationship with Ducommun. In fact, senior leadership officials from Ducommun will be visiting our Bothell, WA office to discuss further support opportunities for EES, specifically regarding our CNC programming services. As always, we will utilize this engagement as a platform to further showcase our range of capabilities enterprise-wide across EAG.

**AIM AEROSPACE:**

AIM Aerospace (http://www.aim-aerospace.com/) has been in business for over 30 years and has developed into a prominent supplier of composite products, especially to The Boeing Company, servicing the 737, 777 and 787 Programs.

In August 2018, our EES Division officially on-boarded AIM Aerospace as a new customer to our organization. We completed our first project for AIM's Poway, CA R&D group and the customer feedback we received was very positive. They were impressed overall with our work product, the quality of our

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

Confidential
DAV000061



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

designs, the level of communication/support and pledged to bring us in on more projects going forward. Accordingly, we have a second project nearing completion, in which we are providing stress engineering and static test support to AIM. As you can imagine, this level of positive regard bodes well for all divisions of EAG, and therefore, we received a new Request for Quote (RFQ) for our EMM Division to provide a machining proposal for a series of metallic components in support of the Boeing 787 Program. This is another great example of our ability to cross-pollinate opportunities between our business units, embracing our overall value-proposition at EAG.

**THE BOEING COMPANY – ROTORCRAFT DIVISION: (NYSE: BA)**

Since the acquisition was completed in late 2017, our team out of Bozeman, MT has successfully supported multiple work packages for The Boeing Company (https://www.boeing.com/), specifically their Rotorcraft Division. These packages consisted of custom designed, engineered, manufactured, assembled and kitted aluminum tooling components for the Apache Helicopter. EAG was previously told that the Boeing Rotorcraft division is so satisfied with our services that they will be using EAG as a preferred source where possible going forward. Since then, we have received additional work packages and Boeing's Global Supply Chain Team has indicated that they would like work with EAG as much as possible.



Accordingly, we were notified regarding a new RFQ that is due to be received soon for another complete shipset of drill fixtures. This package is estimated to contain approximately 700 tooling components, and the SOW includes Elite providing complete design/build solutions including Design, Manufacturing, Inspection, Kitting, and Delivery of these parts, much like the kit showcased in the photo above.

Our YTD revenue from Boeing Rotorcraft is valued at over $650K, the next project should result in similar revenue targets ($600-$700K) putting the yearly total for this customer well over $1MM. Currently, we are working to secure additional tool design work from Boeing Rotorcraft, pending on-site meetings at their Pennsylvania facility and will continue to work diligently towards expanding our business with this customer.

**ZODIAC AEROSPACE: (OTCMKTS: SAFRY)**

Zodiac Aerospace (https://www.zodiacaerospace.com/en), recently acquired by **Safran Aerospace** for $7.7 Billion, is a premier global supplier of Aircraft Interior components and has a long trajectory of growth and development in the A&D Industry. The company is centered around 5 main divisions: Zodiac Aerosafety, Zodiac Aircraft Systems, Zodiac Cabin & Structures, Zodiac Galleys & Equipment and Zodiac Seats.


source: Zodiac Aerospace

Our Engineering Team has been providing steady services to Zodiac in support of their customer

*Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligated ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.*

Confidential                                                                                                    DAV000062

CONFIDENTIAL AND PROPRIETARY MEMORANDUM

Bombardier, specific to interiors design services for their CRJ Series of aircraft. YTD revenue for Zodiac is valued at approximately $500K thus far and continues to grow at a healthy pace. Our objective is to leverage our new and existing relationships with this customer, and grow into other areas of engineering support. We anticipate that this will eventually open additional opportunities so that EAG can develop a manufacturing presence at Zodiac as well.

**PIONEER HUMAN SERVICES:**

Pioneer Human Services (https://pioneerhumanservices.org/) parent company is a non-profit organization that helps individuals released from jail or prison with a variety of post-incarceration support mechanisms including: counseling, treatment, housing, training, job-placement and employment. Additionally, Pioneer has developed a full-service manufacturing division of their company, specializing in sheet metal



fabrication and a variety of machining modalities across their 110K square feet facilities. Accordingly, Pioneer has successfully developed a reputation as a key Tier 1 supplier in the aerospace industry, supporting a wide variety of programs including: Single-Aisle commercial aircraft, Wide-Body commercial aircraft, Cargo and Defense aircraft and AOG, emergent demand and out of production spares manufacturing.

Pioneer continues to be a key customer to our EES Division, specifically to our CNC engineering group. For instance, our team recently completed a large package, supporting 75 part-numbers for off-load CNC programming services, valued at approximately $55K for this SOW. EAG's YTD revenue with Pioneer is valued at approximately $168K and the future remains bright for continued growth due to our excellent relationship with this customer. In fact, Pioneer has openly recognized our EES Division as a highly-valued supplier to their organization. Our engineering team graciously received a special invitation to attend their annual "Change Maker" event on 9/26/18. Dan Hawkins, their General Manager invited our team to sit at the table with their Executive Leadership Team, and we were very honored to take part in such a momentous occasion at Pioneer Human Services.

**ENCORE GROUP:**

EnCore Group (https://encoregroup.aero/) is a premier global supplier in the Commercial Aerospace Industry, consisting of three main divisions: EnCore Interiors (Aircraft Interiors), Lift by Encore (Aircraft Seating) and Encore International (Manufacturing). Our EES Division has been growing the business specifically with the EnCore Interiors Division of this customer. Most recently, we have been awarded with an opportunity to support their customer, Delta Airlines for a 767 Retrofit Project. The SOW involves the coordination, design,



Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

12

DAV000063

modeling and top-level 2D drawings for 4 monuments in total. The initial contract value is at $165,300 and there is a separate proposal that has been submitted for the rest of the drafting which will be awarded at a later date, per the customer. The drafting only bid package was quoted at $50,600 in value. Due to the successful performance delivered and key relationships developed thus far, EAG is confident that we can continue to aggressively grow our business with this strategic customer as well.

## ELITE DIGITAL ENTERPRISE (EDE) – A SUBDIVISION OF EES:



*Product Lifecycle Management (PLM) Services Spotlight:*

EDE specializes in partnering with its customers to create solutions to business, technical, and operational challenges. We offer a wide range of software solutions including Business Process Optimization, Solution Architecture, Technology Deployment, Mechanical Design, and Manufacturing Engineering services. The following are some highlights regarding various customers we support:

**Stratolaunch:**
(https://www.stratolaunch.com/):

Stratolaunch's mission is to revolutionize the approach towards space launch itself, making it safer, consistent and ultimately a more reliable process. Their Stratolaunch plane is acclaimed as "the largest in the world," however it takes flight and lands like any other type of aircraft. Once the aircraft reaches its cruising altitude, it has the capability of releasing one or more launch vehicles from the sky at a time.

### Giant satellite launcher takes shape
The Stratolaunch air-launch platform – the largest aircraft ever to be built – is aiming to begin ferrying rockets to space by the end of the decade

STRATOLAUNCH 351 "Roc": Twin-bodied plane being built by *Scaled Composites* in California, close to completion

Cockpit: Three crew

**Mating adaptor** Designed to hold up to 230,000kg load

**Airframe** Mainly lightweight graphite composites

Satellite payload

**Booster rocket**

**Wingspan 117m**

Six Boeing 747 engines

**Funding:** Microsoft co-founder **Paul Allen.** Estimated development cost: $300m

**2** Ascent to launch altitude – aircraft range 2,200km

**3** Booster rocket released at 9,000m (30,000ft)

**88m An-225** (world's largest plane to date)

**MISSION PROFILE**

**1** Aircraft requires minimum runway length of 3,650m (12,000ft) for takeoff

**4** Rocket takes satellite payload to low Earth orbit

**5** Aircraft returns to base for reuse. Mission avoids huge fuel costs of launching rocket from Earth

Sources: Stratolaunch Systems, Vulcan Aerospace

© GRAPHIC NEWS

Our engineering team at EES is supporting Stratolaunch on the software side by providing them with a Creo Development Kit. Creo is a PTC product (https://www.ptc.com/en/products/cad/creo) that is one of the industry's leading CAD software programs for 3D Product Design. This software supports the world's finest engineers in their prototype & manufacturing design efforts. EAG sold this software package to our customer for approximately $10K in initial value. Subsequent proposals have been submitted for an additional $15K per year, for 3-year subscription packages. Stratolaunch is an up and comer to the Space Industry and we look forward to exploring other areas where we can support them in the realization of their objectives.

## SPIRIT AEROSYSTEMS: (NYSE: SPR)

Spirit AeroSystems (https://www.spiritaero.com/) is a top Tier 1 supplier in the Aerospace & Defense industry, providing aerostructures manufacturing solutions worldwide directly to OEM's like Boeing and Northrup Grumman.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

13

**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

EES has recently provided Spirit's engineering team with an assortment of Creo licensing agreements so they can upgrade their overall technical product design & engineering capabilities. Additionally, our engineering team will be providing a Creo Training Workshop to facilitate the on-boarding and utilization of the software program, with services valued at approximately $22,400 thus far. Considering our history of knowledge on typical platforms supported by this customer, we will utilize this opportunity to cross-market all of our capabilities across EAG. We are confident that we can expand our level of support in both engineering services, as well as for high-volume manufactured product solutions in the future.



*source: Spirit AeroSystems*

**ENCORE GROUP:**

As described above, one of EnCore Group's main divisions is named Lift by EnCore (http://www.liftbyencore.com/). This division provides premier seating solutions to the Commercial Aerospace Industry. Specifically, this division is a leading seating manufacturer supporting the 737 Max and 787 Dreamliner Tourist Class Seats.

In partnership with PTC, our PLM Team has successfully leveraged their growing relationship with this customer by expanding our services to include software subscriptions and support for an application called Windchill. This application is another PTC Product providing a wide range of capabilities centered around technical data control and management. Here is a link to their website for more information about this software:



*source: PTC*

(https://www.ptc.com/en/products/plm/plm-products/windchill). We recently renewed their Windchill license agreement, valued at approximately $16K with room to grow our partnership in other areas where we can support.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

14



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

*PROUD CUSTOMERS OF EES*





## CROSS-SUPPORTED FROM ALL FACILITIES

As described earlier in this quarterly report, our intent is to restructure TTF Aerospace as premier Aircraft Interior Design and Manufacturing division of EAG under our EAI Division. During our Management Agreement, EAG deployed key personnel to provide full support in the areas of

### Elite Aircraft Interiors

Elite Aviation Interiors was formed to meet the extraordinary demand challenges currently being faced by the commercial aircraft interiors market. Not unlike the metallic manufacturing segment of the aerospace industry, the commercial aircraft interiors vertical is vastly under-served as the supply chain has been pushed past its capacity.

Executive Management, Supply Chain Management, Engineering support and overall General Management of the organization. In those 6 months, we were able to grow TTF from $13MM to $35MM in booked business, with the business potential to hit a backlog rate of $50MM in 2019.

The synergies between EAG and TTF have been instrumental in supporting growth customers such as Airbus, Southwest Airlines, Delta Airlines and UPS Cargo. Industry wide, TTF Aerospace has developed a reputation as a quality provider. Now,



*source: TTF Aerospace*

with the support of EAG's expertise in engineering and manufacturing, we can further strengthen their ability to grow into a premier global provider of aircraft interior products and services. We have meetings

*Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.*



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

scheduled in the month of October 2018 and look forward to closing the loop on this acquisition and adding TTF's business operations and contracts to the booked backlog for EAG.

*E360 TECHNOLOGIES:*

**DASSAULT FALCON JET (DFJ): (OTCMKTS: DUAVF)**



(https://www.dassaultfalcon.com/en/Pages/Home.aspx) The foundation of this French Airliner traces back to the early 1900's from its founder, Marcel Bloch, also known as Marcel Dassault in the later years of his life. After a rich history of developing over 100 prototypes of both combat aircraft and business jets, DFJ evolved into a global competitor with much runway ahead for growth. The parent company, Dassault Aviation, is widely known as "the only aircraft manufacturer in the world to build combat and business jets."

Our E360 Technologies division supports DFJ as a sole-source provider for our SkyDock product line consisting of compact USB chargers for their business jets. The SkyDock product line was designed for today's high-end mobile devices in mind, i.e. Apple's Lightning™ USB-enabled devices, etc. As DO-160G-certified components, all SkyDock models meet the highest standards of the aerospace industry and are also certified for cockpit and helicopter installations as well.



SkyDocks are manufactured with controlled IC circuits and provide full current output for the latest generation Apple iPad, iPad Mini, iPhone or any portable electronic device using the Lightning™ (connector) cable. They are also compatible with most consumer grade USB-charged devices such as Android smartphones and tablets, and digital music players and cameras. SkyDocks are ideal for almost all general aviation applications and may be installed in seats, cabin side ledges and monuments. As added precautions, special circuits for fused input protection, transient protection and over current protection are employed to protect the aircraft and the device being charged. At full power, SkyDock is over 85% efficient and provides the connected device with maximum charge with minimal wasted power. EAG is proud to support DFJ and is confident we can continue to grow our partnership together.

**BOMBARDIER: (OTCMKTS: BDRBF)**



Bombardier (https://www.bombardier.com/en/home.html) traces its roots back to its founder Joseph-Armand Bombardier, in the mid 1900's from the Canadian Province of Quebec. Today, Bombardier is a the 4th largest (Original Equipment Manufacturer (OEM) of aircraft and global leader in both Aerospace and the Rail Industry out of Canada. The company consists of 4 main divisions worldwide as follows: Transportation, Business Aircraft, Commercial Aircraft and Aerostructures & Engineering Services.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com



**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

Much like DFJ, EAG services Bombardier as a direct supplier of the SkyDock Product Line via our E360 Technologies Division. This product line consists of both dual and single port devices and can also be custom designed to accommodate any configuration of aircraft seating, side ledges, galley's, flight decks or cabin specific locations required by the customer. As we continue to grow our business with Bombardier, we intend to expose synergies where EAG can support them in additional areas, including engineering design services and high-rate manufactured components.

## INDUSTRY UPDATES AND ARTICLES:

### AIRBUS – GLOBAL MARKET FORECAST (GMF)

As the world's 2nd largest airframe manufacturer, Airbus is global leader supporting the Aerospace & Defense Industry in multiple segments of the market. As one can imagine, considering the level of competition in this industry, sound business strategy must be predicated on calculated risk assessments and market forecasting, as a core component of a comprehensive market analysis. Accordingly, Airbus



places a great deal of effort into the research, review and statistical analytics to develop solid projections for future numbers, characteristics and business trends in our A&D Marketplace. Overall, this GMF Report serves as another form of corroboration to our assumptions about the success and growth of the industry. Please click on the following link for access to all the attachments associated with this report:

https://www.airbus.com/aircraft/market/global-market-forecast.html

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**

### BLOOMBERG BUSINESSWEEK

On 7/26/18, Bloomberg published a fascinating article entitled: *"The New Rockets Racing to Make Space Affordable."* The great thing about this article is that it provides an informative and historical overview of payload capability per type of rocket vs. cost per launch for each respective vehicle. These comparisons among "older rockets" and new generation rockets, like the Falcon 9 from SpaceX demonstrate the level of technological advancements in space travel, where much smaller rockets are now able to carry much larger payloads at costs historically lower than before. This depicts SpaceX and companies like them, such as Blue Origin, Virgin Orbit, etc. as true



disrupters to the Space & Orbital Launch Industry, providing additional validation to the bright future ahead for space travel. This is quite promising for EAG considering our robust capabilities to manufacture complex 5 Axis components, as well as our ability to scale and industrialize as R&D programs evolve and become production rate programs. Here is a link to this article for your review: https://www.bloomberg.com/graphics/2018-rocket-cost/

### MARKET WATCH – INDUSTRY ARTICLE

On 9/19/18, Market Watch published an informative article entitled: *"Aerospace and defense sector may keep flying high for years to come."* As memorialized in this publication, the marketplace is doing some incredible things right now, and shows no signs of slowing, considering the datapoints cited that validate

| | 2018 | 3 years | 5 years | 10 years | 15 years | 20 years |
|---|---|---|---|---|---|---|
| S&P 500 Aerospace and Defense subsector | 12% | 101% | 152% | 333% | 749% | 924% |
| S&P 500 index | 10% | 58% | 91% | 188% | 288% | 312% |

Source: FactSet

our industry. Accordingly, recognizing these types of trends enable us to steer in certain directions based on market forces, and this is what keeps us relevant and ahead of the game in such a bullish marketplace. This particular article focuses on the growth anticipated within the defense sector and does a great job of analyzing a few publicly traded defense companies compared to the S&P 500 Index. Across the board we're seeing real results from these mainstays in the marketplace, that are anticipated to continue into the distant future as defense programs remain relevant and necessary, and newly funded initiatives come to light, i.e., Space Force, etc. Here is a link to this illuminating article for your review: https://www.marketwatch.com/story/aerospace-and-defense-sector-may-keep-flying-high-for-years-to-come-2018-09-18

## CORPORATE GOVERNANCE UPDATES:

### LEGAL UPDATE AND GO-FORWARD STRATEGY:

As many of you may know, the Elite Aerospace Group and some of our employees received SEC subpoenas seeking, among other things, certain information related to Elite's form consultant, Evolution Consulting, Inc., its principals and related entities, as well as information regarding Elite's structure, contracts, financial information, and investor materials. Elite is cooperating fully with the investigation but cannot predict its outcome or timing. Upon learning of the SEC's investigation, Elite immediately retained counsel, Stradling Yocca Carlson & Rauth, a California based law firm with an excellent reputation in helping companies navigate through matters like this, and they continue to support us in this process.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

18

Confidential

DAV000069

**CONFIDENTIAL AND PROPRIETARY MEMORANDUM**



Elite has also terminated our consulting arrangement with Evolution. All services previously provided by Evolution Consulting were transitioned in-house, and/or managed by new vendors. In response to this termination, we have restructured our Investor Relations Department to enhance our compliance with all rules and regulations. We eagerly look forward to concluding this investigation and turning all of our attention back on the growth trajectory in front of us centered on organic and inorganic activities that will continue to benefit our business going forward.

Additionally, we have selected a firm to represent Elite as our General Counsel in regard to all of our legal strategies and matters from this point onward. Hart, David, Carson, LLP is a firm that is based out of Chicago, IL. This team will support overall areas of legal matters for EAG. We are proud to have their support as our Legal Team, and should you have any questions about any of the topics discussed above, please feel free to contact them at their office: (630) 395-9496.

Lastly, EAG is in the process of transitioning from a 506C (regulation D) offering and pivoting towards a preferred mechanism of institutional debt-based financing. This strategy has always been a milestone to achieve by this time, if not sooner, and we are excited to steer the organization towards this format of financial collaboration. We are actively participating with various middle-market firms and key investors in due-diligence reviews to ensure a healthy partnership going forward. The intent is to have this new debt-based financing instrument(s) support the overall growth of company, in terms of financing industrialization costs for existing and new programs, as well as financing pending and future acquisitions of additional companies. We are confident that this strategy can support our global efforts to further develop our enterprise and overall range of capabilities, making EAG even more competitive and able to support a wider scope of products and services for the Aerospace Industry. As we continue down this flight path, we will continue to keep each of you posted regarding developments on this go-forward strategy.

## CLOSING REMARKS FROM THE EXECUTIVE TEAM:

As you can see from all the data and representations provided above, we clearly have a market that continues to expand and break boundaries every year. These factors continue to highlight the dire need for the products, services, and value proposition offered by the Elite Aerospace Group. While our attention from inception centered on the boom within the commercial aerospace segment, since then our business model has grown beyond imagination, and new markets have emerged, that dovetail perfectly with the Space/Orbital Launch and Defense Industries.

We're only at the tip of the iceberg with regards to new industries burgeoning and old industries flourishing. Accordingly, EAG has developed into a competitive supplier of a plethora of products & services and continues to stay at the leading edge in its recognition and ability to strategically and pragmatically support this extraordinary demand pressure that exists in the Aerospace & Defense Industry.

Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

19

DAV000070

**ELITE**
AEROSPACE GROUP

CONFIDENTIAL AND PROPRIETARY MEMORANDUM

We hope you enjoyed all of our updates in this Quarterly Report and please feel free to contact us with any questions or feedback. As always, we will continue to keep you posted and appreciate all of your support in growing our business together!

Our Very Best,

| Dustin Tillman | Zeeshawn Zia | Lee Smith | Bobby Sawhney |
| --- | --- | --- | --- |
| CEO | President | COO | VP – Investor Relations |

Attachment 1: "PwC H1 2018 M&A Report"
Attachment 2: "Airbus GMF-2018-2037"
Attachment 3: "The New Rockets Racing to Make Space Affordable"
Attachment 4: "Aerospace and defense sector may keep flying high for years to come – MarketWatch"

## Notification & Disclosures Concerning Forward-Looking Statements:

*This document contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Words such as "may," "should," "expects," "intends," "projects," "plans," "believes," "estimates," "targets," "anticipates," and similar expressions generally identify these forward-looking statements. Examples of forward-looking statements include statements relating to our future financial condition and operating results, as well as any other statement that does not directly relate to any historical or current fact. Forward-looking statements are based on expectations and assumptions that we believe to be reasonable when made, but that may not prove to be accurate. These statements are not guarantees and are subject to risks, uncertainties, and changes in circumstances that are difficult to predict. Many factors could cause actual results to differ materially and adversely from these forward-looking statements. Among these factors are risks related to: (1) general conditions in the economy and our industry, including those due to regulatory changes; (2) our reliance on our aerospace customers; (3) changing budget and appropriation levels and acquisition priorities; (4) our dependence on U.S. government contracts; (5) our reliance on fixed-price contracts; (6) our reliance on cost-type contracts; (7) our dependence on our subcontractors and suppliers, as well as the availability of raw materials; (8) changes in accounting estimates; (9) changes in the competitive landscape in our markets; (10) threats to the security of our or our customers' information; (11) potential adverse developments in new or pending litigation and/or government investigations; (12) customer and aircraft concentration in our customer financing portfolio; (13) changes in our ability to obtain debt on commercially reasonable terms and at competitive rates in order to fund our operations and contractual commitments; (14) realizing the anticipated benefits of mergers, acquisitions, joint ventures/strategic alliances or divestitures; (15) the adequacy of our insurance coverage to cover significant risk exposures; (16) potential business disruptions, including those related to physical security threats, information technology or cyberattacks or natural disasters; (17) work stoppages or other labor disruptions; (18) potential environmental liabilities.*

*Any forward-looking statement speaks only as of the date on which it is made, and we assume no obligation to update or revise any forward-looking statement, whether as a result of new information, future events, or otherwise, except as required by law.*

*Material contained herein may include predictions, estimates or other information that might be considered forward-looking. While these forward-looking statements represent our current judgment on what the future holds, they are subject to risks and uncertainties that could cause actual results to differ materially. You are cautioned not to place undue reliance on these forward-looking statements, which reflect our opinions only as of the date of this document. Please keep in mind that we are not obligating ourselves to revise or publicly release the results of any revision to these forward-looking statements in light of new information or future events. This material will attempt to present some important factors relating to our business that may affect our predictions. Much information and information contained herein was also obtained from sources deemed reliable but to which no independent research has been performed to verify or discredit.*

15773 Gateway Circle, Tustin, CA 92780 - Office: (949) 748-1299 - Fax: (949) 272-3780
Email: info@eliteaerospacecorp.com - Website: www.EliteAerospaceCorp.com

DAV000071

**EXHIBIT D**

**FORM OF INVESTOR QUESTIONNAIRE**

**[ATTACHED]**

DAV000072

**Elite Aerospace Group, Inc.**
**A Delaware Corporation**

**Investor Questionnaire**

**for**

**Purchase of 12% Convertible Notes**

**FOR THE EXCLUSIVE USE OF:**

Return To:

Elite Aerospace Group, Inc.
15773 Gateway Circle
Tustin, California 92780
Attn: Mr. Dustin Tillman

Confidential

No person is authorized to receive the Investor Questionnaire unless they are preceded or accompanied by a copy of the Private Placement Memorandum. Except as may be set forth in the Private Placement Memorandum, no oral or written representations have been made, or oral or written information furnished to any prospective investors. Reproduction or circulation of these materials, in whole or in part, is prohibited except as specifically provided herein.

EACH EXISTING MEMBER OR PROSPECTIVE INVESTOR (EACH, AN "OFFEREE") PURCHASING 12% CONVERTIBLE NOTES (THE "NOTES") SHOULD EXAMINE THE SUITABILITY OF THIS TYPE OF INVESTMENT IN THE CONTEXT OF HIS/HER OWN NEEDS, PURCHASE OBJECTIVES AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS/HER INDEPENDENT INVESTIGATION AND DECISION AS TO SUITABILITY AND AS TO THE RISK AND POTENTIAL GAIN INVOLVED. ALSO, EACH OFFEREE MAY CONSULT WITH HIS/HER ATTORNEY, ACCOUNTANT, FINANCIAL CONSULTANT OR OTHER BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF THE PROPOSED PURCHASE.

Elite Aerospace Group, Inc. (the "Company") takes precautions against entering into unsuitable associations. The Investor Questionnaire seeks information sufficient to allow the Company, to conduct a background investigation of individuals or entities who seek to invest in the Company. The information provided herein will be held in confidence, but it may be released by the Company to its agents and/or consultants hired to assist the Company in conducting due diligence investigations, to appropriate regulatory agencies under the Act, or by order of a court of competent jurisdiction. Please follow the instructions carefully. The Company will treat all information confidentially, except as otherwise indicated.

THE COMPANY WILL NOT ACCEPT AN INVESTOR QUESTIONNAIRE THAT IS MISSING INFORMATION OR SIGNATURES. OUR COMPLIANCE PROCEDURE REQUIRES COMPLETE INFORMATION AT THE TIME OF SUBMISSION.

DAV000074

## INSTRUCTIONS FOR PURCHASING CONVERTIBLE NOTES:

1. **Complete the Investor Questionnaire and Accredited Investor Status form and sign the signature pages after each section.**

2. **Deliver the FULL Investor Questionnaire and Accredited Investor Status together with documentary evidence.**

3. **Closing of the purchase will take place at a time and date to be determined by the CEO and the executed documents will be forwarded to the Investor.**

## CONTENTS

Section I -    **Investor Information and Questionnaire**
Section II -   **Accredited Investor Status**

**Supply evidentiary documentation as applicable.**

## OWNERSHIP TYPES

1.    <u>Individual Ownership</u>
      It should be noted in instances where investors are purchasing Notes as a married couple both spouses must complete and sign this document. A copy of each individual's driver license or state ID or naturalization papers is required with the submission of the Investor Questionnaire. Each investor also must provide the documentary evidence required hereunder for accredited investor status.

2.    <u>Trusts</u>
      If an investor is purchasing a Note through a trust that is a taxpaying entity, then all trustees must complete and execute the Investor Questionnaire on behalf of the trust and all questions concerning income, assets, and accreditation will pertain to the trust.

3.    <u>Entities (i.e., limited liability companies, corporations, partnerships, etc.)</u>
      If purchasing as an entity, please provide documentation evidencing existence of such entity and governing documentation including ownership structure.

**<u>ALL REQUIRED INFORMATION MUST BE SUBMITTED WITH THE INVESTOR QUESTIONNAIRE. IF ANY DOCUMENTS ARE MISSING, WE CANNOT PROCESS THE PURCHASE UNTIL WE RECEIVE THEM.</u>**

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

DAV000075

## SECTION I - INVESTOR INFORMATION AND QUESTIONNAIRE

*EACH INVESTOR, SPOUSE, TRUSTEE, <u>AND EACH BENEFICIARY OF A TRUST AND EQUITY OWNER OF AN ENTITY</u> MUST COMPLETE THIS FORM. THIS INFORMATION MAY BE USED FOR BACKGROUND CHECKS.*

*Ownership Types*

### Individual Ownership:

a) Name of Investor:
(PLEASE PRINT)  _____

Joint Investor, if applicable:
(PLEASE PRINT)  _____

### Trusts:

b) If Trust, Name of Trust:
(PLEASE PRINT)  _____

Taxpayer Identification Number:  _____

Names of Trustees:
(PLEASE PRINT)
1) _____
2) _____

Names of Beneficiaries:
(PLEASE PRINT)
1) _____
2) _____
3) _____

### Entities (i.e., limited liability companies, corporations, partnerships, etc.):

c) Name of Entity:
(PLEASE PRINT)  _____

Entity Address:  _____

_____

Taxpayer Identification Number:  _____

Business License Number (if app):  _____

Names of Equity Owners:
(PLEASE PRINT)
1) _____
2) _____
3) _____
4) _____

Confidential

**PLEASE INCLUDE A COPY OF A VALID DRIVER'S LICENSE OR STATE ID, OR NATURALIZATION INFORMATION IF NOT U.S. CITIZEN:**

a)  Name: _____

b)  Gender (Male/Female): _____

c)  Birth Date: _____

d)  Social Security Number: _____

e)  Home Address:
    (Address of Record) _____

    City/State/Zip: _____

    County: _____

f)  Mailing Address:
    (if different than above) _____

g)  City/State/Zip: _____

h)  Addresses Used in the past
    <u>TEN</u> years: _____
    _____
    _____
    _____
    _____
    _____
    _____

i)  Current Telephone Number: _____

j)  Facsimile Number: _____

k)  E-mail Address: _____

l)  Employer: _____

    Business Address: _____

    City/State/Zip: _____

    Business Phone Number: _____

    Nature of Business: _____

    Position: _____

    Mail to be sent to:  Home Address ☐  or Business Address ☐

m)  Marital Status: _____ (or present tax filing status)

    Number of Dependents: _____

DAV000077

n)     Country of Citizenship:     _____

o)     Aliases:     _____

p)     Please list employment history for the last ten (10) years.

_____
_____
_____
_____

q)     Please list all other entities in which you have an ownership interest of five percent (5%) or greater (**NOTE**: with respect to any entity that is in the aerospace industry, whether in or out of the United States, the 5% threshold does not apply).

_____
_____
_____
_____

r)     List any business, technical, or professional licenses or permits that the individual or entity has, including the name and telephone number of the licensing entity and any disciplinary action ever taken against the individual or entity:

_____
_____
_____
_____

s)     In the previous ten (10) years, have you or any of your affiliates (meaning any entity owned or controlled by you) been a party to any bankruptcy proceedings, voluntary or involuntary, made an assignment for the benefit of creditors or taken advantage of any insolvency act, or any act for the benefit of debtors?

☐ Yes   ☐ No    If yes, provide details, however **any bankruptcy** may cause the Company to **reject** you for this investment.

_____
_____

DAV000078

t)  Have you or any of your affiliates (meaning any entity owned or controlled by you) currently owe any past taxes, fees, or obligations to any local, state or federal government?

☐ Yes ☐ No   If yes, provide details, however **any back taxes** may cause the Company to **reject** you for this investment.

_____

_____

u)  Have you or any of your affiliates (meaning any entity owned or controlled by you, **or any immediate family member or parent**) been:

a.  convicted of a criminal offense (felony or misdemeanor);

b.  arrested, indicted or charged with a criminal offense (felony or misdemeanor);

c.  subject of a criminal investigation;

d.  convicted of an Excluded offense (a felony or a violation of a controlled substance law); or

e.  arrested, indicted, or convicted or a criminal offense?

☐ Yes ☐ No   If yes, provide details, however, if you are currently a party to **any open criminal matter**, the Company **will not** approve this investment

_____

_____

v)  In the previous ten (10) years, been a party to, or been named in any civil proceeding involving fraud, deceit or misrepresentation, a plaintiff in any lawsuit initiated against a creditor or a lead plaintiff in any class-action litigation?

☐ Yes ☐ No   If yes, provide details, however, if you are currently a defendant to **any open litigation of this type which has not been dismissed with prejudice**, the Company **may not** approve this investment.

_____

_____

DAV000079

w) Have you or any of your affiliates (meaning any entity owned or controlled by you) been named as a defendant in an administrative EEOC matter or named in a lawsuit alleging discrimination, harassment or hostile work environment?

☐ Yes ☐ No   If yes, provide details, however, if you are currently a party to **any open litigation of this type which has not been dismissed with prejudice**, the Company **may not** approve this investment.

_____

_____

x) Are you delinquent with any court ordered payments, including child support?

☐ Yes ☐ No   If yes, provide details.

_____

_____

y) In the previous ten (10) years, have you been affiliated with a real estate financing that has been subject to a delinquency of 60 days or more, default, foreclosure, mortgage relief by a lender, deed in lieu of foreclosure, judgment or similar proceeding (**whether or not dismissed**)?

☐ Yes ☐ No   If yes, provide details.

_____

_____

z) In the past five (5) years, have you or any of your affiliates (meaning any entity owned or controlled by you) made any political contribution to any candidate or elected official in the State of California?

☐ Yes ☐ No   If yes, provide details.

_____

_____

aa) Have you been elected to any office in the State of California or are you related to any official elected in the State of California?

☐ Yes ☐ No   If yes, provide details.

_____

_____

DAV000080

bb) Are you or anyone related to you employed by the FAA or any other agency with regulatory authority over the aerospace industry?

☐ Yes ☐ No   If yes, provide details.

_____

_____

cc) I have previously purchased securities that were sold in reliance on the private offering exemption from registration under the Securities Act of 1933.

☐ Yes ☐ No   If yes, provide details.

_____

_____

dd) I am willing and able to bear the economic risk of an investment in the Company in an amount equal to the amount I have subscribed to purchase. In making this statement, I have considered whether I can afford to hold the Notes for an indefinite period and whether, at this time, I can afford a complete loss of my investment in the Company.

☐ Yes ☐ No

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

Confidential

DAV000081

## SIGNATURE PAGE FOR SECTION I

**THE UNDERSIGNED BEING FIRST DULY SWORN:**

1)       represents and warrants to the Company that the information set forth in Section I of the Investor Questionnaire is true and complete in all respects; and

2)       in accordance with the Privacy Act, Freedom of Information Act, and the Fair Credit Reporting Act, I AUTHORIZE the Company, and any background agency it may engage, any person associated with any education institution, past or present employer, any law enforcement agency, court, driving records, or credit reporting agency to RELEASE this information to the Company or background agency engaged for the purpose of being considered an investor and RELEASE the Company and the background agency from liability as a result of furnishing this information. I authorize that a copy of my signature be as valid as an original.

**ON BEHALF OF OR BY INDIVIDUAL INVESTOR(S):**

_____     _____
Signature Investor #1                   Signature Investor #2 (as applicable)

_____     _____
Please Print Name                        Please Print Name

**ON BEHALF OF OR BY OTHER TRUST/ENTITY (Partnership, LLC, Corporation, etc.):**

NAME OF TRUST/ENTITY:    _____

_____     _____
Signature of Trustee/Officer             Signature of Trustee/Officer

_____     _____
Please Print Name / Title               Please Print Name / Title

---

**PLEASE MAKE ADDITIONAL COPIES
IF THERE ARE MORE THAN ONE SIGNATORY FOR SUCH**

---

Confidential

## SECTION II - STATEMENT OF ACCREDITED STATUS

**For individual investors, Joint Tenants, Tenants in Common, Tenants by Entirety, Community Property and Grantors of Revocable Trusts**

**Initial each statement below that truthfully describes you:**

_____ _____     I am a natural person whose individual net worth or joint net worth with that person's spouse, exceeds $1,000,000 at the time of purchasing the Notes, provided that for purposes of calculating such net worth: (1) the undersigned's primary residence shall not be included as an asset; (2) indebtedness that is secured by the undersigned's primary residence, up to the estimated fair market value of the primary residence at the time of the closing of the undersigned's acquisition of a Note, shall not be included as a liability, provided, however, that if the amount of such indebtedness outstanding at the time of the closing of the undersigned's acquisition of a Note exceeds the amount of indebtedness outstanding 60 days before such time, other than as a result of the acquisition of the primary residence (such as, for example, if the undersigned takes out a home equity loan that is not used to acquire a primary residence during such 60-day time frame), the amount of such new indebtedness shall be included as a liability; and (3) indebtedness that is secured by the undersigned's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability.

_____ _____     I am a natural person who had an individual income in excess of $200,000 in each of the two most recent preceding full calendar years or joint income with my spouse in excess of $300,000 in each of those years, and I have (individually or with my spouse) a reasonable expectation of reaching the same income level in the current year.

**The current value of my liquid assets (cash, marketable securities, cash surrender value of my life insurance and other items easily convertible into cash), after taking into account my prospective purchase of the Notes, is sufficient to provide for my current needs and possible personal contingencies:**

_____Yes     _____No

**For Entities such as Corporations, Limited Liability Companies, Partnerships and Irrevocable Trusts**

**Initial those statements below that truthfully describe the investor:**

_____ _____     Investor is a corporation, a business or other irrevocable trust, a partnership or a limited liability company: (1) not formed for the specific purpose of acquiring the securities offered; (2) with total assets in excess of $10,000,000; and (3) with the power and authority to execute and comply with the terms of the Purchase Agreement.

DAV000083

_____ _____ Investor is any of the following:

(a)   a bank or savings and loan association or other institution acting in its individual or fiduciary capacity;

(b)   a broker or dealer;

(c)   an insurance company;

(d)   an investment company or a business development company under the Investment Company Act of 1940;

(e)   a private business development company under the Investment Advisers Act of 1940;

(f)   a Small Business Investment Company licensed by the U.S. Small Business Administration; OR

_____ _____ Investor is an entity in which all the equity owners are either:

(a)   natural persons whose individual net worth or joint net worth with that person's spouse, exceeds $1,000,000 at the time of purchasing the Notes, provided that for purposes of calculating such net worth: (1) the undersigned's primary residence shall not be included as an asset; (2) indebtedness that is secured by the undersigned's primary residence, up to the estimated fair market value of the primary residence at the time of the closing of the undersigned's acquisition of a Note, shall not be included as a liability, provided, however, that if the amount of such indebtedness outstanding at the time of the closing of the undersigned's acquisition of a Note exceeds the amount of indebtedness outstanding 60 days before such time, other than as a result of the acquisition of the primary residence (such as, for example, if the undersigned takes out a home equity loan that is not used to acquire a primary residence during such 60-day time frame), the amount of such new indebtedness shall be included as a liability; and
(3) indebtedness that is secured by the undersigned's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability; OR

(b)   natural persons who had individual income in excess of $200,000 in each of the two most recent preceding full calendar years or joint income with their spouse in excess of $300,000 in each of those years, and who have (individually or with their spouse) a reasonable expectation of reaching the same income level in the current year.

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

DAV000084

## SIGNATURE PAGE FOR SECTION II

**THE UNDERSIGNED BEING FIRST DULY SWORN**, represents and warranties to the Company that the information set forth in Section II of the Investor Questionnaire is true and complete in all respects.

**ON BEHALF OF OR BY INDIVIDUAL INVESTOR(S):**

_____          _____
Signature Investor #1                       Signature Investor #2 (as applicable)


_____          _____
Please Print Name                           Please Print Name

**ON BEHALF OF OR BY OTHER TRUST/ENTITY (Partnership, LLC, Corporation, etc.):**

NAME OF TRUST/ENTITY: _____


_____          _____
Signature of Trustee/Officer              Signature of Trustee/Officer


_____          _____
Please Print Name / Title                  Please Print Name / Title

| PLEASE MAKE ADDITIONAL COPIES |
| --- |
| **IF THERE ARE MORE THAN ONE SIGNATORY FOR SUCH** |

Confidential

DAV000085

**EXHIBIT E**

**FORM OF PURCHASE AGREEMENT WITH FORM OF NOTE**

**[ATTACHED]**

Confidential

DAV000086

**Elite Aerospace Group, Inc.**
**A Delaware Corporation**

**Note Purchase Agreement**

**For**

**12% Unsecured Convertible Notes**

**FOR THE EXCLUSIVE USE OF:**

Return To:

Elite Aerospace Group, Inc.
15773 Gateway Circle
Tustin, California 92780
Attn: Mr. Dustin Tillman

Confidential

## NOTE PURCHASE AGREEMENT

### Elite Aerospace Group, Inc.

### Up to $10,000,000 of 12% Unsecured Convertible Notes

THIS NOTE PURCHASE AGREEMENT (this "Agreement") is entered into by the undersigned and Elite Aerospace Group, Inc., a Delaware corporation (the "Company"), effective as of the date accepted by the Company.

1.     <u>Purchase of Notes</u>. The undersigned, intending to be legally bound, hereby irrevocably agrees to purchase 12% Convertible Notes in the form attached hereto as Exhibit A (the "Notes") in the Company for the amount set forth on the signature page attached hereto (the "Purchase Price"). The Notes are being purchased pursuant to the terms and conditions of that certain Private Placement Memorandum and all accompanying exhibits, dated as of September 2018, as amended and supplemented as necessary from time to time (the "Memorandum"), receipt of which is hereby acknowledged, and the investment terms specified in this Agreement. Terms not defined herein shall have the same meanings as in the Memorandum.

2.     <u>Amount and Method of Payment</u>. Payment for the Notes purchased hereunder is to be made by either wiring the funds or by delivering, in person or by mail, a check to the Company's address as set forth on the cover page, for the full Purchase Price.

3.     <u>Acceptance of Purchase</u>. The undersigned understands and agrees that the Company, in its sole discretion, reserves the right to accept or reject this or any other offer to purchase for the Notes in whole or in part. If this offer to purchase is rejected in whole or in part, the Company will promptly return the applicable portion of the Purchase Price. The Company further reserves the right to curtail the offer to purchase Notes pursuant to the pre-emptive rights of other offerees who hold such rights. This Agreement shall thereafter have no force or effect with respect to the rejected portion of the purchase of Notes.

4.     <u>Representations and Warranties of the Undersigned</u>. The undersigned hereby acknowledges, represents and warrants that:

    (a)     The Notes offered by the Memorandum have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or under the laws of any state, and are being offered and sold in reliance on exemptions from the provisions of the Securities Act and applicable state law. The Notes have not been approved or disapproved by the Securities and Exchange Commission, any state securities commission or any other regulatory authority, nor have any of the foregoing authorities passed upon, or endorsed the merits of, the offering or the accuracy or adequacy of the Memorandum. The undersigned hereby further acknowledges, represents and warrants that:

        (i)     the undersigned has received the Memorandum, has carefully reviewed it and understands the information contained therein and information otherwise provided in writing by the Company relating to this investment;

        (ii)     the undersigned acknowledges that all documents, records and books pertaining to this investment (including, without limitation, the Memorandum) have been made available for inspection to the undersigned or the undersigned's agents or advisors;

Confidential

(iii)    the undersigned, either directly or through advisors, has had a reasonable opportunity to ask questions of and receive information and answers from a person or persons acting on behalf of the Company concerning the offering of the Notes and, as the undersigned may deem necessary, to verify the information contained in the Memorandum, and all questions have been answered and all such information has been provided to the full satisfaction of the undersigned;

(iv)    no oral or written representations have been made or oral or written information furnished to the undersigned or his or her advisor(s) in connection with the offering of the Notes that were in any way inconsistent with the information stated in the Memorandum;

(v)    the undersigned meets one of the following tests and therefore qualifies as an accredited investor:

    (A)    the undersigned is a natural person who has individual income in excess of $200,000 in each of the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of these years, and has a reasonable expectation of reaching the same income level in the current year; or

    (B)    the undersigned is a natural person whose individual net worth or joint net worth with that person's spouse, exceeds $1,000,000 at the time of purchasing the Notes, provided that for purposes of calculating such net worth: (1) the undersigned's primary residence shall not be included as an asset; (2) indebtedness that is secured by the undersigned's primary residence, up to the estimated fair market value of the primary residence at the time of the closing of the undersigned's acquisition of a Note, shall not be included as a liability, provided, however, that if the amount of such indebtedness outstanding at the time of the closing of the undersigned's acquisition of a Note exceeds the amount of indebtedness outstanding 60 days before such time, other than as a result of the acquisition of the primary residence (such as, for example, if the undersigned takes out a home equity loan that is not used to acquire a primary residence during such 60-day time frame), the amount of such new indebtedness shall be included as a liability; and (3) indebtedness that is secured by the undersigned's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability; or

    (C)    the undersigned is a corporation, business or other irrevocable trust, partnership or limited liability company with total assets in excess of $10,000,000, not formed for the specific purpose of acquiring the Notes;

    (D)    the undersigned is a trust, with total assets over $10,000,000, not formed for the specific purpose of acquiring Notes, , whose purchase is directed by a "sophisticated person," as described in Rule 506(b)(2)(ii) of Regulation D under the Securities Act;

    (E)    the undersigned is: (1) a broker-dealer registered under Section 15 of the Securities Exchange Act of 1934, as amended; (2) an insurance company; (3) an investment company registered under the Investment Company Act of 1940, as amended, or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940, as amended); (4) a small business investment company licensed by the Small Business Administration under Section 301(c) or (d) or the Small Business

Confidential

DAV000089

company (as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended); or (6) a bank as defined in Section 3(a)(2) of the Securities Act, any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity, or any insurance company as defined in Section 2(13) of the Securities Act;

(F)    the undersigned is an entity in which all of the equity owners are an accredited investor as defined above in subparagraph (A) or (B).

(vi)    all information and documentary evidence that the undersigned has provided to the Company concerning its suitability to invest in the Notes (or previously supplied to the Company), is or is still complete, accurate, and correct as of the date of its signature on the last page of this Agreement. The undersigned hereby agrees to notify the Company immediately of any material change in any such information, including any information about changes concerning its net worth and financial position;

(vii)    the undersigned's overall commitment to investments that are not readily marketable is not disproportionate to the undersigned's net worth and the undersigned's investment in the Company will not cause the overall commitment to become disproportionate to the undersigned's net worth;

(viii)    the undersigned has reached the age of majority, has adequate net worth and means of providing for the undersigned's current needs and personal contingencies, is able to bear the substantial economic risks of an investment in the Notes for an indefinite period of time, has no need for liquidity in such investment and, at the present time, could afford a complete loss of such investment;

(ix)    the undersigned has the requisite knowledge and experience in financial and business matters so as to enable the undersigned to use the information made available to evaluate the merits and risks of an investment in the Notes and to make an informed decision;

(x)    the undersigned is acquiring the Notes solely for his or her own account as principal, for investment purposes only and not with a view to the resale or distribution thereof in whole or in part, and no other person has a direct or beneficial interest in the Notes purchased by the undersigned;

(xi)    the undersigned will not sell or otherwise transfer his or her Notes without complying with all applicable laws and fully understands and agrees that he or she must bear the economic risk of his or her purchase for an indefinite period of time because, among other reasons, the Notes may not be readily transferable; and

(xii)    the undersigned's assets have not been the subject of any proceeding under any matter relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors ("Creditor Rights Laws").

(b)    The undersigned recognizes that the purchase of the Notes and an investment in the Company involves a number of significant risks and other factors relating to the structure and objectives of the Company as described in the Memorandum under the heading "Risk Factors" and that there can be no assurance that the Company will achieve its objectives. In addition, the undersigned acknowledges that:

Confidential

(i) no federal or state agency has passed upon the adequacy of the information presented to the undersigned or made any finding or determination as to the fairness of this investment; and

(ii) there is no established market for the Notes and a public market for the Notes may never develop.

(c) If the undersigned is purchasing the Notes in a representative or fiduciary capacity, e.g., serving as a qualified intermediary, the representations and warranties contained herein (and in any other written statement or document delivered to the Company in connection herewith) shall be deemed to have been made on behalf of the person or persons for whom the Notes are being purchased.

(d) The undersigned has not distributed the Memorandum to anyone other than his or her advisors, if any, and no one other than the undersigned and his or her advisors, if any, has used the Memorandum.

(e) The foregoing representations, warranties and agreements, together with all other representations and warranties made or given by the undersigned to the Company in any other written statement or document delivered in connection with the issuance and sale of the Notes shall be true and correct in all respects on and as of the date the purchase is accepted as if made on that date. If more than one person is signing this Agreement, each representation, warranty and undertaking herein shall be the joint and several representation, warranty and undertaking of each such person.

5. <u>Indemnification</u>. The undersigned agrees to indemnify and hold harmless the Company and its respective general partners, officers, directors, employees, beneficiaries, and agents against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened, or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by the undersigned to comply with any covenant or agreement made by the undersigned herein, or in any other document furnished by the undersigned to any of the foregoing in connection with this transaction.

6. <u>Additional Information</u>. The undersigned hereby acknowledges and agrees that the Company may make such further inquiry and obtain such additional information as it may deem appropriate with regard to the suitability of the undersigned.

7. <u>Irrevocability; Binding Effect</u>. The undersigned hereby acknowledges and agrees that, except as provided under applicable state law, the purchase hereunder is irrevocable and may not be canceled, terminated or revoked and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and assigns.

8. <u>Modifications</u>. Neither this Agreement nor any provision hereof shall be waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any such waiver, modification, discharge or termination is sought.

9. <u>Counterparts; Signatures</u>. This Agreement, the related Investor Questionnaire and supporting documents may be executed and delivered (including by facsimile transmission or portable document format (PDF)) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement, Investor Questionnaire or other document, as applicable.

Confidential

10.    Entire Agreement. This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and there are no representations, covenants or other agreements except as stated or referred to herein.

11.    Severability. Each provision of this Agreement is intended to be severable from every other provision, and the invalidity or illegality of any portion hereof shall not affect the validity or legality of the remainder hereof.

12.    Assignability. This Agreement is not transferable or assignable by the undersigned.

13.    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware as applied to residents of that state executing contracts wholly to be performed in that state.

14.    Choice of Jurisdiction. The undersigned agrees that any action or proceeding arising, directly, indirectly, or otherwise, in connection with, out of, or from this \ Agreement, and breach thereof, or any transaction covered hereby shall be resolved, whether by arbitration or otherwise, within the State of Delaware. The parties further agree that any such relief whatsoever in connection with this Agreement shall be commenced exclusively in the United States federal or state courts, or if possible before an arbitral body, located within the State of Delaware.

15.    Reimbursement. If any action or other proceeding, other than arbitration, is brought to enforce this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in the action or proceeding in addition to any other relief to which they may be entitled.

16.    Certificates of Non-Foreign Status. Under penalties of perjury, the undersigned declares that, to the best of his or her knowledge and belief the following statements are true, correct and complete: (1) that unless an Internal Revenue Service Form W-8 has been completed, the undersigned is not a foreign person for purposes of U.S. income taxation (i.e., he or she is not a nonresident alien, nor executing this document as an officer of a foreign corporation, as a partner in a foreign partnership, or as a fiduciary of a foreign employee benefit plan, foreign trust or foreign estate); (2) that the following information contained elsewhere in the Agreement or the Investor Questionnaire is true, correct and complete: the U.S. taxpayer identification number (i.e., social security number), and the home address; and (3) that the undersigned agrees to inform the Company promptly if the undersigned becomes a nonresident alien (in the case of an individual) or other foreign person (in case of an entity) during the three years immediately following the date hereof.

**[SIGNATURE PAGE TO FOLLOW]**

DAV000092

## SIGNATURE PAGE FOR NOTE PURCHASE AGREEMENT

I hereby agree to purchase $_____ of Notes and acknowledge and agree to all of the representations and warranties contained in this Note Purchase Agreement.

**ON BEHALF OF OR BY INDIVIDUAL INVESTOR(S):**

_____          _____
Signature Investor #1                            Signature Investor #2 (as applicable)


_____          _____
Please Print Name                                Please Print Name

Date: _____          Date: _____

**ON BEHALF OF OR BY OTHER TRUST/ENTITY (Partnership, LLC, Corporation, etc.):**

NAME OF TRUST/ENTITY: _____

TAXPAYER IDENTIFICATION NUMBER: _____


_____          _____
Signature of Trustee/Equity Owner              Signature of Trustee/Equity Owner


_____          _____
Please Print Name / Title                        Please Print Name / Title

Date: _____          Date: _____

AGREED AND ACCEPTED:

ELITE AEROSPACE GROUP, INC.

By: Dustin Tillman, Chief Executive Officer

By: _____

Its: _____

Date: _____

DAV000093

**EXHIBIT A**
**[OF NOTE PURCHASE AGREEMENT]**

<u>Form of Note</u>

See Attached

Confidential

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDR THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

## ELITE AEROSPACE GROUP, INC.

## 12% UNSECURED CONVERTIBLE PROMISSORY NOTE

$ _____                          _____, 2018

FOR VALUE RECEIVED, ELITE AEROSPACE GROUP, INC., a Delaware corporation (the "Company"), promises to pay _____("Investor"), or his permitted assigns, the principal sum of _____ and 00/100 Dollars ($ _____) in lawful money of the United States of America, or such lesser amount as shall be outstanding, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance at a rate equal to 12% per annum, non-compounded and computed on the basis of the actual number of days elapsed and a year of 365 days.

1. **Payments**.

(a) *Payment Date*. All accrued but unpaid interest on the Note shall be paid quarterly in arrears, with the first twelve (12) months of interest being paid-in-kind, and the principal amount, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable in full on the earlier of (i) September 31, 2020 (the "Maturity Date"), or (ii) when, upon the occurrence or during the continuance of an Event of Default, such amounts are declared due and payable by Investor. In the event of a voluntary conversion pursuant to Section 2(a), all accrued and unpaid interest shall be converted into securities in accordance with the terms herein.

(b) *Voluntary Prepayment; Penalty*. This Note may be prepaid in whole but not in part without the consent of the Investor, provided, however, that in the event this Note is prepaid prior to the third anniversary of the date above (the "Prepayment Penalty Expiration Date"), the Company shall pay a prepayment penalty to Investor at the time of prepayment equal to fifty percent (50%) of the interest that would have otherwise accrued from the prepayment date through the Prepayment Penalty Expiration Date. Any prepayment shall be preceded by 30 days advance written notice from the Company to Investor so as to provide Investor an opportunity to convert in accordance with Section 2(a). No prepayment shall be paid in the event of a voluntary conversion.

(c) Mandatory Prepayment. This Note shall be subject to mandatory prepayment and shall be prepaid under the following circumstances:

(i) In the event the Company consummates a Change of Control (as such term is defined in the Company's Bylaws) prior to the conversion or repayment in full of the Note, then the Company will at the closing of such Change of Control, in full satisfaction of the Company's obligations under the Note, pay Investor an aggregate amount equal to the greater of (x) the aggregate amount of principal outstanding and interest accrued hereon, plus any prepayment penalty, or (y) the amount Investor would have been entitled to receive in connection with such Change of Control if the aggregate amount of principal and interest then outstanding under this Note had been converted into the latest round of equity securities.

Confidential

      (ii)     In the event the Company consummates a Capital Transaction (as such term is defined in the Company's Bylaws) prior to the conversion or repayment in full of the Note, Investor shall have the option, in its sole discretion, to either (A) continue to hold the Note, in which case the Note will remain in full force and effect in accordance with its terms, or (B) cause the Company to repay the Note in full, in which case the Company will at the closing of such Capital Transaction, in full satisfaction of the Company's obligations under the Note, pay Investor an aggregate amount equal to the greater of (x) the aggregate amount of principal outstanding and interest accrued hereon, plus any prepayment penalty, or (y) the amount Investor would have been entitled to receive in connection with such Capital Transaction if the aggregate amount of principal and interest then outstanding under this Note had been converted into the latest round of equity securities.

    2.    ***Conversion***.

      (a)    *Voluntary Conversion.*

        (i)     At any time prior to the Maturity Date, Investor may convert, in whole or in part, the outstanding principal amount of this Note and all accrued and unpaid interest thereon, into Class B Shares of the Company at a price of $2.00 per Class B Share (the "Class B Conversion Price").

        (ii)     In the event the Company sells a new class of equity securities on or before the Maturity Date in an arms-length equity financing resulting in gross proceeds to the Company of at least $20,000,000.00 (a "Qualified Financing"), then Investor will have the right to convert, in whole or in part, the outstanding principal amount of this Note and all accrued and unpaid interest thereon into either (A) Class B Shares at the Class B Conversion Price or (B) the new class of securities offered in the Qualified Financing at a price per share equal to the lesser of the Class B Conversion Price or the average price per share other investors paid for the equity securities in such Qualified Financing.

        (iii)     In the event Investor agrees to purchase this Note within thirty (30) days of offering, the Investor will receive an additional 70% discount to the conversion price if and when converted. Further, in the event the Investor converts this Note and all accrued paid-in-kind interest within the first 12 months, the Investor will receive a 10% discount on the conversion price on top of the 70% discount, if applicable.

      (b)    *Conversion Procedure.* If this Note is to be converted as provided for in Section 2(a), written notice shall be delivered to the Company by Investor in the form attached hereto as Exhibit A, at the address last given to Investor by the Company for the purpose of notice, notifying the Company of the conversion to be affected and the principal amount of the Note to be converted. The Company will then provide Investor with a notice setting forth the aggregate amount of the Note to be converted, including all accrued and unpaid interest, the date on which such conversion is expected to occur and calling upon such Investor to surrender to the Company, in the manner and at the place designated, the Note. Upon such conversion of this Note, Investor hereby agrees to execute and deliver to the Company all documents entered into by all other equity owners of the Company evidencing Investor's share ownership. Investor also agrees to deliver the original of this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) at the closing of the conversion of this Note. To the extent any principal amount of this Note is not converted, a new convertible Note will be issued by the Company at the lower principal amount, but on same terms and conditions (unless other terms are agreed to).

      (c)    *Notices of Record Date.* In the event of:

        (i)     Any taking by the Company of a record of the holders of any class of securities of the Company for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution or any right to subscribe for, purchase or otherwise acquire any shares of ownership in any class or any other securities or property, or to receive any other right; or

Confidential

(ii)     Any capital reorganization of the Company, any reclassification or recapitalization of the equity of the Company or any transfer of all or substantially all of the assets of Company to any other person or any consolidation or merger involving the Company; or

(iii)     Any Company Change of Control or Capital Transaction (as such terms are defined in the Company's Bylaws), voluntary or involuntary dissolution, liquidation or winding-up of the Company;

the Company will mail to Investor at least ten (10) days prior to the earliest date specified therein, a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend, distribution or right and the amount and character of such dividend, distribution or right; and (B) the date on which any such Change of Control, reorganization, reclassification, transfer, consolidation, merger, dissolution, liquidation or winding-up is expected to become effective and the record date for determining shareholders entitled to vote thereon.

3.     *Security*. Investor understands and acknowledges that this Note is an unsecured obligation of the Company. Investor recognizes that the Company's assets, from time to time, may be secured by one more senior loans and agrees, at the request of the Company, to execute any reasonable documentation necessary to subordinate the obligations evidence by this Note to the Company's senior lender, if any.

4.     *Events of Default*. The occurrence of any of the following shall constitute an "Event of Default" under this Note:

(a)     *Breaches of Note*. The Company shall fail to observe or perform any material covenant, obligation, condition or agreement contained in this Note and such failure shall continue for twenty (20) business days after the Company's receipt of written notice to the Company of such failure; provided that if the Company is in the process of curing such breach, the Company shall have an additional thirty (30) business days to cure such breach; or

(b)     *Bankruptcy or Insolvency Proceedings*. The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated, (v) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vi) take any action for the purpose of effecting any of the foregoing, or proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company, or of all or a substantial part of the property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or any of its Subsidiaries, if any, or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within 60 days of commencement.

(c)     *Default on the Senior Loan*. The Company's senior lender takes an action in a court of competition jurisdiction against the Company seeking repayment of all amounts due and owing to senior lender.

5.     *Rights of Investor upon Default*. Upon the occurrence of any Event of Default and at any time thereafter during the continuance of such Event of Default, (a) Investor may, by written notice to the Company, declare all outstanding amounts due and payable by the Company this Note to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein, and (b) the outstanding principal balance of this Note, together with all accrued unpaid interest thereon, shall bear interest at a rate equal to 18% per annum, non-compounded and computed on the basis of the actual number of days elapsed and a year of 365 days. In addition to the foregoing remedies, Investor may, exercise any other right, power or remedy permitted to it

Confidential

by law, either by suit in equity or by action at law, or both, and anything herein to the contrary notwithstanding, Company agrees to pay all costs and expenses of collection, including Investor's attorneys' fees, whether or not any legal action shall be instituted to enforce this Note.

6.  **Representations and Warranties of the Company**. The Company represents and warrants as of the date of this Note:

(a)  *Organization; Good Standing*. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has the requisite corporate power and authority to own and operate its properties and assets, to carry on its business as presently conducted or proposed to be conducted, to execute and deliver this Note, and to otherwise perform its obligations under this Note.

(b)  *Authority, Enforceability*. The Company has taken all legal action required to authorize, execute and deliver this Note and to perform its obligations under this Note. Upon execution and delivery this Note shall constitute the valid and binding obligation of the Company, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally, and other general principles of equity.

(c)  *Compliance with Laws, Other Instruments*. The execution, delivery and performance by the Company of this Note will not contravene or result in any material breach of the Company's governing documents or any material agreement to which the Company or any of its properties is bound or subject, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any governmental or regulatory authority applicable to the Company, or (iii) violate any law or regulation of any governmental or regulatory authority applicable to the Company. No consent or approval of, or registration or filing with, any governmental or regulatory authority is required in connection with the Company's execution, delivery and performance of this Note.

7.  **Miscellaneous**.

(a)  *Successors and Assigns; Transfers*. The rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties. Neither this Note nor any of the rights, interests or obligations hereunder may be transferred or assigned, by operation of law or otherwise, in whole or in part, by either the Company or Investor without the written consent of the other.

(b)  *Waiver and Amendment*. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and Investor.

(c)  *Notices*. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d)  *Payment*. Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  *Usury*. In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

(f)  *Waivers*. The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this

Confidential

DAV000098

instrument.

       (g)     *Governing Law*. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions.

       (h)     *Waiver of Jury Trial*. By acceptance of this Note, Investor hereby agrees and the Company hereby agrees to waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of this Note.

       (i)     *Counterparts*. This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note. Electronic versions shall have the same effect as originals.

**[SIGNATURE PAGE TO FOLLOW]**

Confidential

DAV000099

The Company has caused this Note to be issued as of the date first written above.

Elite Aerospace Group, Inc.

By : _____
       Dustin Tillman
       Chief Executive Officer

Agreed and Acknowledged:

_____
Investor Name

_____
Authorized Representative Signature

Address:
_____
_____
_____

Confidential

**EXHIBIT A**
**[OF UNSECURED CONVERTIBLE PROMISSORY NOTE]**

**Form of Notice of Conversion**

_____, 20 ___

Elite Aerospace Group, Inc.
15773 Gateway Circle
Tustin, California 92780
Attn: Mr. Dustin Tillman

To Mr. Dustin Tillman:

This letter shall serve as notice that the undersigned irrevocably elects to convert:

☐ all of the principal amount of the undersigned's Note and all interest accrued on the Note into:

   ☐ Class B Shares at $2.00 per Share; or

   ☐ Shares in the Company at the price and of the type offered in the Qualified Financing;

OR

☐ $_____ of the principal amount and interest accrued on the undersigned's Note into:

   ☐ Class B Shares at $2.00 per Share; or

   ☐ Shares in the Company at the price and of the type offered in the Qualified Financing.

The undersigned understands and acknowledges that in order for the election to be effective, the undersigned will be required to execute a counterpart signature to the Company's Bylaws, as amended from time to time, and such other documentation as the Company may require to effectuate the conversion.

_____
Investor Name


_____
Authorized Representative Signature

DAV000101

**EXHIBIT F**

**BYLAWS**

Confidential

# BYLAWS
## OF
## ELITE AEROSPACE GROUP, INC.
a Delaware corporation

Adopted as of May 24, 2016

Confidential

DAV000103

**ELITE AEROSPACE GROUP, INC.**
a Delaware corporation

BYLAWS

TABLE OF CONTENTS

ARTICLE I    OFFICES ................................................................................................ 1

Section 1.1. Registered Office ................................................................................. 1

Section 1.2. Other Offices ....................................................................................... 1

ARTICLE II   STOCKHOLDERS' MEETINGS ........................................................ 1

Section 2.1. Place of Meetings ................................................................................ 1

Section 2.2. Annual Meetings .................................................................................. 1

Section 2.3. Notice of Annual Meeting ................................................................... 1

Section 2.4. Stockholders' List ................................................................................ 2

Section 2.5. Special Meetings .................................................................................. 2

Section 2.6. Notice of Special Meetings .................................................................. 2

Section 2.7. Quorum; Adjournment .......................................................................... 3

Section 2.8. Order of Business ................................................................................. 3

Section 2.9. Voting ................................................................................................... 3

Section 2.10. Proxies ................................................................................................ 4

Section 2.11. Inspectors ............................................................................................ 4

ARTICLE III  DIRECTORS ........................................................................................ 4

Section 3.1. General Powers .................................................................................... 4

Section 3.2. Number and Qualifications of Directors .............................................. 4

Section 3.3. Vacancies; Resignation and Removal of Directors .............................. 5

Section 3.4. Place of Meetings ................................................................................. 6

Section 3.5. Compensation of Directors .................................................................. 6

Section 3.6. Regular Meetings ................................................................................. 6

Section 3.7. Special Meetings .................................................................................. 6

Section 3.8. Action Without Meeting; Use of Communications Equipment ............. 6

Section 3.9. Quorum and Manner of Acting ............................................................ 7

ARTICLE IV  EXECUTIVE AND OTHER COMMITTEES ...................................... 7

Section 4.1. Committees ........................................................................................... 7

Section 4.2. Procedure; Meeting; Quorum ............................................................... 8

ARTICLE V   OFFICERS ............................................................................................ 8

i

Section 5.1. Executive Officers .................................................................. 8

Section 5.2. Election, Term of Office and Eligibility ................................ 9

Section 5.3. Subordinate Officers ............................................................. 9

Section 5.4. Removal ................................................................................. 9

Section 5.5. The Chief Executive Officer ................................................. 9

Section 5.6. The President ......................................................................... 9

Section 5.7. The Secretary ........................................................................ 9

Section 5.8. The Chief Financial Officer ................................................ 10

Section 5.10. Salaries .............................................................................. 10

Section 5.11. Delegation of Duties ......................................................... 10

ARTICLE VI SHARES OF STOCK .......................................................... 11

Section 6.1. Regulation ............................................................................ 11

Section 6.2. Stock Certificates ................................................................ 11

Section 6.3. Restriction on Transfer of Securities ................................. 11

Section 6.4. Transfer of Shares ............................................................... 12

Section 6.5. Fixing Date for Determination of Stockholders of Record ......... 12

Section 6.6. Lost Certificate .................................................................... 13

ARTICLE VII BOOKS AND RECORDS .................................................. 13

Section 7.1. Location ............................................................................... 13

Section 7.2. Inspection ............................................................................ 13

Section 7.3. Corporate Seal .................................................................... 13

ARTICLE VIII DIVIDENDS AND RESERVES ....................................... 13

Section 8.1. Dividends ............................................................................. 13

Section 8.2. Reserves ............................................................................... 14

ARTICLE IX MISCELLANEOUS PROVISIONS ..................................... 14

Section 9.1. Fiscal Year .......................................................................... 14

Section 9.2. Depositories ......................................................................... 14

Section 9.3. Checks, Drafts and Notes .................................................... 14

Section 9.4. Contracts and Other Instruments ........................................ 14

Section 9.5. Notices ................................................................................. 14

Section 9.6. Waivers of Notice ................................................................ 14

Section 9.7. Stock in Other Corporations ............................................... 15

Section 9.8. Indemnification .................................................................... 15

Section 9.9. Amendment of Bylaws ........................................................ 17

ii

DAV000105

# BYLAWS
# OF
# ELITE AEROSPACE GROUP, INC.

## ARTICLE I

## OFFICES

Section 1.1. Registered Office. The registered office of the Corporation shall be maintained in the County of Kent, State of Delaware, and the registered agent in charge thereof is Paracorp Incorporated.

Section 1.2. Other Offices. The Corporation may also have offices and keep the books and records of the Corporation, except as may otherwise be required by law, at such other places both within and outside the State of Delaware as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## STOCKHOLDERS' MEETINGS

Section 2.1. Place of Meetings. All meetings of the stockholders, whether annual or special, shall be held at an office of the Corporation or at such other place, within or outside the State of Delaware, as may be fixed from time to time by the Board of Directors.

Section 2.2. Annual Meetings. The annual meetings of the stockholders for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held during each calendar year on a date and at such hour as may be fixed by the Board of Directors. Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders (i) pursuant to the Corporation's notice of meeting of stockholders and (ii) by or at the direction of the Board of Directors.

Section 2.3. Notice of Annual Meeting. Written notice of the annual meeting stating the place, date and hour of the meeting, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address as it appears on the records of the Corporation. Notice of any annual meeting of stockholders will not be required to be given to any stockholder who attends such meeting in person or by proxy without protesting, prior to or at the commencement of the meeting, the lack of proper notice to such stockholder.

Confidential

DAV000106

Section 2.4. <u>Stockholders' List</u>. At least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder, shall be prepared by the Secretary. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting at the principal place of business of the Corporation. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 2.5. <u>Special Meetings</u>.

(a) Pursuant to the Certificate of Incorporation, special meetings of the stockholders of the Corporation for any purpose or purposes may be called at any time by the Chief Executive Officer of the Corporation, the Board of Directors or by a committee of the Board of Directors which has been duly designated by the Board of Directors and the powers and authority of which, as provided in a resolution of the Board of Directors or in the Bylaws of the Corporation, include the power to call such meetings. Such special meetings may not be called by any other person or persons.

(b) If a special meeting is properly called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by telegraphic or other facsimile transmission to the Chairman of the Board of Directors, the Chief Executive Officer, or the Secretary of the Corporation. No business may be transacted at such special meeting, other than as specified in such notice. The Board of Directors shall determine the time and place of such special meeting, which shall be held not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt of the request. Upon determination of the time and place of the meeting, the officer receiving the request shall cause notice to be given to the stockholders entitled to vote, in accordance with the provisions of Section 2.6 of these Bylaws. If the notice is not given within one hundred (100) days after the receipt of the request, the person or persons properly requesting the meeting may set the time and place of the meeting and give the notice. Nothing contained in this paragraph (b) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

(c) Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected (i) pursuant to the Corporation's notice of meeting or (ii) by or at of the direction of the Board of Directors.

Section 2.6. <u>Notice of Special Meetings</u>. Written notice of a special meeting, stating the place, date and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. If mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address as it appears on the records of the Corporation. Notice of any special meeting of stockholders will not be required to be given to any stockholder who attends such meeting in person or by proxy without

Confidential

DAV000107

protesting, prior to or at the commencement of the meeting, the lack of proper notice to such stockholder.

Section 2.7. Quorum; Adjournment. Unless otherwise required by statute, by the Certificate of Incorporation or by these Bylaws, (i) the holders of a majority of the shares issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of the stockholders for the transaction of business and (ii) where a separate vote by a class or classes is required, a majority of the outstanding shares of such class or classes present in person or represented by proxy shall constitute a quorum entitled to take action with respect to the vote on that matter. If a quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall again be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment, a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation to vote stock, including, without limitation, its own stock, held by it in a fiduciary capacity.

Section 2.8. Order of Business. At each meeting of the stockholders, such business may be transacted as may be properly brought before such meeting, whether or not such business is stated in the notice of such meeting or in a waiver thereof, except as otherwise required by law or expressly provided therein. The order of business at the meetings of the stockholders shall be as determined by the Chairman of the Board.

Section 2.9. Voting. When a quorum is present at any meeting, and subject to the provisions of the General Corporation Law of the State of Delaware, the Certificate of Incorporation, Section 3.2 of these Bylaws in respect of election of directors, or any other section of these Bylaws in respect of the vote that shall be required for a specified action, the vote of the holders of a majority of the shares having voting power, present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one upon which, by express provision of the statutes or of the Certificate of Incorporation or of these Bylaws, a different vote is required in which case such express provision shall govern and control the decision of such question. Each stockholder shall have one vote for each share of stock having voting power registered in his name on the books of the Corporation, except as otherwise provided in the Certificate of Incorporation.

Confidential

DAV000108

Section 2.10. <u>Proxies</u>.

(a)     Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after one year from its date.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power.

(b)     A stockholder may issue a valid proxy by (i) executing a written authorization therefor identifying the person or persons authorized to act for such stockholder by proxy or (ii) transmitting or authorizing the transmission of a telegram, cablegram or facsimile, provided that the telegram, cablegram or facsimile either sets forth or is submitted with information from which it can be determined that the telegram, cablegram or facsimile was authorized by the stockholder.  A copy or other reliable reproduction of a proxy authorized by this Section 2.10 may be substituted for or used in lieu of the original proxy.  Each proxy shall be delivered to the inspectors of election prior to or at the meeting.

Section 2.11.  <u>Inspectors</u>.  Either the Board of Directors or, in the absence of designation of inspectors by the Board of Directors, the chairman of any meeting of the stockholders may, in its or such person's discretion, appoint two (2) or more inspectors to act at any meeting of the stockholders.  Each such inspector shall perform such duties as shall be specified by the Board of Directors or the chairman of the meeting and shall take and sign an oath or affirmation to execute faithfully such duties at such meeting with strict impartiality and according to the best of such inspector's ability.

### ARTICLE III

### DIRECTORS

Section 3.1.  <u>General Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all such powers of the Corporation and do all such acts and things as are not, by the General Corporation Law of the State of Delaware nor by the Certificate of Incorporation nor by these Bylaws, directed or required to be exercised or done by the stockholders.

Section 3.2.  <u>Number and Qualifications of Directors</u>.

(a)     The number of directors which shall constitute the whole Board of Directors shall be no less than one and no more than seven; provided that until changed by resolution of the Board of Directors, the number of directors shall be fixed at two.  With the exception of the first Board of Directors, which shall be elected by the Sole Incorporator, and except as provided in the Corporation's Certificate of Incorporation or in Section 3.3 of this Article III, the directors shall be elected at the annual meeting of the stockholders by a plurality vote of the shares represented in person or by proxy and each director elected shall hold office until his successor is elected and qualified unless he shall resign, become disqualified, disabled, or otherwise removed.  Directors need not be stockholders.

-4-

Confidential

DAV000109

(b)    Each of the directors of the Corporation shall hold office until (i) the next annual meeting of the stockholders following such director's election, unless the directors are classified as described below in Section 3.2(b) hereof, in which case directors would hold office for their designated term, and until such director's successor shall have been elected and qualified or (ii) his earlier death, resignation or removal in the manner that the directors of the Corporation other than those who may be elected pursuant to the terms of any series of Preferred Stock or any other securities of the Corporation other than Common Stock may determine from time to time.  If the Board of Directors of the Corporation so decides by resolution duly adopted by it, the directors of the Corporation may be classified with respect to the time for which they hold office, by resolution duly adopted by the Board of Directors, into three classes as nearly equal in number as possible; one class whose term expires at the first annual meeting of stockholders that is held after the director is elected, another class whose term expires at the second annual meeting of stockholders that is held after the director is elected, and another class whose term expires at the third annual meeting of stockholders that is held after the director is elected, with the directors in each class to hold office until their successors are elected and qualified.  If the Board of Directors is so classified, then directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the Board of Directors.  If the number of directors is changed by the Board of Directors, then any newly-created directorships or any decrease in directorships shall be so apportioned among the classes as to make all classes as nearly equal in number as possible; provided, however, that no decrease in the number of directors shall shorten the term of any incumbent director.  At each annual meeting of the stockholders, subject to the rights of the holders of any class or series of capital stock having a preference over Common Stock as to dividends or upon liquidation, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of stockholders held in the third (3rd) year following the year of their election, unless the directors are classified as described in Section 3.2(b) hereof, in which case directors hold office for their designated term.

Section 3.3.  Vacancies; Resignation and Removal of Directors.

(a)    If the office of any director or directors becomes vacant by reason of death, resignation, removal, retirement, disqualification or other cause and any newly created directorship resulting from any increase in the authorized number of directors between meetings of stockholders shall be filled only by the affirmative vote of a majority of all of the directors then in office, even if less than a quorum, and any director chosen shall hold office for the remainder of the full term of the class of directors in which the vacancy occurred or the new directorship was created and until a successor is duly elected and qualified or until his or her earlier death, resignation or removal from office, any applicable law or pursuant to an order of a court.  If there are no directors in office, then an election of directors may be held in the manner provided by statute.

(b)    Any director of the Corporation may at any time resign by giving written notice to the Board of Directors, the Chairman of the Board, the President or the Secretary of the Corporation.  Such resignation shall take effect upon receipt thereof by the Corporation, unless a later time is specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Confidential

DAV000110

Section 3.4. <u>Place of Meetings</u>. The Board of Directors may hold its meetings inside or outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5. <u>Compensation of Directors</u>. Directors who are not at the time also a salaried officer or employee of the Corporation or any of its subsidiaries may receive such stated salary for their services and/or such fixed sums and expenses of attendance for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings. Each director, whether or not a salaried officer or employee of the Corporation or any of its subsidiaries, shall be entitled to receive from the Corporation reimbursement for the reasonable expenses incurred by such person in connection with the performance of such person's duties as a director.

Section 3.6. <u>Regular Meetings</u>. Regular meetings of the Board of Directors shall be held at such times and places as the Board shall from time to time by resolution determine.

Section 3.7. <u>Special Meetings</u>. Special meetings of the Board of Directors may be held at any time on the call of the Chief Executive Officer, Chairman, or at the request in writing of a majority of the directors. Notice of any such meeting, unless waived, shall be given to directors personally, by telephone, by first-class United States mail, postage prepaid or by facsimile transmission to each director at his or her address as the same appears on the records of the Corporation not less than two (2) days prior to the day on which such meeting is to be held if such notice is delivered personally, by telephone or by facsimile transmission, and not less than four (4) days prior to the day on which the meeting is to be held if such notice is by first-class United States mail; <u>provided, however</u>, that notice of any such special meeting need not be given to any director who shall, either before or after such special meeting, submit a signed waiver of such notice or who shall attend such meeting without protesting, prior to or at its commencement, the lack of such notice to such director. If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer or any one of the directors calling the meeting. Any such meeting may be held at such place as the Board may fix from time to time or as may be specified or fixed in such notice or waiver thereof.

Section 3.8. <u>Action Without Meeting; Use of Communications Equipment</u>.

(a)     Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting, if a written consent to such action is signed by all members of the Board or of such committee, as the case may be, and such written consent is filed with the minutes of proceedings of the Board of Directors.

(b)     Members of the Board of Directors, or any committee designated by the Board, may participate in a meeting of the Board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the

-6-

Confidential                                                                      DAV000111

meeting can hear each other, and participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

### Section 3.9. Quorum and Manner of Acting.

(a)      Except as otherwise provided in these Bylaws, a majority of the total number of directors as at the time specified by the Bylaws shall constitute a quorum at any regular or special meeting of the Board of Directors. Except as otherwise provided by statute, by the Certificate of Incorporation or by these Bylaws, the vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. In the absence of a quorum, a majority of the directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all directors if the adjournment is for more than thirty (30) days. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

(b)      The Board of Directors may adopt such rules and regulations not inconsistent with the provisions of these Bylaws for the conduct of its meetings and management of the affairs of the Corporation as the Board may deem to be proper. In the absence of the Chairman of the Board, such person designated by the Board shall preside at Board meetings.

### ARTICLE IV

### COMMITTEES

Section 4.1. Committees. The Board of Directors may, by resolution adopted by a majority of the entire Board of Directors (except to the extent prohibited by law), designate from among the directors one or more committees, each of which shall have such authority of the Board of Directors as may be specified in the resolution of the Board of Directors designating such committee; provided that no committee shall have such power or authority in reference to:

(a) amending the Certificate of Incorporation or bylaws;

(b) adopting an agreement of merger or consolidation involving the Corporation;

(c) recommending to the stockholders the sale, lease or exchange of all or substantially all of the property and assets of the Corporation;

(d) recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution;

(e) taking any action related to the approval or determination of any matter in connection with any business combination;

-7-

Confidential                                                                 DAV000112

   (f) filling vacancies on the Board of Directors or on any committee of the Board of Directors; or

   (g) amending or repealing any resolution of the Board of Directors which by its terms may be amended or repealed only by the Board of Directors.

A majority of all of the members of such committee may determine its action and fix the time and place of its meetings, unless the Board of Directors shall otherwise provide. The Board of Directors shall have the power at any time to change the membership of, to fill all vacancies in and to discharge any such committee, either with or without cause.

   Section 4.2. <u>Procedure; Meeting; Quorum</u>. Regular meetings of any committee of the Board of Directors, of which no notice shall be necessary, may be held at such times and places as shall be fixed by resolution adopted by a majority of the members thereof. Special meetings of any committee of the Board of Directors will be called at the request of any member thereof. Notice of each special meeting of any committee of the Board of Directors shall be delivered personally, by telephone, by first-class United States mail, postage prepaid or by facsimile transmission to each member thereof not later than one (1) day prior to the day on which such meeting is to be held if such notice is delivered personally, by telephone or by facsimile transmission and not less than four (4) days prior to the day on which such meeting is to be held if such notice is delivered by first-class United States mail. Any special meeting of any committee of the Board of Directors shall be a valid meeting without any notice thereof having been given if all of the members thereof shall be present thereat. Notice of any adjourned meeting of any committee of the Board of Directors need not be given. Each committee of the Board of Directors may adopt such rules and regulations that are not inconsistent with the provisions of law, the Certificate of Incorporation or these Bylaws for the conduct of its meetings as a committee of the Board of Directors may deem to be proper. A majority of the members of any committee of the Board shall constitute a quorum for the transaction of business at any meeting thereof, and the vote of a majority of the members thereof present at any meeting thereof at which such a quorum is present shall be the act of the committee, as the case may be. Each committee of the Board of Directors shall keep written minutes of its proceedings and shall report on such proceedings to the Board of Directors.

ARTICLE V

OFFICERS

   Section 5.1. <u>Executive Officers</u>. The executive officers of the Corporation shall be a Chief Executive Officer and/or a President, a Secretary, a Chief Financial Officer, and such other officers or agents with such titles and such duties as the Board of Directors may from time to time determine. One person may hold any number of said offices.

   Section 5.2. <u>Election, Term of Office and Eligibility</u>. The executive officers of the Corporation may be elected by the Board of Directors at its annual meeting or at any special meeting of the Board of Directors; provided that new or additional officers may be elected at any meeting of the Board. Each officer, except such officers as may be appointed in accordance with the provisions of Section 5.3, shall hold office until his death, resignation or removal.

-8-

Confidential

DAV000113

Section 5.3. <u>Subordinate Officers</u>. The Chief Executive Officer shall have the authority to appoint and remove a Controller, such Vice Presidents, Assistant Secretaries, Assistant Treasurers and such other officers, and such agents as the Chief Executive Officer may determine, to hold office for such period and with such authority and to perform such duties as the Chief Executive Officer may from time to time determine.

Section 5.4. <u>Removal</u>. Subject to any applicable contract of employment, the Chief Executive Officer, the President, the Secretary, the Chief Financial Officer, and/or any officer appointed by the Board of Directors pursuant to Section 5.2, may be removed at any time, either with or without cause, but only by the affirmative vote of the majority of the total number of directors as at the time specified by the Bylaws. Subject to any applicable contract of employment, any subordinate officer appointed pursuant to Section 5.3 may be removed at any time, either with or without cause, by the affirmative vote of the majority of the total number of directors as at the time specified by the Bylaws or by any committee or officer empowered to appoint such subordinate officers.

Section 5.5. <u>The Chief Executive Officer</u>. Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if any, the Chief Executive Officer of the Corporation shall, subject to the control of the Board of Directors, have general supervision, direction, and control of the business and the officers of the Corporation and shall have authority to designate subordinate officers. He or she shall preside at all meetings of the stockholders and, in the absence or nonexistence of a Chairman of the Board, at all meetings of the Board of Directors, and in general shall perform all duties incident to the office of the Chief Executive Officer and such other duties as may be assigned to him or her by the Board of Directors or these Bylaws.

Section 5.6. <u>The President.</u> The President, in the absence or disability of the Chairman of the Board (if any) and the Chief Executive Officer, shall preside at meetings of the Board of Directors and of the stockholders and shall perform the duties and exercise the powers of the Chairman of the Board and the Chief Executive Officer. Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board (if any) or the Chief Executive Officer, the President of the Corporation shall have general supervision, direction and control of the business and the officers of the Corporation. The President shall also have the general powers and duties of management usually vested in the office of the president of a corporation and such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

Section 5.7. <u>The Secretary</u>. The Secretary shall:

(a) Keep the minutes of the meetings of the stockholders and of the Board of Directors;

(b) See that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

Confidential

DAV000114

(c)  Be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized;

(d)  Have charge of the stock record books of the Corporation; and

(e)  In general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him by the Board of Directors, these Bylaws or by the Chief Executive Officer of the Corporation.

Section 5.8.  The Chief Financial Officer.  The Chief Financial Officer shall:

(a)  Receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things:  keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depositary as the Board of Directors, Chief Executive Officer or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b)  Render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the Chief Executive Officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c)  In general, perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him or her by the Board of Directors, these Bylaws, or by the Chief Executive Officer of the Corporation.

Section 5.9.  Salaries.  The salaries of the officers shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving such salary by reason of the fact that he is also a director of the Corporation.

Section 5.10.  Delegation of Duties.  In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, subject to any applicable contract of employment, to any other officer or to any director.

Confidential

DAV000115

## ARTICLE VI

## SHARES OF STOCK

Section 6.1. <u>Regulation</u>. Subject to the terms of any contract of the Corporation, the Board of Directors may make such rules and regulations as it may deem expedient concerning the issue, transfer, and registration of certificates for shares of the stock of the Corporation, including the issue of new certificates for lost, stolen or destroyed certificates, and including the appointment of transfer agents and registrars.

Section 6.2. <u>Stock Certificates</u>. Certificates for shares of the stock of the Corporation shall be respectively numbered serially for each class of stock, or series thereof, as they are issued, shall be impressed with the corporate seal or a facsimile thereof, and shall be signed by the Chief Executive Officer, President or such other officer as designated by the Board of Directors, and by the Secretary or the Chief Financial Officer, or a Controller, an Assistant Secretary or an Assistant Treasurer, provided that such signatures may be facsimiles on any certificate countersigned by a transfer agent other than the Corporation or its employee. Each certificate shall exhibit the name of the Corporation, the class (or series of any class) and number of shares represented thereby, and the name of the holder. Each certificate shall be otherwise in such form as may be prescribed by the Board of Directors.

Section 6.3. <u>Restriction on Transfer of Securities</u>. A restriction on the transfer or registration of transfer of securities of the Corporation may be imposed either by the Certificate of Incorporation or by these Bylaws or by an agreement among any number of security holders or among such holders and the Corporation. No restriction so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.

A restriction on the transfer of securities of the Corporation is permitted by this Section if it:

(a) Obligates the holder of the restricted securities to offer to the Corporation or to any other holders of securities of the Corporation or to any other person or to any combination of the foregoing a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities; or

(b) Obligates the Corporation or any holder of securities of the Corporation or any other person or any combination of the foregoing to purchase the securities which are the subject of an agreement respecting the purchase and sale of the restricted securities; or

(c) Requires the Corporation or the holders of any class of securities of the Corporation to consent to any proposed transfer of the restricted securities or to approve the proposed transferee of the restricted securities; or

-11-

Confidential

(d)  Prohibits the transfer of the restricted securities to designated persons or classes of persons; and such designation is not manifestly unreasonable; or

(e)  Restricts transfer or registration of transfer in any other lawful manner.

Unless noted conspicuously on the security, a restriction, even though permitted by this Section, is ineffective except against a person with actual knowledge of the restriction.

Section 6.4.  <u>Transfer of Shares</u>.  Subject to the restrictions permitted by Section 6.3, shares of the capital stock of the Corporation shall be transferable on the books of the Corporation by the holder thereof in person or by such holder's duly authorized attorney, upon the surrender or cancellation of a certificate or certificates for a like number of shares.  As against the Corporation, a transfer of shares can be made only on the books of the Corporation and in the manner hereinabove provided, and the Corporation shall be entitled to treat the registered holder of any share as the owner thereof and shall not be bound to recognize any equitable or other claim to or interest in such share on the part of any other person, whether or not it shall have express or other notice thereof, save as expressly provided by the statutes of the State of Delaware.

Section 6.5.  <u>Fixing Date for Determination of Stockholders of Record</u>.

(a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; providing, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)  In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section  6.6.    <u>Lost Certificate</u>.   Any stockholder claiming that a certificate representing shares of stock has been lost, stolen or destroyed may make an affidavit or affirmation of the fact and, if the Board of Directors so requires, advertise the same in a manner designated by

-12-

Confidential

DAV000117

the Board, and give the Corporation a bond of indemnity in form and with security for an amount satisfactory to the Board (or an officer or officers designated by the Board), whereupon a new certificate may be issued of the same tenor and representing the same number, class and/or series of shares as were represented by the certificate alleged to have been lost, stolen or destroyed.

## ARTICLE VII

## BOOKS AND RECORDS

Section 7.1. Location. The books, accounts and records of the Corporation may be kept at such place or places within or outside the State of Delaware as the Board of Directors may from time to time determine.

Section 7.2. Inspection. The Corporation's stock ledger, a list of its stockholders and its other books, and records shall be open to inspection by any member of the Board of Directors for a purpose reasonably related to his or her position as director. Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal place of business.

Section 7.3. Corporate Seal. The Corporation may adopt a corporate seal, which may be altered at pleasure, and may use the same by causing it or a facsimile thereof, to be impressed or affixed or in any other manner reproduced.

## ARTICLE VIII

## DIVIDENDS AND RESERVES

Section 8.1. Dividends. The Board of Directors of the Corporation, subject to any restrictions contained in the Certificate of Incorporation and other lawful commitments of the Corporation, may declare and pay dividends upon the shares of its capital stock either out of the surplus of the Corporation, as defined in and computed in accordance with the General Corporation Law of the State of Delaware, or in case there shall be no such surplus, out of the net profits of the Corporation for the fiscal year in which the dividend is declared and/or the preceding fiscal year. If the capital of the Corporation, computed in accordance with the General Corporation Law of the State of Delaware, shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the Board of Directors of the Corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital

-13-

Confidential

DAV000118

represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired.

Section 8.2. <u>Reserves</u>. The Board of Directors of the Corporation may set apart, out of any of the funds of the Corporation available for dividends, a reserve or reserves for any proper purpose and may abolish any such reserve.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1. <u>Fiscal Year</u>. The fiscal year of the Corporation shall end on the 31st day of December of each year.

Section 9.2. <u>Depositories</u>. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 9.3. <u>Checks, Drafts and Notes</u>. All checks, drafts or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board.

Section 9.4. <u>Contracts and Other Instruments</u>. The Board of Directors may authorize any officer to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances. The Chief Executive Officer may designate any officer to contract, execute and deliver, in the name and on behalf of, the Company, in the ordinary course of business.

Section 9.5. <u>Notices</u>. In addition to other means of notice permitted herein, whenever under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, by depositing the same in a post office or letter box, in a postpaid sealed wrapper, or by delivery to a telegraph company, addressed to such director or stockholder at such address as appears on the records of the Corporation, or, in default of other address, to such director or stockholder at the General Post Office in the City of Dover, Delaware, and such notice shall be deemed to be given at the time when the same shall be thus mailed or delivered to a telegraph company.

Section 9.6. <u>Waivers of Notice</u>. Whenever any notice is required to be given under the provisions of the statutes or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor

-14-

Confidential

DAV000119

the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors need be specified in any written waiver of notice.

Section 9.7. <u>Stock in Other Corporations</u>. Any shares of stock in any other corporation which may from time to time be held by this Corporation may be represented and voted at any meeting of shareholders of such corporation by the Chief Executive Officer or the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its Chief Executive Officer or President. Shares of stock belonging to the Corporation need not stand in the name of the Corporation, but may be held for the benefit of the Corporation in the individual name of the Chief Financial Officer or of any other nominee designated for the purpose by the Board of Directors. Certificates for shares so held for the benefit of the Corporation shall be endorsed in blank or have proper stock powers attached so that said certificates are at all times in due form for transfer, and shall be held for safekeeping in such manner as shall be determined from time to time by the Board of Directors.

Section 9.8. <u>Indemnification</u>.

(a) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to, or is otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was a director or an officer of the Corporation, against all judgments, fines, amounts paid in settlement and other liability and loss suffered, and all expenses (including, without limitation, attorneys' fees) reasonably incurred thereby in connection with such action, suit or proceeding to the fullest extent permitted by the General Corporation Law of the State of Delaware and any other applicable law as from time to time in effect. Such right of indemnification shall not be deemed to be exclusive of any rights to which any such director or officer may otherwise be entitled. The foregoing provisions of this Section 9.8(a) shall be deemed to be a contract between the Corporation and each director and officer of the Corporation serving in such capacity at any time while this Section 9.8(a) is in effect, and any repeal or modification thereof shall not affect any right or obligation then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

(b) The Corporation may indemnify any person who was or is a party or is threatened to be made a party to, or is otherwise involved in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was an employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise, against all judgments, fines, amounts paid in settlement and other liability and loss suffered, and all expenses (including, without limitation, attorneys' fees) reasonably incurred thereby in connection with such action, suit or proceeding to the extent permitted by and in the manner set forth in and permitted by the General Corporation Law of the State of Delaware and any other applicable law as from time to time in effect. Such right of indemnification shall not be deemed to be exclusive of any other rights to which any such person may otherwise be entitled.

-15-

Confidential

(c)  If a claim under subsection (a) or (b) of this Section is not paid in full by the Corporation within thirty (30) days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim.  It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because he has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(d)  The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, bylaw, agreement, vote of stockholders or disinterested directors or otherwise.

(e)  The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another Corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(f)  To the extent that any director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, he or she shall be indemnified against all costs and expenses actually and reasonably incurred by him or on his behalf in connection therewith.

(g)  Any amendment, repeal or modification of any provision of this Section by the stockholders or the directors of the Corporation shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time of such amendment, repeal or modification.

-16-

Confidential

DAV000121

Section 9.9. <u>Amendment of Bylaws</u>.

(a)    The stockholders, by the affirmative vote of the holders of a majority of the stock issued and outstanding and having voting power may, at any annual or special meeting if notice of such alteration or amendment of the Bylaws is contained in the notice of such meeting, adopt, amend or repeal these Bylaws.

(b)    The Board of Directors, by the affirmative vote of a majority of the whole Board, may adopt, amend or repeal these Bylaws or any provision of these Bylaws at any meeting.  Bylaws made by the Board of Directors may be altered or repealed by the stockholders upon the affirmative vote of sixty-six and two-thirds percent (66 2/3%) of the stock issued and outstanding and having voting power.

*   *   *   *   *

-17-

Confidential

## CERTIFICATE OF ADOPTION OF
## BYLAWS OF
## ELITE AEROSPACE GROUP, INC.

The undersigned hereby certifies that the undersigned is the duly elected, qualified and acting Secretary of Elite Aerospace Group, Inc. (the "Corporation"), and that the foregoing Bylaws were adopted as the Bylaws of the Corporation on May 24, 2016, by the Board of Directors of the Corporation.

Executed this 24th day of May 2016.

Name: Zeeshawn Zia
Title:   Secretary

C:\Users\Kim Davis\AppData\Local\Temp\Temp1_Fw%3a_Elite_Companies_-_Due_Dilligence_documents_-_Review_and_Sign_and_Return.zip\Bylaws-EliteAero-v2.docx

Confidential          DAV000123

Confidential

DAV000124

# Elite Aerospace Group, Inc.

## Corporate Governance and Securities Project List

### May 8, 2017

| | Issue | Action Items | Responsible Parties | Status | Priority Level |
|---|---|---|---|---|---|
| 1. | **Board Information Sessions & Training**<br><br>*Purpose: Provide directors and executive officers with foundational understanding of legal duties and responsibilities as Company expands and prepares to be a public company* | a. Presentation on corporate governance<br><br>b. Distinction between current requirements, current best practices and anticipated requirements for a public and listed company.<br><br>c. Overview of Nasdaq corporate governance requirements for public companies:<br>• Board committees: Audit, Comp & Nomination, Governance<br>• Director independence standards<br><br>d. Impacts of CA law provisions applicable due to Section 2115, e.g. cumulative voting, etc.<br><br>e. Other topics by request. | ECG: Ben Pugh | Board training session on May 25 | High |

1

CONFIDENTIAL

5/8/2017

Confidential

DAV000125

Confidential

DAV000126

5/8/2017

| Issue | Action Items | Responsible Parties | Status | Priority Level |
|---|---|---|---|---|
| **2.** **Notes/ Series A Offering** **EFS AF I and EFS L&FF I** *Purpose: Raise $30,000,000 in a fully compliant manner* | a. Prepare LLC Operating Agreements for Elite Financial Services Acquisitions Fund I LLC ("AF I") and Elite Financial Services Leasing & Finance Fund I LLC ("L&FF I"; together, the "Funds") | ECG; EAG review | | **High** |
| | b. Prepare Form of Agreement/Note between Elite Financial Services and each of the Funds | ECG; EAG review | | |
| | c. Prepare Form of Agreement/Note between the Investors and each of the Funds | ECG; EAG review | | |
| | d. Ensure that Certificate of Designation of Series A Preferred is amended to include a liquidation preference of some kind | Prior corporate counsel and EAG | | |
| | e. Master Equipment Lease template, with schedule for specific equipment leased | ECG; EAG review | | |
| | f. Prepare PPM for AF I Offering Prepare PPM for L&FF I Offering | ECG; EAG review | | |
| | g. Form D and State notices, as applicable. | ECG | | |
| **3.** **Anti-dilution Issue** *Purpose: Replace existing founders' stock anti-dilution provisions with stock options to reduce dilution exposure to new investors while* | a. Dustin and Zee employment contracts b. ECI principals c. [Any others?] **NOTE: Would be helpful to have a cap table for all existing stock holders, all options, warrants and anti-dilution or other special** | | | **High** |

2

Confidential

DAV000127

Confidential

DAV000128

| Issue | Action Items | Responsible Parties | Status | Priority Level |
|---|---|---|---|---|
| | d. Appointment of Corporate Secretary and training/ review of Board level record keeping | Governance Committee | | |
| | e. Employment Manual | Governance Committee ECG | | |

5/8/2017

4

CONFIDENTIAL

DAV000129

Confidential

DAV000130

# Essam Mohamed

| | |
|---|---|
| **From:** | Urio Zanetti <Urio@spearmanaerospace.com> |
| **Sent:** | Wednesday, September 06, 2017 4:26 PM |
| **To:** | Essam Mohamed |
| **Subject:** | SPA – Terms |

Hello Essam,

I wish to re-cap what we discussed and agreed this morning.

1. Purchase price at $ 2,500,000/total   *regular deals | Escrow account*
2. Initial cash payment of $ 1.00 Mil with 5 ~~cashier~~ checks.
3. First check at closing at 4 further checks dated 30 days one from each other – last check at 120 days since the initial one
4. Promissory note for $ 750,000 to be guarantee by Spearman assets and ~~EAG ( Holding )~~ assets.   *NO EAG*
5. Final payment of $ 750,000 to be done at the end of 18th month at the maturity of promissory note.
6. Final payment consisting of $ 375,000 in EAG shares issued at the time of closing and $ 375,000 to be paid in cash.
7. Total amount of final payment ( shares + cash ) to be guarantee by Spearman assets and EAG assets as for the notes.
8. $ 375,000 in shares value for EAG to be purchased by EAG at nominal price upon seller request within a period of 60 days from the maturity of the promissory note.

I think this will solve all about the payment terms on the deal.
Correct me if I am wrong.
Thanks for your time,
Urio

1

DAV000131

Confidential

DAV000132

Exhibit 03





*Restated Agent
RMM / EAP*

## AGREEMENT FOR SERVICES

**THIS AGREEMENT FOR SERVICES** (hereinafter "**Agreement**") is made and entered into this 16th day of November , 2015, by and between Elite Aviation Products Inc., a Delaware corporation (hereinafter "Client") and RealMedia Marketing, Inc., a Delaware corporation (hereinafter "RMM"), who agree as follows:

### 1. Recitals.

This Agreement is made in contemplation of the following facts and circumstances:

A. RMM is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.

B. RMM provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

C. RMM is not Client's legal, accounting or professional counsel. RMM does not in any way offer or transact in securities on behalf of clients. Client is encouraged to seek professional assistance in areas of legal advice and securities counsel in addition to all accounting and tax representation. RMM will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein.

D. This Agreement is intended by the parties to engage RMM as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. RMM to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.

E. RMM is in the business of providing the services specified in the "Description of Services" attached hereto as **Exhibits "A" Marketing Services, "A-2" Administration, "A-3" Consulting, "A-4" Marketing and Sales Training Services, "A-5" Client Responsibilities, and "A-6" Letter of Intent.**

### 2. Services.

Client and RMM desire to state the terms and conditions under which RMM will provide said services to Client herein:

(a) "Services" means all marketing, administrative, compliance (as defined herein) and other services to be performed by RMM pursuant to the terms of this Agreement.

(b) RMM will provide such staff as RMM deems necessary to perform the Services, at RMM's sole expense. Client shall not control direct, or supervise RMM's employees

Confidential



or agents in the performance of the Services. RMM agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. RMM and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as RMM, in RMM's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, RMM shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c)    Client understands that the performance of the terms of this contract is dependent of mutual effort and compliance of the terms of this contract by both Client and RMM. Client is bound to maintain its obligations as referenced under **Exhibit "A-6" Letter of Intent** included herein.

3.   **Compensation**

(a)    In consideration of the Services to be rendered by RMM pursuant to this Agreement, Client agrees to pay equal installments of $34,750 weekly during the term of the contract. In the event Client pays installments more than one (1) week in advance an early payment discount in the amount of two percent (2%) of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a three percent (3%) discount if paid in good funds.

(b)    In addition, RMM shall invoice Client, weekly in arrears, for expenses incurred by RMM as a result of performing Services in accordance with this Agreement. Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by RMM in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, RMM submits supporting documentation in addition to the approved expense form.

(c)    RMM shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate RMM's charges and expenses hereunder and RMM shall retain such records for a period of one (1) year from the date of final payment.

(d)    Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services (as referenced in Item "3(c)"), if any, exclusive of any taxes based upon RMM's income or payroll, or, in lieu thereof, the Company shall provide RMM with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

(e)    Stock Issuance shall be issued in accordance with **Exhibit "A-6."**

DAV000156



**4. Obligations of Client**

The managers and staff of Client shall comply with all reasonable requests of RMM and shall cooperate with RMM by providing to RMM such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for RMM to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference **Exhibit "A-5"** and **Exhibit "A-6"**, the terms of which are incorporated herein by reference.

**5. Independent Contractor**

It is expressly understood and agreed that this Agreement shall not create an employment relationship of any nature whatsoever between the parties. Pursuant to this Agreement, Consultant maintains the status as one of the Company's independent contractors, and shall therefore at all times maintain complete control and exercise his unfettered discretion over the mode and method by which his obligations under this Agreement are carried out, subject only to the Company's right to accept or reject the Consultant's final results, so as to ensure Consultant's satisfactory performance under this Agreement. Neither this Agreement nor any act undertaken or omission allowed by any party hereunder shall be construed as creating partnership, employer/employee relationship, principal/ agent relationship or any other relationship of any other type or nature whatsoever, other than that of independent contractor. Neither shall the Consultant bind, attempt to bind or in any manner hold himself out as the Company's authorized representative for any purpose, except as expressly set forth herein.

**6. Self-employment Tax**.

Consultant shall be responsible for and shall timely pay all personal income tax, self-employment tax, duties, disability insurance, business license costs, workers' compensation premiums and any and all other levies and/or taxes assessed by any governmental authority as a result of services rendered and/or compensation paid hereunder.

**7. Term and Termination**

(a)  This Agreement shall commence on November 1, 2015 and shall continue in Full Force and effect until October 31, 2018 unless and until terminated earlier in accordance with the provisions of this Agreement.

(b)  Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within thirty (30) calendar days following receipt of written notice to the allegedly breaching party; (ii) upon the material breach of Client's payment obligations under paragraph 3 above, unless such breach is cured within ten (10) calendar days following written notice of the breach, or (iii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt

DAV000157



to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise

(c)     In the event Client receives a formal irrevocable written commitment for investment equity, which equity investment exceeds thirty-six million dollars ($36,000,000), either party may terminate this Agreement by providing six (6) months written notice to the other party. Client and RMM's obligations under this Agreement, including Client's obligation to pay the balance owed under this Agreement, will continue throughout the six month early termination period.

(d)     Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay RMM for all costs incurred by RMM with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to RMM in the event this Agreement is terminated due to the default of Client, and confidentiality obligations under paragraph 9 below shall survive the termination indefinitely.

## 8. Indemnification

(a)     RMM will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of RMM unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold RMM free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services. All work product published by RMM is to be deemed approved by Client and Client accepts full responsibility for the content as published by RMM on clients behalf. All company information is deemed to have been provided by Client including but limited to information pertaining to Client's company offerings, financial data, biographical data for all officers, employees and directors. Client holds RMM and its employees officers and Directors and agents harmless for all material generated by or on behalf of Client at Clients direction pursuant to the scope of this contract.

(b)     Client will maintain in full effect at all times a (1) Commercial General Liability insurance policy, (2) an Employment Practice Liability insurance policy, and (3) either an insurance policy or an endorsement that covers securities claims, each in an amount of no less than $2,000,000 per occurrence. Client will cause to name RMM as additional insured under said policies.

## 9. Confidentiality and Proprietary Rights.

During the term of this Agreement, Client will acquire knowledge of the RMM's Confidential Information in connection with its performance of the Services hereunder and the parties agree to keep such Information in confidence during and following termination or expiration of

DAV000158



this Agreement. Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered proprietary by the parties relating to the current or anticipated business or affairs of the parties which is disclosed directly or indirectly to the parties In addition, Confidential Information means any third party's proprietary or confidential information disclosed in the course of providing Services to Client. Confidential Information does not include any information:

(i) which were lawfully known without restriction on disclosure before the disclosure

(ii) which is now or becomes publicly known through no wrongful act or failure

(iii) which is hereafter lawfully furnished to RMM by a third party as a matter of right and without restriction on disclosure.

The parties agree not to copy, alter, or directly or indirectly disclose any Confidential Information.

**10. Miscellaneous Provisions.**

(a) The undersigned individuals executing this Agreement on behalf of their respective parties represent and warrant that said individuals are authorized to enter into and execute this Agreement on behalf of such parties, the appropriate corporate resolutions or other consents have been passed and/or obtained, and that this Agreement shall be binding on the party on whose behalf they are executing this Agreement.

(b) Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c) This Agreement and the attached **Exhibits A-1** through **A-6** contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein

(d) This Agreement has been entered into and executed in Orange County, California and shall be governed by the laws of the State of California.

(e) All parties agree that any controversy or claim arising out of or relating to this Agreement or breach thereof shall be settled by arbitration in accordance with California Code of Civil Procedure §1280 et seq. before an arbitrator selected from the Orange County JAMS/Endispute panel. The parties waive the right to any court hearing. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

DAV000159



(f)     If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g)     This Agreement shall inure to the benefit of and bind the successors in-interest, and transferees of the parties hereto.

(h)     RMM provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client

(i)     Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

> **RMM at**:
>
> Robert Gunton, Its President
> RealMedia Marketing, Inc. 3158 Red Hill Ave #100
> Costa Mesa, Ca 92626
>
> **&**
>
> **Client at**:
>
> Dustin Tillman, CEO
> Zeeshawn Zia, President
> Elite Aviation Products.
> 1645 Reynolds Ave, Irvine, Ca 92612

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)     This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)     No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

DAV000160



(l)     Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)     This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)     Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)     In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after thirty (30) days are subject additionally to interest based upon ten percent (10%) per annum compounded monthly or the then current maximum allowable by law.

(p)     Client is prohibited from engaging at any time a RMM employee or direct RMM consultant for any purpose outside the scope of this agreement. Client shall not engage or hire directly or indirectly any RMM employee (past or present) for any position with the Client or its affiliates or service providers for a period of not less than one (1) year from the natural termination of this Agreement through fulfillment or expiration, or one (1) year from the termination of said employment by RMM of said former employee.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

**CLIENT:**

Name:  Elite Aviation Products

By: _____

Its CEO or Authorized Signatory

RMM

**RealMedia Marketing, Inc.**

By: _____

Robert Gunton
Its President

                                                                 DAV000161



**EXHIBITS**

| | |
|---|---|
| "A1" | Marketing Services |
| "A2" | Administrative Services |
| "A3" | Consulting Services |
| "A4" | Sales and Marketing Training Services |
| "A5" | Client Responsibilities |
| "A6" | Terms Sheet |

DAV000162



<u>**Exhibit "A1"**</u>

<u>**Marketing Services**</u>

<u>**Marketing Services**</u>

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by RMM in RMM's sole discretion as needed.

**1)  Market Research**

General Market Analysis

Competitive Analysis

Targeted Consumer Analysis

Investor Analysis

Ideal Target Market Identification

**2)  <u>Copy-writing</u>[1]**

News Releases & Pitch Letters

White Papers

Website Copy

Advertisement Copy-writing

Tagline / Slogan Analysis & Consultation

Editorial Calendars

Blog and Social Media Posts & Maintenance

Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

**3)  <u>Branding</u>**

Brand Strategy Analysis & Consulting

Research & Development

Image Analysis

Targeted Campaign Development

**4)  <u>Graphic Design</u>**

Logo Design

Press Kit (visual assets)

---

[1] The term "copy-writing" means writing copy for advertising, marketing and other online and print publication, and is not intended to mean providing advice or services related to copyright or other intellectual property laws

Confidential

DAV000163



    Print Advertisements

    Visual Assets for Web Development

    Presentation Decks

    Brochures

    Banners

    Promotional Items (visual assets)

    Style Guides

5) **Video Production**

    Conceptualization & Storyboarding

    Production

    Direction

    Script Development and Pre-production

    Post-production Editing

    "Shorts" & Viral Videos

    Webinars

    Product Presentations

    Online Hosting & Viewership Metrics

6) **Market Strategy**

    Tactical Marketing Plans

    Campaign Effectiveness Analytics

    Targeting & Segmentation Strategies

    Lead Database Development and management

7) **Public Relations**

    PR Campaign Development & Execution

    Proactive Reputation Management

    Reactive Reputation Management

    Reporting and Analytics

    Editorial Calendars

DAV000164



8) **Account Management**

<u>Oversight / Planning / General Management of the Following</u>:

PR Campaign Execution

Targeted, Regional, and National Media Campaigns

Web Development

Database Implementation and management (I.R.I.S.)

Creative Strategy Implementation

Brand Strategy Implementation

DAV000165



## Exhibit "A2"

## Administrative Services

### Description of Administration Services

First and foremost, RMM's Allocations team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The Allocations team provides Administrative help to assist in daily tasks, including (but not limited to):

Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

Assisting with distribution of company approved information to the Sales floor. RMM is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

May assist in distribution of approved correspondence or other mailings to the subscribers.

Agent Training on the CRM (IRIS)

Assist the Investor Relations Sales Manager in any administrative capacity.

The Compliance team does not and will not act as HR for the issuer. RMM requires that the issuer designate or hire personnel to assist with all HR related items. Allocations may, however, assist issuer in the distribution of this material.

Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation. RMM is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.

Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.

May assist in distribution of approved correspondence or other mailing to the subscribers.

RMM Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our RMM clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by RMM that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor funds. RMM will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Allocations team are as follows:

DAV000166



**Compliance Department Services**

Compliance team member provides support to the Issuers Investor/Subscriber Relations Department. The Compliance Team Member to provide Administrative help to assist in daily tasks, including (but not limited to):

Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

The Compliance Team Member does not act on behalf of the ISSUER as HUMAN RESOURCES for the issuer, sell or promote the issuer's offering, or act as the Investor/Subscriber Relations representative for the issuer. It is required for all of our RMM clients to have a designated Officer of the company to act as their Human Resources officer and their Investor/Subscriber Relations Contact. It is also required by RMM that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. RMM will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines

Compliance facilitates the subscriber's funding of their investment by:

Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In Regards to verification of accreditation, a Compliance Team Member will go to the Compliance Offer the Various Options that the issuer has approved in order to satisfy. This may include, but is not limited to

Confidential

DAV000167



submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by RMM that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received, Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in I.R.I.S. (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

    Funds in Transit information

    Allocation specific Notes

    Documentation Storage

    Investor/Subscriber Correspondence

    Certificate

    Accredited Investor/Subscriber Verification Letter

RMM requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Defined Terms:**

**CRM:** A Customer Relationship Management Software used to manage customer and client contact information and to maintain and Implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers' or clients' trends and behaviors, which ultimately serve to enhance the customers' or clients' overall experience.

**I.R.I.S.:** I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS). This software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing undergoing legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations. Its adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of RMM.

DAV000168



**Investor Compliance Officer**: Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. RMM and its compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

**Compliance Team Member**: A Compliance Team Member (CTM) is a RMM employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

**Chief Human Relation's Officer**: A Chief Human Resources Officer (CHRO) is a corporate officer who oversees all aspects of human resource management and industrial relations policies, practices and operations for an organization.

**Investor Relations Officer**:  A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.

DAV000169



**Exhibit "A3"**

**Consulting Services**

**Consulting Services**

RMM provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

 Executive Summary

 Business Overview

 Products & Services

 Sales & Marketing Plan

 Operating Plan

 Management and Organization

 Action Plan

 Financial Plan

 Investment Opportunity

 Market Strategy

 Tactical Marketing Plans

 Effectiveness Measurement(s)

 Management Information Systems (MIS)

 SaaS Customer Relationship Management (CRM)

 Planning

 Strategic Business Planning

 Opportunity Creation

 Market Evaluation

 Distribution Channels

 Return-on-investment (ROI)

 Consumer Research

 Real Estate Acquisition

 Facility Lease Negotiation

 Facility Design and Construction

DAV000170



## Exhibit "A4"

## Sales and Marketing Training Services

**Sales and Marketing Training Services**

RMM to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. RMM will to provide, on request, strategic consulting services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force.

RMM provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

### Professionalism & Ethics

Ethical Selling Practices

Interoffice communication skills

Client communication skills

Public Speaking

Professional presence and grooming

Core Competency evaluations and recommendations.

Personality profiling

### Professional Sales Preparation

Prospect Presentation Best Practices

Presentation Scripting (at the issuer's direction)

Sales/Marketing Content Creation

(a) How to properly qualify a prospect for your product or service.

### S.W.A.T. (Selling With A Telephone) Sales Training Program (on-going)

Prospecting

Call/Meeting Follow Up Process

Proven Closing Methodologies

Presentation Methods

Proper Qualification

Follow up procedures

Closing methodology

Client Retention Best Practices

DAV000171



**Training Services & Content Delivery Methods**

Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the RMM video library is approved by RMM management on a case-by-case basis. Access to the RMM training library. Additionally, RMM sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

RMM Sales Training staff may vary from region to region. The issuer/client will, be assigned a primary sales training specialist suited for their industry and vertical. RMM sales RMM trainers will employ proven sales methodologies.

*Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.*

DAV000172



## Exhibit "A5"

## Responsibilities' of the Client

**CLIENT REPSONSIBILITIES:**

In order for RealMedia Marketing to properly perform its duties under this agreement the Client must provide the following:

Biographical Data on all principals

Incorporation Documents

Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.)

Names of all Officers (including % owned of the Corporation)

Name of Intended Chief Investment Relations Officer

Name of Intended Chief Human Resources Officer

Directors and Officers Questionnaire

Quarterly Financial Statements as issued

List of Professional Services companies providing Services to Client (Attorneys, CPAs)

Business Plan

Business Overview

Business License

Description of Service Offering or product(s) sold

List of employees and job functions

Client (or clients fully authorized agent) to be available minimum of 10-15 hours per week.

DAV000173



## "EXHIBIT A6"

### Elite Aviation Products

### Contract Terms Sheet:

Contract Term:          36 months

Contract Rate:          $34,750 payable on weekly

Commencement Date:  November 1, 2015

Expiration Date:        October 31, 2018

Engagement Fee:       Waived

Stock issuance:         ELITE AVIATION PRODUCTS, INC.  will issue/reissue Founders Shares
                        of  Common stock in the following amount. Said shares will include an
                        anti-dilution clause.

|  |  |
|---|---|
| Dustin Tillman | 17%* |
| Zeeshawn Zia | 17%* |
| RMM | 20%* |

                        Non-Dilutable *

                        Founders Shares are to be issued or re-issued to reflect the percentage of
                        share ownership of Authorized Stock as required and shall be non-
                        dilutable to below the stated percentage for Founders. Other shares may
                        be dilutable subject to Board Approval.

Board Seats:            ELITE AVIATION PRODUCTS, INC.  will authorize a minimum of a 5
                        member board of directors of which 2 members will be appointed by
                        RMM. RMM will retain the right to alternate appropriate board members
                        during the term of the contract at RMM's sole discretion

Common Shares:          Authorized Common Stock have been increased to 400,000,000
                        (inclusive of founder's shares. Par value will be pre-set at $.0001 per
                        share.)

Termination:            An early termination of this contract may be tendered in the event client
                        receives a formal irrevocable written commitment for investment equity
                        equal to or greater than the amount then being offered by Client to the
                        investment community at any time after its effective date with six (6)
                        months written notice to RMM. Client will continue to maintain the
                        contract current throughout its term including but not limited to the
                        balance of the contract term during the termination period as noted.

                                                    DAV000174



Preferred Stock:    Authorized Preferred Stock has been issued in the amount of 38,000,000 shares will be issued in anticipation of a Preferred Series A offering of $18,000,000 at an offering value of $.50 per share.

Authorized Preferred Stock have been authorized and are denoted as Preferred B shares in the amount of 24,000,000 shares, plus 24,000,000 Preferred Series B shares for attachments in Warrants.

Confidential

DAV000175

5/29/2019

**Subject:** Share certificates to be issued this week, pending board resolutions

**From:** "Saji Gunawardane" <sgunawardane@eliteaviationproducts.com>

**Sent:** 10/28/2015 4:07:00 PM

**To:** "Julie Yale" <yaleentityservices@gmail.com>;

**CC:** "Dustin Tillman" <dtillman@eliteaviationproducts.com>; "Zeeshawn Zia" <zzia@eliteaviationproducts.com>;

Julie -

I intend to provide you with copies of board resolutions this week for the issuance of 22,600,000 shares to RMM pursuant to the parties original agreement. Pursuant to an email I just received from Dawson, the stock is to be issued to the following accredited investors:

19,350,000 titled to RMMH, LLC

1,000,000 titled to Robert Gunton

1,000,000 titled to Andrea Lindstrom

1,000,000 titled to Gabriela Davenport; and

250,000 titled to Adam Eldred

Tomorrow, I will also be providing you with the board resolution authorizing the share cert to Feller per confirmation meeting with Andrea tomorrow.

Just a heads-up for now re. certs we'd like to send out this week so you can plan accordingly.

--
Thank you,

Saji

Saji D. Gunawardane
Chief Legal Officer
Elite Aviation Products, Inc.
1641 Reynolds Avenue
Irvine, California 92614
Direct: (949) 562-3779

1/1

Confidential

2014
ORIG

## AGREEMENT FOR SERVICES

THIS AGREEMENT FOR SERVICES (hereinafter "Agreement") is made and entered into this 12th day of March, 2014, by and between Elite Aviation Products, Inc A Delaware Corporation (hereinafter "Client") and Real Media Marketing, Inc , a Delaware corporation (hereinafter "RMM"), who agree as follows:

1. Recitals. This Agreement is made in contemplation of the following facts and circumstances:

(a) RMM is in the business of providing the services specified in the "Description of Services" attached hereto as Exhibit "A";

(b) Client is desirous of retaining RMM to provide said services; and

(c) Client and RMM desire to state the terms and conditions under which RMM will provide said services to Client.

2. Services to be Performed by RMM.

(a) "Services" means all marketing, administrative and other services to be performed by RMM pursuant to the terms of this Agreement and any mutually agreed upon and executed Statement of Work (each a "Statement of Work"). Each Statement of Work will contain, among other agreed-upon terms, a description of the tasks to be performed by RMM, the deliverables and documentation to be produced by RMM, a schedule of performance, and a special schedule of payments, if applicable. Each Statement of Work entered into by the parties shall reference this Agreement, be subject to its terms and shall be made a part of this Agreement; provided, however, the contents of any Statement of Work shall take precedence over any conflicting provision in this Agreement to the extent necessary to resolve any such conflict.

(b) RMM will provide such staff as RMM deems necessary to perform the Services, at RMM's sole expense. Client shall not control direct, or supervise RMM's employees or agents in the performance of the Services. RMM agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services; provided, however, RMM and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as RMM, in RMM's sole discretion, sees fit. In the event that any individual assigned to perform Services for Client must be replaced, RMM shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c) RMM shall not assign any RMM personnel (including RMM employees or contractors) that are delivering Services to Client hereunder to the account of any competitor of Client without Client's prior consent while such personnel are assigned to Client's account or otherwise

- 1 -

Confidential

DAV000177

providing any Services under this Agreement. RMM shall require all RMM personnel having access to Client's Confidential Information to maintain and enforce the provisions of the Confidentiality Agreement referenced in Section 8 below.

    3. <u>Compensation</u>.

    (a) In consideration of the Services to be rendered by RMM to Client pursuant to this Agreement, Client agrees to pay RMM a INITIAL ENGAGEMENT FEE in the amount of $350,000 (a initial payment of $75,000 was paid on or about February 28, 2014, a second payment of $150,000 on March 15, 2014 and a third payment of $125,00 on or before April 15, 2014) and thereafter 48 equal installments of $ 60,000 on the 15th and the last day of each month commencing on May 1, 2014. In the event EAP does not pay the installment on or before the due dates as defined here-in each late installment will incur a penalty in the amount of 10% of the installment amount.

    (b) In consideration of RMM's execution of this Agreement, Client shall deliver to RMM or it's designee, on or before March 1, 2014 a certificate for Thirty Seven Million Six Hundred Thousand shares of Clients common stock, in the form identical to Exhibit A@ attached hereto. RMM is aware that such shares of Client's common stock have not been registered under the federal Securities Act of 1933, the California Corporations Code or the laws of any other state and may not be transferred in the absence of registration, or the availability of an exemption from registration under such laws; further, said shares are newly issued shares of Client issued in partial reliance on Section 4(2) of the Securities Act of 1933 and Section 25102(f) of the California Corporations Code, and RMM hereby warrants that it is purchasing said shares for its own account and not with a view to or for sale in connection with any distribution of said shares.

    (c) In addition, RMM shall invoice Client, monthly in arrears, for expenses incurred by RMM as a result of performing Services in accordance with this Agreement and/or any Statement of Work. Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by RMM in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, RMM submits supporting documentation in addition to the approved expense form.

    (d) RMM shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate RMM's charges and expenses hereunder and RMM shall retain such records for a period of one (1) year from the date of final payment under any Statement of Work.

    (e) Client agrees to pay the amount of any sales, use, excise or similar

- 2 -

Confidential

taxes applicable to the performance of the Services, if any, exclusive of any taxes based upon RMM's income or payroll, or, in lieu thereof, the Company shall provide RMM with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

    4. <u>Obligations of Client</u>.

      The managers and staff of Client shall comply with all reasonable requests of RMM and shall cooperate with RMM by providing to RMM such information and access to Client's personnel, facilities, equipment, databases, software, and other resources as are necessary for RMM to perform the Services and/or as are specifically set out and agreed to in a Statement of Work.

    5. <u>Independent Contractor</u>.

      In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that RMM is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and RMM an employer/employee, partnership, or joint venture relationship. RMM shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies and equipment. RMM agrees that Client shall have no obligation to withhold from compensation due RMM hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to RMM or the employees or agents of RMM.  RMM hereby waives any and all claims RMM may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

    6. <u>Term and Termination</u>.

      This Agreement shall commence on the date indicated on the first page hereof and shall continue in full force and effect until December 31, 2015 unless and until terminated earlier in accordance with the provisions of this Agreement.

      Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise.

      Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay RMM for all costs incurred by RMM with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive

- 3 -

DAV000179

such termination or expiration including, without limitation, Client's continuing compensation obligations to RMM in the event this Agreement is terminated due to the default of Client.

      7.    <u>Indemnification</u>.

      (a)  RMM will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of RMM unless such acts or omissions are due to willful misconduct and/or gross negligence.  Client will indemnify and hold RMM free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services, unless RMM is judged by a court of competent jurisdiction to be guilty of willful misconduct and/or gross negligence.

      (b)  RMM agrees to defend at its own cost and expense any claim or action against Client, its subsidiaries and/or affiliated companies, for actual or alleged infringement of any patent, copyright or other property right (including, but not limited to, misappropriation of trade secrets) based on any software, program, service and/or other materials furnished to Client by RMM pursuant to the terms of this Agreement or the use thereof by Client. RMM further agrees to indemnify and hold Client, its subsidiaries and/or affiliated companies, free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with any such claim or action.

      (c)  The party requesting indemnification hereunder (the "Indemnified Party") will give notice to the party required to provide indemnification hereunder (the "Indemnifying Party") promptly after the Indemnified Party has actual knowledge of any claim as to which indemnity may be sought hereunder.  The Indemnified Party shall permit the Indemnifying Party (at the expense of the Indemnifying Party) to assume the defense of any claim or litigation resulting therefrom provided that (i) counsel for the Indemnifying Party who shall conduct the defense of such Claim or litigation shall be reasonably satisfactory to the Indemnified Party; (ii) the Indemnified Party may participate in such defense; and (iii) the omission by the Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligations hereunder except to the extent that such omission results in a failure of actual notice to the Indemnifying Party and the Indemnifying Party is damaged as a result of such failure to give notice.

      8.    <u>Confidentiality and Proprietary Rights</u>.

      (a)  During the term of this Agreement, RMM will acquire knowledge of Client Confidential Information (as defined below) in connection with its performance of the Services hereunder and agrees to keep such Client Confidential Information in confidence during and following termination or expiration of this Agreement. AClient Confidential Information@ includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products,

- 4 -

 DAV000180

services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product (as defined herein), and other material or information considered proprietary by Client relating to the current or anticipated business or affairs of Client which is disclosed directly or indirectly to RMM. In addition, Client Confidential Information means any third party's proprietary or confidential information disclosed to RMM in the course of providing Services to Client. Client Confidential Information does not include any information:

(i) which RMM lawfully knew without restriction on disclosure before Client disclosed it to RMM;

(ii) which is now or becomes publicly known through no wrongful act or failure to act of RMM;

(iii) which RMM developed independently without use of the Client Confidential Information, as evidenced by appropriate documentation; or

(iv) which is hereafter lawfully furnished to RMM by a third party as a matter of right and without restriction on disclosure.

In addition, RMM may disclose Client Confidential Information which is required to be disclosed pursuant to a requirement of a government agency or law so long as RMM provides prompt notice to Client of such requirement prior to disclosure.

RMM agrees not to copy, alter, or directly or indirectly disclose any Client Confidential Information. Additionally, RMM agrees to limit its internal distribution of Client Confidential Information to RMM's employees and agents who have a need to know, and to take steps to ensure that the dissemination is so limited, including the execution by RMM's employees and agents of nondisclosure agreements with provisions substantially similar to those set forth herein. In no event will RMM use less than the degree of care and means that it uses to protect its own information of like kind, but in any event not less than reasonable care to prevent the unauthorized disclosure of Client Confidential Information. RMM further agrees not to use the Client Confidential Information except in the course of performing the Services hereunder and will not use such Client Confidential Information for its own benefit or for the benefit of any third party. The mingling of Client Confidential Information with information of RMM shall not affect the confidential nature or ownership of the same as stated hereunder. All Client Confidential Information is and shall remain the property of Client. Upon Client's written request or the termination of this Agreement, RMM shall return, transfer, or assign to Client all Client Confidential Information, including all Work Product, and all copies thereof.

RMM recognizes that the disclosure of Client Confidential Information by RMM or its employees, representatives or independent contractors may give rise to irreparable injury, which may not be adequately compensated by damages. Accordingly, in the event of a breach or threatened breach by RMM or its employees, representatives or independent contractors of the provisions of this

- 5 -

DAV000181

Section 8, Client shall be entitled to an injunction restraining RMM and its employees, representatives and independent contractors from disclosing, in whole or in part, the Client Confidential Information, in whole or in part. The provisions of this Section 8 shall survive the expiration or termination of this Agreement.

(b) Unless otherwise specified in a Statement of Work, all work performed by RMM under this Agreement or any Statement of Work, and all designs, creations, products, works, procedures, documents or deliverables developed or prepared for Client by RMM under this Agreement and any Statement of Work, whether or not such Statement of Work is completed (collectively, "Work Product"), are the property of Client and all title and interest therein shall vest in Client and shall be deemed to be a work made for hire and made in the course of the Services rendered hereunder. To the extent that title to any such works may not, by operation of law, vest in Client or such works may not be considered works made for hire, all rights, title and interest therein are hereby irrevocably assigned to Client. All such materials shall belong exclusively to Client, with Client having the right to obtain and to hold in its own name, copyrights, registrations or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. RMM agrees to give Client and any person designated by Client, reasonable assistance, at Client's expense, required to perfect the rights defined in this Paragraph. Unless otherwise requested by Client, upon the completion of the services to be performed under each Schedule or upon the earlier termination of such Schedule, RMM shall immediately turn over to Client all materials and deliverables developed pursuant to such Schedule.

9. <u>Miscellaneous Provisions</u>.

(a) Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

(b) Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c) This Agreement contains the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein.

(d) All questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California.

(e) If any legal actions or other proceedings are brought for the interpretation or enforcement of this Agreement or any rights of the parties with regard to this Agreement, or because of an alleged dispute, breach, or default, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any

- 6 -

Confidential

DAV000182

other relief to which they might be entitled. The parties hereto agree that (1) this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed in such state and (2) any actions for the interpretation or enforcement of this Agreement shall be brought in the County of Orange, State of California.

(f) If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g) This Agreement shall inure to the benefit of and bind the successors in-interest, assigns, and transferees of the parties hereto.

(h) Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed:
to RMM at:

> Michael P Owens
> Real Media Marketing, Inc.
> 18 Ronsard
> Newport Coast, Ca 92663

and

to Client at:

> Dustin Tillman CEO
> Elite Aviation Products, Inc.
> 3151 Airway Ave, #203
> Costa Mesa, Ca 92626

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(i) This Agreement may be amended or modified only with the written consent of the parties hereto.

(j) No remedy specifically conferred by any of the provisions of this Agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(k) Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

- 7 -

DAV000183

(l)  This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(m) Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof.  All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

CLIENT:
Elite Aviation Products, Inc A Delaware Corporation

By: _____
Name: Dustin Tillman
Title: It's CEO

RMM:
Real Media Marketing, Inc.

By: _____
Name: Michael P. Owens
Title:    It's President

- 8 -

Confidential

DAV000184

EXHIBIT "A"
Description of Services

- Investor Relations Training

- Investors Relations personnel Hiring and Screening

- Assistance with Energy Sales Room acquisition and development

- Sales and Marketing Identity Marketing

- Television Spot Ad Development (cable and syndicated)

- Email Marketing Campaigns

- Publication of energy related educational materials for electronic distribution (commercial and residential)

- Employee and sales training materials

- Oversight for management of investor related communications

- Website development

- Assistance with Customer Relations Management Software integration and Development

Exceptions/exclusions:
Direct ad and television costs will be paid by Client as agreed by the parties.
Custom CRM development costs will be borne by Client; Source code will be owned by Client.
All sales, marketing and investor relations personnel (except administrative and training staff, which will be employed by RMM) will be employed directly by Client and all costs of employment will be borne by Client.

- 9 -

DAV000185

EXHIBIT "B"
Stock Certificate

- 10 -

Confidential
DAV000186

Exhibit 06

# Stock Purchase Agreement, Loan Discharge, and Agreement Amendment

This Agreement made, executed and effective as of June 1, 2014 ("Effective Date"), by and among the Elite Aviation Products, Inc., a Delaware corporation ("EAP"), Michael P. Owens ("Owens"), and Real Media Marketing, Inc, a Delaware corporation ("RMM").

**WHEREAS**, EAP and Owens previously entered into an agreement entitled "Promissory Note" with respect to $100,000, dated January 1, 2014 ("Note"); and

**WHEREAS**, EAP and RMM previously entered into an agreement entitled "Agreement for Services" with an effective date of March 12, 2014 ("Services Agreement");

**WHEREAS**, the parties wish to record the discharge of such Note and correction of the Services Agreement;

**NOW THEREFORE**, in consideration of the following mutual promises contained herein, the parties agree in good faith to the following obligations and duties:

## Section 1- Terms:

**1.1:** <u>Interest on Note Waived</u>: EAP and Owens hereby agree that all interest accruing under the Note is and was waived by Owens.

**1.2:** <u>Receipt of 15,000,000 Common Shares</u>: Owens hereby acknowledges having personally received 15,000,000 shares of common stock of EAP on the Effective Date of this Agreement, in consideration for $100,000 under the Note.

**1.3:** <u>Amendment of March 12, 2014 Services Agreement</u>: EAP and RMM hereby amend and modify the Services Agreement to delete Section 3. (b) of the Services Agreement, which referenced the possible issuance of 37,600,000 common shares of EAP.

**1.4:** <u>Loan Discharged</u>: EAP hereby agrees to issue 22,600,000 shares of common stock of EAP by October 30, 2015 to the persons, and in the amounts, as set forth on <u>Exhibit A</u>, as consideration for Owens' hereby discharging all amounts due now or hereafter under the Note effective October 30, 2015. Owens agrees that upon the issuances of the stock described in this <u>Section 1.4</u>, all obligations of EAP with respect to the Note are fulfilled and any further obligations of EAP with respect to such Note are discharged.

## Section 2- General Provisions:

### 2.1- Waiver:

The waiver by either party of a breach or a default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach or default of

the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has or may have thereunder operate as a waiver of any right, power or privilege by such party.

**2.2- Severability:**

In the event that any provision or particular application of a provision of this Agreement is held to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions or of other applications of the affected provision shall not be affected and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular provision or particular application of that provision that is held to be unenforceable.

**2.3- Entire Agreement:**

This Agreement constitute the entire agreement between the parties with reference to the subject matter hereof and supersedes all prior agreements unless otherwise stated herein. No waiver, consent, modification or change of the terms of this Agreement shall bind either party unless it is in writing signed by both parties by their duly authorized representatives. There are no understandings, agreements, representations or warranties, express or implied, with respect to the subject matter hereof except as expressly set forth in this Agreement. Only the terms and conditions of this Agreement shall govern the transactions contemplated hereunder notwithstanding any additional, different or conflicting terms which may be contained in any other document provided by one party to the other.

**2.4- Governing Law:**

This Agreement shall be governed by the laws of the state of California and shall be deemed when executed to have been made in the state of California.

Any and all disputes where a remedy sought is injunctive relief or other non-monetary remedy, the parties agree to submit to the venue and jurisdiction of the courts of the state of California and of the United States in disputes concerning this Agreement.

Any and all disputes where the only remedy sought is monetary damages, arising directly or indirectly out of or relating in any way to this Agreement which cannot be satisfactorily resolved by the parties shall be referred to and settled by binding arbitration in Los Angeles County, California under the Commercial Arbitration Rules of the American Arbitration Association, using one arbitrator mutually agreeable to the parties. The award of the arbitration shall be final, non-appealable and binding upon the parties and their respective successors and permitted assigns. Judgment upon the award may be entered in any court having the jurisdiction thereof.

**2.5- Headings:**

The headings contained in this Agreement are for convenience of reference only and shall not be considered in interpreting or construing this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their duly authorized representatives on the above Effective Date.

**Elite Aviation Products, Inc.**                    **Real Media Marketing, Inc**

Signature: _____          Signature: _____

Printed Name: _____          Printed Name: _____

Title: _____          Title: _____

**Michael P. Owens**

Signature: _____

Exhibit A

| Shareholder's Name | Shares of Common Stock to be Issued |
|---|---|
| RMMH, LLC | 19,100,000 |
| Gunton, Robert | 1,000,000 |
| Lindstrom, Andrea | 1,000,000 |
| Davenport, Gabriela | 250,000 |
| Eldred, Adam | 250,000 |
| Yale, Julie | 250,000 |
| | |
| | |
| | |
| | |

# Exhibit 07

# AGREEMENT FOR SERVICES

THIS AGREEMENT FOR SERVICES (hereinafter "Agreement") is made and entered into this 12th day of March, 2014, by and between Elite Aviation Products, Inc A Delaware Corporation (hereinafter "Client") and Real Media Marketing, Inc , a Delaware corporation (hereinafter "RMM"), who agree as follows:

1. Recitals. This Agreement is made in contemplation of the following facts and circumstances:

(a) RMM is in the business of providing the services specified in the "Description of Services" attached hereto as Exhibit "A";

(b) Client is desirous of retaining RMM to provide said services; and

(c) Client and RMM desire to state the terms and conditions under which RMM will provide said services to Client.

2. Services to be Performed by RMM.

(a) "Services" means all marketing, administrative and other services to be performed by RMM pursuant to the terms of this Agreement and any mutually agreed upon and executed Statement of Work (each a "Statement of Work"). Each Statement of Work will contain, among other agreed-upon terms, a description of the tasks to be performed by RMM, the deliverables and documentation to be produced by RMM, a schedule of performance, and a special schedule of payments, if applicable. Each Statement of Work entered into by the parties shall reference this Agreement, be subject to its terms and shall be made a part of this Agreement; provided, however, the contents of any Statement of Work shall take precedence over any conflicting provision in this Agreement to the extent necessary to resolve any such conflict.

(b) RMM will provide such staff as RMM deems necessary to perform the Services, at RMM's sole expense.  Client shall not control direct, or supervise RMM's employees or agents in the performance of the Services. RMM agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services; provided, however, RMM and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as RMM, in RMM's sole discretion, sees fit. In the event that any individual assigned to perform Services for Client must be replaced, RMM shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c) RMM shall not assign any RMM personnel (including RMM employees or contractors) that are delivering Services to Client hereunder to the account of any competitor of Client without Client's prior consent while such personnel are assigned to Client's account or otherwise

- 1 -

providing any Services under this Agreement. RMM shall require all RMM personnel having access to Client's Confidential Information to maintain and enforce the provisions of the Confidentiality Agreement referenced in Section 8 below.

 3. Compensation.

 (a)  In consideration of the Services to be rendered by RMM to Client pursuant to this Agreement, Client agrees to pay RMM  a INITIAL ENGAGEMENT FEE in the amount of $350,000 (a initial payment of $75,000 was paid on or about February 28, 2014, a second payment of $150,000 on March 15, 2014 and a third payment of $125,00 on or before April 15, 2014)  and thereafter 48 equal installments of $ 60,000 on the 15th and the last day of each month commencing on May 1, 2014. In the event EAP does not pay the installment on or before the due dates as defined here-in each late installment will incur a penalty in the amount of 10% of the installment amount.

 (b) In consideration of RMM's execution of this Agreement, Client shall deliver to RMM or it's designee, on or before March 1, 2014 a certificate for Thirty Seven Million Six Hundred Thousand shares of Clients common stock, in the form identical to Exhibit A@ attached hereto. RMM is aware that such shares of Client's common stock have not been registered under the federal Securities Act of 1933, the California Corporations Code or the laws of any other state and may not be transferred in the absence of registration, or the availability of an exemption from registration under such laws; further, said shares are newly issued shares of Client issued in partial reliance on Section 4(2) of the Securities Act of 1933 and Section 25102(f) of the California Corporations Code, and RMM hereby warrants that it is purchasing said shares for its own account and not with a view to or for sale in connection with any distribution of said shares.

 (c) In addition, RMM shall invoice Client, monthly in arrears, for expenses incurred by RMM as a result of performing Services in accordance with this Agreement and/or any Statement of Work.  Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by RMM in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, RMM submits supporting documentation in addition to the approved expense form.

 (d) RMM shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate RMM's charges and expenses hereunder and RMM shall retain such records for a period of one (1) year from the date of final payment under any Statement of Work.

 (e) Client agrees to pay the amount of any sales, use, excise or similar

- 2 -

taxes applicable to the performance of the Services, if any, exclusive of any taxes based upon RMM's income or payroll, or, in lieu thereof, the Company shall provide RMM with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

4. Obligations of Client.

The managers and staff of Client shall comply with all reasonable requests of RMM and shall cooperate with RMM by providing to RMM such information and access to Client's personnel, facilities, equipment, databases, software, and other resources as are necessary for RMM to perform the Services and/or as are specifically set out and agreed to in a Statement of Work.

5. Independent Contractor.

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that RMM is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and RMM an employer/employee, partnership, or joint venture relationship. RMM shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies and equipment. RMM agrees that Client shall have no obligation to withhold from compensation due RMM hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to RMM or the employees or agents of RMM. RMM hereby waives any and all claims RMM may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

6. Term and Termination.

This Agreement shall commence on the date indicated on the first page hereof and shall continue in full force and effect until December 31, 2015 unless and until terminated earlier in accordance with the provisions of this Agreement.

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise.

Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay RMM for all costs incurred by RMM with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive

such termination or expiration including, without limitation, Client's continuing compensation obligations to RMM in the event this Agreement is terminated due to the default of Client.

      7.    <u>Indemnification</u>.

      (a)  RMM will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of RMM unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold RMM free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services, unless RMM is judged by a court of competent jurisdiction to be guilty of willful misconduct and/or gross negligence.

      (b)  RMM agrees to defend at its own cost and expense any claim or action against Client, its subsidiaries and/or affiliated companies, for actual or alleged infringement of any patent, copyright or other property right (including, but not limited to, misappropriation of trade secrets) based on any software, program, service and/or other materials furnished to Client by RMM pursuant to the terms of this Agreement or the use thereof by Client. RMM further agrees to indemnify and hold Client, its subsidiaries and/or affiliated companies, free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with any such claim or action.

      (c)  The party requesting indemnification hereunder (the "Indemnified Party") will give notice to the party required to provide indemnification hereunder (the "Indemnifying Party") promptly after the Indemnified Party has actual knowledge of any claim as to which indemnity may be sought hereunder. The Indemnified Party shall permit the Indemnifying Party (at the expense of the Indemnifying Party) to assume the defense of any claim or litigation resulting therefrom provided that (i) counsel for the Indemnifying Party who shall conduct the defense of such Claim or litigation shall be reasonably satisfactory to the Indemnified Party; (ii) the Indemnified Party may participate in such defense; and (iii) the omission by the Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligations hereunder except to the extent that such omission results in a failure of actual notice to the Indemnifying Party and the Indemnifying Party is damaged as a result of such failure to give notice.

      8.    <u>Confidentiality and Proprietary Rights</u>.

      (a)  During the term of this Agreement, RMM will acquire knowledge of Client Confidential Information (as defined below) in connection with its performance of the Services hereunder and agrees to keep such Client Confidential Information in confidence during and following termination or expiration of this Agreement. ᴀClient Confidential Informationᴀ includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products,

- 4 -

services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product (as defined herein), and other material or information considered proprietary by Client relating to the current or anticipated business or affairs of Client which is disclosed directly or indirectly to RMM. In addition, Client Confidential Information means any third party's proprietary or confidential information disclosed to RMM in the course of providing Services to Client. Client Confidential Information does not include any information:

(i) which RMM lawfully knew without restriction on disclosure before Client disclosed it to RMM;

(ii) which is now or becomes publicly known through no wrongful act or failure to act of RMM;

(iii) which RMM developed independently without use of the Client Confidential Information, as evidenced by appropriate documentation; or

(iv) which is hereafter lawfully furnished to RMM by a third party as a matter of right and without restriction on disclosure.

In addition, RMM may disclose Client Confidential Information which is required to be disclosed pursuant to a requirement of a government agency or law so long as RMM provides prompt notice to Client of such requirement prior to disclosure.

RMM agrees not to copy, alter, or directly or indirectly disclose any Client Confidential Information. Additionally, RMM agrees to limit its internal distribution of Client Confidential Information to RMM's employees and agents who have a need to know, and to take steps to ensure that the dissemination is so limited, including the execution by RMM's employees and agents of nondisclosure agreements with provisions substantially similar to those set forth herein. In no event will RMM use less than the degree of care and means that it uses to protect its own information of like kind, but in any event not less than reasonable care to prevent the unauthorized disclosure of Client Confidential Information. RMM further agrees not to use the Client Confidential Information except in the course of performing the Services hereunder and will not use such Client Confidential Information for its own benefit or for the benefit of any third party. The mingling of Client Confidential Information with information of RMM shall not affect the confidential nature or ownership of the same as stated hereunder. All Client Confidential Information is and shall remain the property of Client. Upon Client's written request or the termination of this Agreement, RMM shall return, transfer, or assign to Client all Client Confidential Information, including all Work Product, and all copies thereof.

RMM recognizes that the disclosure of Client Confidential Information by RMM or its employees, representatives or independent contractors may give rise to irreparable injury, which may not be adequately compensated by damages. Accordingly, in the event of a breach or threatened breach by RMM or its employees, representatives or independent contractors of the provisions of this

- 5 -

Section 8, Client shall be entitled to an injunction restraining RMM and its employees, representatives and independent contractors from disclosing, in whole or in part, the Client Confidential Information, in whole or in part. The provisions of this Section 8 shall survive the expiration or termination of this Agreement.

(b) Unless otherwise specified in a Statement of Work, all work performed by RMM under this Agreement or any Statement of Work, and all designs, creations, products, works, procedures, documents or deliverables developed or prepared for Client by RMM under this Agreement and any Statement of Work, whether or not such Statement of Work is completed (collectively, "Work Product"), are the property of Client and all title and interest therein shall vest in Client and shall be deemed to be a work made for hire and made in the course of the Services rendered hereunder. To the extent that title to any such works may not, by operation of law, vest in Client or such works may not be considered works made for hire, all rights, title and interest therein are hereby irrevocably assigned to Client. All such materials shall belong exclusively to Client, with Client having the right to obtain and to hold in its own name, copyrights, registrations or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. RMM agrees to give Client and any person designated by Client, reasonable assistance, at Client's expense, required to perfect the rights defined in this Paragraph. Unless otherwise requested by Client, upon the completion of the services to be performed under each Schedule or upon the earlier termination of such Schedule, RMM shall immediately turn over to Client all materials and deliverables developed pursuant to such Schedule.

9. <u>Miscellaneous Provisions</u>.

(a) Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

(b) Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c) This Agreement contains the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein.

(d) All questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California.

(e) If any legal actions or other proceedings are brought for the interpretation or enforcement of this Agreement or any rights of the parties with regard to this Agreement, or because of an alleged dispute, breach, or default, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any

- 6 -

other relief to which they might be entitled.  The parties hereto agree that (1) this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed in such state and (2) any actions for the interpretation or enforcement of this Agreement shall be brought in the County of Orange, State of California.

(f)  If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g)  This Agreement shall inure to the benefit of and bind the successors in-interest, assigns, and transferees of the parties hereto.

(h)  Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed:

to RMM at:

> Michael P Owens
> Real Media Marketing, Inc.
> 18 Ronsard
> Newport Coast, Ca 92663

and

to Client at:

> Dustin Tillman CEO
> Elite Aviation Products, Inc.
> 3151 Airway Ave, #203
> Costa Mesa, Ca 92626

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(i)  This Agreement may be amended or modified only with the written consent of the parties hereto.

(j)  No remedy specifically conferred by any of the provisions of this Agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(k) Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

- 7 -

(l)  This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(m)  Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof.   All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

CLIENT:
Elite Aviation Products, Inc A Delaware Corporation

By:  _____

Name: Dustin Tillman
Title: It's CEO

RMM:
Real Media Marketing, Inc.

By:  _____
Name: Michael P. Owens
Title:     It's President

- 8 -

EXHIBIT "A"

Description of Services

- Investor Relations Training

- Investors Relations personnel Hiring and Screening

- Assistance with Sales Team acquisition and development

- Sales and Marketing Identity Marketing

- Media and Television Spot Ad Development (cable and syndicated)

- Email Marketing Campaigns

- Social Media Marketing

- Publication of industry  related educational materials for electronic and print distribution

- Employee and sales training materials

- Oversight for management of investor related communications

- Website development

- Assistance with Customer/Investor Relations Management Software integration and Development

Exceptions/exclusions:

Direct ad and television costs will be paid by Client as agreed by the parties.

Direct Custom CRM development costs will be borne by Client; Source code will be owned by Client.

All sales, marketing and investor relations personnel (except administrative and training staff, which will be employed by RMM) will be employed directly by Client and all costs of employment will be borne by Client.

EXHIBIT "B"
Stock Certificate

# Exhibit 08

May 7, 2021

To whom it may concern,

My name is Adam Eldred. I was employed by RealMedia Marketing Inc. (RMM) on or about 06/01/2013 through 12/31/2016 and Evolution Consulting Inc. (Evolution) on or about 01/01/2017 through 12/31/2018. My role at both companies was as a creative professional. I am an alumnus of California State University, Fullerton (CSUF) where I obtained a Bachelor's Degree of Arts from the Communications department with a specialized Advertising Concentration. While attending CSUF in 2013 I led a student run advertising agency that received national recognition for its work on the 2013 Honda Civic by the American Honda Motor Corporation. Since graduating from college in 2013, I have worked as a creative professional accumulating eight years of experience specializing in copy writing, brand development, graphic design, public relations, market research, brand management, and brand identity.

Over the course of my employment with RMM and Evolution as a Creative Marketing Director, Elite Aerospace Group (formerly Elite Aviation Products) was a contracted client for over four years. The scope of multiple contracts executed between RMM / Evolution and Elite Aviation Products / Elite Aerospace group included many services in my area of expertise including branding and brand development, copy writing, graphic design, public relations, and general marketing strategy. Over the course of the four years providing the services agreed upon in the aforementioned contract, I estimate that I personally dedicated over 5,000 hours of my time specifically to servicing the contracts between RMM / Evolution and Elite Aviation Products / Elite Aerospace Group (Elite).

In my role as a Creative Marketing Director for both RMM and Evolution, I ran a team of three RMM / Evolution employees dedicated to creative projects and worked directly with the principals of Elite Aviation Products / Elite Aerospace Group (Elite), primarily Dustin Tillman, Zeeshawn Zia, and Lee Smith on every project that was carried out at their behest under the scope of our contracts. These projects included things like: quarterly newsletters, website development, online content copywriting, brochure design and layout, press release copywriting, social media management, product centric brochures and pamphlets, event presentations, branded promotional event giveaway items, design of custom branded apparel, interior design items such as branded banners for their facilities, custom exterior signage for multiple facilities, custom interior signage for their manufacturing floors at multiple facilities, digital design and layout for internal handbooks, custom letterhead, copywriting for online blog entries, business card design, custom branded folders for promotional materials, digital design, layout and print production of numerous product sales materials for multiple different "sub divisions" of Elite Aerospace Group, design of custom branded email signatures, branded materials for trade shows, and a multitude of other projects over the course of over four years.

Per the scope of the multiple contracts between these companies, all of the projects mentioned above, and countless others, were carried out in concert with and at the direction of Dustin Tillman, Zeeshawn Zia, and Lee Smith. Every single project mentioned, and the countless others left

DAV000555

unmentioned, were not only completed in direct collaboration with Tillman, Zia, and Smith but also explicitly approved and rigorously reviewed and edited by these individuals before being completed and or published. Working in concert with all of these individuals and at their direction was not only required and carried out per the multiple signed contracts, but also mandatory as my expertise is in creative development and not the aerospace or manufacturing industries. As such, to carry out my function as creative marketing director of RMM / Evolution, it required spending hundreds if not thousands of hours meeting directly with Tillman, Zia, and Smith in person or via telephone to learn about the aerospace industry and have them guide the content I was helping them create in the specialized manner that the industry required. Dustin Tillman also published weekly email updates which he referred to as "fire side chats" that were sent to nearly every Elite employee as well as RMM / Evolution employees. In these weekly emails, Tillman discussed updates regarding Elite's business, what contracts they had secured, and general information about what the business was doing. The information he provided in these emails was also integrated into other marketing materials at Tillman's direction.

In addition to working directly with Tillman, Zia, and Smith on an individual basis to complete these projects, I spent countless hours working in a group environment with the executive teams of RMM / Evolution and the principals of Elite Aviation Products / Elite Aerospace Group (Elite). The two groups held weekly meetings every Tuesday for the duration of all contracts executed between them. These weekly meetings reviewed all topics related to the business between Elite and RMM / Evolution. I was involved in these weekly meetings and as such was witness to much of the formal interaction between these entities and their principals including topics not directly related to my specialties such as the general business consulting services that RMM / Evolution provided. These meetings were held every week for the course of the entire relationship between these entities and each meeting ran from two hours to four hours in length. I estimate that I attended over 200 of these meetings. These meetings served as forums for planning, strategizing, and overseeing the development of the Elite Aviation Products' / Elite Aerospace Group's business and how the RMM / Evolution team could carry out their agreed upon functions (per their contracts) to aid Elite's development. Because I was involved in these meetings, I witnessed nearly every primary discussion held regarding every important decision made that involved both groups.

As a witness to these interactions and pivotal conversations regarding the business between the two groups, and as someone who was heavily involved and knowledgeable about the inner-workings of all companies involved, I would like to list some FACTS that I know without a doubt to be true and correct and are pertinent to current disputes regarding RMM, Evolution, Elite Aviation Products, and Elite Aerospace Group:

1. RMM / Evolution **did not** manage or control Elite Aviation Products / Elite Aerospace Group's sale of securities.
2. The principals of Elite Aviation Products / Elite Aerospace Group including Tillman, Zia, and Smith managed and controlled the sale of their companies' securities.
3. RMM / Evolution **did not** hire, pay, or employ the team of individuals who sold Elite Aviation Products / Elite Aerospace Group securities.
4. The Principals of Elite Aviation Products / Elite Aerospace Group including Tillman, Zia, and Smith hired, paid, and employed a team of individuals who sold the companies' securities.

 DAV000556

5. RMM / Evolution executives **never** signed a paycheck to **any** individual regarding the sale of Elite Aviation Products / Elite Aerospace Group securities.

6. The Principals of Elite Aviation Products / Elite Aerospace Group signed hundreds of paychecks to W-2 employees of Elite Aviation Products / Elite Aerospace Group who sold the companies' securities.

7. Elite Aviation Products / Elite Aerospace Group executives including Tillman and Zia were **aware of and explicitly approved** of the sale of a small percentage of shares owned by RMM / Evolution executives and held by a company known as RMMH. I know this because it was openly discussed in weekly meetings between the two groups and was not a point of contention.

8. RMM / Evolution to the absolute best of its ability acted in the best interest of Elite Aviation Products / Elite Aerospace Group and performed its agreed upon services in good-faith during the entirety of its contractual obligation to Elite Aviation Products / Elite Aerospace Group.

The facts stated above I know to be true and correct based on my thousands of hours of accumulated interactions with both the principals of Elite Aviation Products / Elite Aerospace Group and RMM / Evolution and the intimate knowledge I garnered of the inner-workings of all organizations discussed over the course of a relationship lasting over four years.

Sincerely,

Adam Eldred

DAV000557

# Exhibit 12

DocuSign Envelope ID: 84F9A1F9-B302-4658-9BF7-E4B578D808B0



March 5th, 2019

FROM:
Robert Gunton
4790 Irvine Blvd, Ste 105, Box 698
Irvine, California 92620

TO:
Elite Aerospace Group, Inc.
1641-1645 Reynolds Ave
Irvine, California 92614

Elite Aerospace Group (Global Shareholders)
Elite Aerospace Group Employees
Dustin Tillman, CEO, Director, and Chairman of the Board
Zeeshawn Zia, President, Director
Lee Smith, Chief Operating Officer
Andrea Lindstrom, Director
Michael Forbes, Director
Bobby Sawhney, Vice President of Investor Relations

---

**RE: Resignation from Elite Aerospace Group Board of Directors**

Dear Fellow Shareholders;

I hope this message finds you, your families and businesses well.

We have had the pleasure of meeting with many of you over the years during our tenure as Directors as well as during our capacity as EAG shareholders. Additionally, I served as President of Evolution Consulting, Inc., Mrs. Lindstrom also served as Chief Operating Officer of the same company, a media, and marketing company, which maintained a contractual relationship with Elite Aerospace Group as well as their predecessor company, Elite Aviation Products, Inc.

We were appointed to serve as directors on Elite Aerospace Group's Board of Directors in 2017 and formally elected to the board on December 29, 2017, by you, Elite's family of shareholders. We sincerely thank you for the privilege to serve you and our company's interests.

It is with much regret that Mrs. Lindstrom and I tender our resignation as members of Elite Aerospace Group's board of directors. We have worked hard to serve the interests of shareholders and steer the company in a healthy and profitable direction. Sadly, I (as well as Mrs. Andrea Lindstrom) have been unable to overcome recent, multiple, potentially damaging and short sided decisions made by Mr. Tillman, Mr. Zia, and Mr. Forbes. These decisions, which I will describe, in detail are what we consider, improper, conflicted and possibly self-serving behavior that is not in the best interest of shareholders.

For the record, we will outline the aforementioned recent events that have prompted us to make this decision. We will also close this communication with a suggestion of action for Elite's shareholders to undertake to ensure the longevity and health of the company, post-haste.

Page 1 of 5

DocuSign Envelope ID: C84F91A1F2B302465929B77E4B5786D88B0

- I have requested and more recently demanded, in writing complete accounting transparency of Elite Aerospace Group's financial standing for all divisions. These communications have been ignored, and currently, all requests stand without a cure. All formal written requests have been linked to this communication (however numerous requests were also tendered verbally).

- On or around December of 2017 Mr. Tillman and Mr. Zia initiated multiple acquisitions of several aerospace-related companies. The acquisitions below, to my knowledge (and Mrs. Lindstrom's), remain incomplete. Mrs. Lindstrom and I continued to urge Mr. Tillman and Mr. Zia to initiate litigation against these incomplete acquisitions to recover monies expended. To the best of our knowledge over $5,000,000 was spent in cash and to which not a single acquisition finalized.

- Douglas Steel Supply (DSS) – approximately $700,000 was advanced either directly to DSS or legal costs associated with the acquisition. Elite terminated the acquisition, and all monies advanced are due and payable by DSS to Elite as of the last formal board meeting no action had been taken to recover the advanced funds despite urgings by Mrs. Lindstrom and myself.

- Spearman Aerospace (Spearman) – approximately $1,300,000 was advanced either directly to Spearman or legal costs associated with the acquisition. Elite terminated the acquisition, and all monies advanced are due and payable by Spearman to Elite, but as of the last formal board meeting no action had been taken to recover the advanced funds despite urgings by Mrs. Lindstrom and myself.

- TTF Aerospace (TTF) – Approximately $3,000,000 was advanced to TTF by Elite through the issuance of a promissory note in the amount of $1,500,000 which was cross-collateralized by assets of TTF and cross-collateralized by holdings of Elite (an action which was never approved by the board) the note was in default by TTF and Elite as of the last board meeting. Elite advanced an additional (approximately) $1,500,000 to TTF for materials as well as machine parts and engineering which based upon our previous (incomplete) knowledge was still unpaid and no formal action tendered for collection. Furthermore Elite terminated it's management agreement with TTF in April of 2018 and has no ongoing internal operational involvement with TTF. Despite this fact, we have just recently become aware of the fact that Elite is still representing in it's latest investment offering document dated September 1, 2018, that Elite is under a management contract with TTF. This is inaccurate.

- Crenshaw Engineering (Crenshaw): Elite was under a letter of intent to purchase Crenshaw in early to mid-2017 (the exact dates are unclear as the Board did not approve the acquisition). The agreement was terminated reportedly by Crenshaw and sold to another buyer. Crenshaw has however recently initiated legal action against Elite for matters that are still unclear. The recent knowledge of the litigation brought forth the knowledge as mentioned above I am now relaying to you. Litigation which is not disclosed to the board and now to Elite's shareholders as of the latest Offering memorandum dated September 1, 2018.

- Awe Technologies (Awe): despite limited disclosure to the Board from Mr. Tillman and Mr. Zia, the board of directors came to understand that "Awe" was an acquisition target to which several hundred thousand dollars of engineering and acquisition costs which were never brought to the board and the deal terms and conditions are unknown.

- Wireless Innovation Group (WIG): Deal terms unknown as the transaction was never brought to the Board.

Confidential

DAV045796

- Esoteric, (A USB manufacturer) the Deal Points and terms unknown as there was no Board review and to which I have come to understand that the founder of Esoteric has initiated litigation against Elite on or about June 2018, litigation which has not been disclosed to the Board and no disclosure has been made to the shareholders as of the latest offering memorandum dated September 1, 2018.

- Ocean Motion Wave Technologies (Ocean Motion): Deal Points and Terms are unknown as there was never any disclosure to the Board.

- Mrs. Lindstrom and I called an emergency board meeting, according to the company's by-laws in mid-July 2018 to address these issues. The emergency agenda that was initially agreed to via email (prior to the meeting) and covered a myriad of highly essential topics including legal representation and indemnity for board members in connection to past, present and anticipated litigation from third parties, incomplete acquisitions, financial standing of the company and its divisions, a revenue neutrality update, executive compensation, and a formal review of EAG board minutes since inception.

- Once all board members were confirmed in attendance, Mr. Tillman called the meeting to order and adjourned shortly after forming a special committee. Affirmative votes formed this committee from Tillman, Zia, and Forbes. This special committee was established with the express purpose to exclude Mrs. Lindstrom and me from all board matters. Mr. Tillman alleged that this special committee was formed to examine the relationship between Elite Aerospace Group and Evolution Consulting, Inc. - a marketing and media company where myself and Mrs. Lindstrom hold personal interest and serve as officers.

- Since then, Mrs. Lindstrom and I have been barred from board meetings, and our corporate email addresses have been disconnected. Additionally, we have not received any communication related to EAG's Board of Directors since July 18th, 2018 and have not been able to execute our duties as directors and elected board members.

- On September 1, 2018, The Elite Aerospace Group authorized and issued a new private placement memorandum without notice to the board of directors for review or approval.

- Within the aforementioned newly issued private placement memorandum, Dustin Tillman and Zeeshawn Zia presumably through their "Special Committee" (but without notice, review or approval by the board) gave themselves each a $40,000 annual raise in compensation, bringing their salaried (yearly) compensation from $349,400 to $389,400, not including (potential) housing, auto allowances and travel expenses. Additionally, Lee Smith, Elite Aerospace Group's Chief Operating Officer, received an $83,500 annual pay increase, bringing his yearly salary amount from $175,000 to $258,500, not including (potential) housing, auto allowances, and travel expenses.

- Neither I or Mrs. Andrea Lindstrom, reviewed, voted or were previously aware of these salary increases until reading disclosures in the newly issued Private Placement Memorandum dated September 1, 2018. This is one of the very issues, Net Salary reduction until the company was able to maintain revenue neutrality, that Mrs. and I motioned to bring to the board in early 2018. This is one of the very matters we were focused on, Salary Reduction until the Company achieved Revenue Neutrality, this is one of the reasons we feel we were stonewalled in the (attempted) Emergency July Board meeting and Mr. Tillman would not let the matter be heard and put into the record.

- There is currently active litigation against the company (EAG) initiated by Saji Gunawardane, Esq. Mr. Gunawardane served as Elite Aerospace Group's Chief Legal Officer. I am unsure of

Page 3 of 5

DAV045797

DocuSign Envelope ID: ...

the specific date Mr. Gunawardane was terminated from this position. This active litigation is NOT disclosed in Elite Aerospace Group's newly issued private placement memorandum.

- We have become frustrated with the lack of accounting transparency exhibited by Elite. Despite asking (and more recently demanding) for up-to-date financial statements, the board of directors (as well as all shareholders) have NOT been provided complete, up-to-date profit and loss statements, income statements, balance sheets, cash flow statements, statements of changes in Shareholder equity for the company as a whole or its divisions.

- We have been given minimal information in regards to Elite's actual financial standing or the reasoning and purpose of Mr. Tillman's decision to perform yet another roll-up of assets and liabilities into another (possibly new) corporate entity.

- Mr. Tillman and Mr. Zia wanted to remove Andrea Lindstrom and I from the board as we will not vote lock-step for actions which we do not feel are in the best interests of the shareholders at large which now own a majority of Elite Aerospace Group, Inc. common stock, which is contrary to the representation made in the Private Placement Memorandum issued (dated) September 1, 2018. Our calculations indicate that the shareholders at large (non-insiders) presently own approximately 70% of the voting, Common Stock.

- In the absence of total financial transparency prior to vote, a roll-up of any division (or divisions) at this time is highly concerning to us, as "we" (the shareholders) would most likely be asked to vote for an arguably dramatic change in the company's corporate structure without complete, up-to-date information. A move that (for an unknown reason) would retroactively apply this internal merger to April 17, 2017.

- Additionally, Mr. Tillman has proposed the approval of new bylaws of the corporation, a new stockholder's agreement and an amendment to the certification of incorporation amending the corporation's A-1 preferred stock conversion ratio, all "effective immediately." No written legal or accounting opinion has been tendered and likely not even sought. The effect on each shareholder could be significant.

- Our responsibilities as directors and our equity ownership in Elite are NOT taken lightly by myself or my fellow board member and colleague Mrs. Andrea Lindstrom, which is one of the many reasons we have decided to resign in this fashion.

### Suggestion for Immediate Action

We suggest that the shareholders at large come together and immediately begin action to remove Dustin Tillman, Zeeshawn Zia and Michael Forbes from the Board of Directors and appoint/elect a group of independent directors to ensure that we are given a complete and accurate accounting of the company's financial position, revenue, profitability, assets, liabilities, and contracts.

Thank you for the opportunity to be your collective voice and to steer the company in a healthy direction. We wish we could have been given the chance and information to be more effective in our roles, but we cannot continue to serve as directors on the board when we are not given the tools, knowledge or internal access required to execute our positions gainfully.

On a personal note, We are saddened, disappointed and personally offended by the conduct of Mr. Tillman, Mr. Zia, and Mr. Forbes. We trusted and put our faith in all three you. The group has failed not only our moral and ethical expectations but have been unable to meet our expectations on a personal level. All remaining members of the board should be ashamed of their con-

Page 4 of 5

DAV045798

duct and should immediately reexamine their behavior for the greater good for all shareholders of Elite Aerospace Group, Inc.

Respectfully,

*Robert Gunton*

2FA9DF0AFD244ED...

3/5/2019

Mr. Robert Gunton, Director

*[signature]*

067C79207C234B3...

3/6/2019

Mrs. Andrea Lindstrom, Director

**Attachments**

1st Request_RobertDir_Redacted

2nd Demand_RobertDir_Redacted

3rd Demand_RobertDir_Redacted

Emergency Board Meeting Redacted

Page 5 of 5

Confidential

DAV045799

Exhibit 13



# <u>AGREEMENT FOR SERVICES</u>

**THIS AGREEMENT FOR SERVICES** (hereinafter "**Agreement**") is made and entered into as of this 1st day of January, 2017, by and between Elite Aerospace Group, Inc., a Delaware Corporation (hereinafter "Client" or "EAG") and Evolution Consulting, Inc. a Delaware Corporation (hereinafter "ECI"), who agree as follows:

1. <u>**Recitals.**</u>

   This Agreement is made in contemplation of the following facts and circumstances:

   A. ECI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.

   B. ECI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

   C. **ECI is not Client's legal, accounting or professional counsel. Client is encouraged to seek professional advice for any accounting, tax, or legal advice, including compliance with securities laws. ECI does not in any way offer or transact in securities on behalf of clients.** ECI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein.

   D. This Agreement is intended by the parties to engage ECI as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. ECI is to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.

   E. ECI is in the business of providing the services specified in the "Description of Services" attached hereto as **Exhibits "A-1" Marketing Services, "A-2" Administration, "A-3" Consulting, "A-4" Marketing and Sales Training Services, "A-7" Ancillary Services Rate and Terms Sheet, and "A-8" Exclusions of Services from Contract. Exhibit "A-5" Responsibilities of Client and ECI, and Exhibit "A-6" Terms Sheet are also attached. Exhibits "A-1" through "A-8" constitute part of this Agreement and are incorporated by reference herein.**

   Client and ECI desire to state the terms and conditions under which ECI will provide said services to Client herein.



2. **Services.**

   (a)    "Services" means all marketing, administrative, consulting, sales, training, compliance (as defined herein) and other services to be performed by ECI pursuant to the terms of this Agreement (including the exhibits hereto; provided, that ECI must receive prior approval from EAG pursuant to Exhibit "A-7" prior to rendering ancillary services set forth thereunder for additional fees).  As further discussed in Exhibit "A-8," marketing and sales services provided by ECI does not include the marketing, solicitation or sales of securities.

   (b)    ECI will provide such staff as ECI deems necessary to perform the Services, at ECI's sole expense. Client shall not control, direct, or supervise ECI's employees or agents in the performance of the Services. ECI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ECI and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as ECI, in ECI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ECI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

   (c)    Client understands that the performance of the terms of this contract is dependent on the mutual effort and compliance of the terms of this contract by both Client and ECI. Client and ECI are bound to maintain their respective obligations as referenced under Exhibit A-5 included herein.

3. **Compensation**

   (a)    In consideration of the Services to be rendered by ECI pursuant to this Agreement, Client agrees to pay equal installments of $39,750.00 weekly during the term of the contract. In the event Client pays installments more than one week in advance an early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

   (b)    In addition, ECI shall invoice Client, weekly in arrears, for expenses incurred by ECI as a result of performing Services in accordance with this Agreement. Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ECI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ECI submits supporting documentation in addition to the approved expense form.

   (c)    ECI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ECI's



charges and expenses hereunder and ECI shall retain such records for a period of one (1) year from the date of final payment.

(d) Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services, if any, exclusive of any taxes based upon ECI's total compensation hereunder, including independent contractor income, and all stock, warrant and other equity issuances that may be deemed to be compensation pursuant to this Agreement; or, in lieu thereof, the Company shall provide ECI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

4. **Obligations of Client**

The managers and staff of Client shall comply with all reasonable requests of ECI and shall cooperate with ECI by providing to ECI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ECI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits "A-5" Client Responsibilities, "A-6" Letter of Intent.

5. **Independent Contractor**

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ECI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ECI an employer/employee, partnership, or joint venture relationship. ECI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ECI agrees that Client shall have no obligation to withhold from compensation due ECI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ECI or the employees or agents of ECI. ECI hereby waives any and all claims ECI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

ECI and its employees have all material permits and professional licenses that may be required to conduct ECI's business and provide the Services hereunder, if any, and will maintain such permits and licenses in good standing throughout the term of this Agreement.

ECI is, and will remain for the duration of this Agreement, in material compliance with all applicable laws relevant to its performance of the services under this Agreement.  ECI has not received any notices of non-compliance, fines or other form of censure from any governmental authority, agency or other governing organization.



6. **Term and Termination**

This Agreement shall commence effective March 1, 2017, and shall continue in Full Force and effect until February 28, 2019 unless and until terminated earlier in accordance with the provisions of this Agreement. (See Exhibit "A-6"). This initial term may be renewed for an additional one-year period at the option of Client, pursuant to Exhibit A-6.

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement by the other party unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise.

Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ECI for all costs incurred by ECI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ECI in the event this Agreement is terminated due to the default of Client, indemnification obligations in section 7, mutual confidentiality obligations in section 8, and the arbitration agreement in section 9.

In addition, Client may terminate this Agreement early at any time for any reason in its sole and absolute discretion (a termination for "convenience"). If this Agreement is terminated by Client for convenience, or by ECI for a material breach by Client that is not timely cured as provided herein, an early termination fee equal to Six (6) months of the contract amount shall apply and must be tendered by Client to ECI. Written notice of termination for convenience by Client must be given 30 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination payment in good funds tendered upon presentation of the notice. Early termination may not be considered effective in absence of early termination compensation as defined herein.

If the Agreement is terminated by Client pursuant to sections (i) or (ii) above, no further compensation shall be owed to ECI. In addition, no compensation obligations will survive termination if the Agreement is terminated by the mutual agreement of the parties.

7. **Indemnification**

ECI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ECI unless such acts or omissions are due to (i) willful misconduct and/or gross negligence; or (ii) a failure by ECI to perform is obligations under this Agreement or other breach of this Agreement by ECI. Client will indemnify and hold ECI free and harmless from all liabilities, losses, damages, causes of action, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, or growing out of (i) the



performance of any act specifically requested or authorized by Client in connection with this Agreement or (ii) Client's gross negligent acts or willful misconduct in connection with the performance of its obligations under this Agreement. Client accepts full responsibility for the content of all ECI work product that is approved by Client and published by ECI on Client's behalf. ECI may rely on the accuracy of all company information that is provided to ECI by Client including but limited to information pertaining to Clients company offerings, financial data, and biographical data for all officers, employees and directors. Client holds ECI and its employee's, officers and Directors and agents harmless for all information provided to ECI by Client pursuant to this Agreement. Client will maintain in full effect at all times a Professional Liability Insurance Policy in an amount of no less than $2,000,000 per occurrence. Client will cause to name ECI as additional insured under said policy(ies).

ECI shall indemnify and hold Client and its related entities, and the directors, officers, agents, representatives and employees of all such entities, harmless from and against any and all liabilities, obligations, losses, damages, causes of action, costs, claims, judgments, attorneys' fees, and attachments arising from, or growing out of liabilities, losses, damages, costs, expenses, causes of action, claims, suits, legal proceedings and similar matters, including without limitation reasonable attorneys' fees, resulting from or arising out of the failure of ECI or any of its employees to comply with and perform ECI's obligations under this Agreement. If any cause of action, claim, suit or other legal proceeding is brought against ECI in connection with any Services rendered under this Agreement, ECI shall promptly notify the Client upon learning of any such proceeding.

Notwithstanding any other provision herein, neither the Client nor ECI shall be obligated to indemnify the other party in any manner whatsoever for the other party's gross negligence or willful misconduct

8.  **Confidentiality and Proprietary Rights.**

    (a)     During the term of this Agreement, each of Client and ECI will likely disclose Confidential Information (as defined below) to the other party, and each party hereto agrees to keep such information in confidence during and following the termination or expiration of this Agreement.  A party disclosing Confidential Information is referred to as a "Disclosing Party" and a party receiving such information is referred to as a "Receiving Party."  Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered proprietary by the Disclosing Party relating to the current or anticipated business or affairs of the Disclosing Party  which is disclosed directly or indirectly to the Receiving Party or its directors, officers, employees, representatives (although ECI shall not be deemed a representative of the Client for this purpose) and legal and financial advisors (collectively, "Representatives").  In addition, Confidential Information includes any third party's proprietary or confidential information provided by a Disclosing Party in the course of this Agreement. Confidential Information does not include any information:

        (i)      that is lawfully known without restriction on disclosure before the disclosure;



      (ii)    that is now or becomes publicly known through no wrongful act, breach or failure of the Receiving Party; or

      (iii)    that is hereafter lawfully furnished to the Receiving Party by a third party as a matter of right and without violation of a restriction on disclosure or other obligation of confidentiality.

    (b)    The Receiving Party agrees not to copy, alter, or directly or indirectly disclose any Confidential Information.

    (c)    The Receiving Party shall use the Confidential Information solely for purposes consistent with, and in furtherance of, the obligations under this Agreement.

    (d)    All marketing, administrative, consulting, sales, training, and/or compliance materials created and developed by ECI specifically for Client, including all data, results, conclusions and the like, shall be the property of Client.

    (e)    Client acknowledges that ECI possesses certain processes, know-how, trade secrets, improvements, other intellectual properties and assets including analytical methods, techniques and technical expertise, independently developed by ECI that are not derived from Client Confidential Information, which shall remain the sole property of ECI ("ECI Proprietary Rights").

9. **Miscellaneous Provisions**.

    (a)    Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so. The Parties understand and agree that this Agreement will be approved by EAG in accordance with Section 310 of the California Corporations Code.

    (b)    Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

    (c)    This Agreement and its Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein.

    (d)    This Agreement, and the rights, obligations and liabilities of the parties thereunder, shall be governed by the laws of the State of California.

    (e)    Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in state or federal court in Orange County, California. This clause shall not preclude parties from



seeking provisional remedies in aid of arbitration from a state or federal court in Orange County, California.

In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the arbitrator determine a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

(f)     If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g)     This Agreement shall inure to the benefit of and bind the successor's in-interest, and transferees of the parties hereto.

(h)     ECI provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ECI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. ECI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client.

(i)     Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

**ECI at**:

Robert Gunton, Its President

Evolution Consulting, Inc.

3158 Red Hill Ave #100

Costa Mesa, Ca 92626

**&**

**Client at**:

Dustin Tillman, CEO

Zeeshawn Zia, President

15773 Gateway Circle

Tustin, Ca 92780



or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)     This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)     No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(l)     Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)    This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)     Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)     In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p)     During the term of this Agreement, ECI shall not directly consult, assist, aid or advise in any way, any competitive business or enterprise that competes with the Client.

(q)     In order to protect trade secret and other confidential information shared between the parties pursuant to this Agreement, during the term of this Agreement and one (1) year thereafter, (A) Client will not, directly or indirectly, hire, solicit, take away, or attempt to hire, solicit or take away (either on such entity's behalf or on behalf of any other person or entity) any individual who is then an employee of ECI, or who has been employed by ECI within the past sixty (60) days; and (B) ECI will not, directly or indirectly, hire, solicit, take away, or attempt to hire, solicit or take away (either on such entity's behalf or on behalf of any other person or entity) any individual who is then an employee of Client, or who has been employed by Client within the past sixty (60) days.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.



**Elite Aerospace Group, Inc**. ("**CLIENT**")


By: _____

Dustin Tillman

Its CEO and Authorized Signatory


By: _____

Zeeshawn Zia

Its COO and Authorized Signatory


**Evolution Consulting, Inc. ("ECI")**


By: _____

Robert Gunton

Its President and Authorized Signatory


**EXHIBITS**

"A-1"        Marketing Services

"A-2"        Administrative Services

"A-3"        Consulting Services

"A-4"        Sales and Marketing Training Services

"A-5"        Client Responsibilities

"A-6"        Terms Sheet

"A-7"        Ancillary Services Rate and Terms Sheet

"A-8"        Exclusions of Services from Contract



## Exhibit "A-1"

## Marketing Services

### Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ECI in ECI's sole discretion as needed.

1) **Market Research**

    General Market Analysis

    Competitive Analysis

    Targeted Consumer Analysis

    Investor Analysis

    Ideal Target Market Identification

2) **Copy-writing [Added a hyphen to distinguish or avoid confusion with actual "copyright" work.]**

    News Releases & Pitch Letters

    White Papers (based upon information prepared and submitted by Client (EAG) or a contracted 3rd party

    Website Copy

    Advertisement Copy-writing

    Tagline / Slogan Analysis & Consultation

    Editorial Calendars

    Blog and Social Media Posts & Maintenance

    Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

3) **Branding**

    Brand Strategy Analysis & Consulting

    Research & Development

    Image Analysis

    Targeted Campaign Development

4) **Graphic Design**

    Logo Design

    Press Kit (visual assets)

    Print Advertisements

    Visual Assets for Web Development



      Presentation Decks

      Brochures

      Banners

      Promotional Items (visual assets)

      Style Guides

**5)**   **<u>Video Production</u>**

      Conceptualization & Storyboarding

      Production

      Direction

      Script Development and Pre-production

      Post-production Editing

      "Shorts" & Viral Videos

      Webinars

      Product Presentations

      Online Hosting & Viewership Metrics

**6)**   **<u>Market Strategy</u>**

      Tactical Marketing Plans

      Campaign Effectiveness Analytics

      Targeting & Segmentation Strategies

      Lead Database Development and management

**7)**   **<u>Public Relations</u>**

      PR Campaign Development & Execution

      Proactive Reputation Management

      Reactive Reputation Management

      Reporting and Analytics

      Editorial Calendars



**8)** <u>**Account Management**</u>

<u>Oversight / Planning / General Management of the Following</u>:

PR Campaign Execution

Targeted, Regional, and National Media Campaigns

Web Development

Database Implementation and management (I.R.I.S.)

Creative Strategy Implementation

Brand Strategy Implementation



## Exhibit "A-2"

## Administrative Services

### Description of Administration Services

First and foremost, ECI's Compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The Compliance team provides Administrative help to assist in daily tasks, including (but not limited to):

Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

Assisting with distribution of company approved information to the Sales floor. ECI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

May assist in distribution of approved correspondence or other mailings to the subscribers.

Agent Training on the CRM (IRIS)

Assist the Investor Relations Sales Manager in any administrative capacity.

The Compliance team does not and will not act as HR for the issuer. ECI requires that the issuer designate or hire personnel to assist with all HR related items. Compliance may, however, assist issuer in the distribution of this material.

Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation. ECI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.

Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.

May assist in distribution of approved correspondence or other mailing to the subscribers.

ECI Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our ECI clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by ECI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance team are as follows:

### Compliance Department Services

Compliance team member provides support to the Issuers Investor/Subscriber Relations Department. The Compliance Team Member to provide Administrative help to assist in daily tasks, including (but not limited to):

Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

The Compliance Team Member does not act on behalf of Client as Human Resources for the issuer, and Client is required to maintain a contact person to handle Human Resources related issues and decisions. The Compliance Team Member does not sell or promote the Client's offering, or act as the Investor/Subscriber Relations representative for the Client, and Client must have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and



approve their accreditation and funds prior to deposit.  The key function(s) of the Third-Party Compliance Team Member are as follows:

A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines

Compliance facilitates the subscriber's funding of their investment by:

Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering.  Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information.  Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In regards to verification of accreditation, a Compliance Team Member will go to the Investor Compliance Officer the various options that the issuer has approved in order to satisfy accreditation and suitability requirements.  This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status.  It is the issuer's responsibility to enlist one of these independent service providers. .  Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant.   If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer.  To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status.  It is not recommended by ECI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers.  If IRA paperwork is received, Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.



Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval.  Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer.  This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor  Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

> Funds in Transit information

> Allocation specific Notes

> Documentation Storage

> Investor/Subscriber Correspondence

> Certificate

> Accredited Investor/Subscriber Verification Letter

ECI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation.  Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Defined Terms**:

**CRM**:       A Customer Relationship Management Software used to manage customer and client contact information and to maintain and Implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers or clients trends and behaviors, which ultimately serve to enhance the customer's or clients overall experience.

**IRIS**:       I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS) this software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing undergoing legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations. It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of ECI.

**Investor Compliance Officer**:  Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. ECI and its compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

**Compliance Team Member**:  A Compliance Team Member (CTM) is an ECI employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

**Investor Relations Officer**:  A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.



### Exhibit "A-3"

### Consulting Services

**Consulting Services**

ECI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

Executive Summary

Business Overview

Products & Services

Sales & Marketing Plan

Operating Plan

Management and Organization

Action Plan

Financial Plan

Investment Opportunity

Market Strategy

Tactical Marketing Plans

Effectiveness Measurement(s)

Management Information Systems (MIS)

SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

Real Estate Acquisition

Facility Lease Negotiation

Facility Design and Construction



## Exhibit "A-4"

## Sales and Marketing Training Services

**Sales and Marketing Training Services**

ECI is to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ECI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ECI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

### Professionalism & Ethics

Ethical Selling Practices

Interoffice communication skills

Client communication skills

Public Speaking

Professional presence and grooming

Core Competency evaluations and recommendations.

Personality profiling

### Professional Sales Preparation

Prospect Presentation Best Practices

Presentation Scripting (at the issuer's direction)

Sales/Marketing Content Creation

How to properly qualify a prospect for your product or service.

### S.W.A.T. (Selling with a Telephone) Sales Training Program (on-going)

Prospecting

Call/Meeting Follow Up Process

Proven Closing Methodologies

Presentation Methods

Proper Qualification

Follow up procedures

Closing methodology

Client Retention Best Practices



**Training Services & Content Delivery Methods**

Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ECI video library is approved by ECI management on a case-by-case basis. Additionally, ECI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

ECI Sales Training staff may vary from region to region. The issuer/client will be assigned a primary sales training specialist suited for their industry and vertical. ECI sales trainers will employ proven sales methodologies.

Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.



## Exhibit "A-5"

## Responsibilities' of the Client and ECI

**CLIENT REPSONSIBILITIES**:

In order for   to properly perform its duties under this agreement the Client must provide the following:

Biographical Data on all principals including primary company its subsidiaries and ventures

Incorporation Documents for primary company and all subsidiaries and ventures.

Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

Financial Statements will be reviewed by an independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

List of Professional Services companies providing Services to Client (Attorneys, CPAs)

Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

Business Overview for primary company its subsidiaries and ventures

Business License primary company its subsidiaries and ventures

Description of Service Offering's or product(s) sold for primary company its subsidiaries and ventures

List of all management-level employees and job functions for primary company its subsidiaries and ventures

Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

**ECI RESPONSIBILITIES**

During the term of the Agreement, ECI agrees to provide written notice to the Client of any of the following occurrences promptly (and in any event within five business days of such occurrence) if such occurrence materially affects ECI's ability to perform the Services:

- o   Adverse court actions or legal proceedings filed against ECI or any of its officers or directors.
- o   Charges or investigations by any federal, State, or local governmental authority against or involving ECI, or related correspondence.
- o   Notices of non-compliance, fines or other form of censure received by ECI from any governmental authority, agency or similar governing organization .
- o   Any of the following insolvency events, which would affect ECI's ability to fully perform its obligations under this Agreement:
  - ▪   ECI becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets,
  - ▪   ECI becomes subject to any proceedings under any bankruptcy or insolvency law, including involuntary proceedings, whether domestic or foreign, or
  - ▪   ECI winds up or liquidates its business voluntarily or otherwise.



**EXHIBIT "A-6"**

**Elite Aerospace Group, Inc.**

**Contract Terms Sheet:**

| | |
|---|---|
| Contract Term: | Two years, with EAG having an option to renew the Agreement for an additional year upon EAG's written notice of the exercise of such option at least sixty (60) days prior to the natural expiration of the initial two-year term. |
| Contract Rate: | $39,750.00 payable weekly |
| Commencement Date: | March 1, 2017 |
| Expiration Date: | February 28, 2019 |
| Engagement Fee: | Waived |
| Board Seats: | ELITE AEROSPACE GROUP, INC. will authorize a minimum of a 5 person board of which 2 members will be appointed by ECI. ECI will retain the right to alternate appropriate board members during the term of the contract at ECI's sole discretion |
| Termination: | An early termination fee for termination by EAG of this Agreement for convenience, as described under Section 7 of the Agreement, must be tendered to ECI. Such a termination by EAG will be effective only after written notice to ECI of termination is tendered and termination fees have been paid in full. |



**EXHIBIT "A-7"**

**Ancillary Services Schedule of Services and Fees**

The parties anticipate that EAG might request from time to time ECI to perform duties that are not within the Services to be provided under this Agreement. These additional services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the Agreement. Prior to rendering such ancillary services, ECI must receive prior approval from EAG's Chief Executive Officer or Chief Operating Officer in order for EAG to become financially responsible for such additional services.

**General Staffing:**

*Administrative Employees shall be billed at a rate of:*

Junior Administrative          $35.00 Per Hour

Senior Administrative          $50.00 Per Hour

**Technical Support**

*Technical support Employees shall be billed at a rate of:*

IT Administrator               $75.00 Per Hour

Chief Technical Officer        $200.00 Per Hour

**Senior Support**

COO                            $225.00 Per Hour

President                      $250.00 Per Hour

CEO                            $400.00 Per Hour

Corporate Consultant           $250.00 Per Hour

Construction Management:       8% of Construction amount

**Additional Marketing & Production Support**

Junior Marketing Assoc.        $90.00 Per Hour



| | |
|---|---|
| Senior Marketing Director | $125.00 Per Hour |
| Post Production Editor (Internal) | $100.00 Per Hour |
| Post Production Editor (Out) | $90.00 Per Hour |
| Graphic Designer | $75.00 Per Hour |
| Web Designer (Internal) | $125.00 Per Hour |

**Additional Marketing & Production Support**

| | | |
|---|---|---|
| Web Designer (Out) | $75.00 Per Hour | |
| On-Site Production Team (Day) | $3,500.00 - $7,500.00 Per Day | (Orange & Los Angeles County) |
| *On-Site Production Team (Day) | $4,000.00 - $10,000 Per Day | (Outside Orange & Los Angeles County) |

*On Site Production Teams may incur additional expenses and mileage charges when traveling outside Orange or Los Angeles County.*

**Minimum Billing:**

| | |
|---|---|
| Board Meetings | Min. 6 hours including pre and post Board Meeting preparation and review |
| Consulting | Acquisitions and Dispositions minimum of 8 hours |
| Committee | Minimum of 4 Hours per incident |
| Facilities Management | Minimum of 4 hours per incident |



**EXHIBIT "A-8"**

**Exclusions to Services by ECI**


**Securities Sales:** ECI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ECI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ECI is for informational and educational purposes only and is not to be construed in any way that ECI or its Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of EAG or its affiliates. ECI and its Officers, Directors, Employees and directly affiliated consultants are employed in an advisory capacity only. EAG by its execution herein further agree and assert their understanding of these terms.

Exhibit 17



## AGREEMENT FOR SERVICES

**Agreement**

**THIS AGREEMENT FOR SERVICES** (hereinafter "**Agreement**") is made and entered into this 29th day of December, 2016, by and between Elite Aerospace Group, Inc., a Delaware Corporation (hereinafter "Client") and Evolution Services, Inc. a Delaware Corporation (hereinafter "ESI"), who agree as follows:

1. **Recitals. This Agreement is made in contemplation of the following facts and circumstances:**

   A. *ESI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.*

   B. *ESI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.*

   ***ESI is not Client's legal, accounting or professional counsel. ESI does not in any way offer or transact in securities on behalf of clients. Client is encouraged to seek professional assistance in areas of legal advice and securities counsel in addition to all accounting and tax representation. ESI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein..***

   *This Agreement is intended by the parties to engage ESI as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. ESI to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.-*

   E. ESI is in the business of providing the services specified in the "Description of Services" attached hereto as **Exhibit's "A1" Marketing Services, "A-2" Administration, " "A-3 Consulting", "A-4" Marketing and Sales Training Services, "A-5" Client Responsibilities, "A-6" Terms Sheet, "A-7" Ancillary Services Rate and Terms Sheet, "A-8" Exclusions of Services from Contract**

   and

   Client and ESI desire to state the terms and conditions under which ESI will provide said services to Client herein.

**2. Services.**

 EVO021738



(a)     "Services" means all marketing, administrative, compliance (as defined herein) and other services to be performed by ESI pursuant to the terms of this Agreement.

(b)     ESI will provide such staff as ESI deems necessary to perform the Services, at ESI's sole expense. Client shall not control direct, or supervise ESI's employees or agents in the performance of the Services. ESI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ESI and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as ESI, in ESI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ESI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c)     Client understands that the performance of the terms of this contract is dependent of mutual effort and compliance of the terms of this contract by both Client and ESI. Client is bound to maintain its obligations as referenced under Exhibit "A6" included herein.

### 3. <u>Compensation</u>

(a)     In consideration of the Services to be rendered by ESI pursuant to this Agreement, Client agrees to pay equal installments of $34,750 weekly month during the term of the contract. In the event Client pays installments more than one week in advance a early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

(b)     In addition, ESI shall invoice Client, weekly in arrears, for expenses incurred by ESI as a result of performing Services in accordance with this Agreement Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ESI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ESI submits supporting documentation in addition to the approved expense form.

(c)     ESI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ESI's charges and expenses hereunder and ESI shall retain such records for a period of one (1) year from the date of final payment.

(d)     Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services (as referenced in Item "3c"), if any, exclusive of any taxes based upon ESI's income or payroll, or, in lieu thereof, the Company shall



provide ESI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

(e)     Stock Issuance shall be issued in accordance with Exhibit A 6

## 4. Obligations of Client

The managers and staff of Client shall comply with all reasonable requests of ESI and shall cooperate with ESI by providing to ESI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ESI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits A5 Client Responsibilities, A6 Letter of Intent.

## 5. Independent Contractor

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ESI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ESI an employer/employee, partnership, or joint venture relationship. ESI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ESI agrees that Client shall have no obligation to withhold from compensation due ESI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ESI or the employees or agents of ESI. ESI hereby waives any and all claims ESI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

## 6. Term and Termination

This Agreement shall commence (see "EXHIBIT A6) and shall continue in Full Force and effect until (see "EXHIBIT A6) unless and until terminated earlier in accordance with the provisions of this Agreement. (Reference "Exhibit A6

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings

CONFIDENTIAL



under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise

ESI upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ESI for all costs incurred by ESI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ESI in the event this Agreement is terminated due to the default of Client.

An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60. Termination notice must be given 90 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination *payment (i.e. The remaining unearned contract term multiplied by the agreed upon billing rate multiplied by the multiplier .60 or 60%)* in good funds tendered upon presentation of the notice. Early Termination may not be considered effective in absence of early termination compensation as defined herein.

### 7. Indemnification

(a)     ESI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ESI unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold ESI free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services. All work product published by ESI is to be deemed approved by Client and Client accepts full responsibility for the content as published by ESI on clients behalf. All company information is deemed to have been provided by Client including but limited to information pertaining to Clients company offerings, financial data, and biographical data for all officers, employees and directors. Client holds ESI and its employee's officers and Directors and agents harmless for all material generated by or on behalf of Client at Clients direction pursuant to the scope of this contract. Client will maintain in full effect at all times a Professional Liability Insurance Policy in an amount of no less than $2,000,000 per occurrence. Client will cause to name ESI as additional insured under said policy(ies)

### 8. Confidentiality and Proprietary Rights.

(a)     During the term of this Agreement, Client will acquire knowledge of the ESI's Confidential Information in connection with its performance of the Services hereunder and the parties agree to keep such Information in confidence during and following termination or expiration of this Agreement. Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances,

EVO021741



personnel data, Work Product and other material or information considered proprietary by the parties relating to the current or anticipated business or affairs of the parties which is disclosed directly or indirectly to the parties In addition, Confidential Information means any third party's proprietary or confidential information disclosed in the course of providing Services to Client. Confidential Information does not include any information:

(i)     which were lawfully known without restriction on disclosure before the disclosure

(ii)    which is now or becomes publicly known through no wrongful act or failure

(iv)    which is hereafter lawfully furnished to ESI by a third party as a matter of right and without restriction on disclosure.

The parties agree not to copy, alter, or directly or indirectly disclose any Confidential Information.

**9. Miscellaneous Provisions**.

(a)     Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

(b)     Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c)     This Agreement and it' Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein (d) All questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California.

(e)     If any legal actions or other proceedings are brought for the interpretation or enforcement of this Agreement or any rights of the parties with regard to this Agreement, or because of an alleged dispute, breach, or default, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they might be entitled. The parties hereto agree that (1) this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed in such state and (2) any actions for the interpretation or enforcement of this Agreement shall be brought in the County of Orange, State of California. Subject to the Private Binding Arbitration rules of American Arbitration Association.

(f)     If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.



(g) This Agreement shall inure to the benefit of and bind the successor's in-interest, and transferees of the parties hereto.

(h) Evolution Services, Inc., (ESI) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ESI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. ESI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client

(i) Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

**ESI at**:

Robert Gunton, Its President

Evolution Services, Inc.

3158 Red Hill Ave #100

Costa Mesa, Ca 92626

**&**

**Client at**:

Dustin Tillman, CEO

Zeeshawn Zia, President

15773 Gateway Circle

Tustin, Ca 92780

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j) This Agreement may be amended or modified only with the written consent of the parties hereto.

(k) No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

CONFIDENTIAL

EVO021743



(l) Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m) This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n) Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o) In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p) Client is prohibited from engaging at any time an ESI employee or direct ESI consultant for any purpose outside the scope of this agreement. Client shall not engage or hire directly or indirectly any ESI employee (past or present) for any position with the Client or its affiliates or service providers for a period of not less than one year from the natural termination of this Agreement through fulfillment or expiration, or one year from the termination of said employment by ESI of said former employee.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

**CLIENT:**

Name: **Elite Aerospace Group, Inc**.


By: _____

Dustin Tillman

Its CEO or Authorized Signatory


By: _____

Zeeshawn Zia

It's COO or Authorized Signatory

 EVO021744



**ESI**

**Evolution Services, Inc.**

By: _____

Robert Gunton

Its President

<u>**EXHIBITS**</u>

"A1"    Marketing Services

"A2"    Administrative Services

"A3"    Consulting Services

"A4"    Sales and Marketing Training Services

"A5"    Client Responsibilities

"A6"    Terms Sheet

"A7"    Ancillary Services Rate and Terms Sheet

"A8"    Exclusions of Services from Contract



## Exhibit "A1"

## Marketing Services

### Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ESI in ESI's sole discretion as needed.

1) **Market Research**

    General Market Analysis

    Competitive Analysis

    Targeted Consumer Analysis

    Investor Analysis

    Ideal Target Market Identification

2) **Copy-writing [Added a hyphen to distinguish or avoid confusion with actual "copyright" work.]**

    News Releases & Pitch Letters

    White Papers (based upon information prepared and submitted by Client (EAG) or a contracted 3rd party

    Website Copy

    Advertisement Copy-writing

    Tagline / Slogan Analysis & Consultation

    Editorial Calendars

    Blog and Social Media Posts & Maintenance

    Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

3) **Branding**

    Brand Strategy Analysis & Consulting

    Research & Development

    Image Analysis

    Targeted Campaign Development

4) **Graphic Design**

    Logo Design

    Press Kit (visual assets)

    Print Advertisements

    Visual Assets for Web Development

EVO021746



Presentation Decks

Brochures

Banners

Promotional Items (visual assets)

Style Guides

**5)** <u>**Video Production**</u>

Conceptualization & Storyboarding

Production

Direction

Script Development and Pre-production

Post-production Editing

"Shorts" & Viral Videos

Webinars

Product Presentations

Online Hosting & Viewership Metrics

**6)** <u>**Market Strategy**</u>

Tactical Marketing Plans

Campaign Effectiveness Analytics

Targeting & Segmentation Strategies

Lead Database Development and management

**7)** <u>**Public Relations**</u>

PR Campaign Development & Execution

Proactive Reputation Management

Reactive Reputation Management

Reporting and Analytics

Editorial Calendars

 EVO021747



8) **Account Management**

Oversight / Planning / General Management of the Following:

PR Campaign Execution

Targeted, Regional, and National Media Campaigns

Web Development

Database Implementation and management (I.R.I.S.)

Creative Strategy Implementation

Brand Strategy Implementation

CONFIDENTIAL

EVO021748



## Exhibit "A2"

## Administrative Services

### Description of Administration Services

      First and foremost, ESI's Compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The Compliance team provides Administrative help to assist in daily tasks, including (but not limited to):

Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

Assisting with distribution of company approved information to the Sales floor. ESI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

May assist in distribution of approved correspondence or other mailings to the subscribers.

Agent Training on the CRM (IRIS)

Assist the Investor Relations Sales Manager in any administrative capacity.

The Compliance team does not and will not act as HR for the issuer. ESI requires that the issuer designate or hire personnel to assist with all HR related items. The Compliance Team may, however, assist issuer in the distribution of this material.

Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation, if applicable. ESI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs. All costs associated with printing will be the sole responsibility of the issuer.

Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

May assist in the distribution of accredited or non-accredited leads both in the CRM and/or hard copy leads.

May assist in distribution of approved correspondence or other mailing to the subscribers.

 ESI Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance team are as follows:

#### Compliance Department Services

      Compliance team member provides support to the Issuers Investor/Subscriber Relations Department. The Compliance Team Member to provide Administrative help to assist in daily tasks, including (but not limited to):

      Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

      Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

      Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

      The Compliance Team Member does not act on behalf of the ISSUER as HUMAN RESOURCES for the issuer, sell or promote the issuer's offering, or act as the Investor/Subscriber Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Human Resources officer and their Investor/Subscriber Relations Contact. It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take

EVO021749



reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines

Compliance facilitates the subscriber's funding of their investment by:

Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In Regards to verification of accreditation, a Compliance Team Member will go to the Compliance Offer the Various Options that the issuer has approved in order to satisfy. This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. . Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by ESI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received, Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

CONFIDENTIAL



Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

> Funds in Transit information
>
> Allocation specific Notes
>
> Documentation Storage
>
> Investor/Subscriber Correspondence
>
> Certificate
>
> Accredited Investor/Subscriber Verification Letter

ESI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Defined Terms**:

**CRM:** A Customer Relationship Management Software used to manage customer and client contact information and to maintain and Implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers or clients trends and behaviors, which ultimately serve to enhance the customer's or clients overall experience.

**IRIS:** I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS) this software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing undergoing legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations. It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of Evolution Services, Inc. (ESI)

**Investor Compliance Officer**: Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. ESI and its compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

**Compliance Team Member**: A Compliance Team Member (CTM) is an ESI employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

**Chief Human Relation's Officer**: A Chief Human Resources Officer (CHRO) is a corporate officer who oversees all aspects of human resource management and industrial relations policies, practices and operations for an organization.

**Investor Relations Officer**: A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.

CONFIDENTIAL



CONFIDENTIAL

EVO021752



## Exhibit "A3"

## Consulting Services

**Consulting Services**

ESI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

Executive Summary

Business Overview

Products & Services

Sales & Marketing Plan

Operating Plan

Management and Organization

Action Plan

Financial Plan

Investment Opportunity

Market Strategy

Tactical Marketing Plans

Effectiveness Measurement(s)

Management Information Systems (MIS)

SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

Real Estate Acquisition

Facility Lease Negotiation

Facility Design and Construction

CONFIDENTIAL



## Exhibit "A4"

### Sales and Marketing Training Services

**Sales and Marketing Training Services**

ESI to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ESI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ESI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

### Professionalism & Ethics

Ethical Selling Practices

Interoffice communication skills

Client communication skills

Public Speaking

Professional presence and grooming

Core Competency evaluations and recommendations.

Personality profiling

### Professional Sales Preparation

Prospect Presentation Best Practices

Presentation Scripting (at the issuer's direction)

Sales/Marketing Content Creation

(a) How to properly qualify a prospect for your product or service.

### S.W.A.T. (Selling with a Telephone) Sales Training Program (on-going)

Prospecting

Call/Meeting Follow Up Process

Proven Closing Methodologies

Presentation Methods

Proper Qualification

Follow up procedures

Closing methodology

Client Retention Best Practices

**Training Services & Content Delivery Methods**

EVO021754



Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ESI video library is approved by ESI management on a case-by-case basis. Access to the ESI training library. Additionally, ESI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

ESI Sales Training staff may vary from region to region. The issuer/client will, be assigned a primary sales training specialist suited for their industry and vertical. ESI sales ESI trainers will employ proven sales methodologies.

Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.

CONFIDENTIAL



## Exhibit "A5"

## Responsibilities' of the Client

**CLIENT REPSONSIBILITIES**:

In order for   to properly perform its duties under this agreement the Client must provide the following:

Biographical Data on all principals including primary company its subsidiaries and ventures

Incorporation Documents for primary company and all subsidiaries and ventures.

Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

 Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Chief Human Resources Officer to designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

Financial Statements will be reviewed by an independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

List of Professional Services companies providing Services to Client (Attorney's, CPA's)

Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

Business Overview for primary company its subsidiaries and ventures

Business License primary company its subsidiaries and ventures

Description of Service Offering's or product(s) sold for primary company its subsidiaries and ventures

List of all employees and job functions for primary company its subsidiaries and ventures

Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

EVO021756



**EXHIBIT "A6"**

**Elite Aerospace Group, Inc.**

**Contract Terms Sheet:**

| | |
|---|---|
| Contract Term: | 36 months |
| Contract Rate: | $40,000 payable weekly |
| Commencement Date: | January 1, 2017 |
| Expiration Date: | December 31, 2019 |
| Engagement Fee: | Waived |

Stock issuance:　　ELITE AEROSPACE GROUP, INC. will issue/reissue or convert Elite Aviation Products Founders Shares of Common stock in an amount as defined below. Said shares will include an anti-dilution clause or will alternatively include the right to Warrants in an amount equal to ESI (or ESI designees) non-dilutable % of the company. Said warrants will be made available for purchase at the company's PAR Value of $.001 per share as of the date of this agreement. ESI 's right of acquisition of said shares will be evergreen until 1 year after EAG has been offered in a public event such as an Initial Private Offering or sale of the company.

| | |
|---|---|
| Dustin Tillman | 17% |
| Zeeshawn Zia | 17% |
| ESI | 19.99% |

Founders Shares are to be issued or re-issued to reflect the % of share ownership of Authorized Stock as required he current EAP?EAG anti-dilution to below the stated % for Founders is to be exchanged (which is to be deemed receipt of consideration) for warrants of EAG Common Shares at the PAR value as defined in the EAP/EAG Merger and Conversion offering dated 09/20/2016 (the date of solicitation of consents as defined in that certain Solicitation of Consents Agreement to Merger and Plan or Reorganization dated for reference purposes September 20,2016 and to which the effective merger date of January 1, 2017 has been approved in super majority as per State and Federal regulations. All Shares issued in EAG are to have no anti-dilution provisions contemplated or offered to any shareholder without unanimous Board consent.

Board Seats:　　ELITE AEROSPACE GROUP, INC. will authorize a minimum of a 5 man board of which 2 members will be appointed by ESI. ESI will retain the

EVO021757



right to alternate appropriate board members during the term of the contract at ESI's sole discretion

Common Shares:
Authorized Common Stock have been increased to 888,000,000 (inclusive of founder's shares. Par value is as defined in that certain Solicitation of Consents Agreement to Merger and Plan or Reorganization dated for reference purposes September 20,2016.)

Termination:
An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60. Termination will be effective only after written notice ESI of termination is tendered and termination fees have been paid in full.

Stock Offerings:
Authorized Preferred Stock has been issued in the amount of 60,000,000 shares will be issued in anticipation of a Preferred Series A offering of $30,000,000 at an offering value of $.50 per share. The Preferred offering shall be offered in a 506C offering that is offered to Accredited Investors Only and shall be allowed to be offered concurrently with EAG's other offerings as allowed by law.

Authorized Common Stock have been authorized and are denoted as the amount of 880,000,000 shares said shares will be made available for purchase to future shareholders under price and terms as to be approved by The Board at the time of authorization of sale. It is anticipated that an initial Limited Public Offering (LPO) shall be filed for during the 1st quarter of 2017 (or earlier as practical and approved by the Board). The initial offering price is scheduled to be at $2.00 per share of Common Stock. The offering will be filed under the current Regulation A offering rules and will be subject to the regulations pertaining to said offering. The initial LPO will be scheduled to be in the amount of $50,000,000 with an offering of 25,000,000 shares of common stock.

EAG will continue to offer its stock for sale in each subsequent year pursuant to the then current Regulation A offering rules. It is anticipated that each offering will be in the amount of $50,000,000 per annum or as allowed by the then current Regulation A rules.

EAG will make its best efforts to qualify for and file for a publicly traded symbol and offer the company shares for sale on a trading platform such as the NASDAQ or similar dependent upon market availability.

CONFIDENTIAL



**EXHIBIT "A6"**

**Ancillary Services Schedule of Services and Fees**

Principals of ESI shall from time to time perform duties that are not considered within the base contract offering. These services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the agreement by and between the parties.

| | |
|---|---|
| General Staffing: | Administrative Employees shall be billed at a rate |
| Junior Administrative | $35.00 Per Hour |
| Senior Administrative | $50.00 Per Hour |

Technical Support

| | |
|---|---|
| IT Administrator | $75.00 Per Hour |
| Chief Technical Officer | $200.00 Per Hour |

Senior Support

| | |
|---|---|
| COO | $225.00 Per Hour |
| President | $250.00 Per Hour |
| CEO | $400.00 Per Hour |
| Corporate Consultant | $250.00 Per Hour |
| Construction Management: | 8% of Construction amount |

Minimum Billing:

| | |
|---|---|
| Board Meetings | Minimum 6 hours including pre and post Board Meeting preparation and review |
| Consulting | Acquisitions and Dispositions minimum of 8 hours |
| Committee | Minimum of 4 Hours per incident |
| Facilities Management | Minimum of 4 hours per incident |



**EXHIBIT "A7"**

**Exclusions to Services by ESI**

      **Securities Sales:** ESI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ESI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ESI is for informational and educational purposes only and is not to be construed in any way that ESI or its Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of EAG or its affiliates. ESI and its Officers, Directors, Employees and directly affiliated consultants are employed in an advisory capacity only. EAG by its execution here-in further agree and assert their understanding of these terms.

EVO021760

# Exhibit 23

# Evolution / EAG Meeting 04/24/18

- Social Media Videos
  - Publishing 1 video per week over the next 4 weeks:
    - Industry Landscape – Falcon Heavy Launch
    - Industry Landscape – 2017 a Record Year for Aerospace M&A; 2018 even better?
    - Merger & Acquisition Highlight – HALO Industries
    - Industry Landscape - Boeing Embraer Deal
- Social Media Email Signatures
  - Email Sent out this morning
  - Please test copy pasting into your signature settings under file>options>mail>signatures before sending out to entire team to make sure everything translates properly
- TTF Aerospace
  - Web Development
    - 1st draft complete this week
  - Brochure
    - 1st draft complete this week
- EAG PPM Update
  - ITAR addition made along with edits and returned back to team least week
- EAG Brochure Update
  - Brochure needs to be updated to reflect the new divisions of EAG
  - Top priority
    - To be completed by next week
- EAG Website Update
  - Meeting with DT / RG last week
  - Loose structure / wish list established
  - We can begin development in the next 2-3 weeks
- 2017-2018 Annual Report
  - New format in progress
    - Expanded Customer Profiles (top 3 customers) -DT
    - Include MCA Reports - AE
    - Section including challenges of 2017 - DT
    - Removal of proforma graphs - AE

Confidential

# Exhibit 25

**To:** Robert Gunton[r.gunton@realmedia1.com]; zzia@eliteaviationproducts.com[zzia@eliteaviationproducts.com]; dtillman@eliteaviationproducts.com[dtillman@eliteaviationproducts.com]
**Cc:** Mike Owens[m.owens@realmedia1.com]; Adam Eldred[a.eldred@realmedia1.com]; Andrea Lindstrom[a.lindstrom@realmedia1.com]
**From:** Dawson Davenport
**Sent:** Fri 4/8/2016 1:52:16 AM
**Importance:** Normal
**Subject:** Re: OMI Video Shoot
**Received:** Fri 4/8/2016 1:52:35 AM

;;;;;;;
;;;;;;;

I already emailed Lyon for rates earlier as soon as it was mentioned

Sent from Outlook Mobile

On Thu, Apr 7, 2016 at 4:40 PM -0700, "Robert Gunton" <r.gunton@realmedia1.com> wrote:

Waiting for a response from Run and Gun in regard to availability.

Additionally, MPO, DD and I had a meeting of the minds...we think that this Q1 update should be shot in a panel discussion format with Tillman, Zia, Forbes, Schaefer and potentially Ratzenberger to moderate the discussion.

6 hours in front of the camera will give us more than enough footage for the Q1 update as well as several ancillary video projects that can be used as "infomercial-like" presentations for the A+ round. I think it's a great idea.

In fact, I'm Adam is going to email the Lyon Air museum for rates and availability - the museum's backdrop would be a perfect setting for the Q1 video and would provide a lively setting for the other videos to follow.

Thoughts?

_____
**Robert Gunton | President**
Real Media Marketing
(844) 320-7529 Ext. 116

**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*
**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to

infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

**From:** Zeeshawn Zia
**Sent:** Thursday, April 7, 2016 2:55 PM
**To:** Dustin Tillman; Robert Gunton
**Subject:** RE: OMI Video Shoot
  Dustin,
  Lets talk, call me tomorrow sir!
  Thanks,
  Zee
  **From:** Dustin Tillman
**Sent:** Thursday, April 7, 2016 2:54 PM
**To:** Robert Gunton
**Cc:** Zeeshawn Zia
**Subject:** RE: OMI Video Shoot
  Lets tentatively set Tuesday the 3rd.
  **ZEE**, if this doesn't work for you let me know. To get you caught up to speed, we're going to shoot our video and the OMI video same day.
  Cheers,
  D
  **From:** Robert Gunton [mailto:r.gunton@realmedia1.com]
**Sent:** Thursday, April 7, 2016 2:50 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Subject:** Re: OMI Video Shoot

Yes. First week of May is open. We can book now. What day works best for you and Zee?

_____
**Robert Gunton | President**
Real Media Marketing
(844) 320-7529 Ext. 116

**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*
**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding sales, legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

  **From:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Sent:** Thursday, April 7, 2016 2:45 PM
**To:** Robert Gunton; Gabriela Davenport
**Cc:** Dawson Davenport; Mike Owens (letsgompo@gmail.com)
**Subject:** RE: OMI Video Shoot

Hey RG – sounds like a plan. Lets definitely keep it on our radar and regroup when you're back in action. Can you see when the Run and Gun team will be available in early May?

Cheers,

D

**From:** Robert Gunton [mailto:r.gunton@realmedia1.com]
**Sent:** Thursday, April 7, 2016 2:27 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>; Gabriela Davenport <g.davenport@realmedia1.com>
**Cc:** Dawson Davenport <d.davenport@realmedia1.com>; Mike Owens (letsgompo@gmail.com) <letsgompo@gmail.com>
**Subject:** Re: OMI Video Shoot

Et al,

This shoot will need to be postponed until first week of May - at the earliest.

Even with all available "strings pulled" - Run and Gun is not available until then. Also, to clarify, I said I would be available on the 19th - but the crew is not. Weekend shoots for production people are always difficult to arrange. For production company's who will work on weekends, they typically change their regular rate (times 2) - ouch.

I return back to CA on the 18th...let's circle back the following Monday, the 21st, does that work?

As far as scheduling, I suggest we arrange this shoot on the same day as EAP(s) overdue quarterly update video shoot. That way, EAP gets a two-for-one deal.

Thoughts?

Thanks,

_____

**Robert Gunton | President**

Real Media Marketing
(844) 320-7529 Ext. 116

**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

▬                                                                                    ▬

**From:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Sent:** Thursday, April 7, 2016 2:14 PM
**To:** Gabriela Davenport
**Cc:** Robert Gunton; Dawson Davenport; Mike Owens (letsgompo@gmail.com)
**Subject:** RE: OMI Video Shoot

Gabby,

CONFIDENTIAL                                                                    EVO012201

Case 3:21-cv-01424-BEN-DDL Document 59-2 Filed 05/01/23 PageID #: 2093 Page 250 of 365

I am hoping you can coordinate with Mr. Gunton to prepare a short interview question list that I can then forward onto their inventor. Spoke with Robert about this a few weeks back and was informed he l be back Friday ready for the Saturday production. Please let me know your thought!

Thanks!

Dustin

---

**From:** Dustin Tillman
**Sent:** Tuesday, April 5, 2016 11:31 AM
**To:** Personal <letsgompo@gmail.com>
**Cc:** Gabriela Davenport <g.davenport@realmedia1.com>; Robert Gunton Q1-16 <r.gunton@realmedia1.com>; Dawson Davenport <d.davenport@realmedia1.com>
**Subject:** RE: OMI Video Shoot

Thanks MPO. Appreciated.

When I last spoke with RG he said he was going to be back Friday and free Saturday. I think a few hours with some decent production quality footage and a nice Q & A will go a long way. I've been keeping tabs on the wave energy world and things are definitely ripening up nicely. Attached are a couple of things from the show. Booth looks great. Tons of compliments and lots of customer traction.

Cheers,

D

---

**From:** Personal [mailto:letsgompo@gmail.com]
**Sent:** Monday, April 4, 2016 8:32 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Cc:** Gabriela Davenport <g.davenport@realmedia1.com>; Robert Gunton Q1-16 <r.gunton@realmedia1.com>; Dawson Davenport <d.davenport@realmedia1.com>
**Subject:** Re: OMI Video Shoot

What's up DT!

Things are going pretty well here,

Good start to the month!

Yes

We can do the interview,

But let's check the dates as Gunton is

Heading out on Vacation next week I believe.

Please make sure everyone's available on the 16th, I will forward this email to Gabby.

Have a good trip and safe flight home.

See you soon!

MPO

Sent from my iPhone

On Apr 4, 2016, at 7:38 AM, Dustin Tillman <dtillman@eliteaviationproducts.com> wrote:

> Hey MPO,
>
> I know the timing is not great right now, but if you recall I spoke with you a while back about having the

EVO012202

Case 3:21-cv-01427-JPS-JDB Document 59-2 Filed 08/04/23 Page 251 of 365 Page ID #:2002

founder of the Ocean Motion Intl. (OMI) technology come out here in April so we could interview him and start to capture some video to incorporate later in a webinar. Well, Hap Houser (who is 93 I believe) and Dwight (Hap's son and the president) will be flying out next week and I really wanted to see if I could get RMM to stage the interview at Elite's office on Saturday the 16th. Obviously I would love to have Robert and Cuff really making the day a success. While I know some investment would be necessary to make this happen, I wanted to see if this would be agreeable to you?

Cheers,

D

EVO012203

# Exhibit 26

| | |
|---|---|
| **From:** | Robert Gunton <r.gunton@realmedia1.com> |
| **Sent:** | Thursday, April 07, 2016 4:40 PM |
| **To:** | Zeeshawn Zia; Dustin Tillman |
| **Cc:** | Mike Owens; Dawson Davenport; Adam Eldred; Andrea Lindstrom |
| **Subject:** | Re: OMI Video Shoot |

Waiting for a response from Run and Gun in regard to availability.

Additionally, MPO, DD and I had a meeting of the minds...we think that this Q1 update should be shot in a panel discussion format with Tillman, Zia, Forbes, Schaefer and potentially Ratzenberger to moderate the discussion.

6 hours in front of the camera will give us more than enough footage for the Q1 update as well as several ancillary video projects that can be used as "infomercial-like" presentations for the A+ round. I think it's a great idea.

In fact, I'm Adam is going to email the Lyon Air museum for rates and availability - the museum's backdrop would be a perfect setting for the Q1 video and would provide a lively setting for the other videos to follow.

Thoughts?

**Robert Gunton | President**
Real Media Marketing
(844) 320-7529 Ext. 116



**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

1

CONFIDENTIAL TREATMENT REQUESTED BY ELITE AEROSPACE GROUP, INC.     EAGSEC0013787

**From:** Zeeshawn Zia <zzia@eliteaviationproducts.com>
**Sent:** Thursday, April 7, 2016 2:55 PM
**To:** Dustin Tillman; Robert Gunton
**Subject:** RE: OMI Video Shoot

Dustin,
Lets talk, call me tomorrow sir!
Thanks,
Zee

**From:** Dustin Tillman
**Sent:** Thursday, April 7, 2016 2:54 PM
**To:** Robert Gunton <r.gunton@realmedia1.com>
**Cc:** Zeeshawn Zia <zzia@eliteaviationproducts.com>
**Subject:** RE: OMI Video Shoot

Lets tentatively set Tuesday the 3rd.

ZEE, if this doesn't work for you let me know. To get you caught up to speed, we're going to shoot our video and the OMI video same day.

Cheers,
D

**From:** Robert Gunton [mailto:r.gunton@realmedia1.com]
**Sent:** Thursday, April 7, 2016 2:50 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Subject:** Re: OMI Video Shoot

Yes. First week of May is open. We can book now. What day works best for you and Zee?

**Robert Gunton | President**
Real Media Marketing
(844) 320-7529 Ext. 116



**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the

2

CONFIDENTIAL TREATMENT REQUESTED BY ELITE AEROSPACE GROUP, INC.                    EAGSEC0013788

scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

---

**From:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Sent:** Thursday, April 7, 2016 2:45 PM
**To:** Robert Gunton; Gabriela Davenport
**Cc:** Dawson Davenport; Mike Owens (letsgompo@gmail.com)
**Subject:** RE: OMI Video Shoot

Hey RG – sounds like a plan. Lets definitely keep it on our radar and regroup when you're back in action. Can you see when the Run and Gun team will be available in early May?

Cheers,
D

---

**From:** Robert Gunton [mailto:r.gunton@realmedia1.com]
**Sent:** Thursday, April 7, 2016 2:27 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>; Gabriela Davenport <g.davenport@realmedia1.com>
**Cc:** Dawson Davenport <d.davenport@realmedia1.com>; Mike Owens (letsgompo@gmail.com) <letsgompo@gmail.com>
**Subject:** Re: OMI Video Shoot

Et al,

This shoot will need to be postponed until first week of May - at the earliest.

Even with all available "strings pulled" - Run and Gun is not available until then. Also, to clarify, I said I would be available on the 19th - but the crew is not. Weekend shoots for production people are always difficult to arrange. For production company's who will work on weekends, they typically change their regular rate (times 2) - ouch.

I return back to CA on the 18th...let's circle back the following Monday, the 21st, does that work?

As far as scheduling, I suggest we arrange this shoot on the same day as EAP(s) overdue quarterly update video shoot. That way, EAP gets a two-for-one deal.

Thoughts?

Thanks,

**Robert Gunton | President**
Real Media Marketing
(844) 320-7529 Ext. 116



**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

3

CONFIDENTIAL TREATMENT REQUESTED BY ELITE AEROSPACE GROUP, INC.          EAGSEC0013789

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

---

**From:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Sent:** Thursday, April 7, 2016 2:14 PM
**To:** Gabriela Davenport
**Cc:** Robert Gunton; Dawson Davenport; Mike Owens (letsgompo@gmail.com)
**Subject:** RE: OMI Video Shoot

Gabby,

I am hoping you can coordinate with Mr. Gunton to prepare a short interview question list that I can then forward onto their inventor. Spoke with Robert about this a few weeks back and was informed he'll be back Friday ready for the Saturday production. Please let me know your thought!

Thanks!
Dustin

**From:** Dustin Tillman
**Sent:** Tuesday, April 5, 2016 11:31 AM
**To:** Personal <letsgompo@gmail.com>
**Cc:** Gabriela Davenport <g.davenport@realmedia1.com>; Robert Gunton Q1-16 <r.gunton@realmedia1.com>; Dawson Davenport <d.davenport@realmedia1.com>
**Subject:** RE: OMI Video Shoot

Thanks MPO. Appreciated.

When I last spoke with RG he said he was going to be back Friday and free Saturday. I think a few hours with some decent production quality footage and a nice Q & A will go a long way. I've been keeping tabs on the wave energy world and things are definitely ripening up nicely. Attached are a couple of things from the show. Booth looks great. Tons of compliments and lots of customer traction.

Cheers,
D

**From:** Personal [mailto:letsgompo@gmail.com]
**Sent:** Monday, April 4, 2016 8:32 PM
**To:** Dustin Tillman <dtillman@eliteaviationproducts.com>
**Cc:** Gabriela Davenport <g.davenport@realmedia1.com>; Robert Gunton Q1-16 <r.gunton@realmedia1.com>; Dawson Davenport <d.davenport@realmedia1.com>
**Subject:** Re: OMI Video Shoot

What's up DT!

4

CONFIDENTIAL TREATMENT REQUESTED BY ELITE AEROSPACE GROUP, INC.          EAGSEC0013790

Things are going pretty well here,
Good start to the month!

Yes
We can do the interview,
But let's check the dates as Gunton is
Heading out on Vacation next week I believe.
Please make sure everyone's available on the 16th, I will forward this email to Gabby.
Have a good trip and safe flight home.
See you soon!

MPO

Sent from my iPhone

On Apr 4, 2016, at 7:38 AM, Dustin Tillman <dtillman@eliteaviationproducts.com> wrote:

> Hey MPO,
>
> I know the timing is not great right now, but if you recall I spoke with you a while back about having the founder of the Ocean Motion Intl. (OMI) technology come out here in April so we could interview him and start to capture some video to incorporate later in a webinar. Well, Hap Houser (who is 93 I believe) and Dwight (Hap's son and the president) will be flying out next week and I really wanted to see if I could get RMM to stage the interview at Elite's office on Saturday the 16th. Obviously I would love to have Robert and Cuff really making the day a success. While I know some investment would be necessary to make this happen, I wanted to see if this would be agreeable to you?
>
> Cheers,
> D

CONFIDENTIAL TREATMENT REQUESTED BY ELITE AEROSPACE GROUP, INC.        EAGSEC0013791

# Exhibit 27

**To:** Adam Eldred[a.eldred@realmedia1.com]; Robert Gunton[r.gunton@realmedia1.com]
**Cc:** Mike Owens[m.owens@realmedia1.com]
**From:** Andrea Lindstrom
**Sent:** Tue 12/6/2016 5:41:19 PM
**Importance:** Normal
**Subject:** RE: EAG Video assets
**Received:** Tue 12/6/2016 5:41:20 PM

;;;;;
My guess is Wistia? Did you look there?

**From:** Adam Eldred
**Sent:** Tuesday, December 06, 2016 9:39 AM
**To:** Andrea Lindstrom ; Robert Gunton
**Cc:** Mike Owens
**Subject:** EAG Video assets

Hey Guys,

Where can I find the files for the videos found on the EAG investor portal?
Specifically Tillman's opening remarks from EAG's visit to congress and the Fox news video clip. I would like to include these on the media section of the new website

_____

**Adam Eldred | Marketing Director**
844.320.7529 Ext. 128
949.271.2305 Fax
a.eldred@realmedia1.com
www.RealMediaMarketingInc.com



**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

CONFIDENTIAL

EVO007488

# Exhibit 29

**From:** Andrea Lindstrom <a.lindstrom@realmedia1.com>
**To:** Adam Eldred <a.eldred@realmedia1.com>, Robert Gunton <r.gunton@realmedia1.com>
**Cc:** Mike Owens <m.owens@realmedia1.com>
**Subject:** RE: EAG Video assets
**Date:** Tue, 6 Dec 2016 17:41:19 +0000
**Importance:** Normal
**Inline-Images:** image002.png

---

My guess is Wistia? Did you look there?

---

**From:** Adam Eldred
**Sent:** Tuesday, December 06, 2016 9:39 AM
**To:** Andrea Lindstrom ; Robert Gunton
**Cc:** Mike Owens
**Subject:** EAG Video assets

Hey Guys,

Where can I find the files for the videos found on the EAG investor portal?

Specifically Tillman's opening remarks from EAG's visit to congress and the Fox news video clip. I would like to include these on the media section of the new website

_____

**Adam Eldred | Marketing Director**

844.320.7529 Ext. 128

949.271.2305 Fax

a.eldred@realmedia1.com

www.RealMediaMarketingInc.com



**Confidentiality Note.** *This email and any files transmitted with it contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee, or if this message has been addressed to you in error, you are directed not to read, disclose, reproduce, distribute, disseminate or otherwise use this transmission. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail and any attachments from your system. If you are not the intended recipient you are notified that disclosing, reproducing, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Legal Disclaimer.** RealMedia Marketing, Inc. (RMM) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. RMM is not licensed to and does not market or sell securities of any kind. All clients should obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. RMM does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such clients. Any views or opinions presented in this email are solely those of the author

and do not necessarily represent those of the company. Employees of RealMedia Marketing, Inc. are expressly required not to make defamatory statements and not to infringe or authorize any infringement of copyright or any other legal right by email communications. Any such communication is contrary to company policy and outside the scope of the employment of the individual concerned. The company will not accept any liability in respect of such communication, and the employee responsible will be personally liable for any damages or other liability arising.

Exhibit 30



**AGREEMENT FOR SERVICES**

Agreement

THIS AGREEMENT FOR SERVICES (hereinafter "Agreement") is made and entered into this 29th day of December , 2016, by and between Elite Aerospace Group, Inc.. a Delaware Corporation (hereinafter "Client") and Evolution Services, Inc..a Delaware Corporation (hereinafter "ESI"), who agree as follows:

1. Recitals. This Agreement is made in contemplation of the following facts and circumstances:

   A. ESI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.

   B. ESI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement.. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

   ESI is not Client's legal, accounting or professional counsel. ESI does not in any way offer or transact in securities on behalf of clients. Client is encouraged to seek professional assistance in areas of legal advice and securities counsel in addition to all accounting and tax representation. ESI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein..

   This Agreement is intended by the parties to engage ESI as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. ESI to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.-

   E. ESI is in the business of providing the services specified in the "Description of Services" attached hereto as Exhibit's  "A1" Marketing Services, "A-2" Administration, " "A-3 Consulting", "A-4" Marketing and Sales Training Services, "A-5" Client Responsibilities, "A-6"  Terms Sheet, "A-7" Ancillary Services Rate and Terms Sheet, "A-8" Exclusions of Services from Contract and Client and ESI desire to state the terms and conditions under which ESI will provide said services to Client herein.

(THIS SPACE LEFT BLANK INTENTIONALLY)

CONFIDENTIAL



2. Services.

    (a)    "Services" means all marketing, administrative, compliance (as defined herein) and other services to be performed by ESI pursuant to the terms of this Agreement. b)ESI will provide such staff as ESI deems necessary to perform the Services, at ESI's sole expense. Client shall not control direct, or supervise ESI's employees or agents in the performance of the Services. ESI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ESI and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as ESI, in ESI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ESI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

    (c.)    Client understands that the performance of the terms of this contract is dependent of mutual effort and compliance of the terms of this contract by both Client and ESI. Client is bound to maintain it's obligations as referenced under Exhibit "A6" included herein.

3. Compensation

    (a)    In consideration of the Services to be rendered by ESI pursuant to this Agreement, Client agrees to pay equal installments of $40,000 weekly month during the term of the contract. In the event Client pays installments more than one week in advance a early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

    (b)    In addition, ESI shall invoice Client, weekly in arrears, for expenses incurred by ESI as a result of performing Services in accordance with this Agreement Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ESI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ESI submits supporting documentation in addition to the approved expense form.

    (c)    ESI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ESI's charges and expenses hereunder and ESI shall retain such records for a period of one (1) year from the date of final payment.

EVO026345



(d)    Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services ( as referenced in Item "3c" ), if any, exclusive of any taxes based upon ESI's income or payroll, or, in lieu thereof, the Company shall provide ESI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

(e)    Stock Issuance shall be issued in accordance with Exhibit A 6

## 4. Obligations of Client

The managers and staff of Client shall comply with all reasonable requests of ESI and shall cooperate with ESI by providing to ESI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ESI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits A5 Client Responsibilities , A6 Letter of Intent.

## 5. Independent Contractor

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ESI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ESI an employer/employee, partnership, or joint venture relationship. ESI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ESI agrees that Client shall have no obligation to withhold from compensation due ESI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ESI or the employees or agents of ESI. ESI hereby waives any and all claims ESI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

## 6. Term and Termination

This Agreement shall commence (see "EXHIBIT A6") and shall continue in Full Force and effect until (see "EXHIBIT A6) unless and until terminated earlier in accordance with the provisions of this Agreement. (Reference "Exhibit A6

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy



or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise

ESIUpon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ESI for all costs incurred by ESI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ESI in the event this Agreement is terminated due to the default of Client.

An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60. Termination notice must be given 90 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination payment (i.e. The remaining unearned contract term multiplied by the agreed upon billing rate multiplied by the multiplier .60 or 60%)  in good funds tendered upon presentation of the notice. Early Termination may not be considered effective in absence of early termination compensation as defined herein.

7. Indemnification

    (a)    ESI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ESI unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold ESI free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services. All work product published by ESI is to be deemed approved by Client and Client accepts full responsibility for the content as published by ESI on clients behalf. All company information is deemed to have been provided by Client including but limited to information pertaining to Clients company offerings, financial data, biographical data for all officers, employees and directors. Client holds ESI and it's employees officers and Directors and agents harmless for all material generated by or on behalf of Client at Clients direction pursuant to the scope of this contract. Client will maintain in full effect at all times a Professional Liability Insurance Policy in a amount of no less than $2,000,000 per occurrence. Client will cause to name ESI as additional insured under said policy(ies)

8. Confidentiality and Proprietary Rights.

    (a)    During the term of this Agreement, Client will acquire knowledge of the ESI's Confidential Information in connection with its performance of the Services hereunder and the parties agree to keep such Information in confidence during and following termination or expiration of this Agreement. Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered

EVO026347



proprietary by the parties relating to the current or anticipated business or affairs of the parties which is disclosed directly or indirectly to the parties In addition, Confidential Information means any third party's proprietary or confidential information disclosed in the course of providing Services to Client. Confidential Information does not include any information:

(i)     which were lawfully known without restriction on disclosure before the disclosure

(ii)    which is now or becomes publicly known through no wrongful act or failure

(iv)    which is hereafter lawfully furnished to ESI by a third party as a matter of right and without restriction on disclosure.

The parties agree not to copy, alter, or directly or indirectly disclose any Confidential Information.

9. <u>Miscellaneous Provisions</u>.

(a)     Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

(b)     Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c)     This Agreement and it' Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein (d) All questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California.

(e)     If any legal actions or other proceedings are brought for the interpretation or enforcement of this Agreement or any rights of the parties with regard to this Agreement, or because of an alleged dispute, breach, or default, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they might be entitled. The parties hereto agree that (1) this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed in such state and (2) any actions for the interpretation or enforcement of this Agreement shall be brought in the County of Orange, State of California. Subject to the Private Binding Arbitration rules of American Arbitration Association.

(f)     If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.



(g)     This Agreement shall inure to the benefit of and bind the successors in-interest, and transferees of the parties hereto.

(h)     Evolution Services, Inc. . (ESI) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ESI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. ESI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client (i)     Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

ESI at:

Robert Gunton, It's President

Evolution Services, Inc.

3158 Red Hill Ave #100

Costa Mesa, Ca 92626

&

Client at:

Dustin Tillman, CEO

Zeeshawn Zia, President

1645 Reynolds Ave, Irvine, Ca 92612

or at such other addresses as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)     This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)     No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or

more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

EVO026349



(l)     Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)    This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)     Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)     In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p)     Client is prohibited from engaging at any time a ESI employee or direct ESI consultant for any purpose outside the scope of this agreement. Client shall not engage or hire directly or indirectly any ESI employee (past or present) for any position with the Client or it's affiliates or service providers for a period of not less that one year from the natural termination of this Agreement through fulfillment or expiration, or one year from the termination of said employment by ESI of said former employee.

(THIS SPACE LEFT BLANK INTENTIONALLY)

Signature page to follow

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

CONFIDENTIAL     EVO026350



CLIENT:

Name: Elite Aerospace Group, Inc.


By: _____

Dustin Tillman

Its CEO or Authorized Signatory


By: _____

Zeeshawn Zia

It's COO or Authorized Signatory


ESI

Evolution Services, Inc. .

By: _____

Robert Gunton

Its President


EXHIBITS

"A1"                    Marketing Services

| "A2" | Administrative Services |
|------|-------------------------|
| "A3" | Consulting Services |
| "A4" | Sales and Marketing Training Services |
| "A5" | Client Responsibilities |
| "A6" | Terms Sheet |
| "A7" | Ancillary Services Rate and Terms Sheet |
| "A8" | Exclusions of Services from Contract |

CONFIDENTIAL

EVO026352



**Exhibit "A1"**

Marketing Services

Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ESI in ESI's sole discretion as needed.

1) **Market Research**

General Market Analysis

Competitive Analysis

SWOT Analysis - (a study designed to identify an organization's internal strengths and weaknesses, as well as its external opportunities and threats).

Targeted Consumer Analysis

Investor Behavior Analysis

Ideal Target Market Identification

Copy-writing

News Releases & Pitch Letters

White Papers

Website Copy

Advertisement Copy-writing

Tagline / Slogan Analysis & Consultation

Editorial Calendars

Blog and Social Media Posts & Maintenance

Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

*Copywriting (or) other written content conveyed through online media and print materials. Copy is content primarily used for the purpose of advertising or marketing. This type of written material is often used to persuade a person or group as well as to raise brand awareness.

CONFIDENTIAL

EVO026353



**Branding**

Brand Strategy Analysis & Consulting

Research & Development

Image Analysis

Targeted Campaign Development

**Graphic Design**

Logo Design

Press Kit (visual assets)

Print Advertisements

Visual Assets for Web Development

Presentation Decks

Brochures

Banners

Promotional Items (visual assets)

Style Guides

**Video Production**

Conceptualization & Storyboarding

Production

Direction

Script Development and Pre-production

Post-production Editing

"Shorts" & Viral Videos

Online Webinars & other "presentations" designed for investor consumption

Product Presentations

Online Hosting & Viewership Metrics

**Market Strategy**

CONFIDENTIAL

EVO026354



Tactical Marketing Plans

Campaign Effectiveness Analytics

Targeting & Segmentation Strategies

Lead Database Development and management

<u>Public Relations</u>

PR Campaign Development & Execution

Proactive Reputation Management

Reactive Reputation Management

Reporting and Analytics

Editorial Calendars

**<u>Account Management</u>**

<u>Oversight / Planning / General Management of the Following</u>:

PR Campaign Execution

Targeted, Regional, and National Media Campaigns

Web Development

Database Implementation and management (I.R.I.S.)

Creative Strategy Implementation

Brand Strategy Implementation

<u>Exhibit "A2"</u>

<u>Administrative Services</u>

CONFIDENTIAL

EVO026355



**Description of Administration Services**

ESI's administration and compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The administrative team provides Administrative help to assist in daily tasks, including (but not limited to):

- Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.
- Assisting with distribution of company approved information to the Sales floor. ESI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.
- May assist in distribution of approved correspondence or other mailings to the subscribers.
- Issuer Agent Training on the CRM (IRIS)
- Assist the Investor Relations Sales Manager in any administrative capacity.
- The Compliance team does not and will not act as HR for the issuer. ESI requires that the issuer designate or hire personnel to assist with all HR related items. Allocations may, however, assist issuer in the distribution of this material.
- Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation. ESI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.
- Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.
- Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.
- A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.
- May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.
- May assist in distribution of approved correspondence or other mailing to the subscribers.

**Description of Compliance Department Services**

ESI Compliance team member will not sell or promote the issuer's offering, or act as the Investor

EVO026356



Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor

### Description of Compliance Department Services

funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. Compliance team members provide support to the Issuer's Investor/Subscriber Relations Department.

Compliance Team Members provide Administrative help to assist in daily tasks, including (but not limited to):

- Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).
- Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.
- Coordinate the invitations for all prospective shareholder and shareholder Conference Calls
- The Compliance Team Member does not act on behalf of the ISSUER as HUMAN RESOURCES for the issuer, sell or promote the issuer's offering, or act as the Investor/Subscriber Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Human Resources officer and their Investor/Subscriber Relations Contact. It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

    A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

    Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

### Description of Compliance Department Services (Continued)

EVO026357



The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines Compliance facilitates the subscriber's funding of their investment by:

· Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

· Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

· In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

***It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.***

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In Regards to verification of accreditation, a Compliance Team Member will go to the Compliance Offer the Various Options that the issuer has approved in order to satisfy. This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. . Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by ESI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.



Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received,

Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

- Funds in Transit information

- Allocation specific Notes

- Documentation Storage

- Investor/Subscriber Correspondence

- Certificate

- Accredited Investor/Subscriber Verification Letter

ESI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Glossary of Defined Terms:**

EVO026359



CRM:           A Customer Relationship Management Software used to manage customer and
               client contact information and to maintain and Implement principles, practices,
               and guidelines that an organization follows when interacting with its customers.
               From the organization's point of view, this entire relationship not only
               encompasses the direct interaction aspect, such as sales and/or service related
               processes, but also in the forecasting and analysis of customers or clients trends
               and behaviors, which ultimately serve to enhance the customer's or clients
               overall experience.

IRIS:          I.R.I.S. is a compliance based CRM Software developed for the purpose of
               maintaining and tracking investor communication and contact activity primarily
               focused on private capitalization under the SEC Regulation "D" rules. This
               Software is a licensed program developed and owned by 6 Degrees Services,
               Inc. (6DS) This software is undergoing consistent revision to better comply with
               the laws and regulations that may be implemented from time to time. I.R.I.S. has
               under gone legal review and is at the time of this writing under going legal audit
               and compliance review to insure it is compliance processes adhere to current
               laws and regulations.


               It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of
               Evolution Services, Inc. . (ESI)

Investor Compliance Officer:

               Investor Compliance Officer is the officer designated by the Client to be the
               primary responsible party for Client's company in relation to investment rules and
               processes. ESI and it's compliance assistance team do not render final decisions
               on behalf of a client in relation to the final acceptance of investments funds from
               a client's investors. A Compliance Officer should be well versed in the current
               laws and regulations that pertain to Client's Offering.

Compliance Team Member:

               A Compliance Team Member (CTM) is a ESI employee that assists Client in
               acquiring, tracking and documenting materials that the Client's Compliance
               Officer must obtain to make qualified decisions as to the best decision on behalf
               of Client.

Chief Human Relation's Officer:

               A Chief Human Resources Officer (CHRO) is a corporate officer who oversees
               all aspects of human resource management and industrial relations policies,
               practices and operations for an organization.

EVO026360



**Glossary of Defined Terms (Continued):**

Investor Relations Officer:

A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.

(THIS SPACE LEFT BLANK INTENTIONALLY)

**Exhibit "A3"**

CONFIDENTIAL



Consulting Services

**Consulting Services**

ESI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

Executive Summary

Business Overview

Products & Services

Sales & Marketing Plan

Operating Plan

Management and Organization

Action Plan

Financial Plan

Investment Opportunity

Market Strategy

Tactical Marketing Plans

Effectiveness Measurement(s)

Management Information Systems (MIS)

SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

**Exhibit "A3"**

Consulting Services (Continued)

EVO026362



Real Estate Acquisition

Facility Lease Negotiation

Facility Design and Construction

(THIS SPACE LEFT BLANK INTENTIONALLY)

EVO026363



**Exhibit "A4"**

Sales and Marketing Training Services

Sales and Marketing Training Services

ESI to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ESI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ESI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

**Professionalism & Ethics**

- Ethical Selling Practices
- Interoffice communication skills
- Client communication skills
- Public Speaking
- Professional presence and grooming
- Core Competency evaluations and recommendations.
- Personality profiling

**Professional Sales Preparation and Training**

- Prospect Presentation Best Practices
- Presentation Scripting (at the issuer's direction)
- Sales/Marketing Content Creation
- How to properly qualify a prospect for your product or service.
- S.W.A.T. Sales Training Program (on-going)
- Prospecting
- Call/Meeting Follow Up Process
- Proven Closing Methodologies
- Presentation Methods

EVO026364



- Proper Qualification

- Follow up procedures

- Closing methodology

- Client Retention Best Practices

**Training Services & Content Delivery Methods**

Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ESI video library is approved by ESI management on a case-by-case basis. Access to the ESI training library. Additionally, ESI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

ESI Sales Training staff may vary from region to region. The issuer/client will, be assigned a primary sales training specialist suited for their industry and vertical. ESI sales ESI trainers will employ proven sales methodologies.

*Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.*

(THIS SPACE LEFT BLANK INTENTIONALLY)

EVO026365



**Exhibit "A5"**

Responsibilities' of the Client

**CLIENT REPSONSIBILITIES:**

In order for to properly perform it's duties under this agreement the Client must provide the following:

· Biographical Data on all principals including primary company it's subsidiaries and ventures

· Incorporation Documents for primary company and all subsidiaries and ventures.

· Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

· Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

· Chief Human Resources Officer to designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

· Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

· Financial Statements will be reviewed by a independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

· List of Professional Services companies providing Services to Client (Attorney's, CPA's)

· Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

· Business Overview for primary company it's subsidiaries and ventures

· Business License primary company it's subsidiaries and ventures

· Description of Service Offering's or product(s) sold for primary company it's subsidiaries and ventures

· List of all employees and job functions for primary company it's subsidiaries and ventures

· Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

EVO026366



**EXHIBIT "A6"**

Elite Aerospace Group, Inc.

Contract Terms Sheet:

| | |
|---|---|
| Contract Term: | 36 months |
| Contract Rate: | **$40,000 payable weekly** |
| Commencement Date: | January 1, 2017 |
| Expiration Date: | December 31, 2019 |
| Engagement Fee: | Waived |

Stock issuance: ELITE AEROSPACE GROUP, INC. will issue/reissue or convert Elite Aviation Products Founders Shares of Common stock in an amount as defined below. Said shares will include an anti-dilution clause or will alternatively include the right to Warrants in a amount equal to ESI (or ESI designees) non-dilutable % of the company. Said warrants will be made available for purchase at the company's PAR Value of $.001 per share as of the date of this agreement. ESI 's right of acquisition of said shares will be evergreen until 1 year after EAG has been offered in a public event such as a Initial Private Offering or sale of the company.

| | |
|---|---|
| **Dustin Tillman** | **17%** |
| **Zeeshawn Zia** | **17%** |
| **ESI** | **19.99%** |

Founders Shares are to be issued or re-issued to reflect the % of share ownership of Authorized Stock as required and shall be non-dilutable to below the stated % for Founders. Other shares may be dilutable subject to Board Approval.

Board Seats: ELITE AEROSPACE GROUP, INC. , INC. will authorize a minimum of a 5 man board of which 2 members will be appointed by ESI. ESI will retain the right to alternate appropriate board members during the term of the contract at ESI's sole discretion

Common Shares: Authorized Common Stock have been increased to 888,000,000 (inclusive of founder's shares. Par value will be pre-set at $.0001 per share.)

Termination: An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60.

EVO026367



Termination (Cont.)   Termination will be effective only after written notice ESI of termination is tendered and termination fees have been paid in full.

Stock Offerings:   Authorized Preferred Stock has been issued in the amount of 60,000,000 shares will be issued in anticipation of a Preferred Series A offering of $30,000,000 at an offering value of $.50 per share. The Preferred offering shall be offered in a 506C offering that is offered to Accredited Investors Only and shall be allowed to be offered concurrently with EAG's other offerings as allowed by law.

Authorized Common Stock have been authorized and are denoted as the amount of 880,000,000 shares said shares will be made available for purchase to future shareholders under price and terms as to be approved by The Board at the time of authorization of sale. It is anticipated that a initial Limited Public Offering (LPO) shall be filed for during the 1st quarter of 2017 (or earlier as practical and approved by the Board). The initial offering price is scheduled to be at $2,00 per share of Common Stock. The offering will be filed under the current Regulation A offering rules and will be subject to the regulations pertaining to said offering. The initial LPO will be scheduled to be in the amount of $50,o00,000 with a offering of 25,000,000 shares of common stock.

EAG will continue to offer its stock for sale in each subsequent year pursuant to the then current Regulation A offering rules. It is anticipated that each offering will be in the amount of $50,000,000 per annum or as allowed by the then current Regulation A rules.

EAG will make it's best efforts to qualify for and file for a publicly traded symbol and offer the company shares for sale on a trading platform such as the NASDAQ or similar dependent upon market availability.

CONFIDENTIAL



**EXHIBIT "A6"**

Ancillary Services Schedule of Services and Fees

Principals and Contractors of ESI shall from time to time perform duties that are not considered within the base contract offering. These services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the agreement by and between the parties.

**General Staffing:**

*Administrative Employees shall be billed at a rate of:*

Junior Administrative          $35.00 Per Hour

Senior Administrative          $50.00 Per Hour

**Technical Support**

*Technical support Employees shall be billed at a rate of:*

IT Administration              $75.00 Per Hour

Chief Technical Officer        $200.00 Per Hour

**Senior Support**

COO                            $225.00 Per Hour

President                      $250.00 Per Hour

CEO                            $400.00 Per Hour

Corporate Consultant           $250.00 Per Hour

Construction Management:       8% of Construction amount

**Additional Marketing & Production Support**

Junior Marketing Assoc.        $90.00 Per Hour

Senior Marketing Director      $125.00 Per Hour

Post Production Editor (Internal) $100.00 Per Hour

Post Production Editor (Out)   $90.00 Per Hour

Graphic Designer               $75.00 Per Hour

Web Designer (Internal)        $125.00 Per Hour



**Additional Marketing & Production Support**

Web Designer (Out)                    $75.00 Per Hour

On-Site Production Team (Day) $3,500.00 - $7,500.00 Per Day   (Orange & Los Angeles County)

*On-Site Production Team (Day)        $4,000.00 - $10,000 Per Day      (Outside Orange & Los Angeles County)

*On Site Production Teams may incur additional expenses and mileage charges when traveling outside Orange or Los Angeles County.

**Minimum Billing:**

Board Meetings                         Min. 6 hours including pre and post Board Meeting preparation
and review

Consulting                             Acquisitions and Dispositions minimum of 8 hours

Committee                              Minimum of 4 Hours per incident

Facilities Management                  Minimum of 4 hours per incident

CONFIDENTIAL                                                    EVO026370



**EXHIBIT "A7"**

Exclusions to Services by ESI

Securities Sales:

ESI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ESI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ESI is for informational and educational purposes only and is not to be construed in any way that ESI or it's Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of EAG or it's affiliates. ESI and it's Officers, Directors, Employees and directly affiliated consultants are employed in a advisory capacity only. EAG by it's execution here-in further agree and assert their understanding of these terms.

# Exhibit 31



## AGREEMENT FOR SERVICES

**THIS AGREEMENT FOR SERVICES** (hereinafter "**Agreement**") is made and entered into this 1stday of December, 2017, by and between TTF Aerospace, Inc. (hereinafter "Client") and Evolution Consulting, Inc. a Delaware Corporation (hereinafter "ECI"), who agree as follows:

1. **Recitals.**

    This Agreement is made in contemplation of the following facts and circumstances:

    A. ECI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.

    B. ECI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

    C. **ECI is not Client's legal, accounting or professional counsel. Client is encouraged to seek professional advice for any accounting, tax, or legal advice, including compliance with securities laws. ECI does not in any way offer or transact in securities on behalf of clients.** ECI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein.

    D. This Agreement is intended by the parties to engage ECI as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. ECI to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.

    E. ECI is in the business of providing the services specified in the "Description of Services" attached hereto as **Exhibits "A1" Marketing Services, "A-2" Administration, "A-3" Consulting, "A-4" Marketing and Sales Training Services, "A-5" Client Responsibilities, "A-6" Terms Sheet, "A-7" Ancillary Services Rate and Terms Sheet, and "A-8" Exclusions of Services from Contract.**

    Client and ECI to state the terms and conditions under which ECI will provide said services to Client herein.

## 2. Services.

    (a) "Services" means all marketing, administrative, compliance (as defined herein) and other services to be performed by ECI pursuant to the terms of this Agreement.

    (b) ECI will provide such staff as ECI deems necessary to perform the Services, at ECI's sole expense. Client shall not control direct, or supervise ECI's employees or agents in the performance of the Services. ECI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ECI and its employees and contractors

EVO022478



may represent, perform services for, and be employed by such additional clients, persons, or companies as ECI, in ECI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ECI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c)    Client understands that the performance of the terms of this contract is dependent of mutual effort and compliance of the terms of this contract by both Client and ECI. Client is bound to maintain its obligations as referenced under Exhibit "A6" included herein.

## 3. Compensation

(a)    In consideration of the Services to be rendered by ECI pursuant to this Agreement, Client agrees to pay equal installments of $8,500 weekly during the first 16 weeks of the contract and thereafter $37,500 weekly during the balance of the term of the contract. In the event Client pays installments more than one week in advance an early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

(b)    In addition, ECI shall invoice Client, weekly in arrears, for expenses incurred by ECI as a result of performing Services in accordance with this Agreement Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ECI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ECI submits supporting documentation in addition to the approved expense form.

(c)    ECI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ECI's charges and expenses hereunder and ECI shall retain such records for a period of one (1) year from the date of final payment.

(d)    Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services (as referenced in Item "3c"), if any, exclusive of any taxes based upon ECI's income or payroll, or, in lieu thereof, the Company shall provide ECI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

(e)    Stock Issuance shall be issued in accordance with Exhibit A 6

## 4. Obligations of Client

The managers and staff of Client shall comply with all reasonable requests of ECI and shall cooperate with ECI by providing to ECI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ECI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits A5 Client Responsibilities, A6 Letter of Intent.

    



### 5. **Independent Contractor**

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ECI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ECI an employer/employee, partnership, or joint venture relationship. ECI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ECI agrees that Client shall have no obligation to withhold from compensation due ECI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ECI or the employees or agents of ECI. ECI hereby waives any and all claims ECI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

### 6. **Term and Termination**

This Agreement shall commence (see "EXHIBIT A6) and shall continue in Full Force and effect until (see "EXHIBIT A6) unless and until terminated earlier in accordance with the provisions of this Agreement. (Reference "Exhibit A6

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise

Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ECI for all costs incurred by ECI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ECI in the event this Agreement is terminated due to the default of Client, indemnification obligations in section 7, confidentiality obligations in section 8, the arbitration agreement in section 9.

An early termination proration of this contract may be tendered to ECI based upon a proration of the unpaid amount due multiplied by .60. Termination notice must be given 90 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination payment *(i.e. The remaining unearned contract term multiplied by the agreed upon billing rate multiplied by the multiplier .60 or 60%)* in good funds tendered upon presentation of the notice. Early Termination may not be considered effective in absence of early termination compensation as defined herein.

### 7. **Indemnification**

ECI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ECI unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold ECI free and harmless from all liabilities, obligations, costs, claims,

EVO022480



judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services. All work product published by ECI is to be deemed approved by Client and Client accepts full responsibility for the content as published by ECI on clients behalf. All company information is deemed to have been provided by Client including but limited to information pertaining to Clients company offerings, financial data, and biographical data for all officers, employees and directors. Client holds ECI and its employee's officers and Directors and agents harmless for all material generated by or on behalf of Client at Clients direction pursuant to the scope of this contract. Client will maintain in full effect at all times a Professional Liability Insurance Policy in an amount of no less than $2,000,000 per occurrence. Client will cause to name ECI as additional insured under said policy(ies)

8. **Confidentiality and Proprietary Rights.**

    (a)    During the term of this Agreement, Client will acquire knowledge of the ECI's Confidential Information in connection with its performance of the Services hereunder and the parties agree to keep such Information in confidence during and following termination or expiration of this Agreement. Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered proprietary by the parties relating to the current or anticipated business or affairs of the parties  which is disclosed directly or indirectly to the parties  In addition, Confidential Information means any third party's proprietary or confidential information disclosed in the course of providing Services to Client. Confidential Information does not include any information:

        (i)    which were lawfully known without restriction on disclosure before the disclosure

        (ii)    which is now or becomes publicly known through no wrongful act or failure

        (iii)    which is hereafter lawfully furnished to ECI by a third party as a matter of right and without restriction on disclosure.

    (b)    The parties agree not to copy, alter, or directly or indirectly disclose any Confidential Information.

9. **Miscellaneous Provisions**.

    (a)    Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

    (b)    Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

    (c)    This Agreement and its Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein



(d) This Agreement, and the rights, obligations and liabilities of the parties thereunder, shall be governed by the laws of the State of California.

(e) Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in state or federal court in Orange County, California. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a state or federal court in Orange County, California.

In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration. If the arbitrator determine a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

(f) If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g) This Agreement shall inure to the benefit of and bind the successor's in-interest, and transferees of the parties hereto.

(h) Evolution Consulting, Inc., (ECI) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ECI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if ECI, from their own attorneys, accountants, financial and other qualified advisors. ECI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client

(i) Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

**ECI at**:

Robert Gunton, Its President

Evolution Consulting, Inc.

3158 Red Hill Ave #100

Costa Mesa, Ca 92626

**&**

**Client at**:

EVO022482



Lee Smith, President

4620 B St NW Suite 101

Auburn, WA 98001With a Copy to:

Zeeshawn Zia COO

TTf Aerospace, Inc.

1641 Reynolds Ave

Irvine, Ca 92612

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)     This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)     No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(l)     Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)    This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)     Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)     In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p)     Client is prohibited from engaging at any time an ECI employee or direct ECI consultant for any purpose outside the scope of this agreement. Client shall not engage or hire directly or indirectly any ECI employee (past or present) for any position with the Client or its affiliates or service providers for a period of not less than one year from the natural termination of this Agreement through fulfillment or expiration, or one year from the termination of said employment by ECI of said former employee.

EVO022483



IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

**TTF Aerospace, Inc**. ("**CLIENT**")

By: _____

Lee Smith

Its President or Authorized Signatory

**Evolution Consulting, Inc. ("ECI")**

By: _____

Robert Gunton

Its President

**EXHIBITS**

"A1"      Marketing Services

"A2"      Administrative Services

"A3"      Consulting Services

"A4"      Sales and Marketing Training Services

"A5"      Client Responsibilities

"A6"      Terms Sheet

"A7"      Ancillary Services Rate and Terms Sheet

"A8"      Exclusions of Services from Contract

EVO022484



## Exhibit "A1"

## Marketing Services

### Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ECI in ECI's sole discretion as needed.

**1) Market Research**

  General Market Analysis

  Competitive Analysis

  Targeted Consumer Analysis

  Investor Analysis

  Ideal Target Market Identification

**2) Copy-writing [Added a hyphen to distinguish or avoid confusion with actual "copyright" work.]**

  News Releases & Pitch Letters

  White Papers (based upon information prepared and submitted by Client (TTF) or a contracted 3rd party

  Website Copy

  Advertisement Copy-writing

  Tagline / Slogan Analysis & Consultation

  Editorial Calendars

  Blog and Social Media Posts & Maintenance

  Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

**3) Branding**

  Brand Strategy Analysis & Consulting

  Research & Development

  Image Analysis

  Targeted Campaign Development

**4) Graphic Design**

  Logo Design

  Press Kit (visual assets)

  Print Advertisements

  Visual Assets for Web Development

  Presentation Decks

EVO022485

Brochures

Banners

Promotional Items (visual assets)

Style Guides

**5) Video Production**

Conceptualization & Storyboarding

Production

Direction

Script Development and Pre-production

Post-production Editing

"Shorts" & Viral Videos

Webinars

Product Presentations

Online Hosting & Viewership Metrics

**6) Market Strategy**

Tactical Marketing Plans

Campaign Effectiveness Analytics

Targeting & Segmentation Strategies

Lead Database Development and management

**7) Public Relations**

PR Campaign Development & Execution

Proactive Reputation Management

Reactive Reputation Management

Reporting and Analytics

Editorial Calendars

 EVO022486



8) <u>**Account Management**</u>

        <u>Oversight / Planning / General Management of the Following</u>:

        PR Campaign Execution

        Targeted, Regional, and National Media Campaigns

        Web Development

        Database Implementation and management (I.R.I.S.)

        Creative Strategy Implementation

        Brand Strategy Implementation

EVO022487



## Exhibit "A2"

## Administrative Services

### Description of Administration Services

First and foremost, ECI's Compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The Compliance team provides Administrative help to assist in daily tasks, including (but not limited to):

Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

Assisting with distribution of company approved information to the Sales floor. ECI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

May assist in distribution of approved correspondence or other mailings to the subscribers.

Agent Training on the CRM (IRIS)

Assist the Investor Relations Sales Manager in any administrative capacity.

The Compliance team does not and will not act as HR for the issuer. ECI requires that the issuer designate or hire personnel to assist with all HR related items. Compliance may, however, assist issuer in the distribution of this material.

Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation. ECI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.

Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.

May assist in distribution of approved correspondence or other mailing to the subscribers.

ECI Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our ECI clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by ECI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance team are as follows:

#### Compliance Department Services

Compliance team member provides support to the Issuers Investor/Subscriber Relations Department. The Compliance Team Member to provide Administrative help to assist in daily tasks, including (but not limited to):

Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

The Compliance Team Member does not act on behalf of the ISSUER as HUMAN RESOURCES for the issuer, sell or promote the issuer's offering, or act as the Investor/Subscriber Relations representative for the issuer. It is required for all of our ECI clients to have a designated Officer of the company to act as their Human Resources officer and their Investor/Subscriber Relations Contact. It is also required by ECI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

EVO022488



Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines

Compliance facilitates the subscriber's funding of their investment by:

> Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

> Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

> In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In Regards to verification of accreditation, a Compliance Team Member will go to the Compliance Offer the Various Options that the issuer has approved in order to satisfy. This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. . Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by ECI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received, Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

> Funds in Transit information

> Allocation specific Notes

> Documentation Storage



Investor/Subscriber Correspondence

Certificate

Accredited Investor/Subscriber Verification Letter

ECI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Defined Terms**:

**CRM**:     A Customer Relationship Management Software used to manage customer and client contact information and to maintain and Implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers or clients trends and behaviors, which ultimately serve to enhance the customer's or clients overall experience.

**IRIS**:     I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS) this software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing undergoing legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations. It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of Evolution Consulting, Inc. (ECI)

**Investor Compliance Officer**: Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. ECI and its compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

**Compliance Team Member**:     A Compliance Team Member (CTM) is an ECI employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

**Chief Human Relation's Officer**: A Chief Human Resources Officer (CHRO) is a corporate officer who oversees all aspects of human resource management and industrial relations policies, practices and operations for an organization.

**Investor Relations Officer**:     A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, dECIgnate its Compliance Officer to serve this function.

EVO022490



EVO022491



**Exhibit "A3"**

**Consulting Services**

**Consulting Services**

ECI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

Executive Summary

Business Overview

Products & Services

Sales & Marketing Plan

Operating Plan

Management and Organization

Action Plan

Financial Plan

Investment Opportunity

Market Strategy

Tactical Marketing Plans

Effectiveness Measurement(s)

Management Information Systems (MIS)

SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

Real Estate Acquisition

Facility Lease Negotiation

Facility DECIgn and Construction

EVO022492



## Exhibit "A4"

### Sales and Marketing Training Services

**Sales and Marketing Training Services**

ECI to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ECI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ECI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

#### Professionalism & Ethics

Ethical Selling Practices

Interoffice communication skills

Client communication skills

Public Speaking

Professional presence and grooming

Core Competency evaluations and recommendations.

Personality profiling

#### Professional Sales Preparation

Prospect Presentation Best Practices

Presentation Scripting (at the issuer's direction)

Sales/Marketing Content Creation

(a) How to properly qualify a prospect for your product or service.

#### S.W.A.T. (Selling with a Telephone) Sales Training Program (on-going)

Prospecting

Call/Meeting Follow Up Process

Proven Closing Methodologies

Presentation Methods

Proper Qualification

Follow up procedures

Closing methodology

Client Retention Best Practices

#### Training Services & Content Delivery Methods

EVO022493



Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ECI video library is approved by ECI management on a case-by-case basis. Access to the ECI training library. Additionally, ECI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

ECI Sales Training staff may vary from region to region. The issuer/client will, be assigned a primary sales training specialist suited for their industry and vertical. ECI sales ECI trainers will employ proven sales methodologies.

Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.

CONFIDENTIAL



**Exhibit "A5"**

**Responsibilities' of the Client**

CLIENT REPSONSIBILITIES:

In order for to properly perform its duties under this agreement the Client must provide the following:

Biographical Data on all principals including primary company its subsidiaries and ventures

Fully Completed Directors and Officers Questionnaires

Full Criminal and Credit Profile for each officer and principal

Incorporation Documents for primary company and all subsidiaries and ventures.

Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Chief Human Resources Officer to designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

Financial Statements will be reviewed by an independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

List of Professional Services companies providing Services to Client (Attorney's, CPA's)

Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

Business Overview for primary company its subsidiaries and ventures

Business License primary company its subsidiaries and ventures

Description of Service Offering's or product(s) sold for primary company its subsidiaries and ventures

List of all employees and job functions for primary company its subsidiaries and ventures

Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

Client shall lease a fully integrated and functioning Marketing and Sales Office located at 3158 Red Hill Ave #100/170, Costa Mesa, Ca 92626 for a minimum base rent of $5,950 per month commencing December 1, 2017 until May 30, 2018 and thereafter the rent and lease term shall be market rate and terms. Additional Costs which shall be billed on a prorate basis include Internet Connection Services Not to Exceed $1,000 per month, Phone System Service Charges not to exceed $1,000 per month (excluding programming or service calls, copier and printer services not to exceed $400.00 per month.

EVO022495



**EXHIBIT "A6"**

**TTF Aerospace, Inc.**

**Contract Terms Sheet:**

| | |
|---|---|
| Contract Term: | 36 months |
| Contract Rate: | $8,500 per week weeks 1-16 and $37,500 weekly thereafter payable weekly |
| Commencement Date: | December 1, 2017 |
| Expiration Date: | November 30, 2020 |
| Engagement Fee: | $100,000 |
| Stock issuance: | TTF AEROSPACE, INC. will issue stock to ECI (or it's nominee) in the amount of 19.99% non-dilutable common voting stock of the current authorized and issued shares of TTF at the time of execution. Shares shall be non-dilutable until the company is structured to be registered and approved to be offered as a Limited Public Offering or as a Initial Public Offering. Thereafter shares will be fixed as of the date of the offering. |
| | ECI                          19.99% |
| Board Seats: | TTF AEROSPACE, INC. will authorize a minimum of a 5 man board of which 2 members will be authorized to be appointed by ECI. ECI will retain the right to alternate appropriate board members during the term of the contract at ECI's sole discretion |
| Common Shares: | Authorized Common Stock to have been increased to 888,000,000 (inclusive of founder's shares. Par value is to be deemed the greater of the book value of the shares as of the date of this agreement or $.0001 per share. |
| Termination: | An early termination proration of this contract may be tendered to ECI based upon a proration of the unpaid amount due multiplied by .60. Termination will be effective only after written notice ECI of termination is tendered and termination fees have been paid in full. |
| Stock Offerings: | TTF will authorize the issuance of shares in The Company in a amount of no less than 120,000,000 shares of Preferred Stock at a market offering price of no |

EVO022496



less than $.25 per share for it's initial offering pre Public offerings (public offerings for the purposes of this agreement shall mean any offering of Regulation A+ or IPO offerings approved by any applicable government agency and offered to the general public!

Thereafter the company will embark upon a capitalization process in order to obtain the necessary capital to effectuate it's expansion and industrialization plan. The company acknowledges and agrees that the intended follow on offering shall be for no less than $25,000,000 and shall be for no more than 50,000,000 preferred or common shares of the company (as determined appropriate by the Board of Directors). The rights and preferences of preferred shares shall be set and non-voting, dividends (if any) will be accrued and payable only when authorized by the Board of Directors as legally available!

CONFIDENTIAL



**EXHIBIT "A6"**

**Ancillary Services Schedule of Services and Fees**

Principals of ECI shall from time to time perform duties that are not considered within the base contract offering. These services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the agreement by and between the parties.

General Staffing:        Administrative Employees shall be billed at a rate

Junior Administrative    $35.00 Per Hour

Senior Administrative    $50.00 Per Hour

Technical Support

IT Administrator         $75.00 Per Hour

Chief Technical Officer  $200.00 Per Hour

Senior Support

COO                      $225.00 Per Hour

President                $250.00 Per Hour

CEO                      $400.00 Per Hour

Corporate Consultant     $250.00 Per Hour

Construction Management:        8% of Construction or project amount

Minimum Billing:

Board Meetings          Minimum 6 hours including pre and post Board Meeting preparation and review

Consulting              Acquisitions and Dispositions minimum of 8 hours

Committee               Minimum of 4 Hours per incident

Facilities Management   Minimum of 4 hours per incident



**EXHIBIT "A7"**

**Exclusions to Services by ECI**

     **Securities Sales:** ECI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ECI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ECI is for informational and educational purposes only and is not to be construed in any way that ECI or its Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of TTF or its affiliates. ECI and its Officers, Directors, Employees and directly affiliated consultants are employed in an advisory capacity only. TTF by its execution here-in further agree and assert their understanding of these terms.

# Exhibit 32



## AGREEMENT FOR SERVICES

**THIS AGREEMENT FOR SERVICES** (hereinafter "**Agreement**") is made and entered into as of this 1st day of January, 2017, by and between Elite Aerospace Group, Inc., a Delaware Corporation (hereinafter "Client" or "EAG") and Evolution Consulting, Inc. a Delaware Corporation (hereinafter "ECI"), who agree as follows:

1. **Recitals.**

   This Agreement is made in contemplation of the following facts and circumstances:

   A. ECI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and capitalization objectives.

   B. ECI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

   C. **ECI is not Client's legal, accounting or professional counsel. Client is encouraged to seek professional advice for any accounting, tax, or legal advice, including compliance with securities laws. ECI does not in any way offer or transact in securities on behalf of clients.** ECI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein.

   D. This Agreement is intended by the parties to engage ECI as its primary service provider to stage the client for operational start-up success, early stage growth and capitalization. ECI is to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.

   E. ECI is in the business of providing the services specified in the "Description of Services" attached hereto as **Exhibits "A-1" Marketing Services, "A-2" Administration, "A-3" Consulting, "A-4" Marketing and Sales Training Services, "A-7" Ancillary Services Rate and Terms Sheet, and "A-8" Exclusions of Services from Contract. Exhibit "A-5" Responsibilities of Client and ECI, and Exhibit "A-6" Terms Sheet are also attached. Exhibits "A-1" through "A-8" constitute part of this Agreement and are incorporated by reference herein.**

   Client and ECI desire to state the terms and conditions under which ECI will provide said services to Client herein.

2. **Services.**

   (a) "Services" means all marketing, administrative, consulting, sales, training, compliance (as defined herein) and other services to be performed by ECI pursuant to the terms of this Agreement (including the exhibits hereto; provided, that ECI must receive prior approval from EAG pursuant to Exhibit "A-7" prior to rendering ancillary services set forth thereunder

EVO023232



for additional fees). As further discussed in Exhibit "A-8," marketing and sales services provided by ECI does not include the marketing, solicitation or sales of securities.

(b) ECI will provide such staff as ECI deems necessary to perform the Services, at ECI's sole expense. Client shall not control, direct, or supervise ECI's employees or agents in the performance of the Services. ECI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ECI and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as ECI, in ECI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ECI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c) Client understands that the performance of the terms of this contract is dependent on the mutual effort and compliance of the terms of this contract by both Client and ECI. Client and ECI are bound to maintain their respective obligations as referenced under Exhibit A-5 included herein.

3. **Compensation**

(a) In consideration of the Services to be rendered by ECI pursuant to this Agreement, Client agrees to pay equal installments of $40,000 weekly during the term of the contract. In the event Client pays installments more than one week in advance an early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

(b) In addition, ECI shall invoice Client, weekly in arrears, for expenses incurred by ECI as a result of performing Services in accordance with this Agreement. Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ECI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ECI submits supporting documentation in addition to the approved expense form.

(c) ECI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ECI's charges and expenses hereunder and ECI shall retain such records for a period of one (1) year from the date of final payment.

(d) Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services, if any, exclusive of any taxes based upon ECI's total compensation hereunder, including independent contractor income, and all stock, warrant and other equity issuances that may be deemed to be compensation pursuant to this Agreement; or, in lieu thereof, the Company shall provide ECI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

4. **Obligations of Client**

EVO023233



The managers and staff of Client shall comply with all reasonable requests of ECI and shall cooperate with ECI by providing to ECI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ECI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits "A-5" Client Responsibilities, "A-6" Letter of Intent.

5. **Independent Contractor**

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ECI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ECI an employer/employee, partnership, or joint venture relationship. ECI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ECI agrees that Client shall have no obligation to withhold from compensation due ECI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ECI or the employees or agents of ECI. ECI hereby waives any and all claims ECI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

ECI and its employees have all material permits and professional licenses that may be required to conduct ECI's business and provide the Services hereunder, if any, and will maintain such permits and licenses in good standing throughout the term of this Agreement.

ECI is, and will remain for the duration of this Agreement, in material compliance with all applicable laws relevant to its performance of the services under this Agreement. ECI has not received any notices of non-compliance, fines or other form of censure from any governmental authority, agency or other governing organization.

6. **Term and Termination**

This Agreement shall commence effective March 1, 2017, and shall continue in Full Force and effect until February 28, 2019 unless and until terminated earlier in accordance with the provisions of this Agreement. (See Exhibit "A-6"). This initial term may be renewed for an additional one-year period at the option of Client, pursuant to Exhibit A-6.

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement by the other party unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise.



Upon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ECI for all costs incurred by ECI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ECI in the event this Agreement is terminated due to the default of Client, indemnification obligations in section 7, mutual confidentiality obligations in section 8, and the arbitration agreement in section 9.

In addition, Client may terminate this Agreement early at any time for any reason in its sole and absolute discretion (a termination for "convenience"). If this Agreement is terminated by Client for convenience, or by ECI for a material breach by Client that is not timely cured as provided herein, an early termination fee equal to Six (6) months of the contract amount shall apply and must be tendered by Client to ECI. Written notice of termination for convenience by Client must be given 30 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination payment in good funds tendered upon presentation of the notice. Early termination may not be considered effective in absence of early termination compensation as defined herein.

If the Agreement is terminated by Client pursuant to sections (i) or (ii) above, no further compensation shall be owed to ECI. In addition, no compensation obligations will survive termination if the Agreement is terminated by the mutual agreement of the parties.

7. **Indemnification**

ECI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ECI unless such acts or omissions are due to (i) willful misconduct and/or gross negligence; or (ii) a failure by ECI to perform is obligations under this Agreement or other breach of this Agreement by ECI. Client will indemnify and hold ECI free and harmless from all liabilities, losses, damages, causes of action, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, or growing out of (i) the performance of any act specifically requested or authorized by Client in connection with this Agreement or (ii) Client's gross negligent acts or willful misconduct in connection with the performance of its obligations under this Agreement. Client accepts full responsibility for the content of all ECI work product that is approved by Client and published by ECI on Client's behalf. ECI may rely on the accuracy of all company information that is provided to ECI by Client including but limited to information pertaining to Clients company offerings, financial data, and biographical data for all officers, employees and directors. Client holds ECI and its employee's, officers and Directors and agents harmless for all information provided to ECI by Client pursuant to this Agreement. Client will maintain in full effect at all times a Professional Liability Insurance Policy in an amount of no less than $2,000,000 per occurrence. Client will cause to name ECI as additional insured under said policy(ies).

ECI shall indemnify and hold Client and its related entities, and the directors, officers, agents, representatives and employees of all such entities, harmless from and against any and all liabilities, obligations, losses, damages, causes of action, costs, claims, judgments, attorneys' fees, and attachments arising from, or growing out of liabilities, losses, damages, costs, expenses, causes of action, claims, suits, legal proceedings and similar matters, including without limitation reasonable attorneys' fees, resulting from or arising out of the failure of ECI or any of its employees to comply with and perform ECI's obligations under this Agreement. If any cause of action, claim, suit or other legal proceeding is brought against ECI in connection with any Services rendered under this Agreement, ECI shall promptly notify the Client upon learning of any such proceeding.

 EVO023235



Notwithstanding any other provision herein, neither the Client nor ECI shall be obligated to indemnify the other party in any manner whatsoever for the other party's gross negligence or willful misconduct

8. **Confidentiality and Proprietary Rights.**

   (a)   During the term of this Agreement, each of Client and ECI will likely disclose Confidential Information (as defined below) to the other party, and each party hereto agrees to keep such information in confidence during and following the termination or expiration of this Agreement.  A party disclosing Confidential Information is referred to as a "Disclosing Party" and a party receiving such information is referred to as a "Receiving Party."  Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered proprietary by the Disclosing Party relating to the current or anticipated business or affairs of the Disclosing Party  which is disclosed directly or indirectly to the Receiving Party or its directors, officers, employees, representatives (although ECI shall not be deemed a representative of the Client for this purpose) and legal and financial advisors (collectively, "Representatives").  In addition, Confidential Information includes any third party's proprietary or confidential information provided by a Disclosing Party in the course of this Agreement. Confidential Information does not include any information:

      (i)    that is lawfully known without restriction on disclosure before the disclosure;

      (ii)   that is now or becomes publicly known through no wrongful act, breach  or failure of the Receiving Party; or

      (iii)  that is hereafter lawfully furnished to the Receiving Party by a third party as a matter of right and without violation of a restriction on disclosure or other obligation of confidentiality.

   (b)   The Receiving Party agrees not to copy, alter, or directly or indirectly disclose any Confidential Information.

   (c)   The Receiving Party shall use the Confidential Information solely for purposes consistent with, and in furtherance of, the obligations under this Agreement.

   (d)   All marketing, administrative, consulting, sales, training, and/or compliance materials created and developed by ECI specifically for Client, including all data, results, conclusions and the like, shall be the property of Client.

   (e)   Client acknowledges that ECI possesses certain processes, know-how, trade secrets, improvements, other intellectual properties and assets including analytical methods, techniques and technical expertise, independently developed by ECI that are not derived from Client Confidential Information, which shall remain the sole property of ECI ("ECI Proprietary Rights").

9. **Miscellaneous Provisions.**



(a)   Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so. The Parties understand and agree that this Agreement will be approved by EAG in accordance with Section 310 of the California Corporations Code.

(b)   Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c)   This Agreement and its Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein.

(d)   This Agreement, and the rights, obligations and liabilities of the parties thereunder, shall be governed by the laws of the State of California.

(e)   Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in state or federal court in Orange County, California. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a state or federal court in Orange County, California.

In any arbitration arising out of or related to this Agreement, the arbitrator shall award to the prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.  If the arbitrator determine a party to be the prevailing party under circumstances where the prevailing party won on some but not all of the claims and counterclaims, the arbitrator may award the prevailing party an appropriate percentage of the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

(f)   If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g)   This Agreement shall inure to the benefit of and bind the successor's in-interest, and transferees of the parties hereto.

(h)   ECI provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ECI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. ECI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client.

(i)   Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

EVO023237



**ECI at**:

Robert Gunton, Its President

Evolution Consulting, Inc.

3158 Red Hill Ave #100

Costa Mesa, Ca 92626

**&**

**Client at**:

Dustin Tillman, CEO

Zeeshawn Zia, President

15773 Gateway Circle

Tustin, Ca 92780

or at such other address(es) as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)    This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)    No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(l)    Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)    This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)    Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)    In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p)    During the term of this Agreement, ECI shall not directly consult, assist, aid or advise in any way, any competitive business or enterprise that competes with the Client.

EVO023238



(q)    In order to protect trade secret and other confidential information shared between the parties pursuant to this Agreement, during the term of this Agreement and one (1) year thereafter, (A) Client will not, directly or indirectly, hire, solicit, take away, or attempt to hire, solicit or take away (either on such entity's behalf or on behalf of any other person or entity) any individual who is then an employee of ECI, or who has been employed by ECI within the past sixty (60) days; and (B) ECI will not, directly or indirectly, hire, solicit, take away, or attempt to hire, solicit or take away (either on such entity's behalf or on behalf of any other person or entity) any individual who is then an employee of Client, or who has been employed by Client within the past sixty (60) days.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

**Elite Aerospace Group, Inc**. ("**CLIENT**")

By: _____

Dustin Tillman

Its CEO and Authorized Signatory

By: _____

Zeeshawn Zia

Its COO and Authorized Signatory

**Evolution Consulting, Inc. ("ECI")**

By: _____

Robert Gunton

Its President and Authorized Signatory

**EXHIBITS**

"A-1"    Marketing Services

"A-2"    Administrative Services

"A-3"    Consulting Services

"A-4"    Sales and Marketing Training Services

"A-5"    Client Responsibilities

"A-6"    Terms Sheet

"A-7"    Ancillary Services Rate and Terms Sheet



"A-8"    Exclusions of Services from Contract

CONFIDENTIAL

EVO023240



## Exhibit "A-1"

## Marketing Services

### Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ECI in ECI's sole discretion as needed.

**1) Market Research**

> General Market Analysis
>
> Competitive Analysis
>
> Targeted Consumer Analysis
>
> Investor Analysis
>
> Ideal Target Market Identification

**2) Copy-writing [Added a hyphen to distinguish or avoid confusion with actual "copyright" work.]**

> News Releases & Pitch Letters
>
> White Papers (based upon information prepared and submitted by Client (EAG) or a contracted 3rd party
>
> Website Copy
>
> Advertisement Copy-writing
>
> Tagline / Slogan Analysis & Consultation
>
> Editorial Calendars
>
> Blog and Social Media Posts & Maintenance
>
> Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

**3) Branding**

> Brand Strategy Analysis & Consulting
>
> Research & Development
>
> Image Analysis
>
> Targeted Campaign Development

**4) Graphic Design**

> Logo Design
>
> Press Kit (visual assets)
>
> Print Advertisements
>
> Visual Assets for Web Development
>
> Presentation Decks

EVO023241

Brochures

Banners

Promotional Items (visual assets)

Style Guides

5) **Video Production**

Conceptualization & Storyboarding

Production

Direction

Script Development and Pre-production

Post-production Editing

"Shorts" & Viral Videos

Webinars

Product Presentations

Online Hosting & Viewership Metrics

6) **Market Strategy**

Tactical Marketing Plans

Campaign Effectiveness Analytics

Targeting & Segmentation Strategies

Lead Database Development and management

7) **Public Relations**

PR Campaign Development & Execution

Proactive Reputation Management

Reactive Reputation Management

Reporting and Analytics

Editorial Calendars

CONFIDENTIAL

EVO023242



8) **Account Management**

> Oversight / Planning / General Management of the Following:
>
> PR Campaign Execution
>
> Targeted, Regional, and National Media Campaigns
>
> Web Development
>
> Database Implementation and management (I.R.I.S.)
>
> Creative Strategy Implementation
>
> Brand Strategy Implementation

CONFIDENTIAL

EVO023243



## Exhibit "A-2"

## Administrative Services

### Description of Administration Services

First and foremost, ECI's Compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The Compliance team provides Administrative help to assist in daily tasks, including (but not limited to):

Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

Assisting with distribution of company approved information to the Sales floor. ECI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

May assist in distribution of approved correspondence or other mailings to the subscribers.

Agent Training on the CRM (IRIS)

Assist the Investor Relations Sales Manager in any administrative capacity.

The Compliance team does not and will not act as HR for the issuer. ECI requires that the issuer designate or hire personnel to assist with all HR related items. Compliance may, however, assist issuer in the distribution of this material.

Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation. ECI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

Compliance Team assists in printing and assembling the marketing materials hard copy packet. Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.

Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.

May assist in distribution of approved correspondence or other mailing to the subscribers.

ECI Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our ECI clients to have a designated Officer of the company to act as their Investor Relations Contact. It is also required by ECI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance team are as follows:

#### Compliance Department Services

Compliance team member provides support to the Issuers Investor/Subscriber Relations Department. The Compliance Team Member to provide Administrative help to assist in daily tasks, including (but not limited to):

Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

The Compliance Team Member does not act on behalf of Client as Human Resources for the issuer, and Client is required to maintain a contact person to handle Human Resources related issues and decisions. The Compliance Team Member does not sell or promote the Client's offering, or act as the Investor/Subscriber Relations representative for the Client, and Client must have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ECI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

EVO023244



Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines

Compliance facilitates the subscriber's funding of their investment by:

> Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

> Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

> In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In regards to verification of accreditation, a Compliance Team Member will go to the Investor Compliance Officer the various options that the issuer has approved in order to satisfy accreditation and suitability requirements. This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. . Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by ECI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received, Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

> Funds in Transit information

> Allocation specific Notes

> Documentation Storage

EVO023245



Investor/Subscriber Correspondence

Certificate

Accredited Investor/Subscriber Verification Letter

ECI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Defined Terms**:

**CRM**: A Customer Relationship Management Software used to manage customer and client contact information and to maintain and implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers or clients trends and behaviors, which ultimately serve to enhance the customer's or clients overall experience.

**IRIS**: I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS) this software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing undergoing legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations. It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of ECI.

**Investor Compliance Officer**: Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. ECI and its compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

**Compliance Team Member**: A Compliance Team Member (CTM) is an ECI employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

**Investor Relations Officer**: A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.

EVO023246



**Exhibit "A-3"**

**Consulting Services**

**Consulting Services**

ECI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

Executive Summary

Business Overview

Products & Services

Sales & Marketing Plan

Operating Plan

Management and Organization

Action Plan

Financial Plan

Investment Opportunity

Market Strategy

Tactical Marketing Plans

Effectiveness Measurement(s)

Management Information Systems (MIS)

SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

Real Estate Acquisition

Facility Lease Negotiation

Facility Design and Construction

EVO023247



## Exhibit "A-4"

## Sales and Marketing Training Services

**Sales and Marketing Training Services**

ECI is to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ECI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ECI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

### Professionalism & Ethics

Ethical Selling Practices

Interoffice communication skills

Client communication skills

Public Speaking

Professional presence and grooming

Core Competency evaluations and recommendations.

Personality profiling

### Professional Sales Preparation

Prospect Presentation Best Practices

Presentation Scripting (at the issuer's direction)

Sales/Marketing Content Creation

How to properly qualify a prospect for your product or service.

### S.W.A.T. (Selling with a Telephone) Sales Training Program (on-going)

Prospecting

Call/Meeting Follow Up Process

Proven Closing Methodologies

Presentation Methods

Proper Qualification

Follow up procedures

Closing methodology

Client Retention Best Practices

**Training Services & Content Delivery Methods**

EVO023248



Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ECI video library is approved by ECI management on a case-by-case basis. Additionally, ECI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

**Sales Training Specialist(s)**

ECI Sales Training staff may vary from region to region. The issuer/client will be assigned a primary sales training specialist suited for their industry and vertical. ECI sales trainers will employ proven sales methodologies.

Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.

CONFIDENTIAL



## Exhibit "A-5"

## Responsibilities' of the Client and ECI

**CLIENT REPSONSIBILITIES:**

In order for   to properly perform its duties under this agreement the Client must provide the following:

Biographical Data on all principals including primary company its subsidiaries and ventures

Incorporation Documents for primary company and all subsidiaries and ventures.

Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

Financial Statements will be reviewed by an independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

List of Professional Services companies providing Services to Client (Attorneys, CPAs)

Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

Business Overview for primary company its subsidiaries and ventures

Business License primary company its subsidiaries and ventures

Description of Service Offering's or product(s) sold for primary company its subsidiaries and ventures

List of all management-level employees and job functions for primary company its subsidiaries and ventures

Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

**ECI RESPONSIBILITIES**

During the term of the Agreement, ECI agrees to provide written notice to the Client of any of the following occurrences promptly (and in any event within five business days of such occurrence) if such occurrence materially affects ECI's ability to perform the Services:

- o   Adverse court actions or legal proceedings filed against ECI or any of its officers or directors.
- o   Charges or investigations by any federal, State, or local governmental authority against or involving ECI, or related correspondence.
- o   Notices of non-compliance, fines or other form of censure received by ECI from any governmental authority, agency or similar governing organization .
- o   Any of the following insolvency events, which would affect ECI's ability to fully perform its obligations under this Agreement:
  - ECI becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets,
  - ECI becomes subject to any proceedings under any bankruptcy or insolvency law, including involuntary proceedings, whether domestic or foreign, or
  - ECI winds up or liquidates its business voluntarily or otherwise.

EVO023250



**EXHIBIT "A-6"**

**Elite Aerospace Group, Inc.**

**Contract Terms Sheet:**

Contract Term:    Two years, with EAG having an option to renew the Agreement for an additional year upon EAG's written notice of the exercise of such option at least sixty (60) days prior to the natural expiration of the initial two-year term.

Contract Rate:    $40,000 payable weekly

Commencement Date:  March 1, 2017

Expiration Date:    February 28, 2019

Engagement Fee:    Waived

Board Seats:    ELITE AEROSPACE GROUP, INC. will authorize a minimum of a 5 person board of which 2 members will be appointed by ECI. ECI will retain the right to alternate appropriate board members during the term of the contract at ECI's sole discretion

Termination:    An early termination fee for termination by EAG of this Agreement for convenience, as described under Section 7 of the Agreement, must be tendered to ECI. Such a termination by EAG will be effective only after written notice to ECI of termination is tendered and termination fees have been paid in full.

EVO023251



**EXHIBIT "A-7"**

**Ancillary Services Schedule of Services and Fees**

The parties anticipate that EAG might request from time to time ECI to perform duties that are not within the Services to be provided under this Agreement. These additional services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the Agreement. Prior to rendering such ancillary services, ECI must receive prior approval from EAG's Chief Executive Officer or Chief Operating Officer in order for EAG to become financially responsible for such additional services.

**General Staffing:**

*Administrative Employees shall be billed at a rate of:*

| | |
|---|---|
| Junior Administrative | $35.00 Per Hour |
| Senior Administrative | $50.00 Per Hour |

**Technical Support**

*Technical support Employees shall be billed at a rate of:*

| | |
|---|---|
| IT Administrator | $75.00 Per Hour |
| Chief Technical Officer | $200.00 Per Hour |

**Senior Support**

| | |
|---|---|
| COO | $225.00 Per Hour |
| President | $250.00 Per Hour |
| CEO | $400.00 Per Hour |
| Corporate Consultant | $250.00 Per Hour |
| Construction Management: | 8% of Construction amount |

**Additional Marketing & Production Support**

| | |
|---|---|
| Junior Marketing Assoc. | $90.00 Per Hour |
| Senior Marketing Director | $125.00 Per Hour |
| Post Production Editor (Internal) | $100.00 Per Hour |

EVO023252



| Post Production Editor (Out) | $90.00 Per Hour |
|---|---|
| Graphic Designer | $75.00 Per Hour |
| Web Designer (Internal) | $125.00 Per Hour |

**Additional Marketing & Production Support**

| Web Designer (Out) | $75.00 Per Hour |
|---|---|
| On-Site Production Team (Day) | $3,500.00 - $7,500.00 Per Day (Orange & Los Angeles County) |
| *On-Site Production Team (Day) | $4,000.00 - $10,000 Per Day (Outside Orange & Los Angeles County) |

*On Site Production Teams may incur additional expenses and mileage charges when traveling outside Orange or Los Angeles County.*

**Minimum Billing:**

| Board Meetings | Min. 6 hours including pre and post Board Meeting preparation and review |
|---|---|
| Consulting | Acquisitions and Dispositions minimum of 8 hours |
| Committee | Minimum of 4 Hours per incident |
| Facilities Management | Minimum of 4 hours per incident |

EVO023253



**EXHIBIT "A-8"**

**Exclusions to Services by ECI**

     **Securities Sales:** ECI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ECI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ECI is for informational and educational purposes only and is not to be construed in any way that ECI or its Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of EAG or its affiliates. ECI and its Officers, Directors, Employees and directly affiliated consultants are employed in an advisory capacity only. EAG by its execution herein further agree and assert their understanding of these terms.

EVO023254

# Exhibit 33



**AGREEMENT FOR SERVICES**

Agreement

THIS AGREEMENT FOR SERVICES (hereinafter "Agreement") is made and entered into this 29th day of December , 2016, by and between Elite Aerospace Group, Inc.. a Delaware Corporation (hereinafter "Client") and Evolution Services, Inc..a Delaware Corporation (hereinafter "ESI"), who agree as follows:

1.  Recitals. This Agreement is made in contemplation of the following facts and circumstances:

    **A.** ESI is a full service consulting, media, marketing and administrative compliance company that specializes in providing strategic advice and guidance to inception and early growth stage companies seeking to identify and establish strategies to expand their market reach and  capitalization objectives.

    **B.** ESI provides and under this Agreement intends to provide a broad spectrum of consulting, Administrative and Marketing Services within the scope of this Agreement.. These services, as defined within this Agreement, are limited to the scope and intent only as defined herein.

    ESI is not Client's legal, accounting or professional counsel. ESI does not in any way offer or transact in securities on behalf of clients. Client is encouraged to seek professional assistance in areas of legal advice and securities counsel in addition to all accounting and tax representation. ESI will, through its years of experience, be pleased to assist client in seeking proper counsel as well as other professional assistance to facilitate Client's abilities to successfully achieve its specific start-up objectives and early stage growth strategies, as discussed between the parties and herein..

    This Agreement is intended by the parties to engage ESI as its primary service provider to stage the client for operational start-up success, early stage growth  and capitalization. ESI to be the primary marketing and administrative services platform for a successful growth and capitalization plan and process and enhance Client's overall position in the general marketplace.-

    E.  ESI is in the business of providing the services specified in the "Description of Services" attached hereto as Exhibit's  "A1" Marketing Services, "A-2" Administration, " "A-3 Consulting", "A-4" Marketing and Sales Training Services, "A-5" Client Responsibilities, "A-6"  Terms Sheet, "A-7" Ancillary Services Rate and Terms Sheet, "A-8" Exclusions of Services from Contract and Client and ESI desire to state the terms and conditions under which ESI will provide said services to Client herein.

(THIS SPACE LEFT BLANK INTENTIONALLY)

2. Services.

      (a)      "Services" means all marketing, administrative, compliance (as defined herein) and other services to be performed by ESI pursuant to the terms of this Agreement. b)ESI will provide

EVO023727



such staff as ESI deems necessary to perform the Services, at ESI's sole expense. Client shall not control direct, or supervise ESI's employees or agents in the performance of the Services. ESI agrees to cause its employees and contractors to devote that number of hours necessary for the satisfactory performance of the Services, as shall be determined through regular consultation with Client. ESI and its employees and contractors may represent, perform services for, and be employed by such additional clients, persons, or companies as ESI, in ESI's sole discretion, sees fit provided that doing so does not conflict with Client's business objectives or hinder the performance of Services under this Agreement. In the event that any individual assigned to perform Services for Client must be replaced, ESI shall ensure an orderly succession and knowledge transfer without disruption to such Services or Client's business.

(c.)    Client understands that the performance of the terms of this contract is dependent of mutual effort and compliance of the terms of this contract by both Client and ESI. Client is bound to maintain it's obligations as referenced under Exhibit "A6" included herein.

3. <u>Compensation</u>

(a)    In consideration of the Services to be rendered by ESI pursuant to this Agreement, Client agrees to pay equal installments of $40,000 weekly month during the term of the contract. In the event Client pays installments more than one week in advance a early payment discount in the amount of 2% of the installment amount shall be deemed earned by client, payments made one month or more in advance will be subject to a 3% discount if paid in good funds.

(b)    In addition, ESI shall invoice Client, weekly in arrears, for expenses incurred by ESI as a result of performing Services in accordance with this Agreement Such expenses shall be limited to reasonable out-of-pocket expenses necessarily and actually incurred by ESI in the performance of the Services, provided that: (i) Client has given its prior written consent for any such expenses; (ii) the expenses have been detailed on a form acceptable to Client and submitted to the appropriate Client staff member for review and approval; and (iii) if requested by Client, ESI submits supporting documentation in addition to the approved expense form.

(c)    ESI shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles, to substantiate ESI's charges and expenses hereunder and ESI shall retain such records for a period of one (1) year from the date of final payment.

(d)    Client agrees to pay the amount of any sales, use, excise or similar taxes applicable to the performance of the Services ( as referenced in Item "3c" ), if any, exclusive of any taxes based upon ESI's income or payroll, or, in lieu thereof, the Company shall provide ESI with a certificate acceptable to the taxing authorities exempting Client from payment of these taxes.

CONFIDENTIAL



(e)    Stock Issuance shall be issued in accordance with Exhibit A 6

4. Obligations of Client

The managers and staff of Client shall comply with all reasonable requests of ESI and shall cooperate with ESI by providing to ESI such information and access to Clients personnel, facilities, equipment, databases, software, monthly and annual accounting reporting, balance sheet, general ledger, annual audits and other resources as are necessary for ESI to perform the Services and/or as are specifically set out and agreed to under this Agreement.

Client shall reference Exhibits A5 Client Responsibilities , A6 Letter of Intent.

5. Independent Contractor

In the performance of the duties and obligations under this Agreement, including the Services, it is mutually understood and agreed that ESI is at all times acting and performing as an independent contractor, and nothing in this Agreement is intended, nor shall be construed, to create between Client and ESI an employer/employee, partnership, or joint venture relationship. ESI shall be responsible for all costs and expenses incident to performing its obligations under this Agreement and shall provide its own supplies (which pertain to the direct duties) of this agreement and equipment. ESI agrees that Client shall have no obligation to withhold from compensation due ESI hereunder for any federal, state, or local withholding, social security benefits, unemployment insurance payments, or state disability or other insurance premiums applicable to ESI or the employees or agents of ESI. ESI hereby waives any and all claims ESI may have against Client under this Agreement, or otherwise, for social security benefits, worker's compensation benefits, federal or state unemployment benefits, and employee benefits of any kind.

6. Term and Termination

This Agreement shall commence (see "EXHIBIT A6) and shall continue in Full Force and effect until (see "EXHIBIT A6) unless and until terminated earlier in accordance with the provisions of this Agreement. (Reference "Exhibit A6

Either party may terminate this Agreement: (i) upon the material breach of any term or condition of this Agreement unless such breach is cured within 30 calendar days following receipt of written notice to the allegedly breaching party (10 days for breach of a payment obligation), or (ii) if the other party becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition in bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject as a bankrupt to any proceedings under any bankruptcy

or insolvency law, whether domestic or foreign, or has wound up or liquidated its business voluntarily or otherwise

ESIUpon the expiration or termination of this Agreement for any reason: (a) Client agrees to pay ESI for all costs incurred by ESI with Client's approval up to the effective date of termination within ten (10) days of termination; and (b) each party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration including, without limitation, Client's continuing compensation obligations to ESI in the event this Agreement is terminated due to the default of Client.

CONFIDENTIAL



An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60. Termination notice must be given 90 days in advance in writing and shall be tendered accompanied by payment in full of the amount of early termination payment (i.e. The remaining unearned contract term multiplied by the agreed upon billing rate multiplied by the multiplier .60 or 60%) in good funds tendered upon presentation of the notice. Early Termination may not be considered effective in absence of early termination compensation as defined herein.

7. Indemnification

    (a)    ESI will not be liable to Client, or to anyone who may claim any right due to a relationship with Client, for any acts or omissions in the performance of the Services or on the part of the employees or agents of ESI unless such acts or omissions are due to willful misconduct and/or gross negligence. Client will indemnify and hold ESI free and harmless from all liabilities, obligations, costs, claims, judgments, attorneys' fees, and attachments arising from, growing out of, or in any way connected with the Services. All work product published by ESI is to be deemed approved by Client and Client accepts full responsibility for the content as published by ESI on clients behalf. All company information is deemed to have been provided by Client including but limited to information pertaining to Clients company offerings, financial data, biographical data for all officers, employees and directors. Client holds ESI and it's employees officers and Directors and agents harmless for all material generated by or on behalf of Client at Clients direction pursuant to the scope of this contract. Client will maintain in full effect at all times a Professional Liability Insurance Policy in a amount of no less than $2,000,000 per occurrence. Client will cause to name ESI as additional insured under said policy(ies)

8. Confidentiality and Proprietary Rights.

    (a)    During the term of this Agreement, Client will acquire knowledge of the ESI's Confidential Information in connection with its performance of the Services hereunder and the parties agree to keep such Information in confidence during and following termination or expiration of this Agreement. Confidential Information includes but is not limited to all information, whether written or oral, in any form, including without limitation, information relating to the products, services, research, development, methods of operation, trade secrets, business plans, clients, vendors, finances, personnel data, Work Product and other material or information considered proprietary by the parties relating to the current or anticipated business or affairs of the parties which is disclosed directly or indirectly to the parties In addition, Confidential Information means any third party's proprietary or confidential information disclosed in the course of providing Services to Client. Confidential Information does not include any information:

        (i)    which were lawfully known without restriction on disclosure before the disclosure

        (ii)    which is now or becomes publicly known through no wrongful act or failure

        (iv)    which is hereafter lawfully furnished to ESI by a third party as a matter of right and without restriction on disclosure.

The parties agree not to copy, alter, or directly or indirectly disclose any Confidential Information.

9. Miscellaneous Provisions.

EVO023730



(a) Each of the individuals executing this Agreement certifies that he/she is duly authorized to do so.

(b) Waiver by either party of any term, condition, or breach of this Agreement shall not constitute a waiver of any other term, condition, or breach of this Agreement.

(c) This Agreement and it' Exhibits and Attachments contain the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements between the parties concerning the subject matter contained herein. There are no agreements, arrangements, or understandings, oral or written, between the parties relating to the subject matter contained in this Agreement which are not fully expressed herein (d) All questions with respect to the construction of this Agreement and the rights and liabilities of the parties shall be governed by the laws of the State of California.

(e) If any legal actions or other proceedings are brought for the interpretation or enforcement of this Agreement or any rights of the parties with regard to this Agreement, or because of an alleged dispute, breach, or default, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which they might be entitled. The parties hereto agree that (1) this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to agreements made and to be performed in such state and (2) any actions for the interpretation or enforcement of this Agreement shall be brought in the County of Orange, State of California. Subject to the Private Binding Arbitration rules of American Arbitration Association.

(f) If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

(g) This Agreement shall inure to the benefit of and bind the successors in-interest, and transferees of the parties hereto.

(h) Evolution Services, Inc. . (ESI) provides to its clients only agreed-upon marketing and consulting services, excluding any legal, tax, accounting, investment and financial advice. ESI is not licensed to and does not in any way market or sell securities of any kind. Client shall obtain advice regarding the excluded matters listed above, if desired, from their own attorneys, accountants, financial and other qualified advisors. ESI does not direct its clients or their employees and agents on their policies and procedures regarding human resources and investor relations, which policies and procedures are directed solely by such Client (i)

Any notice from either party to the other party in connection with matters arising under this Agreement shall be in writing and shall be deemed duly served when personally delivered to the party to whom directed, or, in lieu of such personal service, when deposited in the United States mail, first-class postage prepaid, addressed to:

ESI at:

Robert Gunton, It's President

Evolution Services, Inc.

3158 Red Hill Ave #100

EVO023731



Costa Mesa, Ca 92626

&

<u>Client at:</u>

Dustin Tillman, CEO

Zeeshawn Zia, President

1645 Reynolds Ave,  Irvine, Ca 92612

or at such other addresses as shall be designated by the parties from time to time by written notice given in accordance with the foregoing.

(j)     This Agreement may be amended or modified only with the written consent of the parties hereto.

(k)     No remedy specifically conferred by any of the provisions of this agreement is intended to be exclusive of any other remedy, each and every remedy shall be cumulative and shall be in addition to every other remedy conferred hereunder or now or hereafter existing at law, in equity, or by statute or otherwise, and the election by a party of one or

more remedies shall not constitute a waiver of such party's right to pursue any other available remedy or remedies.

(l)     Each party hereby agrees to promptly sign any additional instruments or documents which are necessary or appropriate to carry out the purpose of this Agreement.

(m)     This Agreement may be executed in one or more counterparts and by electronic or facsimile signature, each of which will be deemed an original against any party whose signature appears thereon and all of which together constitute one and the same instrument.

(n)     Each party has had the opportunity to be separately represented by independent counsel prior to the execution of this Agreement and in the absence of having obtained independent counsel has waived that opportunity prior to the execution hereof. All parties have participated in the drafting of this Agreement and it shall not be strictly construed against any party.

(o)     In the event Client fails to pay any installment after the due date of each installment the installment shall be subject to a late fee of 10% of the amount of each installment due. Unpaid balances that remain unpaid after 30 days are subject additionally to interest based upon 10% per annum compounded monthly or the then current maximum allowable by law.

(p)     Client is prohibited from engaging at any time a ESI employee or direct ESI consultant for any purpose outside the scope of this agreement. Client shall not engage or hire directly or indirectly any ESI employee (past or present) for any position with the Client or it's affiliates or service providers for a period of not less that one year from the natural termination of this Agreement through fulfillment or expiration, or one year from the termination of said employment by ESI of said former employee.

EVO023732



(THIS SPACE LEFT BLANK INTENTIONALLY)

Signature page to follow

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Costa Mesa, California, on the date first above written.

CLIENT:

Name:  Elite Aerospace Group, Inc.


By: _____

Dustin Tillman

Its CEO or Authorized Signatory


By: _____

Zeeshawn Zia

It's COO or Authorized Signatory


ESI

Evolution Services, Inc. .

By: _____

Robert Gunton

Its President

CONFIDENTIAL



<u>EXHIBITS</u>

"A1"    Marketing Services

"A2"    Administrative Services

"A3"    Consulting Services

"A4"    Sales and Marketing Training Services

"A5"    Client Responsibilities

"A6"    Terms Sheet

"A7"    Ancillary Services Rate and Terms Sheet

"A8"    Exclusions of Services from Contract

CONFIDENTIAL



### Exhibit "A1"

Marketing Services

Marketing Services

At the discretion of the parties the following services will be regularly provided based upon a schedule to be mutually agreed upon at the initialization stage of this agreement. In the absence of a mutually agreeable schedule the schedule shall be offered by ESI in ESI's sole discretion as needed.

**1) Market Research**

General Market Analysis

Competitive Analysis

SWOT Analysis - (a study designed to identify an organization's internal strengths and weaknesses, as well as its external opportunities and threats).

Targeted Consumer Analysis

Investor Behavior Analysis

Ideal Target Market Identification

Copy-writing

News Releases & Pitch Letters

White Papers

Website Copy

Advertisement Copy-writing

Tagline / Slogan Analysis & Consultation

Editorial Calendars

Blog and Social Media Posts & Maintenance

Targeted Copyrighting (by Demographic, Psychographic, Geographic, etc.)

*Copywriting (or) other written content conveyed through online media and print materials. Copy is         content primarily used for the purpose of advertising or marketing. This type of written material is often used to persuade a person or group as well as to raise brand awareness.



**Branding**

Brand Strategy Analysis & Consulting

Research & Development

Image Analysis

Targeted Campaign Development

**Graphic Design**

Logo Design

Press Kit (visual assets)

Print Advertisements

Visual Assets for Web Development

Presentation Decks

Brochures

Banners

Promotional Items (visual assets)

Style Guides

**Video Production**

Conceptualization & Storyboarding

Production

Direction

Script Development and Pre-production

Post-production Editing

"Shorts" & Viral Videos

<span style="color:red">Online Webinars & other "presentations" designed for investor consumption</span>

Product Presentations

Online Hosting & Viewership Metrics


**Market Strategy**

Tactical Marketing Plans

EVO023736



Campaign Effectiveness Analytics

Targeting & Segmentation Strategies

Lead Database Development and management

Public Relations

PR Campaign Development & Execution

Proactive Reputation Management

Reactive Reputation Management

Reporting and Analytics

Editorial Calendars

**Account Management**

Oversight / Planning / General Management of the Following:

PR Campaign Execution

Targeted, Regional, and National Media Campaigns

Web Development

Database Implementation and management (I.R.I.S.)

Creative Strategy Implementation

Brand Strategy Implementation

Exhibit "A2"

Administrative Services

**Description of Administration Services**

EVO023737



ESI's administration and compliance team provides Administrative support to the Client's own Investor Relations Department and Client's direction, subject to the provisions and limitations stated above in this Agreement. The administrative team provides Administrative help to assist in daily tasks, including (but not limited to):

- Compiling the daily metrics used to determine Sales performance as set forth by the sales floor manager.

- Assisting with distribution of company approved information to the Sales floor. ESI is not liable for any material misrepresentations on any distributed materials and must be signed off by HR, or Compliance officer before distribution.

- May assist in distribution of approved correspondence or other mailings to the subscribers.

- Issuer Agent Training on the CRM (IRIS)

- Assist the Investor Relations Sales Manager in any administrative capacity.

- The Compliance team does not and will not act as HR for the issuer. ESI requires that the issuer designate or hire personnel to assist with all HR related items.  Allocations may, however, assist issuer in the distribution of this material.

- Compliance team member will approve initial soft send information to go out through the CRM (IRIS) based on adequate notes in the system about interest, liquidity, and accreditation.  ESI is not responsible for representatives that input inaccurate or fraudulent information about a potential investor/investor.

- Compliance Team assists in printing and assembling the marketing materials hard copy packet.  Printing may be coordinated between marketing services and Compliance Team and an outside vendor may be used to accomplish printing needs.

- Compliance team will be responsible for coordinating shipping of all subscriber related gifts such as Shirts, awards, etc. Costs associated with gifts or shipping will be the sole cost of the issuer.

- A Compliance team member will not be responsible for supervision of the Investor Relations personnel, however, a compliance team member may assist in monitoring sales calls or assisting sales manager carry out certain tasks such as assigning or removing prospects from reps CRM.

- May assist in the distribution of accredited leads both in the CRM and/or hard copy leads.

- May assist in distribution of approved correspondence or other mailing to the subscribers.

**Description of Compliance Department Services**

ESI Compliance team member will not sell or promote the issuer's offering, or act as the Investor Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Investor Relations Contact.  It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of investor

**Description of Compliance Department Services**

EVO023738



funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the investor is indeed an accredited investor. It is the issuer's sole responsibility to take reasonable steps to verify each investor and approve their accreditation and funds prior to deposit. Compliance team members provide support to the Issuer's Investor/Subscriber Relations Department.

Compliance Team Members provide Administrative help to assist in daily tasks, including (but not limited to):

- Assisting issuers with clerical or Investor/Subscriber Relations reporting with Proprietary CRM (IRIS).

- Assisting with distribution of company approved information both to the Investor/Subscriber Relations Department and their Investor/Subscribers and to potential subscribers.

- Coordinate the invitations for all prospective shareholder and shareholder Conference Calls

- The Compliance Team Member does not act on behalf of the ISSUER as HUMAN RESOURCES for the issuer, sell or promote the issuer's offering, or act as the Investor/Subscriber Relations representative for the issuer. It is required for all of our ESI clients to have a designated Officer of the company to act as their Human Resources officer and their Investor/Subscriber Relations Contact. It is also required by ESI that each client have a designated Compliance Officer to handle compliance related decisions and make approvals of Investor/Subscriber funds. ESI will not and does not make the final approval of any funds that are submitted to the client, nor do they make any representations or certifications that the Investor/Subscriber is indeed an accredited Investor/Subscriber. It is the issuer's sole responsibility to take reasonable steps to verify each Investor/Subscriber and approve their accreditation and funds prior to deposit. The key function(s) of the Third-Party Compliance Team Member are as follows:

   A "Compliance Team Member" provides a layer of compliance and professionalism for the benefit of the issuer and the issuer's clientele.

      Compliance ensures that and issuers subscribers properly fill out their subscription documentation and any other supplemental paperwork involved in their subscription to the issuer's investment supplied by issuer.

**Description of Compliance Department Services (Continued)**

      The Compliance Team Member verifies all contact information independent of the Issuers sales team, verifies the amount of the investment, the titling, method and time of funding, and most importantly goes over the requirements of Investor/Subscriber accreditation and individual suitability, directly, with each Investor/Subscriber per issuer's guidelines Compliance facilitates the subscriber's funding of their investment by:

- Providing banking information or wire transfer instructions defined by the issuer to the escrow account as established by the issuer.

- Scheduling third-party courier services to transport subscriber's funding and paperwork, as well as provide shipment oversight and package "tracking" back to the issuer's base of operations.

EVO023739



- In some cases, a Compliance Team Member performs limited follow up to ensure their funding and paperwork arrive safely at the issuer's office.

*It's important to note that the Compliance Team Member is not a "sales department" or "promoter" and does not act in a sales capacity at any time.*

A Compliance Team Member does not "Sell" or convince subscribers to participate in any issuer's investment offering. Compliance Team Member members will not answer any questions about the offering and will direct such questions back to the issuers' employees and representatives. Compliance member may furnish Issuer approved investment details to the Investor/Subscriber Relations Department, but is not liable or responsible for any clerical errors associated with this information. Investor/Subscriber Relations designee should verify this information with their legal and accounting department before using the information to make any decisions.

In Regards to verification of accreditation, a Compliance Team Member will go to the Compliance Offer the Various Options that the issuer has approved in order to satisfy. This may include, but is not limited to submitting the subscriber's contact information to a 3rd Party Accreditation service (on behalf of the issuer) to be verified as an accredited Investor/Subscriber as defined by The Securities and Exchange Commission. The JOBS Act requires issuers to take reasonable steps to verify Investor individual accreditation status. It is the issuer's responsibility to enlist one of these independent service providers. . Issuer may elect to have a Verification Document created for use of Certification of Accreditation namely the 3rd Party Accreditation Verification Letter. They will be given the option of completing this letter on their own which requires the letter to be completed by subscriber's attorney, registered broker-dealer, SEC register investment advisor, or Certified Public Accountant. If Investor/Subscriber fails to comply in a timely manner or refuse, the Compliance Team Member will notify the issuer and any further action will need to be handled by issuer. To comply with the request for verification, it is up to the issuer to approve the subscriber using a Principles Based Approach to determine their Accreditation Status. It is not recommended by ESI that the issuer approve any investment unless they have taken reasonable steps to verify accreditation.

Once paperwork and funding is received by the issuer, the Compliance Team Member will confirm that the paperwork was filled out properly (to the issuer's specifications) as well as request corrections from the subscriber if any documentation requires correction(s). The Compliance Team Member will also verify that funds are OK to deposit as well as alert the issuer of any pending Investor/Subscriber wire transfers from new or existing subscribers. If IRA paperwork is received,

Compliance will forward all information to the issuer's preferred/approved IRA Custodian to start the IRA roll-over/transfer process.

Compliance will inform the issuer when documents (including accreditation verification) are ready for compliance approval. Checks will not be deposited until approval has been given by the compliance officer. In some cases, Compliance Team Member members may deposit checks for the issuer in their designated separate bank account, but only under the request of the issuer. This will be completed in a timely manner.

All of these steps and processes are tracked in IRIS (Investor Relations Information System) and require a basic service package (described in Exhibit A of 6 Degrees Contract) as well as the documentation for Investor subscription, including:

- Funds in Transit information

EVO023740



- Allocation specific Notes

- Documentation Storage

- Investor/Subscriber Correspondence

- Certificate

- Accredited Investor/Subscriber Verification Letter

ESI requires that the issuer's Investor/Subscriber Relations designee be the responsible party to keep the Investor/Subscriber files and other documentation. Although, the Compliance department will create working files for the subscribers' information, the Compliance department is not responsible for maintaining these files.

**Glossary of Defined Terms:**

CRM:   A Customer Relationship Management Software used to manage customer and client contact information and to maintain and Implement principles, practices, and guidelines that an organization follows when interacting with its customers. From the organization's point of view, this entire relationship not only encompasses the direct interaction aspect, such as sales and/or service related processes, but also in the forecasting and analysis of customers or clients trends and behaviors, which ultimately serve to enhance the customer's or clients overall experience.

IRIS:   I.R.I.S. is a compliance based CRM Software developed for the purpose of maintaining and tracking investor communication and contact activity primarily focused on private capitalization under the SEC Regulation "D" rules. This Software is a licensed program developed and owned by 6 Degrees Services, Inc. (6DS) This software is undergoing consistent revision to better comply with the laws and regulations that may be implemented from time to time. I.R.I.S. has under gone legal review and is at the time of this writing under going legal audit and compliance review to insure it is compliance processes adhere to current laws and regulations.

It's adherence to same is not guaranteed by 6 Degrees Services, Inc. or that of Evolution Services, Inc. . (ESI)

Investor Compliance Officer:

EVO023741



Investor Compliance Officer is the officer designated by the Client to be the primary responsible party for Client's company in relation to investment rules and processes. ESI and it's compliance assistance team do not render final decisions on behalf of a client in relation to the final acceptance of investments funds from a client's investors. A Compliance Officer should be well versed in the current laws and regulations that pertain to Client's Offering.

Compliance Team Member:

A Compliance Team Member (CTM) is a ESI employee that assists Client in acquiring, tracking and documenting materials that the Client's Compliance Officer must obtain to make qualified decisions as to the best decision on behalf of Client.

Chief Human Relation's Officer:

A Chief Human Resources Officer (CHRO) is a corporate officer who oversees all aspects of human resource management and industrial relations policies, practices and operations for an organization.

**Glossary of Defined Terms (Continued):**

Investor Relations Officer:

A Chief Investor Resources Officer (CIRO) is a corporate officer who oversees all aspects of Investor Resource management and investor relations policies, practices and operations for an organization. Client may, in its sole discretion, designate its Compliance Officer to serve this function.

(THIS SPACE LEFT BLANK INTENTIONALLY)

CONFIDENTIAL



Exhibit "A3"

Consulting Services

**Exhibit "A3"**

Consulting Services

**Consulting Services**

ESI provides full consulting services for Client these services include assistance on many areas of initial corporate structuring as well as operations and capitalization.

       Executive Summary

       Business Overview

       Products & Services

       Sales & Marketing Plan

       Operating Plan

       Management and Organization

       Action Plan

       Financial Plan

       Investment Opportunity

       Market Strategy

       Tactical Marketing Plans

       Effectiveness Measurement(s)

       Management Information Systems (MIS)

CONFIDENTIAL



SaaS Customer Relationship Management (CRM)

Planning

Strategic Business Planning

Opportunity Creation

Market Evaluation

Distribution Channels

Return-on-investment (ROI)

Consumer Research

### Exhibit "A3"

Consulting Services (Continued)

Real Estate Acquisition

Facility Lease Negotiation

Facility Design and Construction

(THIS SPACE LEFT BLANK INTENTIONALLY)

CONFIDENTIAL



<u>**Exhibit "A4"**</u>

<u>Sales and Marketing Training Services</u>

<u>Sales and Marketing Training Services</u>

ESI to provide comprehensive sales training services including but not limited to on-site coaching, seminars and motivational services. ESI will to provide, on request, strategic consulting (see Exhibit A4) services relating to the hiring of strategic sales, administrative and operational personnel in direct (or indirect) connection with the company's sales force (see administrative/hiring support Exhibit A3).

ESI provides a proprietary, compliance-minded, end-to-end sales training methodology that is made available to our clients. This training program covers:

### **Professionalism & Ethics**

- Ethical Selling Practices
- Interoffice communication skills
- Client communication skills
- Public Speaking
- Professional presence and grooming
- Core Competency evaluations and recommendations.
- Personality profiling

### **Professional Sales Preparation and Training**

- Prospect Presentation Best Practices
- Presentation Scripting (at the issuer's direction)
- Sales/Marketing Content Creation
- How to properly qualify a prospect for your product or service.
- S.W.A.T. Sales Training Program (on-going)
- Prospecting
- Call/Meeting Follow Up Process
- Proven Closing Methodologies
- Presentation Methods
- Proper Qualification
- Follow up procedures

EVO023745



- Closing methodology

- Client Retention Best Practices

## Training Services & Content Delivery Methods

Select training modules may as needed (and available) be made available to issuers/clients via a comprehensive, online training video library. Access to the ESI video library is approved by ESI management on a case-by-case basis. Access to the ESI training library. Additionally, ESI sales training staff will be made available to video conference with an issuer/client's sales team(s), quarterly, monthly, weekly or daily at the direction of the issuer.

## Sales Training Specialist(s)

ESI Sales Training staff may vary from region to region. The issuer/client will, be assigned a primary sales training specialist suited for their industry and vertical. ESI sales ESI trainers will employ proven sales methodologies.

*Special Note: All reference to Sales and Marketing Training is focused on General Sales and Marketing Practices and does not in any way imply that training is for the sale of Securities. All sales training methods and techniques are focused upon sales and marketing methods for goods, services and offerings of client.*

(THIS SPACE LEFT BLANK INTENTIONALLY)



## Exhibit "A5"

### Responsibilities' of the Client

**CLIENT REPSONSIBILITIES:**

In order for to properly perform it's duties under this agreement the Client must provide the following:

- Biographical Data on all principals including primary company it's subsidiaries and ventures

- Incorporation Documents for primary company and all subsidiaries and ventures.

- Current and Past Financial Records (including but not limited to tax returns, last 2 years profit and loss statements and balance sheets.) Names of all Officers (including % owned of the Corporation) at the outset and as they may change from time to time.

- Chief Investment Relations Officer to be designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

- Chief Human Resources Officer to designated and remain in active position at all times (this is a material position that may not remain unfilled at any time during the term of the contract)

- Monthly Financial Statements as issued no later than the 15th of each month subsequent for primary company and all subsidiaries (Monthly Profit and Loss Statement, Balance Sheet and General Ledger for all operating entities owned and or controlled by Client both cash and accrual basis)

- Financial Statements will be reviewed by a independent accounting firm every 6 months and audited annually for primary company and all subsidiaries (if the Company/Client are making offerings to private or public investors in a Regulation A offering)

- List of Professional Services companies providing Services to Client (Attorney's, CPA's)

- Business Plan including case studies for primary company and all wholly or controlled affiliates and subsidiaries.

- Business Overview for primary company it's subsidiaries and ventures

- Business License primary company it's subsidiaries and ventures

- Description of Service Offering's or product(s) sold for primary company it's subsidiaries and ventures

- List of all employees and job functions for primary company it's subsidiaries and ventures

- Client (or clients fully authorized agent) to be available minimum of 20-25 hours per week.

**EXHIBIT "A6"**

CONFIDENTIAL

EVO023747



Elite Aerospace Group, Inc.

Contract Terms Sheet:

| | |
|---|---|
| Contract Term: | 36 months |
| Contract Rate: | **$40,000 payable weekly** |
| Commencement Date: | January 1, 2017 |
| Expiration Date: | December 31, 2019 |
| Engagement Fee: | Waived |
| Stock issuance: | ELITE AEROSPACE GROUP, INC. will issue/reissue or convert Elite Aviation Products Founders Shares of Common stock in an amount as defined below. Said shares will include an anti-dilution clause or will alternatively include the right to Warrants in a amount equal to ESI (or ESI designees) non-dilutable % of the company. Said warrants will be made available for purchase at the company's PAR Value of $.001 per share as of the date of this agreement. ESI 's right of acquisition of said shares will be evergreen until 1 year after EAG has been offered in a public event such as a Initial Private Offering or sale of the company. |

| | |
|---|---|
| **Dustin Tillman** | **17%** |
| **Zeeshawn Zia** | **17%** |
| **ESI** | **19.99%** |

Founders Shares are to be issued or re-issued to reflect the % of share ownership of Authorized Stock as required and shall be non-dilutable to below the stated % for Founders. Other shares may be dilutable subject to Board Approval.

| | |
|---|---|
| Board Seats: | ELITE AEROSPACE GROUP, INC. , INC. will authorize a minimum of a 5 man board of which 2 members will be appointed by ESI. ESI will retain the right to alternate appropriate board members during the term of the contract at ESI's sole discretion |
| Common Shares: | Authorized Common Stock have been increased to 888,000,000 (inclusive of founder's shares. Par value will be pre-set at $.0001 per share.) |
| Termination: | An early termination proration of this contract may be tendered to ESI based upon a proration of the unpaid amount due multiplied by .60. |
| Termination (Cont.) | Termination will be effective only after written notice ESI of termination is tendered and termination fees have been paid in full. |

CONFIDENTIAL



Stock Offerings:

Authorized Preferred Stock has been issued in the amount of 60,000,000 shares will be issued in anticipation of a Preferred Series A offering of $30,000,000 at an offering value of $.50 per share. The Preferred offering shall be offered in a 506C offering that is offered to Accredited Investors Only and shall be allowed to be offered concurrently with EAG's other offerings as allowed by law.

Authorized Common Stock have been authorized and are denoted as the amount of 880,000,000 shares said shares will be made available for purchase to future shareholders under price and terms as to be approved by The Board at the time of authorization of sale. It is anticipated that a initial Limited Public Offering (LPO) shall be filed for during the 1st quarter of 2017 (or earlier as practical and approved by the Board). The initial offering price is scheduled to be at $2,00 per share of Common Stock. The offering will be filed under the current Regulation A offering rules and will be subject to the regulations pertaining to said offering. The initial LPO will be scheduled to be in the amount of $50,o00,000 with a offering of 25,000,000 shares of common stock.

EAG will continue to offer its stock for sale in each subsequent year pursuant to the then current Regulation A offering rules. It is anticipated that each offering will be in the amount of $50,000,000 per annum or as allowed by the then current Regulation A rules.

EAG will make it's best efforts to qualify for and file for a publicly traded symbol and offer the company shares for sale on a trading platform such as the NASDAQ or similar dependent upon market availability.

CONFIDENTIAL

EVO023749



**EXHIBIT "A6"**

Ancillary Services Schedule of Services and Fees

Principals and Contractors of ESI shall from time to time perform duties that are not considered within the base contract offering. These services include but are not limited to special circumstances not anticipated within the basic terms and conditions of the agreement by and between the parties.

**General Staffing:**

*Administrative Employees shall be billed at a rate of:*

Junior Administrative             $35.00 Per Hour

Senior Administrative             $50.00 Per Hour

**Technical Support**

*Technical support Employees shall be billed at a rate of:*

IT Administration                      $75.00 Per Hour

Chief Technical Officer            $200.00 Per Hour

**Senior Support**

COO                                        $225.00 Per Hour

President                                 $250.00 Per Hour

CEO                                         $400.00 Per Hour

Corporate Consultant              $250.00 Per Hour

Construction Management:        8% of Construction amount

**Additional Marketing & Production Support**

Junior Marketing Assoc.          $90.00 Per Hour

Senior Marketing Director         $125.00 Per Hour

Post Production Editor (Internal) $100.00 Per Hour

Post Production Editor (Out)      $90.00 Per Hour

Graphic Designer                      $75.00 Per Hour

Web Designer (Internal)            $125.00 Per Hour

CONFIDENTIAL                                                                                      EVO023750



**Additional Marketing & Production Support**

Web Designer (Out)              $75.00 Per Hour

On-Site Production Team (Day)       $3,500.00 - $7,500.00 Per Day   (Orange & Los Angeles County)

*On-Site Production Team (Day)       $4,000.00 - $10,000 Per Day     (Outside Orange & Los Angeles County)

*On Site Production Teams may incur additional expenses and mileage charges when traveling outside Orange or Los Angeles County.

**Minimum Billing:**

Board Meetings              Min. 6 hours including pre and post Board Meeting preparation and
review

Consulting                  Acquisitions and Dispositions minimum of 8 hours

Committee                   Minimum of 4 Hours per incident

Facilities Management       Minimum of 4 hours per incident

CONFIDENTIAL

EVO023751



**EXHIBIT "A7"**

Exclusions to Services by ESI

Securities Sales:

ESI is a Full Service Marketing and Consulting firm that specializes in initial and early stage corporate organization, operations and capitalization. These services include many facets of the structure and capitalization of a new or early stage venture. Much of ESI's focus in the capitalization markets is in the area of Private Capitalization through Private and Limited Public Offerings that within the general scope of 506c and Regulation "A" and Regulation "A+" offerings. The consultation and training offered by ESI is for informational and educational purposes only and is not to be construed in any way that ESI or it's Officers, Directors, Employees or directly affiliated consultants in any way solicit or sell securities on behalf of EAG or it's affiliates. ESI and it's Officers, Directors, Employees and directly affiliated consultants are employed in a advisory capacity only. EAG by it's execution here-in further agree and assert their understanding of these terms.

EVO023752