UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAWSON L. DAVENPORT; ELITE AEROSPACE GROUP, INC. f/k/a ELITE AVIATION PRODUCTS, INC.; ROBERT A. GUNTON; ANDREA J. LINDSTROM; MICHAEL P. OWENS; DUSTIN B. TILLMAN; JULIE A. YALE; and ZEESHAWN S. ZIA,<br><br>Defendants. | Case No. 8:21-cv-01427-PD<br><br>**ORDER ON MOTION FOR INJUNCTIVE AND MONETARY RELIEF FOLLOWING JURY VERDICT** |

## I.    Procedural History

On September 20, 2024, the Jury returned its Verdict:  liability on all counts.  [Dkt. No. 234.]  On November 1, 2024, Plaintiff Securities and Exchange Commission ("SEC") filed its Motion for Injunctive and Monetary Relief Following Jury Verdict (the "Motion").  [Dkt. No. 240.]  Defendants Michael Owens, Dawson Davenport, Robert Gunton, Andrea Lindstrom, and Julie Yale filed responses to the Motion.  [Dkt Nos. 241-245, 248-252, 259-

263.]  These include responses to the Proposed Consent Judgments of Defendants Dustin Tillman and Zeeshawn Zia.  [Dkt. Nos. 253, 254.]

On December 20, 2024, the Court held a hearing on the Motion.  [Dkt. No. 255.]  Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.    The Verdict

The Jury found Owens, Davenport, Gunton, Lindstrom, and Yale liable for violating Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) or (c).  [Dkt. No. 234 at 2.][1]  The Jury also found Owens, Davenport, Gunton, Lindstrom, and Yale liable for violating Sections 17(a)(1) and 17(a)(3) of the Securities Act.  [*Id.* at 2-3.]  The Jury also found Owens, Gunton, and Yale liable for violating Section 5 of the Securities Act.  [*Id.* at 4.]  Finally, the Jury found Owens liable for violating Section 15(a) of the Exchange Act.  [*Id.*]

## III.    The Remedies Requested by the SEC

The SEC seeks the following remedies as to Owens, Davenport, Gunton, Lindstrom, and Yale:  permanent injunctions; civil penalties; and disgorgement plus prejudgment interest on the disgorgement amount.  [Dkt. No. 240-1 at 10.]  Owens, Davenport, Gunton, Lindstrom, and Yale oppose these remedies.  [Dkt. Nos. 241-245, 248-252, 259-261, 263.]

For the purposes of the Motion, the Court did not consider the SEC's evidence that was "marked but not admitted" for trial.  The Court did consider the testimony and exhibits admitted at trial and the arguments and evidence submitted by the parties in connection with the Motion, including the Declaration of Dora Zaldivar and its exhibits submitted by the SEC and the

---

[1] The Court uses the page numbers placed on the document by the electronic docketing system.

declarations and attached exhibits submitted by Owens, Davenport, Gunton, Lindstrom, and Yale.

## IV.    Discussion

### A.    Permanent Injunctions

#### 1.    The Proposed Permanent Injunctions

The SEC seeks the following permanent injunctions, listed first by conduct and then by defendant.

- A permanent injunction from further violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] — against Owens, Davenport, Gunton, Lindstrom, and Yale.

- A permanent injunction from further violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] — against Owens, Davenport, Gunton, Lindstrom, and Yale.

- A permanent injunction from further violations of Section 5 of the Securities Act [15 U.S.C. § 77e] — against Owens, Gunton, and Yale.

- A permanent injunction from further violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] — against Owens.

- A permanent injunction from providing, engaging in, causing any person or entity to engage in, or deriving compensation from any activity (including but not limited to marketing services, administrative services, consulting services, compliance services, and sales and marketing training services) for the purpose of inducing or attempting to induce the purchase or sale of any

security, with an exception for purchasing or selling securities listed on a national securities exchange for a personal account — against Owens, Davenport, Gunton, Lindstrom, and Yale.

- A permanent injunction from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] — against Owens, Davenport, Gunton, and Lindstrom.

- A permanent injunction from participating in an offering of penny stock (defined as any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1]), including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock — against Owens, Davenport, Gunton, Lindstrom, and Yale.

[Dkt. No. 240-1 at 11, 20-24.]

### 2. Permanent Injunctions from Further Violations of the Securities Laws at Issue

#### a) Applicable Law

"Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices which constitute or will constitute a violation of the provisions of this title . . . the Commission may, in its discretion, bring an action . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b); see also 15 U.S.C. § 78u(d)(1).

4

To obtain these permanent injunctions, "the SEC [has] the burden of showing there [is] a reasonable likelihood of future violations of the securities laws." *SEC v. Murphy* (*Murphy I*), 626 F.2d 633, 655 (9th Cir. 1980). "The existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Id.* "In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations, and it considers factors such as the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." *Id.* (internal citations omitted).

### b) The Parties' Arguments

Owens, Davenport, Gunton, and Lindstrom ("Joint Defendants") argue that permanent injunctions from further violations of the securities laws are inappropriate because the SEC has not shown that any of them are engaged in securities violations or about to engage in such violations. [Dkt. No. 242 at 14.] Joint Defendants also argue that these injunctions are inappropriate because the Jury's Verdict did not contain findings of fact that tend to support any factors that would lead the Court to determine that there is a reasonable likelihood of future violations of the securities laws. [*Id.* at 14-15.] Joint Defendants claim the record evidence showed their skills and experience provided value to the shareholders in Elite Aerospace Group ("Elite"), not that any of them acted in a manner that caused particular harm to any Elite investor. [*Id.*] Joint Defendants point to their declarations, and specifically to

their respective job situations, as further evidence in support of their argument.  [*Id.* at 15; see also Dkt. Nos. 243, 244, 248, 249.]

Yale makes similar arguments against permanent injunctions from further violations of the securities laws.  [Dkt. No. 241 at 12-15.]  She argues that the SEC has the burden to prove she will likely violate the securities laws in the future, the mere possibility of future violations is not enough for injunctive relief, the SEC has not shown she knowingly or recklessly violated the law, and the SEC's three-year delay between investigating this matter in 2018 and filing a claim in 2021 undermines the SEC's arguments.  [*Id.*]

The SEC argues that these injunctions are authorized by both the Securities Act and the Exchange Act, and warranted after analysis of the *Murphy I* factors.  [Dkt. No. 240-1 at 11-12.]  The SEC points to admitted trial exhibits, "marked but not admitted" trial exhibits, and trial transcripts to support arguments that Owens, Davenport, Gunton, Lindstrom, and Yale "acted with a high degree of scienter", "violated the securities laws for over four years", "do not recognize the wrongful nature of their conduct", have "occupations [that] make future violations likely", and "have provided no assurances against future violations."  [Dkt. Nos. 240-1 at 12-18, 240-2 at 2-3.]  Among other responses, the SEC argues the Jury's Verdict "necessarily found that each of them acted with scienter", they continue to deny their wrongdoing while opposing the Motion, and Yale's delay (i.e., "laches") argument is unavailing because it does not apply to the government and "would require at a minimum a showing of affirmative misconduct."  [Dkt. No. 252 at 9-14.]

        **c)**    **Defense Arguments as to the Jury's Findings and Laches are Unavailing**

Contrary to Defendants' arguments, the Jury implicitly found scienter as to certain claims in the general verdict.  The Jury was instructed on the

first claim (violating Section 10(b) of the Exchange Act and SEC Rule 10b-5) that the SEC "must prove . . . that the defendant acted with scienter". [Dkt. No. 226 at 17 (Jury Instruction 14).] The Jury was instructed on the second claim (violating Section 17(a) of the Securities Act) that the SEC "must prove . . . that the defendant acted with scienter with respect to subsection (1), or acted at least negligently with respect to subsection (3)". [*Id.* at 25 (Jury Instruction 22).] The Jury was also instructed on the definitions of "scienter" and "negligence." [*Id.* at 23, 27 (Jury Instructions 20, 24).] The verdict of liability on the first claim and both sections of the second claim were to all defendants tried. [Dkt. No. 234 at 2-3.] Thus, the Jury implicitly found Owens, Davenport, Gunton, Lindstrom, and Yale acted with scienter in violating Section 10(b) of the Exchange Act, SEC Rule 10b-5, and Section 17(a)(1) of the Securities Act, and with negligence in violating Section 17(a)(3) of the Securities Act. *Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir. 1997) ("In interpreting jury verdicts, we must assume that the jury followed the trial court's instructions.").[2]

Also, the Court agrees with the SEC that Yale's laches argument is unavailing. Although three years is a significant amount of time for conducting an investigation, that is not prima facie evidence that the SEC delayed in conducting its investigation. It is plausible that the investigation of a $67 million securities fraud required three years to properly investigate. Without evidence that the SEC delayed in conducting its investigation, the length of time referenced is only a minimal factor when considering the totality of the circumstances.

---

[2] In contrast, the Jury was instructed on the third and fourth claims that these were "strict liability" statutes that did not require a finding of scienter or negligence. [Dkt. No. 226 at 28, 37 (Jury Instructions 25, 27).] Thus, the Jury did not make an implicit finding on scienter or negligence for the third and fourth claims.

The remaining arguments are addressed below in the application of the
evidence to the *Murphy* I factors.

### d)  Permanent Injunctions from Further Violations of These Laws are Appropriate

Applying the evidence at trial to the *Murphy I* factors strongly supports
the imposition of these injunctions on each of these defendants.

Owens had prior experience setting up companies that used salespeople
in bullpens to sell unregistered company securities, and he brought that
experience to Elite.  He and Davenport were already subject to an injunction
brought by the SEC for this conduct.  In short, Owens knew what he was
doing when he violated the securities laws, and the evidence strongly
indicates that he intended to do it.  The Jury found he acted with scienter,
and the Court agrees.

Early on, Owens introduced Yale to Tillman so that Yale could manage
the issuance of stock certificates and other accounting matters critical to the
scheme.  Elite kept Yale even after it hired its own accounting personnel,
which allowed Yale to keep separate stock tables for official accounting and
unofficial accounting.  Yale's duties included helping the unlicensed
salespeople incorporate fake companies, processing the salespeople's
fraudulent invoices, and issuing their illegal "bonuses" — which were
prohibited commissions to non-brokers.  In addition, Owens used Yale to
bookkeep the sales of the "RMMH" shares, which were not authorized for
resale by Elite and could not be legally resold in the manner that they were.
Yale had all the stock information yet did not disclose much of it to Tillman
and Zia, the CEO and COO, respectively, of Elite.  The Jury found that Yale
acted with scienter, and the Court agrees.

Davenport, Gunton, and Lindstrom also took on indirect roles with Elite
and each had roles in the scheme.  Davenport worked closely with Zia,

drafting contracts that led to millions of investor dollars being funneled out of
Elite and into accounts controlled by Defendants and entities they controlled;
Gunton trained the salespeople, drafted their scripts (including in ways that
misled investors during sales calls), and sometimes joined them in calling
investors; and Lindstrom administered the sales program, using software to
keep track of investors, salespeople, and sales of securities.  In concert, Joint
Defendants placed false information into private placement memoranda
("PPMs") that were used to fraudulently deceive investors by misinforming
them about the nature of Elites sales operation and its use of investor funds.
To keep control over Elite, Owens and Davenport attended either every board
meeting or almost every board meeting.  Owens used his leverage as a
primary shareholder and gatekeeper of further investment funds to force
Tillman and Zia to accept Gunton and Lindstrom as members of Elite's board
— despite Gunton and Lindstrom having no experience whatsoever with the
aerospace manufacturing industry.  The Jury found they each acted with
scienter, and the Court agrees.

Because Elite was a legitimate business engaged in specialized
manufacturing for the aerospace industry, Joint Defendants and Yale also
engaged in a minor amount of legitimate business activity.  For example,
Owens and Gunton branded the company in various ways, Davenport
identified real estate for the company's factory, Lindstrom assisted Elite
employees with identifying Elite investors, and Yale assisted with stamping of
authorized stock certificates.  However, as correctly identified by the Jury,
their patina of legitimate activity did not ameliorate their multi-million-dollar
fraud, in which they were primed to profit through harm to investors —
regardless of whether the company ultimately succeeded.

The rest of the factors can be summarized as follows.  Joint Defendants
and Yale have never publicly recognized the wrongful nature of their conduct,

which they engaged in over the course of years. Owens and Davenport were already enjoined from violating the securities laws for similar conduct they engaged in decades ago. Owens appeared to have become involved with at least one other company selling unregistered securities, although by the end of trial he was allegedly disassociated from that company. Most witnesses who testified at trial in support of Joint Defendants testified that they were still working with Owens or hoped to be. For example, Yale is still Owens' bookkeeper, and Owens has recently used real estate services from Davenport's business. Even if Joint Defendants and Yale are not currently working in or with a company that is engaged in the sale of securities, the Court finds that Owens has exercised and continues to exercise control over these longtime associates and co-defendants.

Based on the totality of the circumstances, it is highly likely Owens would further violate securities laws in the absence of an injunction.[3] In considering the totality of the circumstances, which include their continued associations with Owens, the Court assesses the same regarding Davenport, Gunton, Lindstrom, and Yale.

These proposed injunctions are narrowly tailored to further violations of specified sections of specified statutes, and they are only proposed as to the defendants who the Jury found violated those specific sections. The Court will enter them as proposed by the SEC.

### 3. Permanent Conduct-Based Injunctions

#### a) Applicable Law

"Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices which constitute or will constitute a violation of the provisions of this title . . . the Commission may, in

---

[3] This includes the strict liability securities laws, of which there is no requirement for a finding of scienter or negligence.

its discretion, bring an action . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."  15 U.S.C. § 77t(b); see also 15 U.S.C. § 78u(d)(1).

"In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

### b)    The Parties' Arguments

Joint Defendants argue the proposed permanent injunctions from engaging in specified conduct ("conduct-based injunctions") are inappropriate for multiple reasons.  First, the proposed conduct-based injunctions would "make unlawful conduct that the federal securities laws plainly do not reach." [Dkt. No. 242 at 16-17.]  Second, they are vague as proposed (and thus do not meet the specificity requirement in Federal Rule of Civil Procedure 65(d)(1)(B)) and overbroad (by covering activities even when they are not related to the regulation of securities).  [*Id.* at 16-18.]  Third, they lack "the required common sense relationship" with either Joint Defendants' conduct or the Jury's Verdict.  [*Id.* at 16-17.]

Yale does not make any arguments about these injunctions that were not made about the prior injunctions.

The SEC argues that the proposed conduct-based injunctions are "designed to prevent Defendants from offering brokerage and boiler-room services under the guise of marketing and services contracts."  [Dkt. No. 240-1 at 21.]  The SEC further argues that "[w]ithout such a conduct-based injunction there is a reasonable likelihood Defendants will continue to violate the securities laws by using artfully crafted services agreements designed to

defraud investors." [*Id.*]  The SEC responds by pointing to the language of the
proposed injunctions, arguing that they are not vague and that their prefatory
clauses are sufficient to properly tether them to their "prophylactic purpose of
protecting investors in the purchase and sale of securities." [Dkt. No. 252 at
14-15.]  The SEC also responds by pointing to Joint Defendants' conduct and
contracts with Elite, claiming those items show the proposed injunctions
would not be vague.  [*Id.*]  Finally, the SEC responds to the overbreadth
argument by contending that the same factors considered as to the other
permanent injunctions also support their request for conduct-based
injunctions.  [Dkt. No. 240-1 at 18.]

**c)    The Proposed Conduct-Based Injunctions are
Vague and Overbroad**

The Court agrees with several of the concerns raised by Joint
Defendants about the three proposed conduct-based injunctions.

First, the language proposed by the SEC is vague.  Specifically, the
phrase "consulting services" is vague and could cover a wide array of services,
including services not at issue in this case.  While "consulting services" could
be defined in a sufficiently specific way to be enjoined in an appropriate case,
the SEC has not presented sufficient evidence to show that is the situation
here.

Second, the proposed language is facially overbroad.  Although the first
phrase of each conduct-based injunction relates to the purchase and sale of
securities, the SEC subsequently uses the phrase "including, but not limited
to" and then lists a series of activities that are not in and of themselves
inherently related to the purchase and sale of securities.  [Dkt. No. 240-1 at
20-21.]  As an issuer may generally have plans for how its goods and/or
services could affect transactions in its securities, the overall phrasing of
these injunctions raises concerns that parties enjoined by them could be

1    prohibited from "providing marketing services, administrative services,

2    consulting services, compliance services, and sales and marketing training

3    services to any issuer of securities" even when those activities are not related

4    to the purchase or sale of a security.

5        This is not an idle concern.  The SEC seeks the proposed conduct-based

6    injunctions under the general equitable remedy provision (located only in the

7    Exchange Act), not the more specific provision for injunctions (located in both

8    the Securities Act and the Exchange Act) that the SEC cited as the authority

9    for the injunctions against further violations of the securities laws.  [Dkt. Nos.

10   240-1 at 11, 18; 252 at 14-15.]  The statutory text of the general equitable

11   remedy requires that any injunction issued pursuant to that authority be

12   "appropriate or necessary for the benefit of investors" and be brought in an

13   "action or proceeding . . . under any provision of the securities laws . . . ."  15

14   U.S.C. § 78u(d)(5) (emphases added).  The requirement of an injunction being

15   "for the benefit of investors" does not appear in the more specific provisions,

16   although they still require some relation to the regulation of securities.  15

17   U.S.C. §§ 77t(b), 78u(d)(1) ("Whenever it shall appear to the Commission that

18   any person is engaged or is about to engage in acts or practices constituting a

19   violation of any provision of this title, the rules or regulations thereunder,

20   [other items omitted] . . . .") (emphasis added).  Here, the language of the

21   proposed permanent conduct-based injunctions is facially overbroad because

22   the language covers activities that are not related to the purchase or sale of a

23   security.  The language is also facially overbroad because it would enjoin more

24   activities than are appropriate or necessary for the benefit of investors, which

25   is a requirement for the authority the SEC invokes for these specific

26   injunctions.  Thus, to the extent that any conduct-based injunctions issue,

27   they must only enjoin activities related to the regulation of securities and be

28   appropriate or necessary for the benefit of investors.

Third, based on the evidence at trial, the injunctions are overbroad as applied. The SEC argues now (and argued at trial) that Joint Defendants were not engaged in the provision of these services on a legitimate basis but were only engaged in multiple schemes to defraud investors. This is an imprecise description of what the evidence showed at trial. The evidence at trial showed that, in addition to the fraud perpetrated on Elite's investors by Defendants, Elite was a legitimate aerospace manufacturing company that produced parts and sold those parts to other companies. The evidence further showed that, even if it was only to a minor extent in the overall fraudulent scheme, various employees of Elite and Real Media Marketing, Inc. ("RMM") engaged in certain activities (e.g., branding the company, selling manufactured parts, finding real estate that met manufacturing needs, etc.) that were legitimate and did not harm investors or pose a substantial risk of harm to investors. The SEC seeks to enjoin a wide range of conduct that would cover some legitimate activities, without meeting its burden of showing based on the evidence at trial that those activities should also be enjoined. Thus, to the extent any conduct-based injunctions issue, they must only enjoin further fraudulent conduct and not enjoin legitimate conduct that does not pose a risk of harm to investors.

### d) Conduct-Based Injunctions that are Narrower, More Specific, and Clearer are Warranted

The SEC cites multiple district court cases for the proposition that "[c]ourts in this district as well as around the [country] routinely impose an array of conduct-based injunctions" in actions like this one. [Dkt. No. 240-1 at 19-20.] None of these cases include the exact language that is proposed here. The only case cited by the SEC with similar language is *SEC v. CKB168 Holdings, Ltd.*, 2022 WL 3347253, *4 (E.D.N.Y. Aug. 12, 2022) ("*CKB168*"), in which a court entered a permanent injunction prohibiting defendants "from

1  offering, operating, or participating in any marketing or sales program

2  involving a security."[4]   For two reasons, the language of the conduct-based

3  injunction in *CKB168* differs significantly from that of the proposed conduct-

4  based injunctions in this case.

5      First, the *CKB168* injunction is narrower and more specific in multiple

6  ways, such as in its use of the phrase "offering, operating, or participating in

7  any marketing or sales program involving a security" instead of using phrases

8  like "engaging in any activity for the purpose of inducing or attempting to

9  induce the purchase or sale of any security . . . ." The narrowness and

10  specificity of the *CKB168* injunction address the concerns of overbreadth and

11  vagueness discussed above.

12      Second, the *CKB168* injunction is clearer in several respects, such as

13  through its use of a noun ("a program in which a participant is compensated .

14  . .") after the phrase "including but not limited to", which clarifies limited

15  examples of prior proscribed conduct. In contrast, the proposed injunctions

16  here use a present participle and general activities ("by providing marketing

17  services, administrative services, . . .") after the phrase "including, but not

18  limited to", which makes the proposed injunction more ambiguous by

19  widening the scope of already broad categories of prior proscribed conduct. In

20

21      [4] The exact injunctive language proposed in *CKB168* is:

22      ". . . from directly or indirectly, including, but not limited to, through
        any entity owned or controlled by them, offering, operating, or
23      participating in any marketing or sales program involving a security,
        including but not limited to a program in which a participant is
24      compensated or promised compensation solely or primarily for inducing
        another person to become a participant in the program, or if such
25      induced person induces another to become a participant in the
        program."
26

27

28  *CKB168*, 2022 WL 3347253, at *2. This language is substantively identical to the
    language that court entered separately in final judgment.

short, the specific textual, syntactical, and other grammatical choices in the *CKB168* injunction clarify what activities that injunction enjoins.

Considering the totality of the circumstances, including the *Murphy I* factors discussed above, the various concerns raised by the parties, and the cases they cite, and concludes that for the benefit of investors, conduct-based injunctions are appropriate and necessary — albeit in a narrower, more specific, and clearer manner than that proposed by the SEC.

The Court will enter conduct-based injunctions against Joint Defendants and Yale that permanently prohibit them from offering, operating, or participating in any marketing, administrative, compliance, sales, or training program involving a security. The language will follow that used in *CKB168*. These injunctions will not prevent Defendants from purchasing or selling securities listed on a national securities exchange for their respective personal accounts.

### 4.    The Officer and Director Bar
#### a)    Applicable Law

In applicable proceedings, "the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 17(a)(1) of this title from acting as an officer or director of any issuer that has a class of securities registered . . . or that is required to file reports . . . if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § 77t(e); see also 15 U.S.C. § 78u(d)(2) (same for Section 10(b) of the Exchange Act).

"The district court has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, which include the power to order an officer and director bar." *SEC v. First Pac. Bancorp*, 142 F.3d 1186,

1193 (9th Cir. 1998). "In addition to the court's inherent equitable powers,
the Securities Enforcement Remedies and Penny Stock Reform Act of 1990
(Remedies Act) authorizes the court to order an officer and director bar 'if the
person's conduct demonstrates substantial unfitness to serve as an officer or
director.'" *Id.* (quoting 15 U.S.C. § 78u(d)(2)); see also 15 U.S.C. § 77t(e). "In
determining whether to order the bar, a court may consider: (1) the
egregiousness of the underlying securities law violation; (2) the defendant's
repeat offender status; (3) the defendant's role or position when he engaged in
the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic
stake in the violation; and (6) the likelihood that misconduct will recur." *Id.*
(internal quotation marks and citation omitted).

### b)    The Parties' Arguments

Joint Defendants argue against permanent injunctions on their acting
as an officer or director of the types of issuers specified (also known as an
"officer and director bar" or "O&D bar").[5]  [Dkt. No. 242 at 18-19.]  They
reiterate their argument that the SEC did not present evidence that they
harmed Elite investors, and they claim that they "believed their actions in
support of [Elite's] efforts to raise capital were permitted by federal securities
laws."  [*Id.*]  They also rely on their prior arguments as to why no permanent
injunction should issue and note that they "intend to vigorously pursue their
appellate rights in this case."  [*Id.*]

The SEC lists the *First Pacific Ban*corp factors and discusses the
evidence at trial in light of those factors.  [Dkt. No. 240-1 at 22-23.]  The SEC
argues that an O&D bar should be imposed on Joint Defendants because
"there is substantial evidence that, if allowed to act as officers or directors of a

---

[5] The SEC does not seek to impose an O&D bar on Yale.

17

public company, they would abuse their positions for their personal financial benefit and to the detriment of the investing public." [*Id*. at 23.]

### c) An Officer and Director Bars is Appropriate

The Court considers the *First Pacific Bancorp* factors. The underlying securities law violations, in which investors lost $67 million, were egregious. Since 2009, Owens and Davenport have been enjoined from violating these securities laws, yet they engaged in further violations based on similar unlawful practices. Joint Defendants each played a critical role throughout the fraud, and they acted to secure their own financial interests over investors' interests by placing Gunton and Lindstrom on Elite's board and having Owens and Davenport attend board meetings. As discussed above, Joint Defendants each had a high degree of scienter. As discussed below regarding disgorgement, Joint Defendants each extracted substantial amounts in financial gains during the fraud. Finally, given Joint Defendants' complete failure to acknowledge their wrongdoing (much less apologize for it or express contrition), there is a very high likelihood that misconduct will recur absent an O&D bar.

After considering the totality of the circumstances, the Court finds that the SEC has shown the individual conduct of Owens, Davenport, Gunton, and Lindstrom demonstrates each of their unfitness to serve as an officer or director of an issuer. 15 U.S.C. §§ 77t(e), 78u(d)(2). Further, given the factors discussed immediately above, and particularly the very high likelihood that misconduct will recur absent an O&D bar, the Court determines that a permanent and unconditional O&D bar is appropriate to impose on Joint Defendants.

The O&D bar will be entered.

1

### 5.    The Penny Stock Bar

### a)    Applicable Law

In applicable proceedings "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A).

"[T]he Remedies Act gave the SEC authority it did not previously have: the power to bar unfit individuals from participation in any penny stock offering, regardless of whether those individuals are currently associated, or are seeking to become associated, with broker-dealers." *Koch v. SEC*, 177 F.3d 784, 788 (9th Cir. 1999).

### b)    The Parties' Arguments

Joint Defendants argue against permanent injunctions on participating in offerings of penny stock (also known as "penny stock bars"), reiterating arguments made as to prior injunctions. [Dkt. No. 242 at 19.] However, they concede that "limiting the penny stock bar to a period of three years following entry of judgment would be appropriate in this case." [*Id.*]

Yale does not make any arguments about these proposed injunctions that were not made about the prior injunctions.

The SEC states that "[e]ach of the five PPMs at issue in this case were offerings of penny stock" and argues that the Court should impose a penny stock bar against Joint Defendants for the same reasons that support the O&D bar. [Dkt. No. 240-1 at 23-24.] The SEC further argues why application of the evidence to the *First Pacific Bancorp* factors demonstrates that Defendant Yale should also be subject to a penny stock bar. [*Id.* at 24.]

19

### c)   A Penny Stock Bar is Appropriate

The evidence at trial showed that Joint Defendants and Yale participated in the unlawful offer of penny stock during their violations of the securities laws.

As to Joint Defendants, the same circumstances that made the O&D bar appropriate also make a permanent and unconditional penny stock bar appropriate.

As to Yale, she was not previously enjoined and she was not an officer or director in the scheme.  However, she participated in the same egregious securities violations as the others, played a critical role in the scheme, acted with a high degree of scienter, extracted substantial amounts in financial gains during the fraud, and appears very likely to engage in further misconduct given her complete failure to acknowledge her wrongdoing or apologize for it.  *See First Pac. Bancorp*, 142 F.3d at 1193.  Upon considering the totality of the circumstances, the Court finds that the SEC has shown a permanent and unconditional penny stock bar is also appropriate as to Yale. 15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A).

The penny stock bar will be entered.

### B.   Civil Penalties

#### 1.   The Proposed Civil Penalties

The SEC seeks the following civil penalties:

- $1,312,320.00 in penalties against Owens, based on six "third tier" penalties.
- $1,312,320.00 in penalties against Davenport, based on six "third tier" penalties.
- $230,464.00 against Gunton, based on one "third tier" penalty.
- $230,464.00 against Lindstrom, based on one "third tier" penalty.

1  •  $230,464.00 against Yale, based on one "third tier" penalty.

2  [Dkt. No. 240-1 at 32-33.]

3  ## 2.  Applicable Law

4  "There are three tiers of civil penalties for violations of federal securities

5  laws." *SEC v. Heart Tronics, Inc.*, 2016 WL 9049642, *2 (C.D. Cal. Mar. 30,

6  2016) (citing 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)).  "The different tiers reflect

7  escalating levels of culpability." *Id.*

8  Third tier penalties are the most severe, and they result from violations

9  that: (1) "involved fraud, deceit, manipulation, or deliberate or reckless

10 disregard of a regulatory requirement"; and (2) "directly or indirectly resulted

11 in substantial losses or created a significant risk of substantial losses to other

12 persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  "[T]he amount of penalty

13 for each [third tier] violation shall not exceed the greater of (i) $100,000 for a

14 natural person or $500,000 for any other person, or (ii) the gross amount of

15 pecuniary gain to such defendant as a result of the violation". *Id.*  "The

16 amount of the penalty shall be determined by the court in light of the facts

17 and circumstances." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).

18 "A district court has discretion to impose civil penalties so long as the

19 amount is within the statutory maximum." *United States SEC v. Murphy*

20 (*Murphy II*), 50 F.4th 832, 847 (9th Cir. 2022).  Courts apply the factors from

21 *Murphy I* to determine the proper penalty. *Murphy II*, 50 F.4th at 847.  These

22 factors are: "the degree of scienter involved; the isolated or recurrent nature of

23 the infraction; the defendant's recognition of the wrongful nature of his

24 conduct; the likelihood, because of defendant's professional occupation, that

25 future violations might occur; and the sincerity of his assurances against

26 future violations." *Murphy I*, 626 F.2d at 655.

27

28

### 3.     The Parties' Arguments

Joint Defendants argue that civil penalties cannot be imposed because the SEC has not obtained "the necessary factual findings from the jury to impose civil penalties on [Joint] Defendants, or to determine the scope of those civil penalties."[6]  [Dkt. No. 251 at 5.]  Joint Defendants argue further that, in accordance with *SEC v. Jarkesy*, 603 U.S. 109 (2024), they have a Seventh Amendment right to a jury's assessment of civil penalties.  [*Id.* at 2.]  Joint Defendants believe that they are entitled to such protection under the Seventh Amendment because these "civil penalties are legal in nature" and are meant "solely to punish [Joint] Defendants", thus they are "governed by the Seventh Amendment, and must be decided by a jury."  [*Id.*]  Further, Joint Defendants cite *Sowers v. R.J. Reynolds Tobacco Co.*, 975 F.3d 1112, 1129 (11th Cir. 2020) and *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) to assert that, given the factual considerations in this matter, "no new trial on only the issue of damages can be held without violating the Reexamination Clause of the Seventh Amendment."  [*Id.* at 3-5.]

Yale also argues that she has a Seventh Amendment right to a jury trial on the issue of civil penalties and that the Jury did not make the requisite findings to assess such penalties on her.  [Dkt. Nos. 241 at 10-12, 250 at 1-2.]  She argues in the alternative that any civil penalty assessed on her should be a low "first tier" penalty instead of a high "third tier" penalty.  [Dkt. Nos. 241 at 17-19; 250 at 2-3.]  Specifically, she points to various parts of the record and argues a minimal civil penalty would be appropriate because her conduct was not egregious, she did not act with scienter, she caused no substantial

---

[6] Joint Defendants initially argued that the SEC's arguments regarding civil penalties should be disregarded due to briefing limits.  [Dkt. No. 242 at 23-24.]  The parties were afforded (and submitted) supplemental briefing, mooting this issue. [Dkt. Nos. 247, 250, 251.]

losses (or risk of substantial losses) to others, her conduct is not recurrent, and her assets do not warrant a fine.  [*Id.*]

The SEC argues that Joint Defendants and Yale do not have a Seventh Amendment right to a jury trial to determine whether civil penalties are appropriate or to determine the amount of any such penalties, "as *Jarkesy* did not overturn long-standing Supreme Court precedent" on these points.[7]  [Dkt. No. 252 at 23-25.]  The SEC also argues that "third-tier penalties are appropriate because the jury found that [their] violations involved fraud, deceit, and manipulation and [the SEC] presented substantial evidence showing that their fraud directly or indirectly resulted in substantial losses to Elite's investors."  [Dkt. No. 240-1 at 32.]  The SEC explains that six penalties are requested against Owens and Davenport to represent the five PPMs issued between 2014 and 2018 and the scheme involving the illicit sales of Elite stock held by RMMH.  [*Id.* at 32-33.]

### 4.    Civil Penalties are Appropriate

#### a)    The Civil Penalties Determination Does Not Require a Jury Trial

The parties dispute whether the Seventh Amendment right to a jury trial applies to the determination of civil penalties.  *See* U.S. Const. amend. VII ("In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law."); *see also Tull v. United States,* 481 U.S. 412, 425-26 (1987) ("The Seventh Amendment is silent on the question [of] whether a jury must determine the remedy in a trial in which it must determine liability.")

---

[7] The SEC does not address Joint Defendants' Reexamination Clause argument.

1      The Supreme Court resolved this issue in *Tull*, holding that "a

2  determination of a civil penalty is not an essential function of a jury trial, and

3  that the Seventh Amendment does not require a jury trial for that purpose in

4  a civil action." *Tull*, 481 U.S. at 427.  The relevant test for the Seventh

5  Amendment right to a jury trial is "whether the jury must shoulder this

6  responsibility as necessary to preserve the 'substance of the common-law right

7  of trial by jury.'"  *Id*. at 426 (quoting *Colgrave v. Battin*, 413 U.S. 149, 157

8  (1973)).  As to civil penalties, they are not necessary to the common law right

9  of trial by jury because "Congress' authority to fix the penalty by statute has

10  not been questioned, and it was also the British practice."  *Id*. at 426.  "Since

11  Congress itself may fix the civil penalties, it may delegate that determination

12  to trial judges."  *Id*. at 427.  This is particularly the case where the civil

13  penalties involve "highly discretionary calculations that take into account

14  multiple factors" and "are the kinds of calculations traditionally performed by

15  judges."  *Id*.

16      Shortly before trial in this matter, the Supreme Court held that

17  defendants are entitled to a jury trial when the SEC seeks civil penalties

18  against them for securities fraud and that the public rights exception to

19  Article III jurisdiction does not apply.  *Jarkesy,* 603 U.S. at 120-21.  Far from

20  overruling *Tull*, the Supreme Court repeatedly cited Tull in support of its

21  holding in *Jarkesy*.  *Id*. at 120, 122, 123, 124, 133, 134, 136, 139 ("Our

22  analysis of this question follows the approach set forth in *Granfinanciera* and

23  *Tull v. United States*, 481 U.S. 412 (1987).").  Further, in *Jarkesy* the Supreme

24  Court did not reach the post-liability, pre-judgment remedies issue that was

25  addressed in *Tull*.  Had the Supreme Court reached the issue, it appears the

26  reasoning in *Jarkesy* would only support the test set forth in *Tull*:  whether

27  the jury must shoulder the responsibility as necessary to preserve the

28  substance of the common law right of trial by jury.  *Tull*, 481 U.S. at 426.

1   This is because in *Jarkesy* the common law nature of the charges required a
2   jury trial at the liability stage, while in *Tull* the multi-factor, discretionary
3   civil penalties set by Congress were not necessary to the trial itself and could
4   be delegated to a judge at the remedies stage.

5       As the civil penalties for securities violations are analogous in all
6   relevant respects to the civil penalties under the Clean Water Act that were
7   considered in *Tull*, a jury trial is not required under the Seventh Amendment
8   for the remedies portion of this matter.  The Court need not reach Joint
9   Defendants' Reexamination Clause argument.

10             **b)**    **The Availability of Third Tier Civil Penalties**

11       The SEC requests "third tier" penalties, which require finding the
12   violation (1) "involved fraud, deceit, manipulation, or deliberate or reckless
13   disregard of a regulatory requirement" and (2) "directly or indirectly resulted
14   in substantial losses or created a significant risk of substantial losses to other
15   persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).

16       The Court makes those findings as to Joint Defendants and Yale.  As
17   discussed above regarding permanent injunctions, the Jury implicitly found
18   they acted with scienter in violating Section 10(b) of the Exchange Act, SEC
19   Rule 10b-5, and Section 17(a)(1) of the Securities Act.  The Jury's Verdict is
20   sufficient evidence of the first required finding, and the Court also so finds.  In
21   addition, the evidence at trial showed that the securities violations of Joint
22   Defendants and Yale directly and indirectly resulted in $67 million in losses
23   for investors.  Thus, the Court makes the second required finding.

24       The SEC has met its burden to show that third tier civil penalties are
25   available.

26
27
28

25

1          **c)    The Amount of Civil Penalties**

2          Having considered above the *Murphy I* factors as to permanent

3    injunctions, the Court reconsiders those factors in the context of civil

4    penalties and adopts the prior analysis for this context.  *Murphy II*, 50 F.4th

5    at 847.  Based upon the totality of the circumstances, and particularly the

6    failure of Joint Defendants and Yale to recognize the wrongful nature of their

7    conduct, the statutory maximum is the appropriate amount of civil penalties.

8    15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i) ("The amount of the penalty shall be

9    determined by the court in light of the facts and circumstances.")

10         The civil penalties must not exceed the statutory maximum.  *Murphy* II,

11   50 F.4th at 847 ("A district court has discretion to impose civil penalties so

12   long as the amount is within the statutory maximum.").  There are two issues

13   that implicate the statutory maximum.

14         First, the SEC seeks multiple civil penalties as to Owens and

15   Davenport.  However, the Jury's general verdict form did not parse whether

16   the "boiler room scheme" or the "RMMH scheme" were separate violations,

17   nor did it discuss whether each PPM constituted a separate scheme.  [Dkt. No.

18   234.]  Moreover, for the purpose of determining liability during trial, the SEC

19   did not clearly make the point that these were separate schemes as opposed to

20   one, ongoing scheme.  Given that the Jury did not explicitly or implicitly find

21   Joint Defendants and Yale liable for multiple violations of each of the

22   securities laws at issue, the Court will not do so.  Accordingly, the civil

23   penalties will be issued for one violation per defendant.

24         Second, the SEC seeks civil penalties for violations that occurred from

25   2014 to 2018.[8]  [Dkt. No. 240-1 at 32 (discussing how PPMs were issued

26

27         ---

           [8] Against each of Owens and Davenport, the SEC seeks $160,000 for the 2014
     PPM, $230,464 for each of four subsequent PPMs from 2015 to 2018, and another
28   $230,464 for the "RMMH scheme."  [Dkt. No. 240-1 at 32.]  The SEC further seeks

annually from 2014 to 2018 and how the "RMMH scheme" occurred in 2016

and 2017).]  The SEC's proposed statutory maximum penalties appear to

exceed the maximum penalties in effect at the time of the violations.

Although the statute lists $100,000 as the maximum third tier civil

penalty for a natural person, this penalty is subject to the Federal Civil

Penalties Inflation Adjustment Act of 1990 ("CPIAA").  15 U.S.C.

§§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); 28 U.S.C. § 2461 note § 3(2) (defining civil

penalty to include penalties with a maximum amount provided for by federal

law that is assessed or enforced by an agency pursuant to federal law in an

administrative proceeding or civil action in the federal courts).  Under the

CPIAA, heads of agencies must annually publish adjusted civil penalties.  28

U.S.C. § 2461 note § 4(a); *accord Sackett v. EPA*, 566 U.S. 120, 123 n.1 (2012);

*Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 122-23 n.1 (2003).

Accounting for adjustment under the CPIAA, the maximum third tier civil

penalty for the securities violations at issue is $160,000 if the violation

occurred between March 6, 2013 and November 2, 2015; $184,767 if the

violation occurred in calendar year 2018; and $230,464 for violations in 2024.

17 C.F.R. § 201.1001(a), (b); SEC, *Adjustments to Civil Monetary Penalty*

*Amounts* (dated Jan. 8, 2018), https://www.sec.gov/files/rules/other/2018/33-

10451.pdf; SEC, *Adjustments to Civil Monetary Penalty Amounts* (dated Jan.

5, 2024), https://www.sec.gov/files/rules/other/2024/33-11263.pdf.

The penalties are assessed based on calendar year 2018, when the

fraudulent conduct concluded, instead of calendar year 2024, when the trial

concluded.  Accordingly, civil penalties will issue as to each of Owens,

Davenport, Gunton, Lindstrom, and Yale in the amount of $184,767.00 (for a

total amount of $923,835.00 in penalties), which is the 2018 statutory

---

$230,464 in penalties from each of Gunton, Lindstrom, and Yale.  [*Id.* at 33.]  The
total penalties sought from these five defendants is $3,776,960.

maximum for third tier penalties against natural persons for violating these securities laws.

### C.    Disgorgement and Prejudgment Interest

#### 1.    The Proposed Amounts of Disgorgement and Prejudgment Interest

The SEC seeks disgorgement and prejudgment interest in the following amounts:

- Disgorgement of $10,643,495.00 and prejudgment interest of $4,029,319.00 against Owens.

- Disgorgement of $394,698.00 and prejudgment interest of $149,421.28 against Davenport.

- Disgorgement of $1,148,013.00 and prejudgment interest of $434,604.56 against Gunton.

- Disgorgement of $186,799.00 and prejudgment interest of $70,716.67 against Lindstrom.

- Disgorgement of $550,440.00 and prejudgment interest of $208,380.68 against Yale.

[Dkt. No. 240-1 at 27-28.]

#### 2.    Applicable Law

"In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5); *see Liu v. SEC*, 591 U.S. 71, 74-75 (2020) ("[A] disgorgement award that does not exceed a wrongdoer's net

1  profits and is awarded for victims is equitable relief permissible under [15

2  U.S.C.] § 78u(d)(5).").

3      "The district court has broad equity powers to order the disgorgement of

4  'ill-gotten gains' obtained through the violation of the securities laws." *First*

5  *Pac. Bancorp*, 142 F.3d at 1191.  "Disgorgement is designed to deprive a

6  wrongdoer of unjust enrichment, and to deter others from violating securities

7  laws by making violations unprofitable." *Id.*  Unlike civil penalties, the

8  imposition of disgorgement does not require an assessment of scienter. *SEC*

9  *v. M&A W., Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008).  Unlike a permanent

10  injunction, in which the SEC must "show a likelihood of future violations",

11  disgorgement only requires that the court find the defendant "has no right to

12  retain the funds illegally taken from the victims." *SEC v. Colello*, 139 F.3d

13  674, 679 (9th Cir. 1998).  "Further, where two or more individuals or entities

14  collaborate or have a close relationship in engaging in the violations of the

15  securities laws, they have been held jointly and severally liable for the

16  disgorgement of illegally obtained proceeds." *First Pac. Bancorp*, 142 F.3d at

17  1191.

18      "The district court also has broad discretion in calculating the amount

19  to be disgorged." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th

20  Cir. 2006).  "A disgorgement calculation requires only a reasonable

21  approximation of profits causally connected to the violation, and the amount

22  of disgorgement should include all gains flowing from the illegal activities."

23  *Id.* at 1113-14 (internal quotation marks and citations omitted).  "The SEC

24  bears the ultimate burden of persuasion that its disgorgement figure

25  reasonably approximates the amount of unjust enrichment", but "the burden

26  shifts to the defendants to demonstrate that the disgorgement figure was not

27  a reasonable approximation" after "the SEC establishes a reasonable

28  approximation of defendants' actual profits". *SEC v. Platforms Wireless Int'l*

*Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal quotation marks and citations omitted).

"The SEC has adopted the tax underpayment rate for prejudgment interest on orders of disgorgement in all administrative proceedings." *Platforms Wireless Int'l Corp.*, 617 F.3d at 1099.  District courts are allowed to calculate prejudgment interest "based on the rate provided in 26 U.S.C. § 6621 for tax underpayment, rather than the treasury-bill rate provided in 28 U.S.C. § 1961 for post-judgment interest on money judgments in civil cases" because defendants should not "benefit from their unlawful conduct" by using the government's lending rate instead of its borrowing rate.  *Id.*  District courts are also allowed to calculate prejudgment interest "from the date of the sale of securities to the public, rather than from the date the SEC filed its complaint."  *Id.* at 1099-1100.

### 3.    The Parties' Arguments

Joint Defendants argue that disgorgement is inappropriate here because under *Liu* and *SEC v. Govil*, 86 F.4th 89 (2nd Cir. 2023), the SEC did not demonstrate proof of pecuniary harm to investors or establish that the disgorgement proceeds would be disbursed to investors.  [Dkt. No. 242 at 19-21.]  Joint Defendants argue in the alternative that even if the Court orders disgorgement, the SEC has not presented a reasonable approximation of net profits and thus there must be deductions before imposing the remedy.  [Dkt. No. 242 at 21-23.]  Joint Defendants submit their declarations in support of their proposed deductions.  They also argue that based on the record, a reasonable calculation of their net profits should exclude amounts they accrued in the legitimate work conducted by them and their various entities.  [*Id.*; see also Dkt. Nos. 243, 244, 248, 249.]

Yale argues that under *Jarkesy* she has a Seventh Amendment right to a jury's assessment of disgorgement. [Dkt. No. 241 at 10-12.] She also makes similar arguments to the Joint Defendants regarding disgorgement, including that the SEC has not met the requirements for disgorgement and that, in the alternative, her legitimate business expenses must be deducted from any disgorgement award. [*Id.* at 15-17.]

Yale makes three additional arguments regarding prejudgment interest.[9] First, she contends the SEC cannot obtain prejudgment interest on the disgorgement amount because disgorgement is punitive in nature. [Dkt. No. 241 at 16 n.6.] Next, she argues there should not be any prejudgment interest because disgorgement itself is inappropriate. [*Id.* at 16.] Finally, she states that the amount of prejudgment interest sought is inflated due to the SEC's delay in prosecuting the case. [*Id.* at 16 n.6.]

The SEC states that after *Liu*, Congress codified the disgorgement remedy into the Exchange Act without reference to investor harm. [Dkt. No. 240-1 at 26 (citing 15 U.S.C. § 78u(d)(7)).] The SEC contends, however, that the Court need not resolve this issue since the requirements of *Liu* are satisfied here because "it is indisputable that investors in Elite lost the entirety of [their] investments" and the SEC "is prepared to petition the Court to establish a Fair Fund, through which disgorged funds would be disbursed to victims." [*Id.* at 27.] The SEC supplements this argument by discussing why the trial evidence shows Joint Defendants and Yale benefitted from the fraud they perpetrated on Elite's investors. [*Id.* at 12-17.] The SEC also argues that Joint Defendants and Yale should not receive deductions, including for personal income taxes they may have paid on their gains —

---

[9] Joint Defendants do not make any arguments regarding prejudgment interest.

although the SEC concedes that funds Owens received which were then
transferred to other defendants could be legitimately deducted.  [Dkt. No. 240-
1 at 29-31.]  The SEC supplements this argument by discussing the relevant
burdens of proof for disgorgement and why the SEC believes Joint Defendants
and Yale have not met their subsequent burden.  [Dkt. No. 252 at 16-23.]
Finally, the SEC argues that *Jarkesy* does not require a jury trial for an
assessment of disgorgement.[10]  [*Id*. at 23-25.]

### 4.   Disgorgement and Prejudgment Interest are Appropriate but Based on Net Profits

### a)   Disgorgement is Appropriate in Equity

Based on the evidence presented at trial, the Court finds that the SEC
has met its burden of showing that the conduct of Joint Defendants and Yale
benefited them at the expense of Elite's investors.  Each of these defendants
made significant net wrongful gains from their fraudulent activities, and thus
the Court determines that disgorgement is appropriate as a matter of equity.

### b)   The Determination on Equitable Disgorgement Does Not Require a Jury Trial

For the same reasons discussed above regarding civil penalties, the
Court determines that the Seventh Amendment does not require a jury trial
for the purpose of assessing disgorgement at the remedies stage.

In addition, for this specific remedy, the Seventh Amendment guarantee
of a jury trial would not have attached even at the liability phase.  "[T]he
Seventh Amendment preserves the right to trial by jury in statutory actions
seeking traditional legal remedies, such as compensatory damages or civil
penalties."  *FTC v. Com. Planet, Inc.*, 815 F.3d 593, 602 (9th Cir. 2016); *see
also Granfinanciera v. Nordberg*, 492 U.S. 33, 42 n.4 (1989) ("The Seventh
Amendment protects a litigant's right to a jury trial only if a cause of action is

---

[10] The SEC does not respond to Yale's arguments about prejudgment interest.

legal in nature and it involves a matter of 'private right.'").  The Supreme

Court has discussed how "actions to recover preferential or fraudulent

transfers were often brought at law in late 18th-century England" and,

depending on the claim brought and remedy sought, heard in either a court of

law or a court of equity.  *Granfinanciera*, 492 U.S. at 41-49, 49 n.7 (discussing

remedy of "restitution" that was found to be legal in nature).  In contrast to

legal disgorgement assessed by courts at law, "[e]quity courts have routinely

deprived wrongdoers of their net profits from unlawful activity, even though

that remedy may have gone by different names." *Liu*, 591 U.S. at 79 (citing

sources that interchangeably use the terms "disgorgement", "restitution", and

"accounting"); *see also Com. Planet, Inc.*, 815 F.3d at 602; *CFPB v. Cashcall,

Inc.*, 124 F.4th 1209, 1214-16 (9th Cir. 2025); *SEC v. TKO Farms, Inc.*, 2024

WL 4896204, *1 (C.D. Cal. Sept. 20, 2024).  Here, the SEC seeks disgorgement

for violation of the Exchange Act as an equitable remedy, not a legal one.

Accordingly, the disgorgement remedy requested by the SEC in this case does

not implicate the jury trial guarantee of the Seventh Amendment.

### c)    *Liu* and Its Restrictions on Disgorgement

The SEC has not clarified whether it seeks disgorgement under 15

U.S.C. § 78u(d)(5) or § 78u(d)(7).

In *Liu*, the Supreme Court considered what restrictions apply to the

existing disgorgement remedy in the Exchange Act (located at 15 U.S.C.

§ 78u(d)(5)) when that remedy is used in equity.  *Liu*, 591 U.S. at 78-92.  After

*Liu*, Congress amended the Exchange Act by codifying the disgorgement

remedy discussed in *Liu* and changing the statute of limitations placed on it

in an earlier case.  Pub. L. No. 116-283, § 6501(a)-(b) (codified at 15 U.S.C.

§ 78u(d)(3), (7)-(8)); *see also Kokesh v. SEC*, 581 U.S. 455, 461-62 (2017).  The

Ninth Circuit has not considered whether the restrictions in *Liu* apply to both

sections of the Exchange Act.  The Second Circuit has addressed this issue
and held that *Liu* applies to both sections.  *United States SEC v. Ahmed*, 72
F.4th 379, 396 (2nd Cir. 2023) ("So we conclude that disgorgement under
§ 78u(d)(7) must comport with traditional equitable limitations as recognized
in *Liu*."); *see also Govil*, 86 F.4th at 102 ("Under *Ahmed*, the disgorgement
analysis under § 78u(d)(5) and § 78u(d)(7) are the same in that both depend
on *Liu*.").

The Second Circuit came to this conclusion by reasoning:  the Exchange
Act's use of the term "disgorgement" referred to a term in equity; remedies
grounded in equity must, absent other indications, be deemed to contain the
limitations upon their availability that equity typically imposes; repeals by
implication are disfavored; the language of the authorizing statute did not
evince an intent to contradict *Liu* or strip disgorgement of longstanding
principles of equity; and reading the codification as a clarification in this area
of the statute rather than as a repeal made sense, particularly when
compared with another part of the authorizing statute that expressly
overruled the five-year statute of limitations on disgorgement set by the
Supreme Court in *Kokesh*, 581 U.S. at 461-62.  *Ahmed*, 72 F.4th at 396.  The
Court finds this reasoning persuasive and agrees that *Liu* applies to the
disgorgement remedy, regardless of which sub-section it arises from.

In *Liu*, the Supreme Court discussed three traditional restrictions on
disgorgement as an equitable remedy and provided guidance on exceptions to
each restriction.  First, disgorgement must be imposed in the form of a
constructive trust for wronged victims and not deposited directly in the
Treasury, unless there are extenuating circumstances and another way in
which the SEC can meet its obligation to award relief "for the benefit of
investors", such as when "the wrongdoer's profits cannot practically be
disbursed to the victims." *Liu*, 591 U.S. at 82, 89-90.  Second, disgorgement

1 cannot be issued under a joint-and-several liability theory, except in the case

2 of "partners engaged in concerted wrongdoing." *Id.* at 82-83, 90-91.  Third,

3 disgorgement is limited to the net profits from wrongdoing and thus courts

4 "must deduct legitimate expenses before ordering disgorgement", except

5 where a court has ascertained that the "entire profit of a business or

6 undertaking" results from the wrongful activity.  *Id.* at 84, 92 (internal

7 quotation marks and citation omitted).

8 As to the first restriction, the SEC states it is prepared to petition for

9 the establishment of a Fair Fund.  For the following reasons, the

10 establishment of a Fair Fund is a necessary precondition to the SEC's request

11 for disgorgement in this matter.  The SEC requests equitable disgorgement,

12 not legal disgorgement.  This remedy, as provided for in the relevant statute

13 and traditionally by courts at equity, must be for the benefit of the defrauded

14 investors, not for the benefit of the SEC.  The exception to this rule is where

15 the equitable disgorgement recovered exceeds the amount lost or where there

16 is an equitable reason based in the benefit *of investors* not to disburse the

17 disgorged profits to them, such as administrability concerns that would lessen

18 their ultimate benefit.  Here, the defrauded investors are known, including

19 the amounts they were defrauded.  The investor losses far exceed the amounts

20 to be disgorged.[11]  The parties have not provided the Court with any equitable

21 reason based in the benefit of investors (such as unusual difficulty, expense,

22

23

24 [11] "Sarbanes-Oxley's Fair Fund provision provides the SEC with flexibility by permitting it to distribute civil penalties among defrauded investors by adding the

25 civil penalties to the disgorgement fund[.]"  *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 82 (2nd Cir. 2006) (Sotomayor, J.) (citing 15

26 U.S.C. § 7246).  Given the overwhelming losses at issue, disgorgement in this matter

27 would remain an equitable remedy even if civil penalties were added to any disgorged profits and prejudgment interest in a Fair Fund because those amounts

28 would still be grossly insufficient to make the defrauded investors whole.

1    or administrability) for why a Fair Fund should not be required.  Therefore,

2    the Court requires the establishment of a Fair Fund for disgorgement.

3        As to the second restriction, this is not an issue because the SEC

4    requests individualized disgorgement amounts from each defendant.

5        As to the third restriction, the Court considers below what are the net

6    wrongful gains for each defendant and what legitimate business expenses (if

7    any) should be deducted.

8 / 9
### d)    The SEC Meets Its Initial Burden to Show Reasonable Approximations of Net Profits

10       The SEC submits the Declaration of Dora Zaldivar and the exhibits

11   attached thereto ("Zaldivar Declaration") in support of its disgorgement

12   request.  [Dkt. No. 240-3.]  Among other things, the Zaldivar Declaration

13   discusses where monies came from, only accounts for funds that were later

14   distributed to other defendants or entities they controlled, and only includes

15   in its final disgorgement figures amounts that are adjusted for the proportion

16   of payments received from Elite.[12]  [*Id.*]  Appended to this Order are a table

17   from the body of the Zaldivar Declaration and a table from one of its exhibits.

18       Joint Defendants do not contest the inclusion of the Zaldivar

19   Declaration; Yale focuses on Zaldivar's deposition and trial testimony, only

20   noting as to the Zaldivar Declaration that it does not include any money paid

21   to Yale "for 'offering costs,' because there was none."  [Dkt. No. 241 at 17.]

22       Upon considering the materials submitted and the parties' arguments,

23   the Court finds the SEC has met its initial burden to show that the

24   calculations in the Declaration are reasonable approximations of the net gains

25   Joint Defendants and Yale made in unjust enrichment.  *See Platforms*

26   *Wireless Int'l Corp.*, 617 F.3d at 1096 (the burden of persuasion on the

27

28       [12] The exception to this appears to be a $2 million figure for the sale of the
     Elite shares held by RMMH, which would not have come directly from Elite.

36

disgorgement figure is ultimately with the SEC but shifts from the SEC to defendants after the SEC "establishes a reasonable approximation of defendants' actual profits").

### e) Defendants Do Not Meet Their Subsequent Burden to Show the SEC's Approximations are Unreasonable

Joint Defendants argue "the SEC fails to show reasonable approximation[s] of net gains" because "the SEC identifies no causal connection to the violations" and seeks "all payments" made by Elite to Defendants and their entities instead of focusing on "entity profits." [Dkt. No. 242 at 21-22.] According to Joint Defendants, this means there is no basis for the disgorgement of any of their profits. [*Id.* at 22-23.] Owens, Davenport and Gunton provided tables with their own approximations of their net profits. [Dkt. Nos. 243-5 at 96-98 (Owens Disgorgement Approximation); 249-1 at 2 (Davenport Disgorgement Approximation); 244-5 at 34-35 (Gunton Disgorgement Approximation).]

The evidence does not support Joint Defendants' arguments. First, as discussed above, the Jury found Joint Defendants liable for various securities violations, and the evidence at trial demonstrated that their payments from Elite were causally connected with their fraudulent activities. Second, the SEC has met its initial burden by showing sufficient evidence that all of the payments were fraudulent, wrongful net profits. It is therefore Joint Defendants' burden to counter with evidence that the SEC's approximations are unreasonable or that there should be deductions from the SEC's approximations. Finally, the tables submitted with the declarations of Owens, Davenport, and Gunton provide the pre-deduction figures provided by the SEC — supporting the SEC's argument that its disgorgement

1    approximations are reasonable.  Joint Defendants and Yale do not meet their

2    subsequent burden to show the SEC's approximations are unreasonable.

3          **f)      Limited Deductions from the SEC's
                     Approximations are Appropriate as to Owens,
4                    Davenport and Gunton**

5          Joint Defendants argue that "proper deductions must be made" if

6    disgorgement is imposed.  [Dkt. No. 242 at 23.]  However, Joint Defendants do

7    not clearly argue what, exactly, it is they seek deductions for.  It appears that

8    Joint Defendants request the Court allow four categories of deductions:  inter-

9    entity payments, income taxes, expenses, and proportional deductions to

10   income for legitimate work.

11         As noted above, the SEC concedes that the amount of investor funds

12   that RMM, Evolution and 7 Degrees transferred to other Defendants should

13   be deducted.  [Dkt. No. 240-1 at 29.]  Zaldivar deducted those amounts in

14   calculating the total disgorgement for each Defendant.  [See Dkt. No. 240-3,

15   Zaldivar Decl. ¶¶ 10-16.]  However, the SEC argues that Defendants "are not

16   entitled to deductions for any personal income taxes they may have paid on

17   their ill-gotten gains."  [Dkt. No. 240-1 at 30-31.]  The SEC further argues

18   that the tax returns submitted to the Court "appear to show that the claimed

19   business deductions actually supported the fraud" and that it is not the

20   Court's role to "ferret through their tax returns and divine what are

21   legitimate or illegitimate expenses, independent of operating their fraud".

22   [Dkt. No. 252 at 21.]

23         As to inter-entity payments, the Court agrees that they should be

24   legitimately deducted.  The SEC's requested disgorgement totals take these

25   deductions into account.

26         As to income taxes, "at common law, it is quite likely that tax benefits

27   would be ignored for purposes of a rescissory remedy."  *Randall v.*

28

                                         38

*Loftsgaarden*, 478 U.S. 647, 658 (1986).  "Under the 'direct product' rule, the party seeking rescission was required to credit the party against whom rescission was sought only with gains that were the 'direct product' of the property that the SEC had acquired under the transaction to be rescinded[.]" *Id*.  Accordingly, courts have repeatedly ignored tax benefits to investors in the securities fraud cases.  *Id.* at 656-60; *see also DCD Programs v. Leighton*, 90 F.3d 1442, 1447-52 (9th Cir. 1996) (holding, among other things, that investors' tax liabilities cannot be recovered as consequential damages or benefit-of-the-bargain damages); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1414 (9th Cir. 1987) ("An investment which leads to a suit for fraud does not vest a prevailing purchaser with a different measure of damages solely because the investment was marketed as a tax shelter. . . .[because] they did not acquire any alienable rights to tax losses having value apart from either the securities themselves or their status as limited partners.").  Further, courts have repeatedly limited tax deductions in analogous contexts.  *See, e.g., Nesbit v. McNeil*, 896 F.2d 380, 386-87 (9th Cir. 1990) (holding that a defendant engaged in fraud cannot "deduct the expenses he incurred in perpetrating the fraud and then return the rest to the client."); *see also Donell v. Kowell*, 533 F.3d 762, 778-79 (9th Cir. 2008) (holding even good faith investors cannot claim tax offsets from disgorgement under the Uniform Fraudulent Transfer Act).  Thus, taxes paid on net profits from unlawful gains are not deductible because they are not the direct product of the activities at issue.

Expenses and proportional deductions to income for legitimate work are addressed below on an individualized basis.

39

### **(1)   Owens**

The SEC calculates total disgorgement for Owens at $10,643,495.00
[Dkt. No. 240-3, Zaldivar Decl. ¶ 16.]  Owens does not dispute this calculation;
he argues that the SEC has not met its burden to establish the reasonable
approximation of the amount to be disgorged.  Specifically, Owens declares
that he "was the owner and operator of Real Media Marketing, Inc. ('RMM'),
from 2014 through 2018, as well as its successor, Evolution Consulting, Inc.
('Evolution'), from 2017 through Evolution's dissolution in 2018, and was the
owner and operator of 6 Degrees Services, Inc. ('6 Degrees') from 2014 through
2018." [Dkt. No. 243 at ¶ 5.]  He claims he "was not an owner, operator,
employee, associate, agent, or beneficiary of Legacy Leasing at any time, and
to the best of [his] knowledge, Legacy Leasing was owned and operated by
Blake Paz at all relevant times."  [*Id*.]  According to Owens, "RMM and
Evolution provided marketing and consulting services, including media
productions and administrative services to Elite from 2014 through 2018, that
Elite used to promote itself to prospective customers, investors, and
acquisition targets."  [*Id*. at ¶ 8.]  In addition, "RMM, Evolution, and 6
Degrees were companies that provided marketing and consulting services that
its clients used to promote its business to customers, potential acquisition
targets, and investors."  [*Id*. at ¶ 15.]

Owens lists dozens of specific services that RMM, Evolution, and 6
Degrees were apparently engaged in.  [*Id*.]  He also claims that these
companies "incurred legitimate expenses" and he provides more than two
dozen examples of such expenses.  Among other things, he states the SEC
"never alleged that the sale of data sets from 6 Degrees to Elite violated any
securities laws, or that the purpose or work of that separate entity was
wrongful or violated securities laws."  [*Id*. at ¶ 14.]  Owens declares "that at

40

least 1/3 (to at most 2/3) of [his] time working for Elite was spent helping Elite with work that it used to market and sell its securities". [*Id.* at ¶ 38.]  Owens also declares that he "personally loaned Elite $100,000 on a promissory note that [he] was not repaid, and [he] did not claim as bad debt on [his] tax returns." [*Id.* at ¶ 35; see also Dkt. No. 243-5 at 100-01.]  He submits a summary exhibit for what he believes any disgorgement amount against him should be. [*Id.* at ¶ 21; *see also* Dkt. No. 243-5 at 96-98.]

First, in his declaration Owens does not address the $2 million the SEC alleges he made from the illegal sale of the Elite shares held by RMMH.  This entire transaction was wholly fraudulent, and there is no basis for any deduction related to it.

Second, Owens' claim about Legacy Leasing and Blake Paz is belied by the evidence and testimony at trial.  Contrary to Owens' claim that he "was not an owner, operator, employee, associate, agent, or beneficiary of Legacy Leasing at any time," Blake Paz credibly testified that Owens paid him an extra $1,000.00 per week to establish Legacy Leasing and formally list him as the head of it.  Paz knew Yale through Owens, and Owens told Paz to go with Yale to the bank to create Legacy Leasing — which Paz did, in significant part because Owens had previously played the role of a father figure to Paz. However, Paz never had any control of Legacy Leasing, and he never personally signed or authorized any checks to employees on behalf of it.  Dora Zaldivar declares that she reviewed the bank records for Legacy Leasing from September 2016 through May 2018, noted that Elite comprised approximately 98% of the payments to Legacy Leasing, and Legacy Leasing in turn paid 6 Degrees Services $508,500.00 from October 31, 2016 through January 26, 2018.  [Dkt. No. 240-3 at ¶ 13.]  The Court finds the evidence from Dora Zaldivar to be credible.  Legacy Leasing was an illegal sales operation; the money Elite sent to Legacy Leasing that was not fraudulently siphoned to pay

1    Owens through 6 Degrees was primarily used to pay illegal commissions to

2    unlicensed salespeople.  Because all activities associated with Legacy Leasing

3    were wholly fraudulent, there is no basis for any deduction related to it.

4         Third, none of 6 Degrees' activities were legitimate.  The purpose of this

5    entity was to obtain and produce data sets of investors for the illegal sales

6    operation.  As discussed above, the entity also obtained money from Legacy

7    Leasing, which itself was an illegal sales operation.  Because all activities

8    associated with 6 Degrees were wholly fraudulent, there is no basis for any

9    deduction related to it.

10        Fourth, the evidence and testimony at trial demonstrated that Owens

11   engaged in some legitimate activities, including some of the activities

12   identified in his declaration that involved RMM and Evolution.  In addition, a

13   minor amount of legitimate activity can be imputed to Owens for his branding

14   and marketing activities, as discussed below regarding Gunton.  However, the

15   overwhelming majority of his and his companies' activities were violations of

16   securities laws by maximizing the use and effectiveness of unlicensed brokers

17   for the purpose of obtaining investor funds through any means possible.

18   Putting aside that the evidence at trial did not show Owens' companies

19   provided some of these services (e.g., "consumer research", "core competency

20   evaluations and recommendations", or "financial plans"), it defies both the

21   evidence presented and logic to believe that Owens or his companies assisted

22   Elite with activities like "return-on-investment", "proper qualification", and

23   "ethical selling practices."  [Dkt. No. 243 at ¶ 15.]  As Owens' trial testimony

24   was not credible, the Court cannot accept his words as evidence that "at most"

25   2/3 of his time for Elite was spent on the marketing and sale of securities.

26        Fifth, the evidence and testimony at trial indicate that Owens' proposed

27   deductions for expenses had nothing to do with the legitimate activities

28   discussed above.  For example, Owens provides RMM's 2014 through 2018

profit and loss statements.  [Dkt. Nos. 243-1 at 113-114; 243-2 at 2-3; 243-2 at 5-6; 243-2 at 8-9; 243-2 at 11-12; 243-2 at 14-15.]  These documents do not explain what some of these expenses were (e.g., $240,445.37 in "outside services" and $82,000.00 in "consulting" in the 2014 profit and loss statement).  Further, these documents do not explain to what extent some of these expenses were legitimate activities as opposed to fraudulent ones (e.g., $67,216.60 in "marketing" and $99,685.07 in "media production" in the 2018 profit and loss statement).[13]  Owens does not provide explanations for these expenses in his declaration.  In addition, a review of Owens' and his entities' tax returns and profit and loss statements suggests that he engaged in rampant over-expensing.  The Court determines Owens has not met his burden of showing why any of these deductions were related to the minor amount of legitimate business activities he engaged in on behalf of Elite.  Given the proposed deductions, the Court concludes that the decrease in the SEC's disgorgement approximation by 5% should more than adequately account for any legitimate deductions to which Owens might be entitled.

Finally, there is no basis for a deduction based on the $100,000.00 in "bad debt" due to the promissory note Owens contracted with Elite.  That amount is not part of the SEC's approximation of net profits from unlawful gains.  Had Elite paid Owens back on the promissory note and had Zaldivar counted that amount in calculating the disgorgement amount, Owens would have a reasonable argument for requesting a deduction.  But the evidence presented does not indicate that this amount is included as part of the SEC's disgorgement approximation.  Further, this amount is not a direct product of his legitimate work for Elite.  Rather, it appears to be an individual contract

---

[13] This presumes that these expenses were incurred in the first place.  The Court cannot verify the veracity of any expenses because documentation corroborating Defendants' declarations, tax returns, and other exhibits was not provided.

43

that he entered into with the company, separate from the securities violations at issue in this matter. Thus, it would be inappropriate to deduct this amount.

The evidence showed that Owens engaged in a minor amount of legitimate activity. Specifically, as discussed below, 25% of Gunton's work for Elite was legitimate; since Owens asked Gunton to join RMM, arguably that legitimate work should be credited to Owens as well. However, that legitimate work is a small percentage of Owens's overall activities, which were predominately fraudulent. Based on the testimony and exhibits admitted at trial and the arguments and evidence submitted by the parties in connection with the Motion, the Court finds that at most 5% of Owens' activities were legitimate and should be deducted from the disgorgement amount calculated by Zaldivar. Accordingly, the total disgorgement amount sought by the SEC is decreased by 5%. This decrease more than adequately accounts for any legitimate deductions to which Owens might be entitled, despite his failure to provide the specific information required to support them.

### (2)    Davenport

The SEC calculates total disgorgement for Davenport at $394,698.00 [Dkt. No. 240-3, Zaldivar Decl. ¶ 16.] Davenport does not dispute this calculation; he argues that the SEC has not met its burden to establish the reasonable approximation of the amount to be disgorged. Specifically, Davenport declares that he "provided construction and facilities management, real property development, and business consulting services on behalf of RMM and Evolution to Elite", and that examples of his work include "installing fire sprinklers, purchasing and installing construction materials, including lumber". [Dkt. No. 242-3 at ¶¶ 9-10.] Davenport contends that

"[his] primary trade is real estate development and construction management, and that work accounts for the vast majority [he] performed for Elite." [*Id.* at ¶ 30.] He claims "no evidence was presented at trial and the jury made no determination as to how much of [his] time working for Elite concerned real estate versus other administrative and consulting matters outside of [his] real estate work that had nothing to do with Elite's investor sales." [*Id.*] His "best, most accurate estimate is that at most, 1% of [his] time working for Elite was spent performing services that were in one way or another related to the marketing and sale of Elite securities or otherwise put at issue in this lawsuit". [*Id.* at ¶ 31.]

The evidence and testimony at trial established that Davenport was far more involved in the scheme than his declaration suggests. Davenport worked as a consultant for Owens' entities, helping him hide the true nature of his activities. As stated above, Davenport worked closely with Zia, drafting contracts that led to millions of investor dollars being funneled out of Elite and into accounts controlled by Defendants and their entities. The trial evidence showed that Davenport assisted in the dissemination to auditors of false, backdated letters regarding purported discretionary bonuses and that he was involved in drafting and reviewing Elite's offering documents that failed to disclose the investment-related compensation to the sales team. The evidence also showed Davenport directing that a false footnote be added to an Elite financial statement. He attended and participated in Elite's board meetings, using his influence to control Elite's decisions to benefit his interests over investors' interests.

Based on the trial evidence, Davenport's testimony as to the percentage of time he spent "performing services that were in one way or another related to the marketing and sale of Elite securities or otherwise put at issue in this lawsuit" is not credible. While the trial evidence corroborates the statements

45

1    in his declaration that he engaged in real estate activities in support of the

2    legitimate functioning of Elite, they do not corroborate that anywhere near

3    99% of his time was spent on such activities.  Davenport does not meet his

4    evidentiary burden, as he has only presented the Court with his tax returns,

5    his testimony, and an argument about the absence of evidence at trial.  For

6    the reasons discussed above, the evidence at trial was sufficient to find that

7    he was highly involved in the fraudulent activities at issue.

8         Regarding expenses, Davenport points to his tax returns to claim "total

9    legitimate expenses of $500,806" from 2015 to 2018.  [Dkt. No. 249 at ¶ 22.]

10   Davenport also claims that "85% of [his] total business efforts can be

11   reasonably attributed to the services [he] performed for all of RMM,

12   Evolution, and 6 Degrees' customers, including Elite and others."  [*Id.* at ¶

13   23.]  This does not seem to be a meaningful datapoint, except to the degree

14   that it would explain how much any of his legitimate expenses should be

15   apportioned downward.  Davenport also includes (as an unlisted exhibit to his

16   declaration) a table that seems to compile his transactions from June 2015 to

17   February 2018.  Most items on this table do not have any memoranda; the

18   items that could have any potential connection to Davenport's real estate

19   work for Elite include in the memo line "Reimb".  This table indicates

20   Davenport was reimbursed for any legitimate expenses he incurred.

21        Based on the testimony and exhibits admitted at trial and the

22   arguments and evidence submitted by the parties in connection with the

23   Motion, the Court finds that at most 20% of Davenport's activities were

24   legitimate and should be deducted from the disgorgement amount calculated

25   by Zaldivar.  Accordingly, the total disgorgement amount sought by the SEC

26   is decreased by 20%.  This decrease more than adequately accounts for any

27   legitimate deductions to which Davenport might be entitled, despite his

28   failure to provide the specific information required to support them.

### (3)    Gunton

The SEC calculates total disgorgement for Gunton at $1,148,013.00
[Dkt. No. 240-3, Zaldivar Decl. ¶ 16.]  Gunton does not dispute this
calculation; he argues that the SEC has not met its burden to establish the
reasonable approximation of the amount to be disgorged.  Specifically,
Gunton declares that he "provided marketing and consulting services focused
on production, including video, audio, and other media, emcee, and related
administrative services to Elite from 2014 through 2018, which Elite used to
promote itself to prospective customers, investors, and acquisition targets."
[Dkt. No. 244 at ¶ 7.]  Gunton further declares that he "would [reasonably]
estimate that approximately a minimum of 1/3 and a maximum of 2/3 of [his]
time was dedicated towards the work that Elite used to promote, market, and
sell Elite securities."  [*Id.* at ¶ 43.]

The trial evidence and testimony demonstrated some of Gunton's
marketing activities were legitimate, as they included efforts to brand Elite
and promote the company to prospective customers for the manufacturing
side of the business.  However, as with Owens and Davenport, Gunton's
statements in his declarations as to the percentage of his legitimate work for
Elite are not credible.  Gunton was placed on the board of Elite, despite
having no experience with aerospace manufacturing, so that he could control
Elite's decisions and benefit himself over investors.  Gunton was heavily
involved with the salespeople illegally selling securities, as testified to by
multiple witnesses.  Gunton worked with Lindstrom on hiring the salespeople.
While Gunton made multiple videos that were used for branding and
advertising Elite, some of these videos were focused on investors and others
were focused on both investors and legitimate aerospace clients.  For the

1  reasons discussed above, the evidence at trial was sufficient to find that he

2  was highly involved in the fraudulent activities at issue.

3      As to expenses, Gunton claims that his entity Big Gun Creative, Inc.

4  ("BGC") "had total deductions of $1,049,321.00 for legitimate business

5  expenses", which were recorded in his and his entities' tax returns.  [Dkt. No.

6  244 at ¶ 25.]  He lists the various expenses that he claims "all represent the

7  legitimate cost of doing business."  [*Id.*]  However, based on the evidence at

8  trial, there is no basis for the Court to conclude that many of the items listed

9  in the tax returns (e.g., computers, cameras, vocal equipment, etc.) were used

10 exclusively for the legitimate marketing purposes of Elite and not in

11 furtherance of the fraudulent scheme.  To the extent that expenses were

12 incurred for items used for both legitimate and fraudulent purposes, Gunton

13 has not provided evidence to support his claim that these expenses are

14 suitable for deductions.  The Court has reviewed Gunton's expenses and finds

15 he has not met his burden to show further deductions for expenses are

16 warranted.

17     Based on the testimony and exhibits admitted at trial and the

18 arguments and evidence submitted by the parties in connection with the

19 Motion, the Court finds that at most 25% of Gunton's activities were

20 legitimate and should be deducted from the disgorgement amount calculated

21 by Zaldivar.  Accordingly, the total disgorgement amount sought by the SEC

22 is decreased by 25%.  This decrease more than adequately accounts for any

23 legitimate deductions to which Gunton might be entitled, despite his failure to

24 provide the specific information required to support them.

25          **(4)    Lindstrom**

26     The SEC calculates total disgorgement for Lindstrom at $186,799.00

27 [Dkt. No. 240-3, Zaldivar Decl. ¶ 16.]  Lindstrom does not dispute this

28

calculation; she argues that the SEC has not met its burden to establish the reasonable approximation of the amount to be disgorged.  Specifically, Lindstrom declares that she "provided administrative support services to Elite that included:  confirming that documents were completely filled out by prospective investors, and compiling information to be transmitted to decision makers within Elite to determine accreditation status; assisting in compiling other various documents and data entry, as well as proof reading other documents at the direction of Elite."  [Dkt. No. 242-2 at ¶ 10.]

However, none of these activities were required for Elite's legitimate functioning.  Rather, the evidence at trial showed that all of these activities directly contributed to the fraud perpetrated upon Elite's investors.[14]  In other words, Lindstrom's efforts were not in service of Elite's legitimate activities. Without legitimate activities, there cannot be legitimate expenses.

Lindstrom has not met her burden of showing any deductions from the SEC's disgorgement approximation are appropriate. Accordingly, the Court orders disgorgement in the amount calculated by the SEC.

### (5)   Yale

The SEC calculates total disgorgement for Yale at $550,440.00 [Dkt. No. 240-3, Zaldivar Decl. ¶ 16.] Yale does not dispute this calculation; she argues that the SEC has not met its burden to establish the reasonable approximation of the amount to be disgorged. Specifically, Yale declares that she "provided, through [her] company, Yale Entity Services, Inc., bookkeeping services for [Elite], as well as for Real Media Marketing and Evolution Consulting, Inc., among others."  [Dkt. No. 241-1 at ¶ 9.]

---

[14] Joanne Abma testified that she was employed by Elite as the payroll and human resources manager, and she processed the biweekly payroll and worked on benefits and human resources matters.

As explained above, Yale's bookkeeping services were not required for the legitimate functioning of Elite. Rather, the evidence at trial showed that Elite eventually obtained in-house staff, who did the books for Elite's employees, manufacturing sales, and legitimate activities. Yale's bookkeeping services were instead used primarily to further securities fraud. Again, without legitimate activities, there cannot be legitimate expenses.

Yale has not met her burden of showing any deductions from the SEC's disgorgement approximation are appropriate. Accordingly, the Court orders disgorgement in the amount calculated by the SEC.

### g)    Prejudgment Interest is Appropriate

"Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *W. Va. v. United States*, 479 U.S. 305, 310 n.2 (1987). Although not all statutes explicitly mention prejudgment interest, "the failure to mention interest in statutes which create obligations has not been interpreted by [the Supreme Court] as manifesting an unequivocal congressional purpose that the obligation shall not bear interest." *Rodgers v. United States,* 332 U.S. 371, 373 (1947). In practice, this has led courts to hold that prejudgment interest is available in equity for "recoverable damages" to those who have "suffered actual money damages" but that it is unavailable in equity for civil and criminal penalties. *Id.* at 373-75 (holding the Government "is therefore equitably entitled to interest" if "a taxpayer fails to pay taxes when due" because the Government "does suffer recoverable damages"). "Statutory damages differ meaningfully from actual damages: while actual damages only compensate the victim, statutory damages may compensate the victim, penalize the wrongdoer, deter future wrongdoing, or

1    serve all those purposes." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1008

2    (9th Cir. 2023).  "Allowing prejudgment interest on statutory damages may

3    inflate them to amounts disproportionate to what Congress thought fit to

4    remedy those harms."  *Id.*

5         The Exchange Act does not explicitly include a remedy for prejudgment

6    interest on disgorgement amounts.  *See* 15 U.S.C. § 78u(d).  In *Kokesh*, 581

7    U.S. at 457, the Supreme Court held that "[d]isgorgement in the securities-

8    enforcement context is a 'penalty' within the meaning of [28 U.S.C.] § 2462,

9    and so disgorgement actions must be commenced within five years of the date

10   the claim accrues."  But three years later, the Supreme Court held "that a

11   disgorgement award that does not exceed a wrongdoer's net profits and is

12   awarded for victims is equitable relief permissible under [15 U.S.C.]

13   § 78u(d)(5)."  *Liu*, 591 U.S. at 75.

14        First, the disgorgement allowed in this order is equitable relief in

15   compliance with *Liu* that compensates victims and does not exceed their

16   actual damages.  Thus, the Court will allow prejudgment interest solely on

17   the disgorgement amounts discussed above, using the undisputed

18   methodology requested by the SEC.

19        Second, contrary to Yale's argument, disgorgement is warranted.  Thus,

20   there is no corresponding reason why prejudgment interest should be

21   disallowed.

22        Finally, as discussed above, there is no evidence in the record that the

23   SEC delayed in investigating this case.  There is similarly no evidence in the

24   record that the SEC delayed in prosecuting this case once it was filed.  Thus,

25   the amount of prejudgment interest sought is not inflated due to delay.

26

27

28

### D.    The Effect (or Lack Thereof) of Tillman and Zia's Proposed Consent Judgments on These Remedies

#### 1.    Procedural Background

On December 17, 2024, the SEC filed Consent of Defendant Dustin B. Tillman to Entry of Final Judgment and Consent of Defendant Zeeshawn S. Zia to Entry of Final Judgment ("Proposed Consent Judgments"). [Dkt. Nos. 253, 254.] The Proposed Consent Judgments would impose permanent injunctions against further violations of the securities laws, officer and director bars, and penny stock bars, but they would not impose conduct-based injunctions, civil penalties, disgorgement, or prejudgment interest. [*Id*.] Because the Proposed Consent Judgments were filed after the Motion and responsive papers were filed, the parties were provided the opportunity to submit supplemental briefing as to the effect (if any) of the Proposed Consent Judgments. [Dkt. No. 255.]

#### 2.    Applicable Law

"The Supreme Court has long endorsed the propriety of the use and entry of consent judgments." *SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984). "A consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions . . . ." *Id*. "In addition, because it is a form of judgment, a consent decree must conform to applicable laws." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). "However, a consent decree need not impose all the obligations authorized by law." *Id*. at 581. Moreover, a court should not condition approval of a consent decree based "on what it consider[s] to be the public's best interest." *Randolp*h, 736 F.2d at 529 (emphasis in original). "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Id*.; see also Oregon, 913 F.2d at 585. "Also, the courts should pay deference to the judgment of the government

1  agency which has negotiated and submitted the proposed judgment."

2  *Randolph*, 736 F.2d at 529.

3  ### 3.  The Parties' Arguments

4  Joint Defendants argue that the differences between the remedies

5  sought in the Proposed Consent Judgments and in the Motion show that the

6  SEC has "impermissibly stray[ed] from the purpose and limitations of [the

7  SEC's] own mission of protecting investors, maintaining fair, orderly, and

8  efficient markets, and facilitating capital formation."  [Dkt. No. 260 at 2.]

9  Joint Defendants further argue that the facts and evidence in the record

10 should raise a suspicion that the Proposed Consent Judgments were entered

11 into via collusion and a quid pro quo.  [*Id.* at 3.]  Joint Defendants then repeat

12 their claims about what they believe the evidence showed, how that evidence

13 ostensibly established "the individuals ultimately responsible for [the $67

14 million in Elite shareholder] losses were Tillman and Zia", and why the

15 remedies at issue should be imposed on Tillman and Zia — but not on Joint

16 Defendants.[15]  [*Id.* at 4-6.]

17 Yale joins Joint Defendants' arguments.  [Dkt. No. 261.]  In addition,

18 she reiterates prior arguments as to why she believes these remedies are

19 inappropriate as to her, why she believes the conduct of Tillman and Zia

20 warrants remedies, and how the late revelation that the SEC "negotiated and

21 agreed not to seek disgorgement or civil penalties in any amount" from

22

23

24

25

26 [15] In support of their arguments, Joint Defendants cite a footnote from a bankruptcy case involving Tillman and Zia.  [Dkt. No. 260 at 3-4 (citing Tr. Ex. 1650

27 n.2.)]  Although the Jury was presented with this footnote, the Jury still found Joint Defendants and Yale liable on all counts tried.

28

1  Tillman and Zia should result in the Court not imposing those remedies on
2  her.[16]  [Dkt. No. 259 at 1-4.]

3       The SEC cites *Randolph*, 736 F.2d at 529 and *Oregon*, 913 F.2d at 581
4  for the proposition that substantial deference should be made to an
5  administrative agency's discretionary authority to determine appropriate
6  remedial relief considering the specific facts of a case.  [Dkt. No. 262 at 2.]  In
7  addition, the SEC discusses the evidence at trial, what the SEC believes the
8  evidence showed, how the proposed consent judgments are fair in light of the
9  evidence, and how the remedies on Joint Defendants and Yale are also fair
10 considering the evidence.  [*Id*. at 5-6.]  The SEC argues that the
11 distinguishing factors between Tillman and Zia and the other defendants "is
12 their conduct, culpability, recognition of wrong-doing, and cooperation with
13 [the SEC]."  [*Id*. at 2.]  The SEC also argues that the conduct-based
14 injunctions sought against Joint Defendants are only appropriate against
15 them, and not against Tillman and Zia, because Tillman and Zia "were not in
16 the business of operating fraudulent boiler rooms under the guise of so-called
17 service contracts."  [*Id*. at 5.]

18            **4.    The Proposed Consent Judgments are Fair,**
                     **Adequate, and Reasonable — and Thus Have No**
19                   **Effect on the Remedies at Issue**

20       The evidence at trial showed that Owens, Davenport, Gunton,
21 Lindstrom, Yale, Tillman, and Zia all knowingly engaged in fraudulent
22 conduct that harmed investors to the tune of $67 million.  To paraphrase one
23 of the trial witnesses, no one is an angel in this case.  However, there is no
24 evidence of collusion or a quid pro quo between the SEC and Tillman and Zia,
25 and it would be a false equivalency to place Tillman and Zia in the same
26

27       [16] Yale's argument about delay is moot.  The Court gave the parties an
   opportunity for supplemental briefing as to the effect of the proposed consent
28 judgments.

54

1    category as Owens, Davenport, Gunton, Lindstrom, and Yale.  As noted by the

2    SEC, Tillman and Zia acted differently than Joint Defendants and Yale, both

3    before and after this case began.  The former spent most of their time trying

4    to create a legitimate aerospace manufacturing company; the latter did not.

5    The former accepted their culpability and cooperated with the SEC; the latter

6    have not.  The former have ceased working on securities-related matters; the

7    latter have raised concerns that they will engage in further violations of the

8    securities laws.

9          The relevant question is whether the proposed consent judgments are

10   fair, adequate, and reasonable — not whether the proposed consent

11   judgments are the best deals possible for the public, or whether the SEC

12   strayed from its mission in crafting the deals.  *See Randolph*, 736 F.2d at 529.

13   Tillman and Zia may not have to pay civil penalties or disgorgement, but they

14   will be permanently barred from further violations of the securities laws,

15   officer and director positions in public companies, and participating in

16   offerings of penny stock.  These permanent injunctions are no small

17   concessions for two individuals who held officer and director positions in Elite.

18   Significantly, they both accepted responsibility for their actions and

19   cooperated with the SEC, both during investigation and at trial.  Ultimately,

20   the proposed consent judgments do not authorize all remedies under law, nor

21   do they have to.  "Compromise is the essence of a settlement."  *Id.*

22         The Court finds that the proposed consent judgments are fair, adequate,

23   and reasonable.  This is an independent finding, without any need to defer to

24   the agency's judgment.  *See Randolph*, 736 F.2d at 529.  The Court further

25   finds that the proposed consent judgments have no effect on the remedies

26   requested by the SEC as to Joint Defendants and to Yale.

27

28

**V.    Conclusion**

    The SEC's Motion is Granted in part.

    The Court will enter judgment as discussed above as to each defendant.

    The SEC will submit a proposed order for the establishment of a Fair Fund.  The Court encourages the SEC to submit a proposed order that adds the civil penalty amounts to the Fair Fund pursuant to 15 U.S.C. § 7246(a).

    IT IS SO ORDERED.

DATED: April 24, 2025

PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

Attachments:

- Adjustments to Civil Monetary Penalty Amounts (signed January 8, 2018)
- Adjustments to Civil Monetary Penalty Amounts (signed January 5, 2024)
- Summary of Disgorgement Amounts [Dkt. No. 240-3 at 7-8]
- Summary of Elite Payments to Defendants [Dkt. No. 240-3 at 14]
- Service List