UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 8:21-cv-01427-PD |
| Plaintiff, | **ORDER RE MOTION FOR PRELIMINARY INJUNCTION CONTINUING ASSET FREEZE** |
| v. | |
| DAWSON L. DAVENPORT, et al., | |
| Defendants. | |

## I.    Summary

Before the Court is the motion by Plaintiff Securities and Exchange Commission ("SEC") for a preliminary injunction.  The Motion is fully briefed and the Court has considered all the pleadings and the arguments of counsel.

The SEC seeks a preliminary injunction to continue the temporary restraining order ("TRO") freezing assets entered on April 14, 2025, and modified on June 10, 2025.  The SEC argues the asset freeze should continue because it meets the four-factor test for a preliminary injunction, including likelihood of success on a claim to void transfers of assets made by Defendant and Judgment Debtor Michael Owens ("Owens") to Orlina Owens pursuant to the marital settlement agreement ("MSA") incorporated into their divorce

judgment by the Superior Court of California, County of Orange ("Superior Court"). The SEC filed its request for a TRO on April 9, 2025, and (as noted above) the TRO was issued on April 14, 2025. To date, the SEC has not submitted a proposed amended pleading for a cause of action for voiding a fraudulent conveyance, whether pursuant to the Securities Exchange Act of 1934 ("Exchange Act"), California's Uniform Voidable Transactions Act ("CUVTA"), or another basis. At the June 13, 2025 hearing, SEC counsel stated that it was seeking authorization to do so and requested 60 days in which to bring its claim. Owens responded that the SEC was required to make its showing by the time of the hearing and that it was choosing not to act quickly despite its ability to do so.

For the reasons set forth below, the Court finds as follows:

Federal courts across the country exercise jurisdiction over pre-judgment and post-judgment fraudulent transfer claims for the purpose of enforcing judgments. They do so in district courts, bankruptcy courts, and tax courts, and according to various state and federal laws. The *Rooker-Feldman* doctrine would not preclude the SEC from filing a fraudulent transfer claim in federal court, including a claim under CUVTA to set aside the MSA at issue. To the contrary, jurisdiction would lie in federal court via 28 U.S.C. § 1345 for a separate lawsuit by the SEC under CUVTA to void any fraudulently made transfers, including transfers made pursuant to an incorporated MSA and otherwise protected by California state law.

However, federal courts are courts of limited jurisdiction. The scope of ancillary jurisdiction over a CUVTA claim arising from this case would be limited. Specifically, there is not post-judgment ancillary jurisdiction in this case over Orlina Owens as a new party or a new cause of action under CUVTA to set aside the MSA because that would stretch ancillary jurisdiction farther than allowed by the Supreme Court under *Peacock v. Thomas*, 516 U.S. 349

2

(1996).  As to ancillary jurisdiction over Orlina Owens, the existence of the

MSA incorporated into the divorce judgment involves mixed questions of law

and fact as to whether the SEC seeks only to enforce its judgment against

Owens or to also establish liability against Orlina Owens.  As to ancillary

jurisdiction under CUVTA to set aside the MSA, the text of CUVTA and

California case law indicate it is a separate cause of action that, in the

circumstances of this case, would not allow it to be used for ancillary

jurisdiction pursuant to Federal Rule of Civil Procedure 69 or the Exchange

Act.

 The Ninth Circuit and other federal courts have found the exercise of

ancillary jurisdiction over post-judgment fraudulent transfers to be consistent

with *Peacock*.  However, in addition to the reasons discussed above, the

proposed fraudulent transfer litigation here presents multiple complexities

that make those cases inapposite for the purposes of ancillary jurisdiction.

Such complexities include but are not limited to:  whether upon considering

the factors in CUVTA it is more likely than not that Owens fraudulently

transferred his property to Orlina Owens; whether defendants who bring a

cause of action pursuant to CUVTA have a Seventh Amendment right to a

jury trial pursuant to *Granfinanciera v. Nordberg*, 492 U.S. 33 (1989);

whether the California Family Code (see, e.g., sections 902, 903, 910, 2620,

2623, 2625) allows the SEC to reach the entire community property solely

through Owens and not by suing both Owens and Orlina Owens; whether

sections 704.114 and 704.115 of the California Code of Civil Procedure allow

the SEC to reach and seek to void the retirement plan that Owens argues is

validly established pursuant to those sections; and, in a potential scenario

where the MSA should be set aside but the entire community cannot be

reached, what the proper division of property should be under California law.

By contrast, cases in which federal courts have exercised ancillary

3

1  enforcement jurisdiction to set aside a judgment debtor's fraudulent transfer

2  did not establish new liability.   As discussed further below, these

3  complexities mean the exercise of ancillary jurisdiction would run afoul of the

4  boundaries set forth in *Peacock*.

5       The Court therefore does not reach the issue of whether the SEC is

6  likely to succeed on the merits of a potential CUVTA claim over the MSA and

7  therefore denies the SEC's request for a preliminary injunction.  *Winter v.*

8  *Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

9       Although the SEC has not filed its proposed claim, the SEC has shown

10  the assets are likely to dissipate and become unrecoverable if the asset freeze

11  is lifted.  That would place hardship and inequity on the investors, as the SEC

12  seeks to recover at least a portion of these assets for return to investors via a

13  Fair Fund plan.  On the other side, Orlina Owens is not a defendant in this

14  securities violation matter or a defendant in a separate fraudulent conveyance

15  lawsuit; it would place a hardship and inequity on Orlina Owens to be

16  enjoined from assets that were adjudicated to be hers by the Superior Court.

17       For these reasons, the Court exercises its inherent authority to stay this

18  Order until July 23, 2025.  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  At

19  that time, if the SEC has not brought any fraudulent conveyance claim, the

20  asset freeze will lift.  If the SEC has brought a fraudulent conveyance claim,

21  the asset freeze will remain in effect until August 11, 2025.  Within one week

22  of the SEC bringing a fraudulent conveyance claim, the SEC, Owens, and

23  Orlina Owens may submit a supplemental pleading setting forth their

24  positions regarding the asset freeze.

25  ## II.    Pertinent Procedural History

26       A jury found Owens liable for securities fraud and registration

27  violations on September 20, 2024.  [Dkt. No. 234.]  Pursuant to the final

28

4

judgment against him entered on April 24, 2025, Owens is liable for disgorgement of $10,111,320.20, as well as prejudgment interest in the amount of $3,827,853.05 and a civil penalty in the amount of $184,767.00. [Dkt. No. 296 at 6.][1]  The final judgment provides that the SEC may enforce the judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law.  [*Id.* at 7.]

On April 9, 2025, the SEC filed its ex parte application for a TRO and order to show cause ("OSC") why a preliminary injunction should not be granted and orders (1) freezing specified assets of Owens, (2) requiring an accounting, and (3) granting expedited discovery (the "Application").  [Dkt. No. 273.]  Owens opposed the Application, and on April 14, 2025, the Court held a hearing.  [Dkt. Nos. 275, 276, 281.]  The Court granted the Application, issued the TRO, and set a hearing on the OSC.  [*Id.*]  The SEC and Owens filed supplemental briefing.[2]  [Dkt. Nos. 287-289, 302, 303.]  Trustee Mark A. Ziebold ("Ziebold") submitted an amended response and Orlina Owens requested limited intervention.  [Dkt. Nos. 290, 305.]

On April 28, 2025, the Court held a hearing on the OSC.  [Dkt. No. 311.] After considering the filings and hearing argument, the Court extended the TRO with modifications on a briefing schedule as agreed by the parties, allowed additional discovery, and granted Orlina Owens' unopposed request for intervention.  [Dkt. Nos. 311, 312.]  The hearing on the OSC was further continued pursuant to the parties' stipulation.  [Dkt. Nos. 325, 327.]  Prior to the OSC, the Court lifted in part the asset freeze and directed the turnover of

---

[1] The Court uses the page numbers placed on the document by the electronic docketing system.

[2] Owens objected to the SEC's supplemental filing at Docket No. 287, arguing it was unauthorized and defeats the purpose of the briefing schedule.  [Dkt. No. 291.] As the parties have since stipulated to and been provided opportunities for supplemental briefing on this matter, the objection is overruled.

certain funds to the SEC, also pursuant to the parties' stipulation.  [Dkt. Nos. 337, 338.]

The SEC, Owens, and Orlina Owens submitted supplemental briefing and Ziebold submitted a declaration.  [Dkt. Nos. 318, 331, 334-336, 339.]  On June 13, 2025, the Court held the hearing on the OSC and extended the TRO until the issuance of this Order.  [Dkt. No. 341.]

## III.   Legal Standard for Preliminary Injunctions

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Id.* at 24.  The Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  *Id.*  Courts must apply the traditional four factors articulated in *Winter* when interpreting statues that authorize preliminary and permanent injunctions, absent a clear command from Congress.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).

"The point of an asset freeze is to prevent [the assets'] dissipation and waste so they will be available for disgorgement."  *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1360 (S.D. Cal. 2012) (citing *SEC v. Hickey*, 322 F.3d 1123, 1132 (9th Cir. 2003)).  A request for a temporary asset freeze is subject to the same test for a preliminary injunction.  *SEC v. Liu*, SACV 16-974-CJC(AGRx), 2020 WL 8125530, at *1 (C.D. Cal. Dec. 8, 2020) ("An asset freeze is also akin to a preliminary injunction."); *see also SEC v. Bar Works Cap., LLC*, No. 17-cv-4392-EMC, 2017 WL 4642311, at *3 (N.D. Cal. Oct. 16, 2017) (same).  "A party seeking an asset freeze must show a likelihood of dissipation of the

claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).

## IV.    Discussion

The SEC moves the Court to enter a preliminary injunction continuing the freeze over the assets identified in the TRO, as modified by the order partially lifting the freeze. [Dkt. Nos. 312, 338.] The SEC argues likelihood of success on the merits of a claim to set aside as fraudulent transfers of specified assets to Orlina Owens pursuant to the MSA. Owens and Orlina Owens argue the Court lacks jurisdiction over this proposed fraudulent conveyance claim and the SEC would not prevail even if there were jurisdiction. Owens further argues there can be no relief because the SEC has not brought a fraudulent conveyance claim.

### A.    California's Fraudulent Conveyance Law

CUVTA permits defrauded creditors to reach property in the hands of a transferee. *Mejia v. Reed*, 31 Cal. 4th 657, 663 (2003).[3] CUVTA provides that a transfer incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" or "[w]ithout receiving a reasonably equivalent value in exchange for the transfer". *Bijan Boutiques, LLC*, 104 Cal. App. 5th at 140 (quoting Cal. Civ. Code § 3439.04(a)(1)-(2)). CUVTA applies to property transfers under marital settlement agreements. *Mejia*, 31 Cal.4th at 669.

---

[3] In 2015, the California Legislature amended what had been known as the Uniform Fraudulent Transfer Act, replacing the word "fraudulent" with "voidable". *Bijan Boutiques, LLC v. Isong*, 104 Cal. App. 5th 132, 138 n.5 (Ct. App. 2024). The law is now "cited as the Uniform Voidable Transactions Act." Cal. Civ. Code § 3439. "Although the enactment added specified burdens of proof, it did not alter the essential elements of a cause of action for a fraudulent or voidable transfer." *Bijan Boutiques, LLC*, 104 Cal. App. 5th at 138 n.5 (internal citation omitted). Courts in California thus "continue to rely on opinions addressing the UFTA." *Id.*

### B.    The SEC's Authorization Under 28 U.S.C. § 1345

The SEC is an agency of the United States authorized to bring suit. "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." 28 U.S.C. § 1345. Accordingly, under 28 U.S.C. § 1345, there would be subject matter jurisdiction in federal court over a suit by the SEC under CUVTA.[4]

### C.    The *Rooker-Feldman* Doctrine Would Not Bar a Separate CUVTA Claim to Set Aside Transfers Made Under the MSA

Owens and Orlina Owens argue the *Rooker-Feldman* doctrine bars such a suit. [Dkt. Nos. 289 at 9-12, 334 at 22-24, 335 at 7-8.] Because their MSA is integrated into the divorce judgment issued by the Superior Court, Owens and Orlina Owens contend the exercise of jurisdiction over the Superior Court judgment would be a collateral attack that violates the *Rooker-Feldman* doctrine. [*Id.*] Their position is that any attack on the Superior Court judgment can occur only in Superior Court. [*Id.*]

### 1.    The Rooker-Feldman Doctrine

"The *Rooker-Feldman* doctrine recognizes that federal district courts generally lack subject matter jurisdiction to review state court judgments." *Fontana Empire Ctr., LLC v. City of Fontana*, 307 F.3d 987, 992 (9th Cir.

---

[4] Cases alleging violations of CUVTA have also been brought in the United States Tax Court and the United States Bankruptcy Court. *See, e.g., Bresson v. Comm'r of Internal Revenue*, 213 F.3d 1173, 1173-75, 1179 (9th Cir. 2000); *Wolkowitz v. Beverly*, 374 B.R. 221, 226-27, 229, 246 (B.A.P. 9th Cir. 2007). There is an additional basis for jurisdiction in those cases, as the IRS is authorized via 26 U.S.C. § 6901(a)(1)(A) to collect on tax obligations by using CUVTA to avoid fraudulent transfers, and bankruptcy trustees are authorized to do the same under 11 U.S.C. § 548(a)(1) and 11 U.S.C. § 544(b), the latter in conjunction with CUVTA. *Bresson*, 213 F.3d at 1174 n.4; *Wolkowitz*, 374 B.R. at 232. Notably, those cases did not involve post-judgment ancillary enforcement jurisdiction.

2002).  "With very limited exceptions, the United States Supreme Court is the only federal court empowered to review the final judgments of state courts." *Miroth v. Cnty. of Trinity*, 136 F.4th 1141, 1146 (9th Cir. 2025).

However, the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Reed v. Goertz*, 598 U.S. 230, 235 (2023) (The *Rooker-Feldman* doctrine "prohibits federal courts from adjudicating cases brought by state-court losing parties challenging state-court judgments.").

"*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions." *Exxon Mobile Corp.*, 544 U.S. at 284.  The Ninth Circuit has "emphasized that *Rooker-Feldman* and preclusion 'are analytically distinct'" and that "*Rooker-Feldman* is a jurisdictional doctrine, whereas preclusion is not." *Miroth*, 136 F.4th at 1149 (quoting *Cogan v. Trabucco*, 114 F.4th 1054, 1064 (9th Cir. 2024)). "Further, under 28 U.S.C. § 1738, the preclusive effect of state court judgments is a matter of state law, whereas the reach of *Rooker-Feldman* is a question of federal law. *Id.* (citing *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam)).

In addition, *Rooker-Feldman* does not apply (1) where the state law "expressly authorizes the filing of a separate action" in which the judgment "is revived if [the] plaintiff succeeds on [the] separate action," or (2) where the federal action is "separable from and collateral to the merits of the state-court

9

1  judgment." *Fontana Empire Ctr., LLC*, 307 F.3d at 993, 995-96 (internal
2  quotation marks omitted).

3          "Special difficulties can arise under *Rooker-Feldman* when the federal
4  plaintiff sues an adverse party from a state court proceeding and claims that
5  the adverse party fraudulently procured the state court judgment." *Miroth*,
6  136 F.4th at 1150.  This is because "[a] plaintiff alleging extrinsic fraud on a
7  state court is not alleging a legal error by the state court; rather, he or she is
8  alleging a wrongful act by the adverse party." *Kougasian v. TMSL, Inc.*, 359
9  F.3d 1136, 1140-41 (9th Cir. 2004).  "But for *Rooker-Feldman* to apply, a
10  plaintiff must seek not only to set aside [the] state court judgment; he or she
11  must also allege a legal error by the state court as the basis for that relief."
12  *Id.* at 1140.  "It has long been the law that a plaintiff in federal court can seek
13  to set aside a state court judgment obtained through extrinsic fraud." *Id.* at
14  1141.  Moreover, "[u]nder California law, extrinsic fraud is a basis for setting
15  aside an earlier judgment." *Id.* at 1140 (citing *Zamora v. Clayborn*
16  *Contracting Grp., Inc.*, 28 Cal. 4th 249 (2002)).  "Fraud allegations against an
17  adverse party in litigation can avoid *Rooker-Feldman* even when they are not
18  couched in extrinsic fraud terms." *Miroth*, 136 F.4th at 1153.  But when an
19  extrinsic fraud claim "was *itself* separately litigated before and rejected by
20  [the] state court," such claims "constitute a *de facto* appeal of a state court
21  decision and are therefore barred by the *Rooker-Feldman* doctrine." *Reusser*
22  *v. Wachovia Bank, N.A.*, 525 F.3d 855, 860 (9th Cir. 2008) (italics in original).

23              **2.    *Rooker-Feldman* Does Not Apply**

24          For several independent reasons, the *Rooker-Feldman* doctrine does not
25  apply here.

26          First, the SEC was not a party to the Superior Court proceedings and
27  did not participate in them in any way.  Thus, *Rooker-Feldman* does not apply
28

because the SEC is not a state-court loser in the sense contemplated by the doctrine.

Second, California created a separate cause of action through CUVTA that would revive the portion of the Superior Court judgment covering the division of community property if the SEC succeeds on its separate claim. Under *Fontana Empire Center*, this is a sufficient basis to determine *Rooker-Feldman* does not apply.

Third, the SEC's allegations of fraud as to the MSA and the division of property are separable from and collateral to the merits of the divorce and the judgment of divorce, neither of which depended on whether there was a fraud on the Superior Court.  In other words, Owens and Orlina Owens could still have been divorced under California law regardless of how their community property was divided, and thus a collateral attack solely on the division of their property pursuant to CUVTA does not implicate *Rooker-Feldman*.  This is also a sufficient basis under *Fontana Empire Center* to determine *Rooker-Feldman* does not apply.

Fourth, the SEC alleges that Owens engaged in fraud when procuring the MSA as part of the integrated judgment, not that the Superior Court erred.  In addition, the SEC did not litigate the fraud claim in the California case.  California law recognizes this as a sufficient basis for collaterally attacking the judgment, and thus the *Rooker-Feldman* doctrine does not bar such a claim.

Accordingly, the *Rooker-Feldman* doctrine does not bar the SEC from bringing its proposed CUVTA fraudulent conveyance claim in federal district court as to Owens' transfer of assets to Orlina Owens.[5]

---

[5] *Williams v. Wofford*, No. 22-35628, 2023 WL 5453344, at *1 (9th Cir. Aug. 24, 2023), cited by Owens and Orlina Owens, is inapplicable.  [Dkt. Nos. 334 at 22; 335 at 7.]  *Williams* involved a petition for federal for habeas corpus pursuant to 28 U.S.C. § 2254.  Owens and Orlina Owens cite no authority for the proposition that

1

2

**D.    Absent Ancillary Jurisdiction, the Court Lacks Authority
to Issue the Requested Injunction Based on the Allegations
in the Complaint**

3    "A preliminary injunction is appropriate when it grants relief of the

4    same nature as that to be finally granted." *Pac. Radiation Oncology, LLC v.*

5    *Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015).  The Ninth Circuit has

6    held "that there must be a relationship between the injury claimed in the

7    motion for injunctive relief and the conduct asserted in the underlying

8    complaint." *Id.* at 636.  "This requires a sufficient nexus between the claims

9    raised in a motion for injunctive relief and the claims set forth in the

10    underlying complaint itself." *Id.*  "The relationship between the preliminary

11    injunction and the underlying complaint is sufficiently strong where the

12    preliminary injunction would grant 'relief of the same character as that which

13    may be granted finally.'" *Id.* (quoting *De Beers Consol. Mines, Ltd. v. United*

14    *States*, 325 U.S. 212, 220 (1945)).  "Absent that relationship or nexus, the

15    district court lacks authority to grant the relief requested." *Id.*  Injunctions

16    granted without that relationship or nexus are not exercised consistent with

17    Article III. *LA All. for Hum. Rts. v. Cnty. of L.A.*, 14 F.4th 947, 961 (9th Cir.

18    2021).

19    The only "relationship" or "nexus" between the injury claimed in the

20    application for injunctive relief and the conduct asserted in the Complaint is

21    that the SEC obtained a judgment based on the conduct in the Complaint and

22    the SEC now claims Owens has been attempting to dissipate his assets to

23    hinder, delay, or defraud the SEC in satisfying that judgment.  Although

24

25    the body of law addressing when and how federal courts have jurisdiction under
§ 2254 to adjudicate a habeas corpus petition challenging a state court conviction

26    applies here.  The cases cited in *Williams* to which Owens and Orlina Owens refer,

27    *Shinn v. Kayer*, 592 U.S. 111 (2020), and *Wetzel v. Lambert*, 565 U.S. 520 (2012), are
also habeas cases addressing the Antiterrorism and Effective Death Penalty Act of

28    1996.  [Dkt. Nos. 334 at 22; 335 at 7.]

12

1  there are similarities between conduct of securities fraud and fraudulent

2  conveyances, there is not a sufficient relationship or nexus between the two in

3  this matter to determine that the injunctive relief presently requested (a

4  freeze on assets to stop and eventually allow the unwinding of a fraudulent

5  conveyance) would be of the same character as the relief requested in the

6  Complaint (damages, disgorgement, and various securities-related

7  injunctions).  Thus, absent ancillary jurisdiction, the Court lacks the

8  authority to issue the requested injunctive relief based on the claims made in

9  the Complaint.

10      **E.      The Court Lacks the Requested Ancillary Jurisdiction**

11           **1.      Ancillary Jurisdiction**

12      "Federal courts are courts of limited jurisdiction." *Kokkonen v.*

13  *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "It is to be presumed

14  that a cause lies outside this limited jurisdiction, and the burden of

15  establishing the contrary rests upon the party asserting jurisdiction." *Id.*

16  (internal citations omitted).

17      Courts assert ancillary jurisdiction "for two separate, though sometimes

18  related, purposes: (1) to permit disposition by a single court of claims that are,

19  in varying respects and degrees, factually interdependent; and (2) to enable a

20  court to function successfully, that is, to manage its proceedings, vindicate its

21  authority, and effectuate its decrees." *Kokkonen*, 511 U.S. at 379-80 (1994)

22  (internal citations omitted).  The first category is codified in the supplemental

23  jurisdiction statute, 28 U.S.C. § 1367.  *K.C. v. Torlakson*, 762 F.3d 963, 966

24  (9th Cir. 2014).

25      This case involves the second category, which remains a matter of

26  federal common law.  *Peacock*, 516 U.S. at 354.  In *Peacock*, the Supreme

27

28

1  Court addressed the scope of this second, enforcement branch of ancillary

2  jurisdiction:

> We have reserved the use of ancillary jurisdiction in subsequent
> proceedings for the exercise of a federal court's inherent power to
> enforce its judgments. Without jurisdiction to enforce a judgment
> entered by a federal court, "the judicial power would be
> incomplete and entirely inadequate to the purposes for which it
> was conferred by the Constitution." In defining that power, we
> have approved the exercise of ancillary jurisdiction over a broad
> range of supplementary proceedings involving third parties to
> assist in the protection and enforcement of federal judgments —
> including attachment, mandamus, garnishment, and the
> prejudgment avoidance of fraudulent conveyances.

9  *Id.* at 356 (internal citations omitted). The Court explained that "[w]e have

10  never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit

11  to impose an obligation to pay an existing federal judgment on a person not

12  already liable for that judgment." *Id.* at 357.

13  The plaintiff in *Peacock* had prevailed in an ERISA action against his

14  former employer, a corporation. *Id.* at 351. Unable to collect on that

15  judgment, he sued an officer and shareholder of the corporation in federal

16  court alleging conspiracy to siphon corporate assets to prevent satisfaction of

17  the ERISA judgment and fraudulent conveyance of the company's assets to

18  prevent the same, and seeking to pierce the corporate veil. *Id.* at 352. The

19  Supreme Court held that *H.C. Cook Co. v. Beecher*, 217 U.S. 497 (1910)

20  "governs this case and persuades us that [the plaintiff's] attempt to make [the

21  officer and shareholder] answerable for the ERISA judgment is not ancillary

22  to that judgment." *Peacock*, 516 U.S. at 358. *Beecher* held that veil-piercing

23  claims in a subsequent suit were not ancillary to the judgment against the

24  corporation and required an independent jurisdictional basis. *Beecher*, 217

25  U.S. at 498-99.

26  In *Peacock*, the Supreme Court expressly declined to address the

27  argument that the lawsuit against the corporate officer and shareholder was

28  "intended merely as a supplemental bill to preserve and force payment of the

14

ERISA judgment by voiding fraudulent transfers of [the corporation]'s assets"
because the plaintiff and the lower courts had not characterized it that way,
with the plaintiff instead arguing the action was "not one to *collect* a
judgment, but one to *establish liability* on the part of the [third-party officer
and shareholder]." *Peacock*, 516 U.S. at 357 n.6 (italics in original).

The Ninth Circuit addressed this language in *Peacock* and concluded
that *Peacock* did not foreclose the exercise of ancillary enforcement
jurisdiction over claims to reach assets fraudulently transferred by a
judgment debtor to a third party. *See Thomas, Head & Greisen Emps. Tr. v.
Buster* (*Thomas, Head*), 95 F.3d 1449, 1454-55 (9th Cir. 1996). After
obtaining an ERISA judgment, the plaintiffs in *Thomas, Head* amended their
complaint pursuant to Alaska state law to join new defendants to whom an
original defendant had allegedly made fraudulent transfers to avoid payment
of the ERISA judgment. *Id.* at 1451-53. *Peacock* did not preclude the exercise
of ancillary jurisdiction because the new defendants were "indispensable
parties to the fraudulent conveyance claims" under Alaska law and the
plaintiff was not attempting to establish their liability for the ERISA
judgment but only sought disgorgement of the fraudulent transfers made to
them by the judgment debtor defendant. *Id.* at 1454.

Several other circuit courts have also interpreted *Peacock* as not
foreclosing the exercise of ancillary enforcement jurisdiction over claims to
reach assets fraudulently transferred by a judgment debtor to a third party.

> Since *Peacock*, most courts have continued to draw a distinction
> between post-judgment proceedings to collect an existing
> judgment and proceedings, such as claims of alter ego liability and
> veil-piercing, that raise an independent controversy with a new
> party in an effort to shift liability. Where the post-judgment
> proceeding is an effort to collect a federal court judgment, the
> courts have permitted judgment creditors to pursue, under the
> ancillary enforcement jurisdiction of the court, the assets of the
> judgment debtor even though the assets are found in the hands of
> a third party.

*Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001).

> *Peacock* draws a distinction between "an attempt simply to collect a judgment duly rendered by a federal court, even if chasing after the assets of the judgment debtor now in the hands of a third party"—in which case ancillary jurisdiction exists—and a proceeding that "presents a new substantive theory to establish liability directly on the part of a new party"—in which case "some independent ground is necessary to assume federal jurisdiction over the claim."

*Peterson v. Bank Markazi*, 121 F.4th 983, 999 (2nd Cir. 2024) (quoting *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 230 F.3d 489, 498 (1st Cir. 2000)).

In applying *Peacock*, courts have "distinguished between collecting on an original judgment and obtaining a new judgment in a separate proceeding against a new party." *Burgos-Yantín v. Mun. of Juana Díaz*, 909 F.3d 1, 6 (1st Cir. 2018) (citing *U.S.I. Properties*, 230 F.3d at 496). In *Burgos-Yantín*, the First Circuit allowed ancillary enforcement jurisdiction over a proceeding to enforce the municipality's statutory obligation to indemnify officers found liable for civil rights violations. *Id.* at 7. The court emphasized that the judgment creditor sought to collect on a judgment from the party holding the proceeds the creditor was owed, not to impose liability on that party. *Id.*

Other courts have drawn the same distinction. *See Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1321 (10th Cir. 2022) ("[T]he third-party boundary of *Peacock* . . . is not implicated in actions to reach and collect assets of the judgment debtor held by a third party; it is only when the plaintiff seeks to hold the third party personally liable on the judgment that an independent jurisdictional basis is required.") (internal quotation marks omitted) (quoting *Ellis v. All Steel Constr., Inc.*, 389 F.3d 1031, 1034 (10th Cir. 2004)); *Nat'l Mar. Servs., Inc. v. Straub* (*National Maritime*), 776 F.3d 783, 787 (11th Cir. 2015) ("In contrast with *Peacock*, the district court had ancillary jurisdiction over this supplementary proceeding because [the plaintiff] sought to disgorge [the third party] of a fraudulently transferred

16

asset, not to impose liability for a judgment on a third party. Unlike the defendant in *Peacock*, [the third party] is not personally liable for the judgment against [the liable defendant in the original action].  [The third party's] liability is limited instead to the proceeds that [the defendant] fraudulently transferred to him."); *Thomas v. Hughes*, 27 F.4th 995, 1019 (5th Cir. 2022) ("Under *Peacock*, a district court has enforcement jurisdiction over a judgment creditor's fraudulent conveyance claims against transferees who were not parties to the underlying action, so long as the creditor limits himself to collecting the judgment debtor's assets, rather than attempting to impose liability on the transferees for the original judgment.") (internal quotation marks omitted) (quoting *Epperson*, 242 F.3d at 106); *Gambone v. Lite Rock Drywall*, 288 F. App'x 9, 12 (3rd Cir. 2008) ("Nothing in *Peacock*, however, precludes ancillary jurisdiction over suits involving assets already subject to the judgment; it only bars the exercise of ancillary jurisdiction over attempts to impose personal liability for an existing judgment on a new party.");  *See also SEC v. Antar*, 120 F. Supp. 2d 431, 440 (D.N.J. 2000) ("*Peacock* reaffirms the SEC's right to pursue [disgorgement relief against the relief defendants] in a Rule 69 proceeding under the court's ancillary enforcement jurisdiction" because "the SEC's claim is exactly the sort of claim approved in *Peacock*—it seeks to reach assets belonging to the judgment debtor but found in the hands of the relief defendants.").

### 2.  Under *Peacock*, This Court Does Not Have Ancillary Jurisdiction Over The Proposed Fraudulent Transfer Claim

This case is distinguishable from the cases in which courts exercised ancillary enforcement jurisdiction over fraudulent transfer actions for several reasons.  As an initial matter, in every case the Court found, the party seeking ancillary jurisdiction filed a new suit, amended their pleading in the

17

1   prior suit, or sought leave to file a new suit.  The SEC has not taken any of

2   those actions, nor has it filed a motion for the ultimate relief it seeks.  As with

3   all matters of Article III jurisdiction, ancillary jurisdiction can only emerge

4   upon a case or controversy.

5       Second, the existence of the MSA incorporated into the judgment of

6   divorce differentiates this case from the others.  Simply put, the Court cannot

7   ignore a prior judicial adjudication that certain assets belong to Owens and

8   other assets belong to Orlina Owens.  The SEC seeks to set aside the MSA as

9   a fraudulent transfer, and it proposes to do so in this case by only going

10  through Owens, not Orlina Owens.  To freeze the entirety of these assets in

11  anticipation of bringing its CUVTA claim, the SEC would thus necessarily

12  need to address (and succeed on) all the following issues:  whether upon

13  considering the factors in CUVTA it is more likely than not that Owens

14  fraudulently transferred his property to Orlina Owens; whether California

15  Family Code (see, e.g., sections 902, 903, 910, 2620, 2623, 2625) allows the

16  SEC to reach the entire community property solely through Owens and not by

17  suing both Owens and Orlina Owens; and whether the applicable sections of

18  the California Code of Civil Procedure allow the SEC to reach the retirement

19  plan and all other assets within the community.[6]

20

21

22

---

23      [6] Section 704.115 "shields from money judgments private retirement plans,
   profit-sharing plans designed for retirement purposes, and other forms of retirement
24  assets."  *In re Elliott*, 969 F.3d 1006, 1008 (9th Cir. 2020) (citing Cal. Code Civ. Proc.
   § 704.115(a)-(b)).  A private retirement plan "used in part to shield assets is still
25  exempt if it was designed and used primarily for retirement purposes."  *In re Rucker*,
   570 F.3d 1155, 1160 (9th Cir. 2009) (citation omitted).  Whether a retirement plan
26  was designed and used primarily for retirement purposes is a fact-intensive inquiry.
   *See O'Brien v. AMBS Diagnostics, LLC*, 38 Cal. App. 5th 553, 561-65 (Ct. App. 2019);
27  *Salameh v. Tarsadia Hotel*, No. 09-cv-2739-GPC (BLM), 2015 WL 60289227, at *4-5,
   13-16 (S.D. Cal. Oct. 15, 2015).
28

In a potential scenario where the MSA should be set aside but the entire community cannot be reached, there would need to be an assessment of the proper division of property under California law, as at least some of the frozen assets would remain with Orlina Owens.  Reaching these issues necessarily involves mixed questions of law and fact that touch on the potential liability of Orlina Owens.  *See, e.g., In re Marriage of Whitman*, 98 Cal. App. 5th 456 (Ct. App. 2023) (discussing marital liabilities to the community as a result of SEC enforcement actions).  This is a clear-cut *Peacock* issue:  ancillary jurisdiction only lies as to enforcement of judgments, not establishment of liability over third parties.

Third, the SEC seeks to set aside an allegedly fraudulent transfer under CUVTA.  The text of CUVTA uses language indicative of a substantive cause of action, not a "procedure on execution" as that term is used in Federal Rule of Civil Procedure 69(a).  *See* Cal. Civ. Code § 3439.09 ("A *cause of action* with respect to a transfer or obligation under this chapter is extinguished unless *action* is brought . . .") (italics added).  The location of CUVTA in California's Civil Code, as opposed to its Code of Civil Procedure, is further indication of this.  *See, e.g.,* Cal. Code Civ. Proc. §§ 680.010, et seq. ("Enforcement of Judgments"), 712.010, et seq. ("Enforcement of Nonmoney Judgments"), 1710.10, et seq. ("Money Judgment of Other Jurisdictions").  Case law confirms that this is how the statute is used.  *See, e.g., Aghaian v. Minassian*, 59 Cal. App. 5th 447, 453-54 (Ct. App. 2020) ("Plaintiffs commenced this action [under the UVTA and constructive trust] by filing a complaint in July 2018."); *see also Sturm v. Moyer*, 32 Cal. App. 5th 299, 304 (Ct. App. 2019) ("During a judgment debtor examination in July 2016, [plaintiff discovered that [defendants married] in or around 2014, and that they had entered into a premarital agreement. . . . [Plaintiff] filed the instant lawsuit against [defendants], asserting a single cause of action under the UFTA to set aside

19

1  the alleged transfer of [one defendant's] community property interest in [the

2  other defendant's] earnings and income."). By comparison, *Thomas, Head*

3  discussed how Alaska procedural law "permits the use of postjudgment orders

4  to prevent fraudulent conveyances." *Thomas, Head*, 95 F.3d at 1453 (italics

5  omitted).

6      This is not to say that CUVTA can never be used in supplementary

7  procedures, as contemplated by Federal Rule of Civil Procedure 69 and the

8  various circuits that have considered ancillary jurisdiction for fraudulent

9  conveyances. For example, in *Donell v. Kowell*, 533 F.3d 762, 768-69 (9th Cir.

10  2008), a receiver appointed by a federal district court in an earlier SEC case

11  brought a California UFTA case in federal district court against an innocent

12  investor in a Ponzi scheme, seeking to avoid the fraudulent conveyances to

13  that investor. The Ninth Circuit noted that it had subject matter jurisdiction

14  over the suit "because this proceeding is ancillary to the SEC enforcement

15  action" in which the perpetrator of the Ponzi scheme had been found liable.

16  *Id.* at 769. However, *Donell* involved the same fraudulent conveyances in

17  both the original SEC case and the receiver's ancillary case. By contrast, the

18  alleged fraudulent conveyance from Owens to Orlina Owens is an entirely

19  different claim and theory of liability than the securities fraud claims in the

20  Complaint. Thus, this is another clear-cut *Peacock* issue.

21      Fourth, the Supreme Court has held that an action to recover a

22  fraudulent conveyance of money is legal in nature, not equitable, and that

23  "the Seventh Amendment entitles such [defendants] to a trial by jury" on such

24  claims. *Granfinanciera*, 492 U.S. at 43-49. The assets at issue in this case

25  involve both property and ascertained amounts of money, and, as previously

26  stated, the conduct at issue is based on an entirely different claim and theory

27  of liability than those brought in the Complaint. The parties have not

28  addressed whether ancillary jurisdiction lies when a party might have a right

20

to a jury trial—particularly in situations where the ancillary jurisdiction sought is for post-judgment proceedings *within* a case (as opposed to ancillary jurisdiction for a new lawsuit).

### 3. The Exchange Act Does Not Provide Ancillary Jurisdiction Over The Proposed Fraudulent Transfer Action

The SEC argues the Court has equitable authority under Sections 21(d)(5) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") to freeze assets and ancillary jurisdiction to adjudicate claims necessary to facilitate the SEC's efforts to collect on the judgment against Owens, even if those claims touch property nominally held by third parties.  [Dkt. No. 318 at 10.]  Section 21(d)(5) states that "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  Section 27 provides that federal and territorial district courts "shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder."  15 U.S.C. § 78aa(a).

"[F]ederal courts have inherent equitable authority to issue a variety of 'ancillary relief' measures in actions brought by the SEC to enforce the federal securities laws."  *Hickey*, 322 F.3d at 1131 (internal quotation marks omitted) (quoting *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir.1980)); *see also In re San Vicente Med. Partners Ltd.,* 962 F.2d 1402, 1406 (9th Cir. 1992) ("Generally, federal courts enjoy wide discretion in fashioning relief and protective measures in SEC actions.").  The Ninth Circuit held in *Hickey* that a district court properly froze a nonparty corporate entity's assets "as doing so

1  was necessary to protect and give life to the disgorgement and contempt

2  orders already entered" against the defendant because the defendant had

3  exercised "total and complete control" over the nonparty entity. *Hickey*, 322

4  F.3d at 1131 ("The necessity of the district court's asset freeze is

5  demonstrated by the total and complete control that [the defendant] exercised

6  over [the entity], and by the fact that [the defendant's] only source of income

7  was the money that he ordered paid to himself through the [entity] from the

8  assets frozen by the court's order.") (emphasis omitted). "That [a defendant]

9  may have been clever enough to organize a completely separate, successful

10 entity, and construct a unique employment compensation agreement covering

11 all of his personal expenses using corporate assets, does not put him beyond

12 the reach of a court's powers of disgorgement." *Id.* at 1131-32.

13      Once the equity jurisdiction of the district court has been properly

14 invoked, the court has power to order all equitable relief necessary under the

15 circumstances, including the impoundment of assets. *Smith v. SEC*, 653 F.3d

16 121, 127 (2d. Cir. 2011) (citation and quotation omitted). The purpose of an

17 asset freeze "is to ensure that any funds that may become due can be

18 collected." *SEC v. Kontilai*, No. 23-7537, 2025 WL 615190, at *4 (2d Cir. Feb.

19 26, 2025) (quoting *Smith*, 653 F.3d at 127).

20      Upon considering equitable relief pursuant to 15 U.S.C. § 78u(d)(5), it is

21 clear that a freeze on the assets at issue would benefit investors, as Orlina

22 Owens admitted at the hearing that she has already prepared to transfer the

23 assets overseas if the Court lifts the TRO. This is important because, as with

24 the ERISA claim in *Peacock*, the "equitable relief" section of the Exchange Act

25 is not equitable relief "at large"; it is equitable relief "that may be appropriate

26 or necessary" for investors' benefit.

27      However, a prolonged freeze on assets in this case would be neither

28 "appropriate or necessary," as required. A prolonged freeze is only

1    "necessary" if there is no alternative.  Here, there is.  Unlike the plaintiff in

2    *Peacock*, the SEC has federal subject matter jurisdiction under 28 U.S.C.

3    § 1345 to file its proposed CUVTA cause of action in a new lawsuit and

4    concurrently file for injunctive relief.  Therefore, obtaining a prolonged freeze

5    in this case is unnecessary.

6         There are two reasons why a prolonged freeze is not "appropriate" under

7    the Exchange Act.

8         First, 15 U.S.C. § 78u(d)(5) authorizes equitable relief, not legal relief.

9    Although the freezing of assets is equitable relief, the proposed CUVTA

10   claim—which would at least in part involve setting aside an MSA that

11   transfers certain monies from Owens to Orlina Owens—would involve legal

12   relief.  Given the ultimate relief sought by the SEC is beyond the authority it

13   sued upon, it would be inappropriate to still grant a prolonged asset freeze.

14        Second, Orlina Owens was not a party to the securities matter.  The

15   Superior Court adjudicated the division of community property, and thus

16   certain assets that are currently frozen belong at this time to Orlina Owens,

17   not Michael Owens.  As discussed above, the merits of this matter necessarily

18   involve mixed questions of law and fact that touch on Orlina Owens' potential

19   liability.  The Supreme Court held in *Peacock* that ancillary jurisdiction is

20   inappropriate as to third parties such as Orlina Owens, who the SEC did not

21   sue and did not obtain a judgment against.  Thus, it is inappropriate to grant

22   a prolonged asset freeze as to Orlina Owens under the Exchange Act.

23   **V.    Stay of This Order Until July 23, 2025**

24        "District courts do ordinarily have authority to issue stays where such a

25   stay would be a proper exercise of discretion."  *Rhines v. Weber*, 544 U.S. 269,

26   276 (2005) (internal citations omitted).  "[T]he power to stay proceedings is

27   incidental to the power inherent in every court to control the disposition of the

28

23

1  causes on its docket with economy of time and effort for itself, for counsel, and

2  for litigants." *Landis*, 299 U.S. at 254.  "Whether or not to grant a stay is

3  within the court's discretion and it is appropriate when it serves the interests

4  of judicial economy and efficiency." *Rivers v. Walt Disney Co.*, 980 F. Supp.

5  1358, 1360 (C.D. Cal. 1997).

6      Although the SEC has not filed its proposed CUVTA claim, the SEC has

7  shown the assets are likely to dissipate and become unrecoverable if the asset

8  freeze is lifted.  That would place hardship and inequity on the investors, as

9  the SEC seeks to recover at least a portion of these assets for return to

10  investors via a Fair Fund plan.  On the other side, Orlina Owens is not a

11  defendant in this securities violation matter or a defendant in a separate

12  fraudulent conveyance lawsuit; it would place a hardship and inequity on

13  Orlina Owens to be enjoined from assets that were adjudicated to be hers by

14  the Superior Court.

15      For these reasons, the Court exercises its inherent authority to stay this

16  Order until **July 23, 2025**.  *Landis*, 299 U.S. at 254.  At that time, if the SEC

17  has not brought any fraudulent conveyance claim, the asset freeze will lift.  If

18  the SEC has brought a fraudulent conveyance claim, the asset freeze will

19  remain in effect until **August 11, 2025**.  Within one week of the SEC bringing

20  a fraudulent conveyance claim, the SEC, Owens, and Orlina Owens may

21  submit a supplemental pleading setting forth their positions regarding the

22  asset freeze.

23      IT IS SO ORDERED.

24  DATED: July 15, 2025

25  _____

26  PATRICIA DONAHUE
    UNITED STATES MAGISTRATE JUDGE

27

28